## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **INTERNATIONAL UNION, UNITED** | ) | Case No.: 1:02CV01484 |
| **GOVERNMENT SECURITY OFFICERS** | ) | |
| **OF AMERICA**, | ) | Judge Gladys Kessler |
| | ) | |
| and | ) | |
| | ) | |
| **ANN J. BARKLEY** | ) | |
| 6408 Elliot Pl. | ) | |
| Hyattesville, Maryland   20783 | ) | |
| | ) | |
| and | ) | |
| | **)** | |
| **WILLIAM J. BURGE** | ) | |
| 372 Washington Ave. | ) | |
| Jermyn, Pennsylvania   18433 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| **HARLEN D. COY** | ) | |
| 784 Covent Court | ) | |
| Vandalia, Ohio   45377 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| **DON E. KEMP** | ) | |
| 8489 Hwy. 4 | ) | |
| Winnsboro, Louisiana   71295 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| **KEITH MORRIS** | ) | |
| 13320 Co. Rd. 124 W. | ) | |
| Odessa, TX 79762-8943 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| **CARL AKINS** | ) | |
| P.O. Box 506 | ) | |
| Kiefer, Oklahoma 74041 | ) | |
| | ) | |
| and | ) | |

**THOMAS A. ALEXANDER**                                )
2538 E. 48th St. North                                 )
Tulsa, Oklahoma   74130                                )
                                                       )
and                                                    )
                                                       )
**DONALD H. ALLEN**                                    )
1333 Gilmore Trail                                     )
Fairbanks, Alaska   99712                              )
                                                       )
and                                                    )
                                                       )
**FRANK BROWDER, JR.**                                 )
9263 High Point Road                                   )
Baton Rouge, Louisiana   70810                         )
                                                       )
and                                                    )
                                                       )
**JIMMY D. BURROW**                                    )
6025 N.W. 234th                                        )
Edmond, Oklahoma   73003                               )
                                                       )
and                                                    )
                                                       )
**ALBERT J. BUSAM**                                    )
52 Saville Row #1405                                   )
Cincinnati, Ohio   45246                               )
                                                       )
and                                                    )
                                                       )
**CLARENCE BYNUM**                                     )
8931 Town Center Cindz                                 )
Upper Marlboro, Maryland   20774                       )
                                                       )
and                                                    )
                                                       )
**MICHAEL L. CAMPBELL**                                )
P.O. Box 304                                           )
Marfa, Texas   79843                                   )
                                                       )
and                                                    )
                                                       )
**LAWERENCE K. CHURM**                                 )
R.R. 1 Box 102 D                                       )

Montrose, Pennsylvania   18801            )
                                          )
and                                       )
                                          )
**BYRON G. DAHLEN**                       )
3307 Vandiver Drive                       )
Marietta, Georgia   30066                 )
                                          )
and                                       )
                                          )
**DONALD DURHAM**                         )
630 Trace Drive                           )
Wilmington, NC 28411                      )
                                          )
and                                       )
                                          )
**PHILIP I. ELDER**                       )
481 Daroca Ave.                           )
Long Beach, California   90803            )
                                          )
and                                       )
                                          )
**ROBERT FARNSWORTH**                     )
9672 Allegheny Drive                      )
Sacito, California   95827                )
                                          )
and                                       )
                                          )
**GILMER S. FORBIS**                      )
527 Vista Drive                           )
Fayetteville, North Carolina             )
                                          )
and                                       )
                                          )
**RUBEN V. GONZALES**                     )
1923 Iowa                                 )
Pecos, Texas   79772                      )
                                          )
and                                       )
                                          )
**WILLIAM F. GUTHRIE**                    )
1551 Orchard Road                         )
Gardnerville, Nevada   89410              )
                                          )
and                                       )

**JOHN HANSEN**                              )
709 West 9th Street                          )
Juneau, AK 99801                             )
                                             )
and                                          )
                                             )
**FRANK HRUZA**                              )
7652 Painted Dunes Drive                     )
Las Vegas, NV 89149                          )
                                             )
and                                          )
                                             )
**ROBERT HUBBARD**                           )
240 Hunters Lane                             )
Gladys, VA 24554                             )
                                             )
and                                          )
                                             )
**DONALD W. JOHNSON**                        )
2021 Kilburn Avenue                          )
Rockford, Illinois   61101                   )
                                             )
and                                          )
                                             )
**JAMES D. KIMBREL**                         )
19000 W. 58th Avenue                         )
Golden, Colorado   80403                     )
                                             )
and                                          )
                                             )
**WALTER E. LAMB**                           )
30392 Moonlight Court                        )
Temecula, California   92591                 )
                                             )
and                                          )
                                             )
**WILLIAM P. LAMBRIGHT**                     )
2013 Bedford Place                           )
Bossier City, LA 7111                        )
                                             )
and                                          )
                                             )
**JAMES E. LANE**                            )
5216 NW 58th Terrace                         )
Kansas City, Missouri   64151                )

| | |
|---|---|
| | ) |
| and | ) |
| | ) |
| **MONTY L. LAUGHLIN** | ) |
| 3617 53rd Street, N.W. | ) |
| Gig Harbor, Washington   98335 | ) |
| | ) |
| and | ) |
| | ) |
| **STEPHEN F. McDONALD** | ) |
| 12515 145th Street, E. | ) |
| Puyallup, Washington   98374 | ) |
| | ) |
| and | ) |
| | ) |
| **CHESTER L. McKUNE** | ) |
| 416 The Bluff Drive | ) |
| Modesto, CA 95355 | ) |
| | ) |
| and | ) |
| | ) |
| **JACK C. MOREHEAD** | ) |
| 604 Holly Avenue | ) |
| Oxnard, CA 93036 | ) |
| | ) |
| and | ) |
| | ) |
| **DALLAS K. MURPHY** | ) |
| 2741 Harper Street | ) |
| Lawrence, Kansas 66046 | ) |
| | ) |
| and | ) |
| | ) |
| **MILLER PEARSON** | ) |
| 1117 N. Grand Avenue | ) |
| St. Louis, MO 63106 | ) |
| | ) |
| and | ) |
| | ) |
| **ROBERT RARICK** | ) |
| 16121 Old Settlement Lane | ) |
| Zachary, LA 79925 | ) |
| | ) |
| and | ) |
| | ) |

**RONALD F. RAY**                            )
101 Rohrer Drive, #109                       )
Tipp City, OH 45371                          )
                                             )
and                                          )
                                             )
**FELIPE JORGE RODRIGUEZ**                   )
URB. Bayamon Gardens                         )
Jackeline Street, KK-12                      )
Bayamon, PR 00957                            )
                                             )
and                                          )
                                             )
**THOMAS J. ROY**                            )
5424 Paul Kurtz Way, #106                    )
Las Vegas, NV 89108                          )
                                             )
and                                          )
                                             )
**JOHN B. SCOTT**                            )
402 N. Bonham Drive                          )
Allen, TX 75813                              )
                                             )
and                                          )
                                             )
**RHYS SIRJANE**                             )
790 Ledge Road                               )
Medina, OH 44256                             )
                                             )
and                                          )
                                             )
**BRIAN J. SMITH**                           )
1925 E. 11th Avenue                          )
Spokane, WA 99202                            )
                                             )
and                                          )
                                             )
**DONALD SMITH**                             )
180 Reliance Drive                           )
Wilkes-Barre, PA 18702                       )
                                             )
and                                          )
                                             )
**FRED A. THATCHER**                         )
9372 Nevins Way                              )

Orangevale, CA 95662                          )
                                              )
                    Plaintiffs,               )
                                              )
            v.                                )
                                              )
**BENIGNO G. REYNA**, **DIRECTOR OF THE**     )
**UNITED STATES MARSHALS SERVICE,**           )
**In His Official Capacity,**                 )
                                              )
and                                           )
                                              )
**AKAL SECURITY, INC.**                       )
7 Infinity Loop                               )
Espanola, NM 87532                            )
                                              )
and                                           )
                                              )
**MVM, INC.**                                 )
1593 Spring Hill Road                         )
Suite 700                                     )
Vienna, VA 22182                              )
                                              )
                    Defendants.               )
_____     )

## PLAINTIFF'S THIRD AMENDED COMPLAINT

## I.  INTRODUCTION

Plaintiff, the International Union, United Government Security Officers of America

("UGSOA"), on behalf of its bargaining unit members, brings this Third Amended Complaint

against Benigno G. Reyna, Director of the United States Marshals Service ("USMS") for

violations of due process guaranted under the Fifth Amendment to the United States Constitution

that arose when the USMS summarily terminated UGOSA's members without due process for

failing to meet certain medical and physical standards.  The individual Plaintiff Court Security

Officers ("CSO") hereby bring this Third Amended Complaint against Benigno G. Reyna,

Director of the United States Marshals Service ("USMS"), Akal Security, Inc. ("Akal"), and

MVM Security Services, Inc. ("MVM") alleging violations of their civil rights guaranteed by the Fifth Amendment of the United States Constitution, as well as the Rehabilitation Act of 1973 and the Americans with Disabilities Act.  Plaintiffs are seeking injunctive and declaratory relief, as well as compensatory damages.

## II.  JURISDICTION

1.      This is a civil action arising under the Constitution of the United States of America  and is brought pursuant to the Fifth Amendment to the United States Constitution. Jurisdiction is proper in this Court pursuant to 28 U.S.C. §§1331, 1343 and 1367.

2.      This civil action is also brought under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*, and the Rehabilitation Act of 1973, 29 U.S.C. § 791 *et seq.*  This Court has jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 & 1343.

3.      Venue is appropriate in this Court pursuant to 28 U.S.C. §1391(e).

## III.  PARTIES

4.      Plaintiff UGSOA is a labor organization serving as exclusive representative for private-sector security officers and guards throughout the United States, including Court Security Officers ("CSOs") and Special Security Officers ("SSOs")working in the District Courts of the United States and contracted to the Federal Judicial Court System through private security companies.[1]  The UGSOA brings this action by and on behalf of its membership and those

---

[1]  In or about July 2003, the USMS changed the title of the Plaintiff UGSOA's bargaining unit members working in Twelfth Circuit buildings other than the District Court building from Court Security Officers ("CSO") to Special Security Officers ("SSO").  The SSOs work under the same Judicial Security Contract as the CSOs and perform the same duties, only in such buildings as the District of Columbia Superior Courthouse, the National Court building which houses the Federal Circuit Court and the Federal Court of Claims, and the National Tax Court building.  At the time this case was filed, all UGSOA members working under Judicial Security Contracts were titled CSOs.  For the purposes of this Complaint and this case, Plaintiffs will refer to all UGSOA members working under Judicial Security Contracts as CSOs, despite the

making up the UGSOA bargaining unit consisting of CSOs.  UGSOA has associational standing to bring this action on behalf of its affected members.

      5.     The following is true of all of the individual herein listed:  Plaintiffs Carl Akins from Kiefer, Oklahoma; Donald Allen from Fairbanks, Alaska; Thomas Alexander from Tulsa, Oklahoma; Frank Browder from Baton Rouge, Louisiana; William J. Burge from Jermyn, Pennslyvania; Jimmy Burrow from Edmond, Oklahoma; Albert Busam from Cincinnati, Ohio; Clarence Bynum from Upper Marlboro, Maryland; Michael Campbell from Marfa, Texas; Lawrence Churm from Montrose, Pennsylvania; Harlen Coy from Winnsboro, Louisiana; Byron Glenn Dahlen from Marietta, Georgia; Philip Elder from Long Beach, California; Robert Farnsworth from Sacito, California; Gilmer Forbis from Fayetteville, North Carolina; Ruben Gonzales from Pecos, Texas; William Guthrie from Gardnerville, Nevada; John Hansen from Juneau, Alaska; Frank Hruza from Las Vegas, Nevada; Robert Hubbard from Gladys, Virginia; Donald Johnson from Rockford, Illinios; James Kimbrel from Golden, Colorado; Walter Lamb from Temecula, California; William Lambright from Bossier City, Louisiana; James Lane from Kansas City, Missouri; Monty Laughlin from Gig Harbor, Washington; Stephen McDonald from Puyallup, Washington; Chester McKune from Modesto, California; Jack Morehead from Oxnard, California; Keith Morris from Odessa, Texas; Dallas Murphy from Lawrence, Kansas; Miller Pearson from St. Louis, Missouri; Robert Rarick from Zachary, Louisiana; Ronald Ray from Tipp City, Ohio; Felipe Jorge Rodriguez from Bayamon, Puerto Rico; Thomas Roy from Las Vegas, Nevada; John Scott from Allen Texas; Rhys Sirjane from Medina, Ohio; Brian Smith from Spokane, Washington; Donald Smith from Wilkes-Barre, Pennsylvania; and Fred Thatcher from Orangevale, California.  All were employed as CSOs in federal courthouses in which

---

fact that the USMS may have changed some titles in the course of this litigation.

Plaintiff UGSOA served as the exclusive representative for the CSOs and negotiated collective bargaining agreements that provided that the CSOs could not be terminated except for cause. Each was terminated after the USMS rescinded their credentials based on the USMS finding that they failed the new USMS medical/physical exam. Each was adversely affected because the USMS deprived them of their property, their employment, without providing any due process either prior or subsequent to said termination. All were terminated based on either actual or perceived medical disabilities and were terminated regardless of whether the specific medical disability could have been reasonably accommodated.

6.      Defendant Reyna is the Director of the Unites States Marshals Service ("USMS") which is  vested with the authority to protect the Federal courts. Defendants Reyna is sued in his official capacity as the Director of the USMS. The USMS is an executive-branch federal agency operating under the United States Department of Justice and contracted with Defendants Akal and MVM to provide judicial security to the federal courthouses.

7.      Defendant Akal Security, Inc., a New Mexico corporation doing business in the District of Columbia, was the direct employer of several of the above-listed CSO Plaintiffs. Akal is a federal contractor who contracts with the USMS Judicial Protective Services Program to provide judicial security in various federal courthouses across the country. In those federal courthouses in which it provides judicial security and in which the CSOs are represented by Plaintiff UGSOA, Akal entered into collective bargaining agreements ("CBAs") with Plaintiff UGSOA that provided rights and benefits to certain of the CSO Plaintiffs.

8.      Defendant MVM Security, Inc., a California corporation headquartered in Vienna, Virginia, does business in the District of Columbia, among other states. Defendant MVM was the direct employer of several of the above-listed CSO Plaintiffs. MVM is a federal contractor

who contracts with the USMS Judicial Protective Services Program to provide judicial security in various federal courthouses across the country, including the federal courthouses known as the Twelfth Circuit.  In those federal courthouses in which it provides judicial security and in which the CSOs are represented by Plaintiff UGSOA, MVM entered into collective bargaining agreements ("CBAs") with Plaintiff UGSOA that provided rights and benefits to certain of the CSO Plaintiffs.

### IV.  STATEMENT OF FACTS

9.      In or about 1983, the Judicial Protective Services Program was formed for the purpose of establishing a federal court security system for the United States District Courts. Since its inception, the Program has sought and employed as its primary security work force retired law enforcement officers and military personnel, which arose partly from the requirement that all security personnel have a minimum of three years law enforcement experience.  As such, an overwhelming majority of the CSOs are retired state and local law enforcement and military personnel.

10.      The CSOs are directly employed by private security companies, including Defendants Akal and MVM, which contract for the provision of security services in the United States District Courts through the USMS Judicial Protective Services Program.

11.      As part of the application process, as well as annually after employment begins, CSOs are required to take a physical examination.  The original physical was similar in extent and scope to that given to the Deputy U.S. Marshals and consisted of three pages of medical questions.

12.      In or about 2000, the Judicial Conference, through its Securities and Facilities Committee ("Committee"), ordered a CSO job function analysis to be conducted by the United

States Public Health Service's Office of Federal Law Enforcement Medical Programs ("USPHS").

13.     After the analysis, the USPHS doctors compiled their findings, established new medical standards and presented their results to the Judicial Conference's Security and Facilities Committee.  The Committee endorsed the findings and the Judicial Conference adopted the same and then requested that the USMS Judicial Protective Services Program apply the new standards.

14.     In or about January 2001, Marc Farmer, Chief of Judicial Protective Services, USMS, in collaboration with Ralph Mecham, Director of the Administrative Office of the United States Courts, implemented, pursuant to the mandate given to the USMS by the Judicial Conference, a new twenty-two (22) page medical/physical examination for CSOs containing new and heightened medical standards, especially as related to hearing and vision, for the annual medical/physical examination given to the CSOs.

15.     After the adoption of the new medical/physical examination, the USMS implemented the same by advising Defendants Akal and MVM that it was amending its Judicial Security Contracts and that it would require full compliance with the new medical/physical examination as to both their present and future CSO personnel.

16.     After the amendment of the Judicial Security Contracts, the USMS began requiring all CSOs to undergo medical and physical examination based on the new standards. After a CSO was examined by his or her private physician, the examination was provided to the USPHS for it to determine whether the CSO met the new medical and physical standards. Defendants Akal and MVM were required to provide the CSO with the results from USPHS and an opportunity to ask for re-examination by the USPHS.  The USPHS then made a final determination regarding whether the CSO passed the new USMS medical/physical examination

or not.

17.     Upon failure of the new medical/physical examination by the CSO, Defendant USMS notified Defendants Akal and MVM of the test results via letter in which USMS wrote that "it has been determined that the CSO is not medically qualified to perform the essential functions of the job."  That CSO was then considered "medically disqualified" by the USMS and would not be permitted to continue working as a CSO under the employer's service contract with the USMS.

18.     After Defendants Akal and MVM received notification of the results, they advised the CSO of the same and terminated the CSO from his position due to the USMS's demand that he be removed from the contract because of the USMS's medical disqualification.

19.     Pursuant to the terms and conditions of the respective UGSOA CBAs under which they work, CSOs are not "at will" employees, but rather can only be terminated for just cause.  Each of the CBAs negotiated by Plaintiff UGSOA contains a "just-cause clause", providing that the CSOs can only be terminated for cause or just cause.  Presently, all of the Plaintiff UGSOA's CBAs contain a just-cause clause.

20.     Prior to July 2002, under the terms and conditions of the Judical Security Contracts between Defendants Akal and MVM and the USMS, the USMS could not request that Defendants remove a CSO without cause.  The USMS had to have grounds for removal of the CSOs and the CSOs retained the right to appeal such removal.

21.     In or around July 2002, the USMS inserted a new clause into the Judicial Security Contracts with the private security companies, including Defendants Akal and MVM.  Under the new clause, Section H(3)(h), the appeals procedure for CSOs who USMS sought to terminate would not apply in cases of removal for failing the new USMS medical/physical examination.

22.     After inserting Section H(3)(h) into the service contracts, the USMS failed to adopt any comprehensive and effective administrative review process whereby the disqualified CSOs can have their cases reviewed for both medical and legal inconsistencies and violations.

<u>Disability Discrimination</u>

23.     Plaintiff Ann Barkley suffered from a slight hearing loss for thirty (30) years that has not changed.  She suffered this same hearing loss while she worked as an officer with the District of Columbia Department of Corrections, from which she retired after twenty-seven (27) years, and had same hearing loss when she was hired as a CSO in 1997.  Plaintiff performed successfully as a law enforcement officer, and specifically as a CSO, with her hearing loss and without hearing aids during her entire career.  Plaintiff passed the required physical in 1997 and each year thereafter until the 2002 physical.  On or about February 5, 2003, she was terminated by Defendants USMS and MVM for her slight hearing loss.  She was not given the opportunity to acquire hearing aids or be tested with such hearing aids.

24.     Plaintiff Donald Allen began working as a CSO in December 1999.  He had suffered a hearing loss and had worn hearing aids since approximately 1996 and he was hired as a CSO with the hearing loss and with his hearing aids.  Plaintiff Allen performed successfully his duties as a CSO.  In 2002 after his annual physical, Defendant USMS requested that his hearing be re-tested.  Plaintiff Allen had his hearing re-tested, but was not allowed to use his hearing aids during the test.  Defendants USMS and Akal terminated Plaintiff Allen in April 2002 because of his failure to pass the hearing part of the new USMS medical/physical without the use of hearing aids.  Subsequent to his termination, Plaintiff Allen took the same hearing test with his hearing aids, passed the test and sent the results to Defendant USMS.  He was not reinstated based on the subsequent hearing test.

25.     Plaintiff Frank Browder, Jr. was hired as a CSO by Defendant Akal in February 2003.  He took a physical before he was hired and believed he passed the physical.  He worked as a CSO until August 15, 2003, when Defendants USMS and Akal terminated him for failing the hearing part of the new USMS medical/physical exam.  Prior to that point, Plaintiff Browder was unaware that he had a hearing loss.  Mr. Browder's doctor suggested that his hearing could be corrected with hearing aids.  He was not provided any opportunity to acquire hearing aids to remedy his hearing loss.

26.     Plaintiff Michael Campbell was hired by Defendant Akal to work as a CSO in May 2001.  Plaintiff Campbell performed his duties successfully as a CSO.  The first physical Plaintiff took after he was hired indicated that he had some high-frequency hearing loss.  Although his audiologist did not consider the high-frequency hearing loss a real hearing loss, Plaintiff paid approximately $5,000 for hearing aids that corrected his high-frequency hearing.  Plaintiff passed the hearing part of the new USMS medical/physical exam with the hearing aids, but he failed the test when he was forced to take the test without hearing aids.  Defendants USMS and Akal terminated Plaintiff in May 2002 because of his failure to pass the hearing part of the new USMS medical/physical without the use of hearing aids.

27.     Plaintiff Byron Glenn Dahlen began working as a CSO in 1990.  He passed the hearing part of the physical exam every year until 2001.  Plaintiff Dahlen performed his duties successfully during his entire career as a CSO.  At his physical in the spring of 2001, Plaintiff Dahlen was told that his hearing did not meet the standards.  He spent $1,500 on hearing aids and used them for more than one year.  Plaintiff Dahlen's hearing was re-tested with the hearing aids and he met or exceeded the USMS standards with the hearing aids.  Plaintiff was unable to pass the same test when not using the hearing aids.  Plaintiff Dahlen was terminated by Defendants

USMS and Akal in September 2002 for failing to meet the hearing part of the new USMS medical/physical standards without using hearing aids.

28.     Plaintiff Gilmer Forbis began working as a CSO in 1985.  He successfully performed his duties throughout his career as a CSO.  After a physical during which he was told that he suffered from hearing loss, Plaintiff Forbis paid $5,000 for hearing aids to correct his hearing.  He passed the hearing part of the new USMS medical/physical exam with the hearing aids, but failed the test without the hearing aids.  Defendants USMS and Akal terminated Plaintiff Forbis in January 2003 for failing the hearing part of the new USMS medical/physical exam without hearing aids.

29.     Plaintiff William Guthrie suffered from a hearing loss for more than ten years.  He was diagnosed with a hearing loss while working as a police officer for the Las Vegas Police Department and used hearing aids to correct his hearing.  He was hired as a CSO in 1996 with the hearing loss and with his hearing aids.  Plaintiff Guthrie successfully performed his duties during his entire tenure as a CSO.  Plaintiff Guthrie was able to pass the hearing part of the new USMS medical/physical exam with his hearing aids; he was not able to pass the hearing test without his hearing aids.  In June 2002, Defendants USMS and Akal terminated Plaintiff Guthrie for failing the hearing part of the new USMS medical/physical exam when not using hearing aids.

30.     Plaintiff Frank M. Hruza became a CSO in 1997 after retiring from his position of Deputy Chief of Police with the Newark, New Jersey Police Department.  He discovered he had suffered a hearing loss in 1998 or 1999 during his annual physical, and spent $5000 on hearing aids.  He passed the old physicals with the hearing aids.  Plaintiff Hruza successfully performed his CSO duties during his tenure.  In his 2001 annual physical, Plaintiff Hruza was sent to an

audiologist for the hearing test.  Plaintiff Hruza was able to pass the hearing part of the new

USMS medical/physical exam with his hearing aids; he was not able to pass the hearing test

without his hearing aids.  In June 2002, Defendants USMS and Akal terminated Plaintiff Hruza

for failing the hearing part of the new USMS medical/physical exam when not using hearing

aids.

      31.     Plaintiff Donald Johnson began working as a CSO in 1986.  He started using

hearing aids prior to becoming a CSO and used them regularly at work.  He successfully

performed his duties as a CSO until 2002.  Plaintiff Johnson was able to pass the hearing part

of the new USMS medical/physical exam with his hearing aids, but he was not able to pass the

hearing test without hearing aids.  On or about March 22, 2002, Defendants USMS and Akal

terminated Plaintiff Johnson for failing the hearing part of the new USMS medical/physical exam

when not using hearing aids.

      32.     Plaintiff Chester McKune began working as a CSO in June 2000 after retiring

from his position as a police officer with the Modesto Police Department.  He had been deaf in

his left ear since 1986, but he worked successfully for the police department with the disability

until 1999.  Plaintiff McKune was hired as a CSO with his deafness and successfully performed

his duties during his tenure.  When he was hired as a CSO, he was able to pass the general

hearing test.  After his annual physical in 2002, Plaintiff McKune was sent to be re-tested;

however, his condition is permanent and had not changed.  Defendants USMS and Akal

terminated Plaintiff McKune for failing the hearing part of the new USMS medical/physical

exam when not using hearing aids.

      33.     Plaintiff Keith Morris began working as a CSO in April 1995 after retiring from

his position as a sergeant with the Texas Highway Patrol.  Plaintiff Morris successfully

performed his duty as a CSO.  He passed the hearing test until 2001.  In 2001, Plaintiff Morris

was sent to an audiologist for the new hearing test.  After the audiologist found he suffered from

hearing loss, Plaintiff Morris paid $1,500 for hearing aids to correct his hearing.  He wore those

hearing aids at work and continued to ably perform his duties.  In May 2002, Defendants USMS

and Akal terminated Plaintiff Morris for failing the hearing part of the new USMS

medical/physical exam when not using hearing aids.  Plaintiff Morris was not given an

opportunity to re-test with his hearing aids.

       34.     Plaintiff Dallas Murphy became a CSO in 1994 after retiring from his position as

a police officer.  Plaintiff Murphy performed his duties successfully as a CSO.  In 2000, Plaintiff

Murphy became aware that he had a hearing loss.  He spent $4,800 on hearing aids.   In 2002,

Plaintiff Murphy was sent back for re-testing two times.  He passed the hearing part of the new

USMS medical/physical exam with his hearing aids; he did not pass the hearing part of the new

exam without the hearing aids.  In October 2002, Defendants USMS and Akal terminated

Plaintiff Murphy for failing the hearing part of the new USMS medical/physical exam when not

using his hearing aids.

       35.     Plaintiff Miller Pearson became a CSO in 1990 after he retired from his position

as a MP with the U.S. Army.  He performed successfully as a CSO.  Plaintiff Pearson discovered

he had a small hearing loss in 2002 after his annual physical, at which time he was sent to an

audiologist for additional testing.  The audiologist stated he had a small hearing loss in one ear

and that his hearing loss would be corrected by hearing aids.  Plaintiff Pearson was not given the

opportunity to acquire the hearing aids and re-test with the hearing aids.  Defendants USMS and

Akal terminated Plaintiff Pearson in December 2002 for failing the hearing part of the new

USMS medical/physical exam when not using his hearing aids.

36.     Plaintiff Ronald Ray became a CSO in 1997 after serving as a police officer for more than twenty (20) years.  Plaintiff Ray successfully performed his duties as a CSO.  Plaintiff Ray knew that he had a hearing loss for years and certainly years before he was hired as a CSO. After his 2001 annual physical, Defendant USMS directed Plaintiff Ray to have his hearing re-tested.  He went for additional tests, but still did not pass the hearing part of the new USMS medical/physical exam.  He did not get hearing aids because his supervisor told him he would be terminated if he used hearing aids and that others had been terminated for using hearing aids. Plaintiff Ray also suffers from diabetes, with which he was diagnosed in the early 1990s.  He suffered from diabetes when he was hired and during his tenure as a CSO.  His diabetes was controlled by medicine and diet and it never interfered with the performance of his duties as a CSO.  Defendants USMS and Akal terminated Plaintiff Ray in September 2002 for failing the hearing part of the new USMS medical/physical exam when not using his hearing aids and for having diabetes.

37.     Plaintiff Thomas Roy became a CSO in 1994 after retiring as a police officer in Minnesota.  Plaintiff Roy started wearing hearing aids when he was thirty (30) years old and wore them while he served as a police officer and CSO.  Plaintiff Roy was wearing his hearing aids when he was hired as a CSO and wore them during his entire tenure as a CSO.  Plaintiff Roy successfully performed his duties as a CSO.  In his 2002 annual physical, the audiologist informed Plaintiff Roy that his hearing aids were no longer working and tried to sell him new hearing aids.  Plaintiff Roy did not want to purchase hearing aids from that audiologist and, instead, went to a highly-respected audiologist and spent $3,200 on new hearing aids. Defendants USMS and Akal terminated Plaintiff Roy in May 2002 for failing the hearing part of the new USMS medical/physical exam when not using his hearing aids.  Plaintiff Roy was not

given any opportunity to be re-tested with his new hearing aids. Nonetheless, Plaintiff Roy returned to the audiologist with his new hearing aids and passed the hearing standards from the new USMS medical/physical exam.

38. Plaintiff Rhys Sirjane became a CSO in 1994 after retiring from his position as a deputy sheriff in Louisiana. He had been a firearms instructor in the 1960s and 1970s and, as a result, had suffered a hearing loss that was diagnosed in the mid 1980s. After surgeries on his ear, he suffered a complete hearing loss in one ear, a loss that cannot be corrected by hearing aids. Plaintiff Sirjane was hired as a CSO with the uncorrected hearing loss and performed his duties so successfully that he was asked to apply for the Lead CSO position and was selected for the position in early 2002. He also was able to pass the CSO hearing test until the implementation of the new USMS medical/physical standards. After his annual physical in 2001, Plaintiff Sirjane was sent for re-testing; however the results did not vary. Defendants USMS and Akal terminated Plaintiff Sirjane in June 2002 for failing the hearing part of the new USMS medical/physical exam.

39. Plaintiff Donald Smith became a CSO in 1998 after retiring from his position as a police officer with the Wilkes-Barre, Pennsylvania police force. He was diagnosed with a hearing loss and acquired hearing aids in 2001 that corrected his hearing. Plaintiff Smith's hearing loss did not interfere with the performance of his CSO duties. In his 2002 annual physical, Plaintiff Smith failed to pass the hearing portion of the new USMS medical/physical exam because he was tested without his hearing aids. As a result of failing the hearing test, Defendants USMS and MVM terminated Plaintiff Smith in April 2002. Subsequent to his termination, Plaintiff Smith had his hearing tested with his hearing aids and he passed the hearing test.

40.     Plaintiff Roberto Torrez became a CSO in 1988 after retiring from his position as Inspector with the U.S. Boarder Control.  At all times, Plaintiff Torrez successfully performed his CSO duties, including working as a firearms instructor.  Plaintiff Torrez discovered his hearing loss in December 2001, after he was sent for re-testing from his 2001 annual physical. He was told by Defendant Akal's site supervisor that he should get a hearing aid, so he spent $2,100 on a hearing aid.  He wore the hearing aid but was never allowed to re-test with the hearing aid.  The hearing aid fully corrected his hearing.  Defendants USMS and Akal terminated Plaintiff Torrez in May 2002 for failing the hearing portion of the new USMS medical/physical exam.

41.     Plaintiff Fred A. Thatcher became a CSO in 1993 after a career in law enforcement.  Plaintiff Thatcher suffered from hearing loss and used hearing aids during his long tenure as a CSO.  Plaintiff Thatcher successfully performed his duties until 2001.  In 2001, Plaintiff Thatcher received a letter from Defendant USMS stating that, because he wore hearing aids, he needed to take a new hearing test.  He took the hearing test with and without hearing aids.  He passed the hearing test with his hearing aids.  Nonetheless, Defendants USMS and Akal terminated Plaintiff Thatcher in August 2001 for failing the hearing part of the new USMS medical/physical exam.

42.     Plaintiff Carl Akins became a CSO in April 2002 after retiring from his position as a corporal with the Tulsa Police Department.  He had been diagnosed with diabetes approximately fifteen years earlier, but controlled his diabetes with low amounts of medication. Plaintiff Akins worked successfully both as a police corporal and a CSO with diabetes, which never interfered with the performance of his duties.  Plaintiff Akins took a physical exam prior to being hired and informed Defendants USMS and Akal that he had diabetes.  He was not told his

employment was conditional on passing the physical exam; he understood that he had passed the physical exam prior to being hired.  Plaintiff Akins successfully performed his duties as a CSO. He never missed a day of work due to diabetes and suffered no symptoms from the disease. Despite the absence of symptoms, Defendants USMS and Akal terminated Plaintiff Akins in December 2002 for allegedly failing the new USMS medical/physical exam because of his diabetes.

43.     Plaintiff Thomas Alexander became a CSO in April 2002 after retiring as a police officer from the Tulsa Police Department.  Plaintiff Alexander had suffered from diabetes for fifteen or twenty years prior to his becoming a CSO.  Plaintiff Alexander took a physical exam prior to being hired and informed Defendants USMS and Akal that he had diabetes.  He was not told his employment was conditional on passing the physical exam; he understood that he had passed the physical exam prior to being hired.  Plaintiff Alexander successfully performed his duties as a CSO.  Plaintiff Alexander's diabetes was under control with low doses of insulin, which he has since stopped taking.  He never missed a day of work due to diabetes and suffered no symptoms from the disease.  Despite the absence of symptoms, Defendants USMS and Akal terminated Plaintiff Alexander in December 2002 for allegedly failing the new USMS medical/physical exam because of his diabetes.

44.     Plaintiff Jimmy Burrow became a CSO in 1990 after retiring from a career in law enforcement.  He developed Type II diabetes in 1996 or 1997, which was controlled by medication until 2004.  Plaintiff Burrow performed his CSO duties successfully.  He had no physical weaknesses from the diabetes and had no restrictions on his work therefrom.  Plaintiff Alexander passed all of the physicals under the old standards.  After the implementation of the new USMS medical/physical exam, Plaintiff was sent for re-testing on his diabetes.  His doctor

sent in information stating that Plaintiff was physically fit to work.  Despite the absence of symptoms, his good performance and doctor's certification of his physical fitness, Defendants USMS and Akal terminated Plaintiff in September 2003 for failing to pass the new USMS medical/physical exam because of his diabetes.

45.     Plaintiff Lawrence Churm became a CSO in 1999 after retiring from the New Jersey State Police as a police officer.  Plaintiff Churm successfully performed his CSO duties during his tenure.  He developed Type II Diabetes in 2002, which he controlled with medication and diet.  After his 2002 annual physical, Plaintiff Churm was asked for additional information on his diabetes, which Defendant USMS first complained about not receiving but later admitted having received.  After his 2003 annual physical, Plaintiff Churm was not given an opportunity for retesting.  Despite the absence of symptoms and good performance, Defendants USMS and MVM terminated him due to his failure of the new USMS medical/physical exam because of his diabetes.

46.     Plaintiff Robert Farnsworth became a CSO in 1985 after working as a law enforcement officer for many years.  He successfully performed his CSO duties during his tenure. Plaintiff Farnsworth suffered from diabetes for a number of years.  His diabetes did not interfere with the performance of his duties.  Nonetheless, in May 2002, Defendants USMS and Akal terminated Plaintiff Farnsworth for failing the new USMS medical/physical standards based on his diabetes.

47.     Plaintiff Ruben V. Gonzales became a CSO in August 2000 after retiring from law enforcement work with the local sheriff's office.  Plaintiff Gonzales has had diabetes since approximately 1977, however, his illness never interfered with the performance of his duties, either as a deputy sheriff or a CSO.  Indeed, Plaintiff Gonzales successfully performed his CSO

duties during his tenure.  After his 2001 annual physical, Plaintiff Gonzales was requested to provide additional information on his diabetes.  He provided the medical information on three different occasions.  Nonetheless, in October 2002, Defendants USMS and Akal terminated Plaintiff Gonzales for failure to provide medical documentation on his medical condition and, therefore, failing to pass the new USMS medical/physical exam.

48.     Plaintiff John Hansen became a CSO in April 2001 after retiring from his position as a senior patrol officer for the Juneau Police Department.  He was diagnosed with diabetes in 1996 and both Defendants USMS and Akal knew about his condition.  Plaintiff Hansen controlled his diabetes with medication.  Plaintiff Hansen successfully performed his CSO duties during his tenure.  His diabetes never interfered with his performance as a CSO.  Nonetheless, Defendants USMS and Akal terminated Plaintiff Hansen in August 2002 for failing the new USMS medical/physical standards because of his diabetes.

49.     Plaintiff William Lambright became a CSO in December 1991.  He spent three years working in the U.S. District Court for the Eastern District of Texas and then, after a gap of approximately fifteen (15) months, spent six years working in the Western District of Louisiana. Plaintiff Lambright contracted diabetes when he was twenty-seven (27) years old, in or around 1961.  He controlled his diabetes with insulin.  Plaintiff Lambright successfully performed his CSO duties during his tenure.  After his 2001 annual physical, Plaintiff Lambright was sent for re-testing for his diabetes.  His doctor submitted documentation stating that Plaintiff Lambright's disease created no limitations on his work activities and posed no risk to the health or safety of himself or other.  Nonetheless, Defendants USMS and Akal terminated Plaintiff Lambright in May 2002 for his failing the new USMS medical/physical standards because of his diabetes.

50.     Plaintiff James Lane became a CSO in November 2001 after retiring from a career

as an officer with the Missouri State Highway Patrol.  Plaintiff Lane had been diagnosed with Type II Diabetes in the 1980s.  He informed Defendants USMS and Akal that he had diabetes when he was hired as a CSO.  Plaintiff Lane worked successfully as a state highway patrol officer and successfully performed all his duties as a CSO with diabetes.  He controlled his diabetes with medication.  After the physical he took in October 2002, Plaintiff Lane was asked to provide more information on his diabetes, which he did.  Nonetheless, Defendants USMS and Akal terminated Plaintiff Lane in July 2003 for failing the new USMS medical/physical standards because of his diabetes.

51.     Plaintiff Robert Rarick became a CSO in 1995 after retiring from his position as a police officer with the Baton Rouge Police Department.  He developed diabetes in or around 1992 and worked successfully as a police officer and CSO with diabetes.  Plaintiff Rarick informed Defendants USMS and Akal of his medical condition when he was hired.  He performed his CSO duties well despite his condition and, in fact, was promoted to the position of Lead CSO.  He never missed a day of work due to his diabetes or related conditions.  After his physical in Octobe 2001, Plaintiff Rarick was asked to submit additional documentation on his condition.  His doctor submitted documentation and stated that Plaintiff Rarick's diabetes was under control with medication.  Nonetheless, Defendants USMS and Akal terminated Plaintiff Rarick in May 2002 for failing the new USMS medical/physical standards because of his diabetes.

52.     Plaintiff Felipe Jorge-Rodriguez began working as a CSO in 1998 after leaving a career as a law enforcement officer.  He suffered from diabetes, however, passed the annual physical in 2000.  Plaintiff Rodriguez successfully performed his CSO duties during his tenure.  After his 2001 annual physical, Plaintiff Rodriguez was requested to submit additional

documentation, which he did.  He was asked again for additional information after his 2002 annual physical.  Plaintiff Rodriguez submitted the requested information.  As a result, Defendants USMS and MVM terminated Plaintiff Rodriguez in February 2003 for failing the new USMS medical/physical exam due to his diabetes.

53.     Plaintiff John Scott began working as a CSO in 1995 after retiring from law enforcement work.  He had been diagnosed with diabetes prior to becoming a CSO.  Despite his medical condition, Plaintiff Scott successfully performed his CSO duties during his tenure.  Plaintiff Scott's medical condition was controlled with medication and he never missed a day of work due to his diabetes or any related conditions.  After his physical in spring 2002, Plaintiff Scott was requested to submit additional information, which he did.  Nonetheless, Defendants USMS and Akal terminated Plaintiff Scott in June 2002 for failing the new USMS medical/physical standards because of his diabetes.

54.     Plaintiff Donald B. Durham began working as a CSO in 1991 after retiring from the North Carolina State Highway Patrol.  Plaintiff Durham was diagnosed with a cardiac condition, hypertrophic cardiomyopathy, in or around 1984.  He had the condition when he was hired as a CSO and informed Defendants USMS and Akal thereof.  Plaintiff Durham's medical condition never interfered with the performance of his duties.  He successfully performed all of his CSO duties during his tenure.  After his 2003 annual physical, Plaintiff Durham was sent for re-testing, allegedly for an abnormal EKG.  He submitted information from his doctor that his EKG was not abnormal.  Nonetheless, Defendants USMS and Akal terminated Plaintiff Durham in November 2003 for failing the new USMS medical/physical standards because of his cardiac condition.

55.     Philip Elder became a CSO in 1984 after spending eighteen (18) years with the

county marshals.  He successfully performed his CSO duties during his tenure.  After his 2002 annual physical, he was sent to take a stress test, which did not provide conclusive results.  Upon further request, Plaintiff Elder made an appointment to re-take the stress test, however his appointment was cancelled by the doctor.  Without being given an opportunity complete the testing, Defendants USMS and Akal terminated Plaintiff Elder in April 2003 for failing the new USMS medical/physical standards because of his cardiac condition.

56.     Plaintiff Jack Morehead became a CSO in 1996 after retiring from his position as a police officer from the local police department.  Plaintiff Morehead was diagnosed with atrial tachycardia in the 1980s and with mild cardiomyopathy in 1993.  When he was hired, he informed Defendant Akal about the atrial tachycardia.  Plaintiff Morehead successfully performed his CSO duties despite his medical condition and his medical condition never interfered with the performance of his duties.  He regularly passed the annual physical until 2002, when his doctor stated that his atrial tachycardia "was up" and he should not lift more than 150 pounds and engaged in vigorous exercise.  Plaintiff Morehead returned to his physician several times and provided the additional information to Defendants.  Six months later in April 2003, Defendants USMS and Akal terminated Plaintiff Morehead for failing the new USMS medical/physical standards because of his cardiac condition.

57.     Plaintiff Robert Hubbard began working as a CSO in April 2003 after retiring from a career in law enforcement.  He suffers from a condition called deutan anomoly or partial color vision, which limits his ability to differentiate shades of color.  He was diagnosed with this condition in 1970.  Plaintiff Hubbard passed his pre-employment exam, including the color vision part of the exam.  Several months after he began working as a CSO, Defendant Akal requested that he go for further vision testing.  Plaintiff Hubbard returned twice for testing, with

one doctor stating that his vision limitation should not present any functional difficulties. Plaintiff Hubbard successfully performed his duties as a CSO and his medical condition did not interfere with the performance of his duties.  Nevertheless, Defendants USMS and Akal terminated Plaintiff Hubbard in December 2003 for failing the new USMS medical/physical exam because of his limited vision.

58.    Plaintiff James Kimbrel became a CSO in 1998 after retiring from his position as a police officer.  He performed his CSO duties successfully during his tenure.  In April 2002, Plaintiff Kimbrel was diagnosed with melanoma in his right eye, which had to be removed to remove the cancer.  He was left with monovision.  His doctor cleared him to return to work in May 2002 with no limitations.  Prior to returning to work, Plaintiff Kimbrel passed the firearms test at an expert level and in all other ways was medically fit to perform his CSO duties.  Despite his doctor's clearance, Defendants USMS and Akal would not allow him to return to his duties and terminated him two weeks after he returned to work.  Neither Defendant provided any opportunity to discuss or explore reasonable accommodation of his condition.

59.    Defendant USMS controlled the hiring and firing of individual CSOs.  It controlled many aspects of the CSO's job, including the CSO's duties and responsibilities and the physical requirements.  It controlled the means of a CSO's work by providing the service weapons and other equipment and the manner and times of work.  As such, Defendant USMS was a co-employer along with the federal contractor, either Defendant Akal or MVM.

60.    Defendants USMS, Akal and MVM perceived the terminated CSOs to be disabled for the specific medical condition from which the individual Plaintiff CSO suffered.  Based on their termination of said Plaintiffs, Defendants believed that Plaintiffs were incapable of performing a broad category of work, specifically law enforcement work.

61.     Defendants USMS, Akal and MVM failed to provide any reasonable accommodation to the above-listed Plaintiff CSOs for their actual or perceived disabilities. Further, Defendants failed to even consult with the above-listed Plaintiff CSOs regarding possible accommodation of their disabilities, as required under the standards of the Americans with Disability Act, 42 U.S.C. § 12101 *et seq.*, and incorporated into the Rehabilitation Act of 1973, 29 U.S.C. § 791 *et seq.*

62.     Defendant USMS prevented the individual Plaintiff CSOs from filing discrimination complaints under the Rehabilitation Act of 1973, 29 U.S.C §§ 791 & 794, for their termination.  Individual Plaintiff CSOs who contacted Defendant USMS to attempt to file a discrimination claim were told that they could not file a complaint with Defendant USMS. Indeed, the Equal Employment Opportunity Office for Defendant USMS told Plaintiffs that it would not accept their disability discrimination complaints and did not send their complaints to the Department of Justice Equal Employment Opportunity Office.  This advice was contrary to the regulations of the U.S. Department of Justice, which called for agency officials to fully advise and apprise CSOs of their civil rights and forward complaints of discrimination under the Rehabilitation Act to the Department of Justice Director for Equal Employment Opportunity. See 28 C.F.R. § 39.170(d)(4).

63.     As a result of Defendant USMS's actions, the individual Plaintiff CSOs suffered harm when they were terminated from their CSO positions because of their disabilities or their perceived disabilities.  Plaintiffs suffered additional harm when they were denied access to EEO procedures that could have provided them with some measure of relief from the disability discrimination by Defendant USMS's actions that deliberately prevented said Plaintiffs from asserting their rights and filing claims of disability discrimination.

<u>COUNT I:</u>
<u>VIOLATION OF FIFTH AMENDMENT DUE PROCESS RIGHTS</u>
**(Against Defendant USMS)**

64.     Plaintiffs hereby realleges the prior paragraphs 1 through 63, supra, as if fully set forth below.

65.     The presence of Plaintiff UGSOA's CBA just-cause clauses that cover the Class Members and appeals provisions in service contracts under which the CSOs work create a constitutionally-protected property interest in the CSO position, the deprivation of which can only occur with due process.

66.     Plaintiff UGSOA's members have a property interest that arises from CBA that justifies the Plaintiff's members' claim of entitlement to continued employment absent sufficient cause and procedural safeguards.  Individual CSO Plaintiffs have a property right interest in their employment as CSOs arising out of the CBA's just-cause provision which cannot be rescinded without due process.

67.     Defendant has terminated Plaintiff UGSOA's members and individual Plaintiff CSOs for allegedly failing to pass the new USMS medical/physical examination .

68.     In its termination of Plaintiff UGSOA's members and individual Plaintiff CSOs, Defendant's actions have denied Plaintiff UGSOA's bargaining unit members their right to procedural due process as secured to them by the Fifth Amendment to the Constitution of the United States.  As a result of the Defendant's unlawful deprivations of procedural due process, Plaintiff UGSOA and individual Plaintiff CSOs have suffered damages in endeavoring to protect themselves from the Defendant's unlawful actions, including costs and reasonable attorney's fees.

69.     Plaintiff UGSOA, its bargaining unit members and individual Plaintiff CSOs have been and will continue to be damaged and threatened with immediate irreparable harm by being

subjected to the new medical/physical examination for which they have no adequate remedy at law.

**COUNT II:**
**VIOLATION OF THE REHABILITATION ACT OF 1973**
**(Against Defendants USMS, Akal and MVM)**

70.     Plaintiffs hereby realleges the prior paragraphs 1 through 69, supra, as if fully set forth below.

71.     The following individual Plaintiff CSOs bring claims for violations of the Rehabilitation Act of 1973, 29 U.S.C. §§ 791 & 794, against Defendants USMS and Akal: Thomas Alexander, Donald Allen, Frank Browder, Jimmy Burrow, Michael Campbell, Byron Glenn Dahlen, Donald Durham, Philip Elder, Robert Farnsworth, Gilmore Forbis, Ruben Gonzales, William Guthrie, John Hansen, Frank Hruza, Robert Hubbard, Donald Johnson, James Kimbrel, William Lambright, James Lane, Chester McKune, Jack Morehead, Keith Morris, Dallas Murphy, Miller Pearson, Robert Rarick, Ronald Ray, Thomas Roy, John Scott, Rhys Sirjane, Fred Thatcher, and Roberto Torrez.  The following individual Plaintiff CSOs bring claims for violations of the Rehabilitation Act of 1973, 29 U.S.C. §§ 791 & 794, against Defendants USMS and MVM:  Anne Barkley, Lawrence Churm, Felipe Jorge-Rodriguez, and Donald Smith.

72.     Defendants Akal and MVM stand as government actors, making claims against them under the Rehabilitation Act appropriate.

73.     Defendants discriminated against Plaintiffs listed in Paragraph 71 in violation of the Rehabilitation Act by terminating them solely because of their disability or perceived disability regardless of whether Plaintiffs could perform the essential functions of their position. The Plaintiffs listed in Paragraph 71 all performed the essential functions of their position

without any accommodation and without any performance problems.

74.     Defendants discriminated against Plaintiffs listed in Paragraph 71 by failing to offer reasonable accommodation for their disabilities or perceived disabilities as required by the Rehabilitation Act.  Defendants also discriminated against said Plaintiffs by failing to even discuss or entertain reasonable accommodation as required under the Rehabilitation Act.

75.     Defendants further discriminated against Plaintiffs listed in Paragraph 71 by using qualification standards that screen out disabled individuals in violation of the Rehabilitation Act, 29 U.S.C. § 794.

76.     Plaintiffs listed in Paragraph 71 are excused from exhausting any administrative remedies because of futility because Defendant USMS failed to provide notice of the administrative complaint procedure, refused to accept their complaints and actively sought to prevent Plaintiffs from filing said complaints.

77.     As a result of Defendants' discriminatory actions in violation of the Rehabilitation Act, said Plaintiffs suffered loss of wages and benefits and compensatory damages including, but not limited to, pain and suffering and mental anguish.

### COUNT III:
### VIOLATIONS OF AMERICANS WITH DISABILITIES ACT
#### (Against Defendant Akal)

78.     Plaintiffs hereby realleges the prior paragraphs 1 through 77, supra, as if fully set forth below.

79.     Plaintiffs Frank Browder, Jimmy Burrow, Donald Durham, Robert Hubbard and James Lane have all filed complaints of disability discrimination with the U.S. Equal Employment Opportunity Commission against Defendant Akal in violation of the Americans with Disability Act ("ADA"), 42 U.S.C. § 12112(b).  Although they have not yet received their

right-to-sue letters, they expect said letters shortly.  They plead their claims of discrimination in this Amended Complaint in the interests of judicial efficiency and economy because their claims arise from the same set of facts and circumstances as the claims properly brought above and are otherwise properly included in this Amended Complaint.

80.    Defendant Akal violated the ADA when it entered into a contractual relationship with Defendant USMS that had the effect of subjecting its qualified employees with disabilities or perceived disabilities to prohibited discrimination.  This occurred when Defendant Akal agreed to implement the new USMS medical/physical standards which instituted physical standards that discriminated against individuals based on their disabilities.  This also occurred when Defendant Akal agreed to implement changes in Judicial Services Contract that allowed Defendant USMS to terminate CSOs based on Defendant USMS's determinations of medical or physical fitness without any appeal procedures.

81.    As a result of the discriminatory actions, Plaintiffs listed in Paragraph 79 suffered lost wages and benefits as well as compensatory damages including, but not limited to, emotional distress and mental anguish.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff UGSOA, prays that the Court issue the following Orders and relief:

A.    An order declaring that the Defendant USMS failed to provide adequate and sufficient process prior to the deprivation of the CSOs property interests in their positions and that the actions of the Defendant towards the Plaintiffs in said deprivation were in violation of the 5th Amendment; and

B.    An Order permanently enjoining Defendants from removing CSOs from contracts

and rescinding their credentials for failing to pass the USMS medical/physical exam  without

providing them meaningful and adequate due process prior or subsequent to the deprivation; and

        C.      An Order requiring the Defendant USMS to rescind any and all prior orders

and/or directives it issued to Defendants Akal and MVM and any other private security

companies employing Plaintiff UGSOA's members and individual Plaintiff CSOs when said

orders mandated that Defendants Akal and MVM remove the said CSO from the Judicial

Security Contract and rescinded the credentials of Plaintiff UGSOA members and individual

Plaintiff CSOs as a result of their failure to pass the new USMS medical/physical exam; and

        D.      An Order reinstating all Plaintiff UGSOA's terminated bargaining unit members

and individual Plaintiff CSOs to their former positions as CSOs which they held prior to their

removal from the Judicial Security Contracts under which they were working; and

        F.      An Order restoring to all Plaintiff UGSOA's terminated bargaining unit members

and individual Plaintiff CSOs their USMS credentials; and

        G.      An Order providing remedies on behalf of all injured CSOs represented by

Plaintiff UGSOA on grounds generally applicable to all, including all declaratory, injunctive and

equitable relief; and

        H.      An Order setting forth both the manner in which the Defendants will be required

to implement meaningful and lawfully adequate due process for future CSOs that the fail the new

USMS medical/physical exam and the time in which said process must be in place; and

        I.      An Order declaring that Defendants USMS, Akal and MVM violated the

Rehabilitation Act of 1973 and the Americans with Disabilities Act by unlawfully discriminating

against the individual Plaintiff CSOs listed in Paragraphs 71 and 79 above when they terminated

said Plaintiffs because of their disabilities when Plaintiffs were qualified individuals with a

disability and when they failed to offer any reasonable accommodation for Plaintiffs.

J.     An award to the individual Plaintiff CSOs of any and all damages to which they

may be entitled, including, but not limited to, back pay and future pay and benefits and

compensatory damages for emotional distress and mental anguish; and

K.     An award to the Plaintiffs of their reasonable attorney fees and expenses under the

Equal Access to Justice Act, the Rehabilitation Act and the ADA and any other applicable

statutes, for prosecuting this action; and

L.     Any and all other relief that may be just and appropriate in this matter.


Respectfully submitted,


_____
Leslie Deak, Esq. [PA0009]
Deats & Levy, P.C.
1200 G Street, N.W.
Suite 800, #099
Washington, D.C.  20005
Tel.:    (800) 781-3967
Fax:    (512)


John A. Tucker (0052055 - OH. S.Ct.)
Malyuk, Tucker & Gingrich, LLP
39 East Market Street, Suite 402
Akron, Ohio 44308
Phone: (330) 258-1400
Fax:    (330) 258-1407

ATTORNEYS FOR PLAINTIFF,
INTERNATIONAL UNION, UNITED
GOVERNMENT SECURITY
OFFICERS OF AMERICA

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that a copy of the foregoing Amended Complaint  was sent to John R. Griffith, Esq., Trial Attorney Federal Programs Branch, U.S. Department of Justice, Civil Division P.O. Box 883,Washington, D.C., 20044 by regular U.S. mail and facsimile on March ____, 2004.

_____
Leslie Deak, Esq. [PA0009]