## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| INTERNATIONAL UNION, UNITED GOVERNMENT SECURITY OFFICERS OF AMERICA, <u>et al.</u>, | ) ) ) | Civil Action No. 1:02cv1484 |
| | ) | Judge Gladys Kessler |
| Plaintiffs, | ) ) | |
| v. | ) ) | Status Conference Scheduled for 10:00 a.m. on August 10, 2004 |
| BENIGNO G. REYNA, DIRECTOR OF THE UNITED STATES MARSHALS SERVICE, in his Official Capacity, <u>et al.</u>, | ) ) ) ) | |
| Defendants. | ) ) | |

## DEFENDANT BENIGNO G. REYNA'S MOTION FOR SUMMARY JUDGMENT ON COUNT I OF THE THIRD AMENDED COMPLAINT AND MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT ON COUNT II OF THE THIRD AMENDED COMPLAINT

Pursuant to Fed. R. Civ. P. 12(b)(1) and 56, Defendant Benigno G. Reyna, Director of the United States Marshals Service, hereby moves for summary judgment on Count I of Plaintiffs' Third Amended Complaint and to dismiss or, in alternative, for summary judgment on Count II of Plaintiffs' Third Amended Complaint.  The grounds for this motion are set forth in the accompanying memorandum of points and authorities.

August 2, 2004                          Respectfully submitted,

                                        PETER D. KEISLER
                                        Assistant Attorney General

                                        KENNETH L. WAINSTEIN
                                        U.S. Attorney for the District of Columbia

                                         /s/  John R. Griffiths
                                        _____
                                        HENRY A. AZAR, JR. (D.C. Bar No. 417249)
                                        JOHN R. GRIFFITHS (D.C. Bar No. 449234)
                                        DANIEL M. RIESS
                                        Attorneys
                                        U.S. Department of Justice
                                        Civil Division, Federal Programs Branch
                                        P.O. Box 883
                                        Washington, D.C. 20044
                                        Telephone:    (202) 514-4652
                                        Fax:          (202) 616-8460

                                        Attorneys for the Defendant, Benigno G. Reyna,
                                        Director of the United States Marshals Service,
                                        in his Official Capacity

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

INTERNATIONAL UNION, UNITED           )
GOVERNMENT SECURITY OFFICERS          )
OF AMERICA, et al.,                   )          Civil Action No. 1:02cv1484
                                      )          Judge Gladys Kessler
      Plaintiffs,           )
                                      )
v.                                    )          Status Conference Scheduled for
                                      )          10:00 a.m. on August 10, 2004
BENIGNO G. REYNA, DIRECTOR OF         )
THE UNITED STATES MARSHALS            )
SERVICE, in his Official Capacity, et al.,   )
                                      )
      Defendants.           )
                                      )

**DEFENDANT BENIGNO G. REYNA'S STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT ON COUNT I OF THE THIRD AMENDED COMPLAINT AND MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT ON COUNT II OF THE THIRD AMENDED COMPLAINT**

Pursuant to Local Civil Rule 7(h), Defendant Reyna submits the following statement of material facts as to which no genuine issue exists, with respect to his Motion for Summary Judgment on Count I of the Third Amended Complaint and Motion to Dismiss, Or, In the Alternative, for Summary Judgment on Count II of the Third Amended Complaint.

1.    With the exception of plaintiffs William J. Burge, Lawrence Churm, and Donald Smith, all plaintiffs are employed under collective bargaining agreements ("CBAs"), the "just cause" provisions of which take one of two forms.  See Declaration of John Kraus ¶ 6 and exhibits thereto (attached as Exhibit 13 to Defendant Reyna's Memorandum in Support of his Motion for Summary Judgment on Count I of the Third Amended Complaint and Motion to Dismiss Or, in the Alternative, for Summary Judgment on Count II of the Third Amended Complaint ("Def.'s Mem.")).

2.    One version of the "just cause" provisions of the CBAs under which plaintiffs (except for William J. Burge, Lawrence Churm, and Donald Smith) are employed begins by stating that "[a]fter completion of [a] probationary period . . . no Employee shall be dismissed or suspended without just cause."  See, e.g., CBA for the District of Alaska, § 6.1(a) (Kraus Decl., Ex. A).  The very next sentence states that "[j]ust cause shall include any action or order of removal of an employee from working under the contract by the U.S. government, or revocation of required CSO credentials by the USMS under the removal of Contractor employee provision in Section H-3 of [the contract] between the US Marshals Service and Akal Security, Inc."  See id.

3.      The second version of the "just cause" provision in the CBAs under which plaintiffs (except for William J. Burge, Lawrence Churm, and Donald Smith) are employed states that "[a]fter completion of the probationary period, no Employee shall be dismissed or suspended without just cause, unless the Employee is ordered by the Government to be removed from working under the Employer's contract with the Government, or if the Employee's credentials are denied or terminated by the Marshals Service."  CBA for the Twelfth Circuit (the District of Columbia), § 6.1.1. (Kraus Decl., Ex. E); see also Kraus Decl. Ex. F, I, K, L, O, Q, R, S, V, W, Y, Z.

4.      The CBAs under which plaintiffs (except for William J. Burge, Lawrence Churm, and Donald Smith) are employed provide a grievance procedure for employees to contest actions taken by the contractors.  See, e.g., CBA for the District of Alaska, § 5.1 (Kraus Decl., Ex. A).  The CBAs state that the "grievance procedure shall not be used for any action or order of removal of an Employee from working under the contract by the U.S. government." Id.

5.      The CBAs under which plaintiffs are employed provide that physical/medical exams may be required by the U.S. Government and that employees must pass the physical/medical exams in order to be employed and to maintain employment.  See, e.g., id. § 13.2.B.

6.      The CBAs under which plaintiffs William J. Burge, Lawrence Churm, and Donald Smith are employed contain provisions that specifically recognize the federal government's authority to set and apply medical standards and otherwise to enforce the terms of its contract with MVM.  See Kraus Decl., Ex. T, Art. 23 (USMS-DC 09865), Art. 28 (USMS-DC 09867-68), Amendment to Art. 28 (USMS-DC 09875-76); Kraus Decl., Ex.

U, Art. 23 (USMS-DC 09897), Art. 28 (USMS-DC 09899-900), Amendment to Art. 28
(USMS-DC 09906).

7.      The judicial security contracts between the U.S. Marshals Service ("USMS") and the
contractors that employ plaintiffs state that the contractors are required to provide Court
Security Officers ("CSOs") who meet the medical requirements provided in the contracts.
See, e.g., Excerpts from Twelfth Circuit Contract between USMS and MVM (attached as
Exhibit 2 to Def.'s Mem.), § C-8(a) (USMS-CON 01204).

8.      The judicial security contracts between USMS and the contractors that employ plaintiffs
also state that "[a]ny employee provided by the Contractor that fails to meet the
requirements of the Contract . . . may be removed from performing services for the
Government under this Contract upon written request of the Contracting Officer."  Id. §
H-3(a).

9.      The judicial security contracts between USMS and the contractors that employ plaintiffs
further state that "[t]he United States Marshals Service reserves the right at all times to
determine the suitability of any Contractor employee to serve as a CSO. . . .  [and that]
[d]ecisions rendered under any dispute resolution process . . . available to the contractor
and its employees shall not be binding upon the United States Marshals Service."  Id. §
H-3(b) (USMS-CON 01250).

10.     The judicial security contracts between USMS and the contractors that employ plaintiffs
also provide that "[a]ny decision to continue a Contractor employee in a CSO capacity
will be made solely by the Judicial Protective Services Program on a case-by-case basis in
accordance with the requirement to safeguard the federal judicial process, the Judiciary,

-3-

citizens, and property as per policies and directives governing Judicial Protective Services operations." Id.

11.     The judicial security contracts between USMS and the contractors that employ plaintiffs set out procedures for addressing disciplinary and performance issues, but not for medical disqualifications.  See, e.g., Twelfth Circuit Contract, § H-3(c)-(e) (USMS-CON 01250).

12.     In 2002, the judicial security contracts between USMS and the contractors that employ plaintiffs were modified to state explicitly that the procedures in H-3 do not apply to medical disqualifications.  See, e.g., id., Modification No. M011 (USMS-CON 01305A-C).

13.     The judicial security contracts between USMS and the contractors that employ plaintiffs do not provide that plaintiffs are intended third-party beneficiaries of the judicial security contracts.  See, e.g., Twelfth Circuit Contract.

14.     USMS did not negotiate, approve, or sign the CBAs under which plaintiffs are employed. See Deposition of Donna Huff (June 8, 2004), at 52:18 – 54:3 (attached as Exhibit 15 to Def.'s Mem.).

15.     Only the contractors that employ plaintiffs, not USMS, have the authority to terminate CSOs from their jobs.  See Deposition of John Kraus (March 24, 2004) at 230:17-22 (attached as Exhibit 1 to Def.'s Mem.).

16.     The Marshals Service's medical disqualification of plaintiffs precluded them from working on contracts with the USMS, but did not require MVM or Akal to terminate plaintiffs or preclude plaintiffs from continued participation with MVM and Akal on other contracts or in other employment capacities.  Id. at 230:17-22, Deposition of Marc

-4-

Farmer (March 26, 2004) ("Farmer Dep. II") at 91:10 – 92:3 (attached as Exhibit 4 to Def.'s Mem.).

17.    The judicial security contracts between USMS and the contractors that employ plaintiffs authorize USMS to determine whether CSOs are qualified to provide services under the contracts "in accordance with the requirement to safeguard the federal judicial process, the Judiciary, citizens, and property."  Twelfth Circuit Contract § H-3(b) (USMS-CON 01250).

18.    Pursuant to Section C-8 of the CSO Contract between USMS and each private security company that employs CSOs ("Contractor"), the Contractor must submit a Certificate of Medical Examination for Court Security Officers ("Certificate") for all prospective CSOs. See Resp. to Interrogatory No. 2, Def.'s Objections and Responses to Pls.' First Set of Interrogs. and Request for Production of Documents (Sept. 17, 2003) ("Interrog. Resp. 2") (attached as Exhibit 12 to Def.'s Mem.).

19.    After the CSO is initially cleared, the Contractor must submit a Certificate annually for each of its CSOs.  See Interrog Resp. 2.  The due date for this submission is the anniversary of the individual CSO's start date.  Id.

20.    The procedure for both the initial medical determination and the annual review is the same.  Id.

21.    The initial medical determination and the annual review for CSOs begins with an examination of the CSO by a physician selected by the Contractor and approved by the U.S. Public Health Service's ("PHS") Office of Federal Law Enforcement Medical

Program, which specializes in occupational medicine for federal law enforcement officers.  Id.

22.     During the initial medical determination and the annual review for CSOs, the examining physician performs a comprehensive medical examination, and completes the Certificate, which documents the results of the examination.  Id.

23.     During the initial medical determination and the annual review for CSOs, the examining physician provides the completed Certificate, along with any related documentation (e.g., EKG data or blood test results), to the Contractor, which forwards the materials to USMS's Judicial Protective Services Program ("JPS").  Id.

24.     During the initial medical determination and the annual review for CSOs, a nurse consultant employed by USMS reviews the Certificate and any related materials to make sure they are complete, then forwards the packet to PHS.  Id.  The file is then reviewed by a reviewing physician with PHS.  Id.  The reviewing physicians are experienced in occupational medicine, particularly as it applies to law enforcement occupations.  Id.; see also Deposition of Marc Farmer (March 25, 2004) ("Farmer Dep. I") at 60:5 - 61:8 (attached as Exhibit 5 to Def.'s Mem.).  Most CSO files are reviewed by a single reviewing physician (currently, Dr. Louis Chelton); other physicians assist when needed. See Interrog Resp. 2; Farmer Dep. I at 63:11-16.  Because these doctors review hundreds of CSO files each year, they are familiar with the medical standards required of CSOs. See Interrog Resp. 2.

25.     During the initial medical determination and the annual review for CSOs, if the reviewing physician determines, based on the information contained in the Certificate, that the CSO

may have a disqualifying condition, or that additional information is required before making even a preliminary assessment, the contractor is notified by the Marshals Service of this interim determination, and is given thirty days to respond to the reviewing physician's concerns or provide further medical information or medical examinations as set forth in the review form.  <u>See</u> Interrog Resp. 2; Farmer Dep. I at 74:13 - 75:10; 75:21 - 76:13.

26.     The further medical information requested by the reviewing physician during the initial medical determination and the annual review for CSOs may include, for example, information from the CSO's treating physician (such as a cardiologist, if the CSO has a heart condition) or data from a hearing center that has the equipment and training to perform the tests required by the CSO medical standards.  <u>See</u> Interrog Resp. 2.

27.     During the initial medical determination and the annual review for CSOs, if no further medical information is received by USMS within thirty days (a period that can be extended), the Contractor may be asked to remove the CSO from the contract.  <u>Id</u>.  If further information is received within the time allowed, it is forwarded to the reviewing physician for review.  <u>Id</u>.

28.     During the initial medical determination and the annual review for CSOs, if, after reviewing all the documentation, the reviewing physician determines that the CSO is not medically qualified, the USMS contracting officer sends a disqualification letter to the Contractor requesting that the CSO be removed from performing under the contract and that the Contractor submit an application for a replacement within fourteen days.  <u>Id</u>.; <u>see also</u> Farmer Dep. I at 77:1-16.

-7-

29.     The current CSO medical standards were drafted by Dr. Richard Miller with input from other physicians, and they were approved by the Judicial Conference.  Farmer Dep. I at 59:4-12.

30.     During the initial medical determination and the annual review for CSOs, the examinations are administered by a number of different physicians designated by the contractors.  Id. at 67:21 – 68:18.

31.     During the initial medical determination and the annual review for CSOs, the review process is conducted not just by Dr. Miller, but by several different reviewing physicians at the Public Health Service.  Interrog. Resp. 2.

32.     With the exception of plaintiffs Carl Akins, Donald Durham, Don E. Kemp, and Walter E. Lamb, none of the plaintiffs have filed administrative complaints with the USMS EEO office.  Declaration of Joann W. Grady ¶¶ 4-5 (attached as Exhibit 19 to Def.'s Mem.).

33.     With the exception of plaintiffs Carl Akins, Don E. Kemp, and Walter E. Lamb, none of the plaintiffs have exhausted their administrative remedies with USMS.  Id. ¶¶ 4, 6.

34.     Plaintiffs' Rehabilitation Act claim alleges work-related discrimination (both by their employers and by USMS).  See Third Am. Compl. ¶¶ 72-77.

35.     Plaintiff Carl Akins exhausted his administrative remedies by obtaining a dismissal order by USMS, filing an appeal with the EEOC, and receiving a final decision on that appeal on May 8, 2003.  Grady Decl. ¶ 4.

36.     Plaintiff Carl Akins did not move for leave to allege a violation of § 501 of the Rehabilitation Act by USMS until March 21, 2004.  See Mot. for Leave to File Third Am. Compl. (March 21, 2004).

-8-

37.     After receiving a final agency decision from USMS dismissing his administrative

        complaint, Plaintiff Walter E. Lamb filed an appeal with the EEOC and received a final

        decision on that appeal on August 23, 2003.  Grady Decl. ¶ 4.

38.     Plaintiff Walter E. Lamb did not move for leave to allege a § 501 claim under the

        Rehabilitation Act against USMS until March 21, 2004.  See Mot. for Leave to File Third

        Am. Compl. (March 21, 2004).

39.     Plaintiff Don E. Kemp received his final decision from the EEOC on July 23, 2003.

        Grady Decl. ¶ 4

40.     Plaintiff Don E. Kemp did not move for leave to allege a § 501 claim in the present case

        until March 21, 2004.  See Mot. for Leave to File Third Am. Compl. (March 21, 2004).

41.     Before joining this action, plaintiffs William J. Burge, Lawrence Churm, and Donald

        Smith were already plaintiffs in a suit filed against USMS and MVM in the Eastern

        District of Pennsylvania, which also seeks relief under a procedural due process theory.

        See Leitch, et al. v. MVM, Inc., et al., No. 03-04344 (E.D. Pa.) (complaint attached as Ex.

        2 to Def. Opp. to Pl. Mot. to File Am. Compl. dated Nov. 19, 2003).

42.     Plaintiffs Harlen D. Coy, Albert J. Busam, Walter E. Lamb, and Monte Laughlin all have

        suits pending against USMS in other jurisdictions.  See Second Am. Complaint, Strolberg

        v. Akal Security, No. 03-0004-S-DOC (D. Idaho).

43.     Plaintiff Danny E. Beck has a case pending against USMS in another jurisdiction.  Beck

        v. U.S. Marshals Service, No. 02-1579-T (W.D. Okla.).

44.     Plaintiff Don E. Kemp has a case pending against USMS in another jurisdiction.  Kemp

        v. Ashcroft, No. 03-1633-M (W.D. La.).

August 2, 2004                              Respectfully submitted,

                                           PETER D. KEISLER
                                           Assistant Attorney General

                                           KENNETH L. WAINSTEIN
                                           U.S. Attorney for the District of Columbia

                                           _/s/  John R. Griffiths_____
                                           HENRY A. AZAR, JR. (D.C. Bar No. 417249)
                                           JOHN R. GRIFFITHS (D.C. Bar No. 449234)
                                           DANIEL M. RIESS
                                           Attorneys
                                           U.S. Department of Justice
                                           Civil Division, Federal Programs Branch
                                           P.O. Box 883
                                           Washington, D.C. 20044
                                           Telephone:    (202) 514-4652
                                           Fax:          (202) 616-8460

                                           Attorneys for the Defendant, Benigno G. Reyna,
                                           Director of the United States Marshals Service,
                                           in his Official Capacity

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| INTERNATIONAL UNION, UNITED GOVERNMENT SECURITY OFFICERS OF AMERICA, et al., ) ) ) | Civil Action No. 1:02cv1484 |
| ) | Judge Gladys Kessler |
| Plaintiffs, ) | |
| ) | |
| v. ) | Status Conference Scheduled for |
| ) | 10:00 a.m. on August 10, 2004 |
| BENIGNO G. REYNA, DIRECTOR OF THE UNITED STATES MARSHALS SERVICE, in his Official Capacity, et al., ) ) ) | |
| ) | |
| Defendants. ) | |
| ) | |

**DEFENDANT BENIGNO G. REYNA'S MEMORANDUM IN
SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT ON
COUNT I OF THE THIRD AMENDED COMPLAINT AND MOTION
TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY
JUDGMENT ON COUNT II OF THE THIRD AMENDED COMPLAINT**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

PROCEDURAL HISTORY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

STANDARDS OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

      I.     THE COURT SHOULD GRANT SUMMARY JUDGMENT FOR
           DEFENDANT REYNA ON PLAINTIFFS' PROCEDURAL DUE
           PROCESS CLAIM. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

               A.     Plaintiffs' Collective Bargaining Agreements Do Not Give
                      Them a Property Interest That Is Applicable to this Case. . . . . . . 12

                       1.     The Court's Memorandum Opinion Denying
                              Defendant Reyna's Motion to Dismiss the Procedural
                              Due Process Claim Relied on Plaintiffs' Allegation
                              that their Collective Bargaining Agreements Contain
                              "Just Cause" Provisions. . . . . . . . . . . . . . . . . . . . . . . . 12

                       2.     The "Just Cause" Provisions in the Collective
                              Bargaining Agreements Are Expressly Limited in a
                              Way that Makes CSOs "At-Will" Employees in the
                              Circumstances at Issue Here. . . . . . . . . . . . . . . . . . . 15

                       3.     The Contents of the Judicial Security Contracts
                              Between USMS and Its Contractors Confirm
                              that the CSOs Lack a Protected Property Interest. . . . . . 17

               B.     Regardless of their Terms, the Collective Bargaining
                        Agreements Cannot Impose Due Process Obligations
                        on the U.S. Marshals Service With Respect to Medical
                        Qualification Decisions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

C.      The USMS Medical Review Procedures Provide Due Process.  . 25

    1.      The USMS Procedures At Issue Comport Fully
        With <u>Mathews v. Eldridge</u>.  . . . . . . . . . . . . . . . . . . . . . 26

        a.      Private Interest Affected by the Official Action  . 26

        b.      Risk of Erroneous Deprivation  . . . . . . . . . . . . . 27

        c.      The Public Interest . . . . . . . . . . . . . . . . . . . . . . 30

    2.      In the Alternative, the USMS Procedures at Issue
        Satisfy the <u>Loudermill</u> Test.  . . . . . . . . . . . . . . . . . . . . 31

II.     THE COURT SHOULD DISMISS OR, IN THE ALTERNATIVE, GRANT
    SUMMARY JUDGMENT ON PLAINTIFFS' REHABILITATION ACT
    CLAIMS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

    A.      The Court Lacks Subject-Matter Jurisdiction Over All But Three
        Plaintiffs' Rehabilitation Act Claims Because They Have Failed
        to Exhaust Their Administrative Remedies.  . . . . . . . . . . . . . . . . . . 34

        1.      The Court Lacks Subject Matter Jurisdiction Over the
            Claims Made Under § 501 of the Rehabilitation Act by
            Those Plaintiffs Who Have Neither Sought Counseling
            nor Filed Administrative Claims with the Marshals Service.  . . . 34

            a.      An Individual Cannot Sue a Federal Agency Under
                § 501 of the Rehabilitation Act Without First
                Complying with Federal-Sector Title VII Exhaustion
                Procedures. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

            b.      Forty-One of the Forty-Four Named Plaintiffs
                Have Not Exhausted Their Administrative Remedies
                and Thus Cannot Bring Claims Against Defendant
                Reyna Under § 501 of the Rehabilitation Act. . . . . . . . . 37

            2.      The Plaintiffs Who Have Failed to Exhaust Their Administrative
               Remedies Are Also Barred from Seeking Relief under § 504
               of the Rehabilitation Act. . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

B.      Defendant Reyna is Entitled to Summary Judgment on the
        Rehabilitation Act Claims of Plaintiffs Akins, Kemp, and Lamb
        Because These Plaintiffs Failed to Initiate Suit in a Timely Fashion. . . . 41

III.    THE COURT SHOULD DISMISS FROM THIS ACTION THE
        PLAINTIFFS WHO ARE ATTEMPTING TO LITIGATE THEIR
        CLAIMS IN MORE THAN ONE COURT.  . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

**INTRODUCTION**

This case has proceeded for two years based on an erroneous assumption regarding Plaintiffs' alleged property interest in their jobs as Court Security Officers (CSOs).  Throughout this litigation, Plaintiffs have told the Court that they work under collective bargaining agreements ("CBAs") that prohibit their employers (Akal Security, Inc., and MVM, Inc.) from terminating them without "just cause."  Those just-cause provisions, they have argued, entitle them to due process when the United States Marshals Service (USMS) determines whether they are medically qualified to serve as CSOs. What Plaintiffs have failed to explain to the Court is that the vast majority of the CBAs expressly provide that the employer does *not* need just cause to terminate a CSO if USMS has directed that the CSO be removed from working under USMS's contract with the employer.  In other words, the just-cause provisions on which Plaintiffs have relied do not apply to the factual circumstances presented here.  These provisions may require Akal or MVM to demonstrate just cause before terminating a CSO for other reasons, but they impose no such obligation when USMS has determined that a CSO is no longer qualified to provide services under the applicable judicial security contract.

Until now, the Court has been presented with an incomplete picture of the case because it has had to rely upon and accept as true the description of the just-cause provisions in Plaintiffs' complaints. In their pleadings, Plaintiffs alleged that each of the CBAs contains a just-cause provision, but they did not quote the relevant language or attach copies of the agreements.  Accepting Plaintiffs' characterization of the CBAs (as was required on a motion to dismiss), the Court held last August that CSOs possess a property interest in their positions.  However, that issue should be revisited now that the Court has the actual language of the CBAs before it.  Indeed, the fact that the CBAs (both in the just-cause provision and elsewhere) expressly recognize the Marshals Service's discretion to determine

whether individuals meet the qualifications for serving as CSOs negates any suggestion that CSOs have a "legitimate claim of entitlement" to their positions.  Without that claim of entitlement, there can be no cause of action under the Fifth Amendment.

This is not the only ground, however, on which summary judgment is warranted.  Regardless of their language, the CBAs under which Plaintiffs work cannot impose conditions on the Marshal Service's authority to determine whether CSOs are qualified to guard federal courthouses.  Union officials have now confirmed that USMS plays no role in the negotiation of the CBAs, does not approve their contents, and does not sign them.  The only significance of the CBAs to the USMS is in determining the minimum wages that contractors are required to pay their employees under the Service Contract Act.  Except in that limited sense, USMS is in no way bound by the terms of the CBAs.  It is simply buying services, and its contracts are with Akal and MVM, not with individual CSOs or their unions.  Furthermore, the Marshals Service does not, and could not, terminate individuals from their jobs with MVM or Akal Security.  Its role is simply to make sure that the companies it contracts with are meeting their contractual obligations by providing CSOs who are medically (and otherwise) qualified to guard the judiciary.  Accordingly, plaintiffs must show that they have an entitlement to their medical clearances.  The judicial contracts, however, make clear that, like a security clearance, CSO medical clearances are issued at the sole discretion of the USMS.  Defendant is entitled to summary judgment that on that basis as well.

Furthermore, even if Plaintiffs were entitled to due process, USMS satisfied any obligation it had under the Fifth Amendment by providing two opportunities for CSOs to submit medical information.  The contracts with Akal and MVM state that CSOs must undergo physical examinations

upon hiring and annually thereafter.  Those examinations are conducted by physicians selected by the

contractors and approved by the U.S. Public Health Service (PHS).  The results are then reviewed by

a physician at PHS who works exclusively in the field of occupational medicine for federal law

enforcement agencies.  Following that initial review, the PHS physician either determines that the CSO

satisfies the medical standards or requests additional information needed to make a recommendation.

CSOs are disqualified only if they fail to submit additional information in the time required or if the

additional information that they do provide fails to demonstrate that they satisfy the relevant medical

standard.

Plaintiffs may argue in favor of some additional procedure, such as a formal medical review

board.  But the proper question is not whether one process is "better" than another, or whether there

could be some additional review procedure.  There could always be additional layers of review, or a

slightly different process, but that is not what the Fifth Amendment requires.  A plaintiff is not entitled to

his or her choice of procedure.  Instead, the Fifth Amendment only requires adequate process, taking

into account the risk of erroneous decisions and the interests at stake.

As the Honorable Jane R. Roth of the United States Third Circuit Court of Appeals explained

in her deposition, the procedure at issue here was implemented at the behest of the Committee on

Security and Facilities of the Judicial Conference of the United States, which acts on behalf of the

judiciary to ensure the security of federal courts.  Both the judiciary and the executive branch have a

significant and compelling interest in making sure that federal courts and judicial personnel are protected

from violent attacks and other emergencies.  The procedure in place strikes the right balance between

ensuring that CSOs are physically able to respond in these situations and affording them an opportunity

to provide relevant medical information before they are qualified or disqualified.  To the extent that there is any obligation under the Fifth Amendment, it has been satisfied.

Finally, in addition to granting summary judgment on Plaintiffs' due process claim, the Court should dismiss or grant summary judgment on Count II of Plaintiffs recently-filed Third Amended Complaint.  Count II asserts a claim under the Rehabilitation Act, but only three of the 44 Plaintiffs have exhausted their administrative remedies.  All three plaintiffs who exhausted, however, waited too long after exhausting their administrative remedies before filing their Rehabilitation Act claims in federal court. Additionally, the Court should dismiss the claims of several other plaintiffs who are attempting to proceed against the Marshals Service in more than one jurisdiction.  In short, none of the Plaintiffs have timely, properly-exhausted Rehabilitation Act claims to assert in this case.  Accordingly, the Court should dismiss or grant summary judgment on Count II of the Third Amended Complaint.

## FACTUAL BACKGROUND

USMS has been given the responsibility to "provide for the security and to obey, execute, and enforce all orders of the United States District Courts, the United States Courts of Appeals, and the Court of International Trade." 28 U.S.C. § 566(a).  It carries out that responsibility, in part, by contracting with private companies to provide security officers at federal courthouses.  See 28 U.S.C. § 604(a)(22).  The contracts are negotiated on a circuit-by-circuit basis.  See Deposition of John Kraus, at 15:10 – 19:7 (March 24, 2004) (attached hereto as Exhibit 1).  Defendants MVM, Inc., and Akal Security, Inc., currently hold the contracts for all twelve circuits.  See Third Am. Compl. ¶¶ 7, 8, 10.  Relevant excerpts from the "Twelfth Circuit" contract, which covers the U.S. District Court for the

4

District of Columbia, the U.S. Court of Appeals for the District of Columbia, and other courthouses in

the District of Columbia, are attached hereto as Exhibit 2.

Under the contracts, MVM and Akal are "responsible for providing employees that meet the

qualifications and requirements established under the Contract," including those related to medical and

physical standards.  Id. § H-3(a).  Before a CSO may be assigned to a federal courthouse, he or she

must undergo a pre-employment medical examination.  Id. § C-8(a).  Current CSOs must also undergo

an examination at least once each year.  Id.  The purpose of the examination is to ensure that applicants

and current CSOs are "able to withstand physical demands of the job and [are] capable of responding

to emergency situations."  Id. § C-6(2).  "Failure to meet any one of the required medical and/or

physical qualifications will disqualify" the CSO from duty.  Id. § C-8(e).  The contracts say nothing

about whether an individual who is removed from working in the CSO program is thereafter terminated

by the contractor or is retained to do other work.  In fact, both MVM and Akal Security provide

security services to a number of other private and governmental entities.  See Declaration of Larry

Homenick filed in Walton v. United States Marshals Serv., No. C 03-1460 (N.D. Cal.), ¶¶ 2-4

(attached hereto as Exhibit 3); www.mvminc.com; www.akalsecurity.com.  As the customer that is

purchasing security services, USMS is only interested in ensuring that its contractors provide CSOs

who meet the physical and medical standards described in the contract.  It plays no role in the decision

as to whether a CSO is terminated from his or her employment or continues working for Akal or MVM

in a different capacity.  Kraus Dep. at 230:17-22; Deposition of Marc Farmer (March 26, 2004), at

91:10 – 92:3 ("Farmer Dep. II") (attached hereto as Exhibit 4).

USMS implemented the current medical standards and procedures at the behest of the Judicial Conference's Committee on Security and Facilities (hereinafter, the "Judicial Conference").  See Deposition of Marc Farmer (March 25, 2004), at 21:17 – 22:6, 22:20 – 23:5, 23:13-19, 48:18-22, 59:4-12 ("Farmer Dep. I") (attached hereto as Exhibit 5); Deposition of the Honorable Jane R. Roth (April 23, 2004), at 14:10-21 ("Roth Dep.") (attached hereto as Exhibit 6).  By statute, it is the judiciary that funds and ultimately has authority over the CSO program.  See 28 U.S.C. § 604(a)(22) (providing that the Director of the Administrative Office of the U.S. Courts, under the supervision and direction of the Judicial Conference, shall "[r]eceive and expend, either directly or by transfer to the United States Marshals Service or other Government agency, funds appropriated for the procurement, installation, and maintenance of security equipment and protective services for the United States Courts in courtrooms and adjacent areas, including building ingress/egress control, inspection of packages, directed security patrols, and other similar activities.").

Until a few years ago, CSOs were evaluated for medical conditions using a Civil Service Commission form that had been developed in the 1960s.  See Farmer Dep. I at 27-28.  The form could be filled out by a CSO's private physician, who was unlikely to be familiar with the particular job requirements of the position.  Id.; see also Judicial Conference Committee on Security and Facilities, June 1999 Agenda Item (attached hereto as Exhibit 7) (observing that having personal physicians conduct the annual examinations "has resulted in varied interpretation and application of the medical standards" and "has created a significant security concern for the judiciary").

Beginning in 1997, the Judicial Conference became concerned that some CSOs were not physically capable of responding to security threats and other strenuous emergency situations.  See

6

Farmer Dep. at 21-22; Roth Dep. at 14:22 – 15:9, 23:16 – 24:1; Annotated Agenda, Committee on

Security, Space and Facilities (June 9-10, 1997) (attached hereto as Exhibit 8).  As Mr. Farmer

explained, the judges on the committee "were concerned about their security in general, especially after

the Oklahoma City bombing and other events that were going on in the United States at that time."

Farmer Dep. I at 21:13 – 22:6; see also Deposition of Denis Chapas (April 21, 2004), at 42:13-17

("Oklahoma City had occurred.  Several judges ha[d] been assassinated.  They were concerned about

security.  And we're dealing with security, not only in this area, but in other areas, in an aggressive

way.") ("Chapas Dep.") (attached hereto as Exhibit 9); June 9-10, 1997 Annotated Agenda (USMS-

DC 08127) ("A number of judges have raised the issue of the physical fitness abilities of court security

officers to respond to threat situations.").

　　　　The Judicial Conference, working with USMS, arranged for the U.S. Public Health Service's

office of Federal Occupational Health ("FOH") to conduct a study of the CSO position.  See Roth

Dep. at 22:6-13; Farmer Dep. I at 34:16 – 35:1; 48:16 – 49:3; Summary of the Report of the Judicial

Conf. Comm. on Security and Facilities dated Sept. 2000, at USMS-DC 08244 (attached hereto as

Exhibit 10) ("Sept. 2000 Report").  Richard Miller, M.D., who was then the director of law

enforcement medical programs within FOH, conducted the study.  Farmer Dep. I at 34:18 – 35:1.  The

goal was to identify the essential job functions of the CSO position and then to recommend whether any

changes needed to be made to the CSO medical standards or procedures.  Id. at 54:1 – 55:19.  As

part of the study, Dr. Miller visited five courthouses, where he conducted focus groups of CSOs,

interviewed judges and USMS personnel, and observed CSOs on the job.  Id. at 37:14 – 38:11,

43:10-17, 51:2-9.  He produced a final report in February 2000.  After discussion and consideration of

7

the report, the Judicial Conference directed the Marshals Service to implement several changes to the

medical standards and procedures.  See Sept. 2000 Report (USMS-DC 08245); Report of the

Proceedings of the Judicial Conf. of the United States, at 34 (Mar. 14, 2001) (attached hereto as

Exhibit 11).

      With regard to procedures, one change is that the annual medical examinations are now

conducted by physicians designated by the contractors (e.g., Akal and MVM), rather than by each

CSO's personal physician.  Farmer Dep. I at 67:21 – 68:18.  USMS, working with PHS, reviews the

selections to ensure that there are enough doctors available in each locality and that each designated

doctor is properly licensed.  Id.  The results of the examinations are forwarded through the contractor

to USMS, which checks them for completeness.  See Resp. to Interrogatory No. 2, Def.'s Objections

and Responses to Pls.' First Set of Interrogs. and Request for Production of Documents (Sept. 17,

2003) ("Interrog. Resp.") (attached hereto as Exhibit 12).  The information is then given to the Public

Health Service for review.  Id.  A physician at the Public Health Service reviews the forms and medical

data and makes one of two findings — either that the CSO is medically qualified or that more

information is required.  Id.  Except in the most unusual circumstances (not present here), no CSO is

disqualified at this point in the process.  Instead, he or she is given an opportunity to undergo additional

testing or provide additional information before any final decision is made.  Id.  This supplemental

information often comes from the CSO's treating physician (if he or she is already under medical care

for the condition at issue) or from a specialist (such as an audiologist).  Id.  The new information is again

forwarded to the Public Health Service, which reviews it and issues a recommendation as to whether

the CSO meets the relevant medical standard.  Id.  If PHS recommends disqualification, USMS writes

to the contractor and requests that the CSO be removed from the contract and that a replacement CSO be provided.  Id.  The Marshals Service does not instruct the contractor to terminate the CSO, nor does it restrict in any way the ability of the contractor to place a former CSO in another position with the company.  Kraus Dep. at 230:17-22, Farmer Dep. II at 91:10 – 92:3.

## PROCEDURAL HISTORY

The United Government Security Officers of America (UGSOA) originally sued USMS in the Southern District of Ohio.  See Ohio Compl. (attached as Exhibit 1 to Def. Opp. to Pl. Mot. for Leave to File Third Am. Compl.).  Its complaint in that case included both a due process claim and a claim under the Rehabilitation Act (among other theories).  Id. ¶¶ 29-36.  UGSOA later withdrew that complaint and filed this action on July 26, 2002.  The original complaint in this case did not seek recovery under the Rehabilitation Act, but instead was limited to a facial due process challenge and a rulemaking challenge under the Administrative Procedure Act (APA).  See Complaint (July 26, 2002).

The Court dismissed the APA claim on August 28, 2003.  It declined, however, to dismiss the due process claim.  In its ruling, the Court accepted (as it was required to on a Rule 12(b)(6) motion to dismiss) the factual allegations of the Second Amended Complaint.  See Mem. Op. at 2 n.1 (Aug. 28, 2003).  Thus, the Court treated as a fact the UGSOA's allegation that "all of [its] bargaining unit members work under collective bargaining agreements ("CBAs"), all of which contain a provision explicitly limiting termination to cases of 'just-cause'."  Id. at 2.  The Court expressly relied upon that alleged fact when deciding whether to dismiss the due process claim.  See id. at 10 ("There is no doubt that CSOs have a protected property interest in continued employment which derives exclusively from the 'just-cause' clause in their CBAs.").

9

On December 17, 2003, the Court granted UGSOA leave to file a Second Amended Complaint in order to add as plaintiffs a number of former employees of the private contractors that provide judicial security services to USMS.  Those plaintiffs asserted "the same claims and are seeking similar redress to that sought by Plaintiff UGSOA."  Pl. Mot. for Leave to File Second Am. Compl., at 4 (Nov. 10, 2003).  On January 8, 2004, Defendant Reyna filed a motion for partial judgment on the pleadings.  The motion requested a judgment in favor of defendant with respect to Plaintiffs' requests for reinstatement and damages, and a dismissal of at least some of the individual plaintiffs on the ground that they were improperly splitting their claims.  The Court recently denied that motion as moot, because the complaint to which it was directed has now been superseded.  See Order dated July 21, 2004.

Plaintiffs moved for leave to file their Third Amended Complaint on March 21, 2004.  Their Third Amended Complaint again sought relief under the Due Process Clause of the Fifth Amendment, see Compl. ¶¶ 64-69, and the Rehabilitation Act of 1973, see id. ¶¶ 70-77.  Defendant Reyna opposed amendment of the complaint to allege a violation of the Rehabilitation Act on the grounds of failure to exhaust administrative remedies and lack of timeliness.  On July 9, 2004, the Court "reluctantly" granted Plaintiffs' motion for leave to file a Third Amended Complaint, but did not reach Defendant Reyna's exhaustion or timeliness defenses.  The Third Amended Complaint was officially filed on July 14, 2004.

## STANDARDS OF REVIEW

Defendant is moving for summary judgment on Count I of the Third Amended Complaint.  Summary judgment is warranted where "there is no genuine issue of material fact and . . . the moving

10

party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  The initial burden is on the moving party to point out the absence of any genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once that initial burden is satisfied, the responsibility shifts to the opponent to demonstrate through the production of probative evidence that there remains an issue of fact to be tried.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).  The non-moving party must make a sufficient showing on all essential elements of the case with respect to which the non-moving party has the burden of proof.  Celotex, 477 U.S. at 323.  If the non-moving party fails to make this showing, then the moving party is entitled to judgment as a matter of law.  Id.

Defendant also has moved to dismiss Count II of the Third Amended Complaint, which asserts a claim under the Rehabilitation Act, for lack of subject-matter jurisdiction (or, in the alternative, for summary judgment).  Federal courts are courts of limited jurisdiction possessing only that power authorized to them by the Constitution and federal statutes.  Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994).  The plaintiff bears the burden of proving subject-matter jurisdiction by a preponderance of the evidence.  See id. at 47 n.3.  As this Court has recently explained,

> While the Court must accept as true all the factual allegations contained in the Complaint when reviewing a motion to dismiss pursuant to Rule 12(b)(1), plaintiff's factual allegations in the complaint will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for failure to state a claim, because the plaintiff has the burden of proof to establish jurisdiction.  Finally, in deciding a 12(b)(1) motion, it is well-established in this Circuit that the Court is not limited to the allegations in the Complaint but may consider material outside of the Complaint in an effort to determine whether the Court has jurisdiction in the case.

Duncan v. Washington Metropolitan Area Transit Auth., 214 F.R.D. 43, 45 (D.D.C. 2003).

## ARGUMENT

**I.    THE COURT SHOULD GRANT SUMMARY JUDGMENT FOR DEFENDANT REYNA ON PLAINTIFFS' PROCEDURAL DUE PROCESS CLAIM.**

  **A.    Plaintiffs' Collective Bargaining Agreements Do Not Give Them a Property Interest That Is Applicable to this Case.**

   **1.    The Court's Memorandum Opinion Denying Defendant Reyna's Motion to Dismiss the Procedural Due Process Claim Relied on Plaintiffs' Allegation that their Collective Bargaining Agreements Contain "Just Cause" Provisions.**

It is axiomatic that a plaintiff alleging a due process violation must first demonstrate that he or she possesses a property or liberty interest that entitles them to due process.[1]  As the Court explained in its August 28, 2003 Memorandum Opinion:

> In considering Plaintiff's claim that the USMS violated the due process rights of CSOs, the Court must first determine whether Plaintiff [at that time, just the UGSOA] has alleged a cognizable property interest which entitles its CSO bargaining unit members to procedural due process protection.  See Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532 (1985). This initial determination is crucial because "[p]roperty interests ... are not created by the Constitution.  Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law – rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.  Bd. of Regents of State Colleges v. Roth, 408 U.S. 564, 577 (1972) (finding protected property interest where terms of appointment of assistant professor secured absolutely no interest in re-employment for the next year and there was no state statute or university rule or policy that secured his interest in re-employment or that created any legitimate claim to it).

---

[1]  Plaintiffs have not alleged the deprivation of any "liberty" interest, nor could they have any, since there was no injury to their public reputation and since they were not prevented from obtaining other employment.  Accordingly, the issue before the Court is whether the plaintiffs have a property right that USMS has deprived them of without the requisite due process.

Mem. Op. (Aug. 28, 2003), at 9-10.  "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it.  He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it."  Roth, 408 U.S. at 577; see also Hall v. Ford, 856 F.2d 255, 266 (D.C. Cir. 1988) ("For [an] employee to have a constitutionally protected property interest in his job, the statute must provide the employee with an objectively reasonable expectation that he is entitled to retain it."); Upadhya v. Langenberg, 834 F.2d 661, 664-665 (7th Cir. 1987) ("A 'legitimate claim of entitlement' means more than a high probability of renewal.  It means an expectation ... that was legally enforceable, a mutually binding obligation.  . . .  [A] misunderstanding of one's entitlements, even if reasonable, does not enlarge those entitlements.") (internal citations and quotation marks omitted).

In this case, Plaintiffs have *alleged* that they have a property interest in their jobs as CSOs, an interest that was created when their union entered into CBAs with their employers.  According to Plaintiffs, those CBAs contain just-cause provisions that entitle them to due process whenever USMS decides whether they are medically qualified to provide security services under USMS's contracts with their employers.  Thus, the Third Amended Complaint states:

> Pursuant to the terms and conditions of the respective UGSOA CBAs under which they work, CSOs are not "at will" employees, but rather can only be terminated for just cause. Each of the CBAs negotiated by Plaintiff UGSOA contains a "just-cause clause", providing that the CSOs can only be terminated for cause or just cause. Presently, all of the Plaintiff UGSOA's CBAs contain a just-cause clause.

Third Am. Compl. ¶ 19.  Plaintiffs have described the CBAs in this same manner throughout the litigation.  See Second Am. Compl. ¶ 25 (attached as exhibit to plaintiffs' motion to amend dated Nov. 16, 2003); First Am. Compl. ¶ 17 (Sept. 9, 2002); Pl. Mem. in Opp. to Def. Mot. to Dismiss,

13

at 2 (Dec. 23, 2002) ("The CSOs represented by Plaintiff UGSOA work under collective bargaining agreements containing prohibitions against their termination without just cause."); id. at 2-3 ("Plaintiff's members' property interest in their employment arises from the 'just-cause clauses' in their collective bargaining agreements, giving them an expectation in continued employment that creates a property interest."); Pl. Surreply to Def. Reply to Pl. Opp. to Def. Mot. to Dismiss, at 5 (Feb. 7, 2003) ("[A]ll of the CSO represented by the UGSOA are covered by collective bargaining agreements containing a provision limiting termination to cases of just cause."); id. at 11 ("Plaintiff UGSOA's members have a right to continued employment because they work under collective bargaining contracts that contain clauses prohibiting their termination without just cause.").

The Court relied on Plaintiffs' description of the CBAs in denying Defendant Reyna's original motion to dismiss.  See Mem. Op. at 10 (Aug. 28, 2003) ("There is no doubt that CSOs have a protected property interest in continued employment which derives exclusively from the 'just-cause' clause in their CBAs.").  It was, of course, required to do so in deciding whether Plaintiffs had stated a claim upon which relief could be granted.  See Pitney Bowes, Inc. v. U.S. Postal Service, 27 F. Supp. 2d 15, 19 (D.D.C. 1998) (when reviewing a motion to dismiss under Rule 12(b)(6), "[t]he court must accept as true all well-pleaded factual allegations and draw all reasonable inferences in favor of the plaintiff").  Unfortunately, the Court never had before it (until now) the actual language of the CBAs at issue.

14

2.     The "Just Cause" Provisions in the Collective Bargaining Agreements
Are Expressly Limited in a Way that Makes CSOs "At-Will"
Employees in the Circumstances at Issue Here.

The CBAs are not as straightforward as the pleadings suggest.  In fact, 41 of the 44 plaintiffs

are employed under CBAs that specifically provide that Akal and MVM do not need "just cause" to

terminate CSOs when USMS has determined that the individuals in question must be removed from

working under the applicable judicial security contract.[2]  Although there may be slight variations in the

language of those CBAs, the relevant provisions take one of two basic forms.

One version of the "just-cause" provision on which Plaintiffs' claims are founded begins by

saying that, "[a]fter completion of [a] probationary period . . . no Employee shall be dismissed or

suspended without just cause."  See, e.g., CBA for the District of Alaska, § 6.1(a) (Kraus Decl., Ex.

A).  The very next sentence, however, states that "*[j]ust cause shall include any action or order of*

*removal of an employee from working under the contract by the U.S. government, or revocation*

*of required CSO credentials by the USMS under the removal of Contractor employee provision*

*in Section H-3 of [the contract] between the US Marshals Service and Akal Security, Inc.*"  Id.

---

[2]  The three exceptions are William J. Burge, Lawrence Churm, and Donald Smith.  Before
joining this action, however, all three of these individuals were already plaintiffs in a suit filed against
USMS and MVM in the Eastern District of Pennsylvania, which also seeks relief under a procedural
due process theory.  See Leitch, et al. v. MVM, Inc., et al., No. 03-04344 (E.D. Pa.) (complaint
attached as Ex. 2 to Def. Opp. to Pl. Mot. to File Am. Compl. dated Nov. 19, 2003).  As discussed
below, their claims must be dismissed on that basis alone.  In any event, although the CBAs under
which these plaintiffs worked include broadly-worded "just cause" clauses, they contain other
provisions that specifically recognize the federal government's authority to set and apply medical
standards and otherwise to enforce the terms of its contract with MVM.  See Declaration of John
Kraus (attached hereto as Exhibit 13), Ex. T, Art. 23 (USMS-DC 09865), Art. 28 (USMS-DC
09867-68), Amendment to Art. 28 (USMS-DC 09875-76); Kraus Decl., Ex. U, Art. 23 (USMS-DC
09897), Art. 28 (USMS-DC 09899-900), Amendment to Art. 28 (USMS-DC 09906).

(emphasis added); <u>see also</u> Kraus Decl., Ex. B, C, D, G, H, J, M, N, P, X.  Thus, under this version, "just cause" is expressly defined to include any action by USMS to remove a CSO from working under its contract with the private security companies.  Under those circumstances, the contractor need not justify its decision to terminate the CSO, in effect making that individual an employee at-will.  <u>See Hatfield v. Johnson Controls, Inc.,</u> 791 F. Supp. 1243, 1251 (E.D. Mich. 1992) (explaining that parties can "create an employment contract that is partially an at will contract and partially a just-cause contract").

The second version of the "just cause" provision has the same effect, even though its language is slightly different.  It states that, "[a]fter completion of the probationary period, no Employee shall be dismissed or suspended without just cause, *unless the Employee is ordered by the Government to be removed from working under the Employer's contract with the Government, or if the Employee's credentials are denied or terminated by the Marshals Service.*"  CBA for the Twelfth Circuit (the District of Columbia), § 6.1.1. (emphasis added) (Kraus Decl., Ex. E); <u>see also</u> Kraus Decl. Ex. F, I, K, L, O, Q, R, S, V, W, Y, Z.  The only difference between this version and the first version is that, rather than stating that a USMS-directed removal from the contract is automatically, and by definition, "good cause," these CBAs simply exclude those circumstances from the "good cause" provision altogether.

The clear intent and effect of these provisions is that the employer may be required to follow certain procedures when terminating a CSO for other reasons, but there is no such obligation in situations where USMS has determined that a CSO does not meet the requirements of the judicial security contract.  In the latter situation, "just cause" is automatically assumed (under the first version)

16

or is simply not implicated (under the second version).  In either case, a CSO employed under one of

these CBAs clearly does not have a "legitimate claim of entitlement" to his or her position, see Roth,

408 U.S. at 577, at least under the circumstances presented here.  Accordingly, there is no right to due

process.

Other provisions in the CBAs further illustrate this lack of entitlement.  For example, the CBAs

provide a grievance procedure for employees to contest actions taken by the contractors.  See, e.g.,

CBA for the District of Alaska, § 5.1 (Kraus Decl., Ex. A).  The CBAs state, however, that the

"grievance procedure shall not be used for any action or order of removal of an Employee from

working under the contract by the U.S. government."  Id.  Furthermore, the CBAs acknowledge that

"[p]hysical/medical exams may be required by the U.S. Government contract," and that "[e]mployees

must pass the physical exam prescribed by the Employer's contract with the U.S. Government in order

to be employed and to maintain employment."  Id. § 13.2.B.  When these sections of the CBAs are

read in conjunction with the expressly limited just-cause provision, the indisputable conclusion is that

USMS has the sole authority to determine whether individuals are qualified to serve as CSOs and that

Akal and MVM need not demonstrate "just cause" when removing a CSO in accordance with USMS

instructions.

> **3.  The Contents of the Judicial Security Contracts Between USMS and Its Contractors Confirm that the CSOs Lack a Protected Property Interest.**

If any further support is needed for the idea that CSOs lack a property interest in the

circumstances presented here, the Court need only look to the judicial security contracts between

USMS and its contractors.  Those contracts, after all, are the only agreements that USMS has

17

negotiated and signed.  They make clear that the contractors are required to provide CSOs who meet

the medical requirements, see, e.g., Excerpts from Twelfth Circuit Contract between USMS and MVM

(attached hereto as Exhibit 2), § C-8(a) (USMS-CON 01204), and that "[a]ny employee provided by

the Contractor that fails to meet the requirements of the Contract . . . may be removed from performing

services for the Government under this Contract upon written request of the Contracting Officer."  Id. §

H-3(a).  They further state that "[t]he United States Marshals Service reserves the right at all times to

determine the suitability of any Contractor employee to serve as a CSO. . . .  [and that] [d]ecisions

rendered under any dispute resolution process . . . available to the contractor and its employees shall

not be binding upon the United States Marshals Service."  Id. § H-3(b) (USMS-CON 01250).

Finally, they provide that "[a]ny decision to continue a Contractor employee in a CSO capacity will be

made solely by the Judicial Protective Services Program on a case-by-case basis in accordance with

the requirement to safeguard the federal judicial process, the Judiciary, citizens, and property as per

policies and directives governing Judicial Protective Services operations."  Id.  Against this backdrop,

Plaintiffs cannot reasonably be said to have possessed a property interest in their position as CSOs.

Notwithstanding these provisions, Plaintiffs have alleged that, "[p]rior to July 2002, under the

terms and conditions of the Judicial Security Contracts between Defendants Akal and MVM and the

USMS, the USMS could not request that Defendants remove a CSO without cause."  Third Am.

Compl. ¶ 20.  There is, however, no "just cause" provision in these contracts.  On the contrary, as the

above language demonstrates, USMS clearly retains sole authority to determine whether the CSOs

provided by its contractors meet the requirements of the contracts.  See, e.g., Twelfth Circuit Contract,

§ H-3(b) (USMS-CON 01250).  The contracts do set out procedures for addressing disciplinary and

18

performance issues, but not for medical disqualifications.  See, e.g., id. § H-3(c)-(e).  In 2002, the contracts were modified to state explicitly that the procedures in H-3 do not apply to medical disqualifications.  See, e.g., id., Modification No. M011 (USMS-CON 01305A-C).

Moreover, Plaintiffs have no standing to challenge or enforce provisions of contracts to which they are not parties.  There is nothing to suggest that plaintiffs are intended third-party beneficiaries of the judicial security contracts, which is the only way that they could enforce the contract terms.  See Rafferty v. NYNEX Corp., 60 F.3d 844, 849 (D.C. Cir. 1994); Beckett v. Air Line Pilots Ass'n, 995 F.2d 280, 288 (D.C. Cir. 1993) (explaining, in the context of consent decrees, that only an intended third-party beneficiary to a government contract, not an incidental beneficiary, may enforce the contract); accord RESTATEMENT (2D) OF CONTRACTS § 302 (a beneficiary is "intended" only if "the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance") (emphasis added).  Quite the opposite — the provisions described above clearly show that the contracts were solely intended to benefit USMS and the judiciary, which are the recipients of the security services, and the contractors, which are compensated for the services they provide.  See Kroekel v. United States Marshals Serv., No. 98-N-983, slip op. at 33 (D. Colo. May 21, 1999) (attached hereto as Exhibit 14) (holding that CSOs were not intended third-party beneficiary of a judicial security contract); Perry v. Delaney, 74 F. Supp.2d 824, 836 (C.D. Ill. 1999) (stating that CSOs were not third-party beneficiaries of such a contract).[3]

---

[3] Even if Plaintiffs could establish that they are third-party beneficiaries, they would have to sue in the Court of Federal Claims unless they were willing to limit their damages to $10,000 per individual.  See 28 U.S.C. §§ 1346(a)(2), 1491.

19

* * *

Thus, the entire factual basis of Plaintiffs' due process claim — that the collective bargaining agreements contain "just cause" provisions that give them a property interest in continued employment — is untrue.  The undisputed fact is that these provisions expressly provide that a CSO's loss of employment due to removal from his or her contract by USMS constitutes just cause.  Therefore, as a matter of law, Defendant Reyna is entitled to summary judgment on Count I of the Third Amended Complaint.  See Kroekel, slip op. at 35 (holding that, because plaintiff CSO "had no property interest, neither [Marshal Service's nor contractor's] actions or inactions with regard to [plaintiff's] termination implicate a due process right").

> **B.** **Regardless of their Terms, the Collective Bargaining Agreements Cannot Impose Due Process Obligations on the U.S. Marshals Service With Respect to Medical Qualification Decisions.**

As set forth above, the expressly limited just-cause provisions of plaintiffs' CBAs do not create a property interest that is relevant to this case.  The Court can enter summary judgment on that basis alone.  But even assuming the language of the CBAs matched plaintiffs' description of them in their pleadings, those agreements could not limit the USMS's authority to determine whether individuals are medically qualified to serve as CSOs.

The USMS did not negotiate, approve, or sign the CBAs.  See Deposition of Donna Huff (June 8, 2004), at 52:18 – 54:3 (attached hereto as Exhibit 15).  Moreover, only the contractors, not the Marshals Service, have the authority to terminate CSOs from their jobs.  See Kraus Dep. at 230:17-22.  Therefore, plaintiffs are left with arguing that the USMS improperly interfered with their right (assuming they had one) of continued employment with MVM or Akal.  The only action the

20

Marshals Service took, however, was to determine that the plaintiffs were not medically qualified to safeguard federal courthouses.  Accordingly, plaintiffs must demonstrate that they have a constitutionally-protected property interest in the medical clearance that is required for them to serve as CSOs.

In denying Defendant's motion to dismiss last year, the Court did not reach the question of whether plaintiffs could have a property interest in their medical clearances.  Instead, it held that "property interests protected by the Fifth Amendment may be created by virtue of purely private contractual agreements," and that due process is required when government officials "cause[] [individuals] to lose their private employment."  Mem. Op. at 12 (Aug. 28, 2003).  Assuming that statement to be true as a general principle, however, the circumstances presented here are distinguishable from those at issue in the cases cited by the Court last August.

The Court primarily relied on Greene v. McElroy, 360 U.S. 474 (1959).  In that case, the Supreme Court remarked that "the right to hold specific private employment and to follow a chosen profession free from unreasonable government interference comes within [both] the 'liberty' and 'property' concepts of the Fifth Amendment."  Id. at 492.[4]  The Court's overall approach to the case,

---

[4] As we previously argued in support of our motion to dismiss, see Def. Resp. to Pl. Surreply, p. 8-9 (Feb. 27, 2003), this statement in Greene is dicta.  The Supreme Court explicitly acknowledged that it had not answered whether the plaintiff's due process assertions were justified, Greene, 360 U.S. at 493 (1959) ("[I]n view of our conclusion that this case should be decided on the narrower ground of 'authorization,' we find that we need not determine the answers to these questions."); Cafeteria & Restaurant Workers Union, Local 473, AFL-CIO v. McElroy, 367 U.S. 886, 889-90 (1961). ("Accordingly we did not reach the constitutional issues which that case otherwise would have presented."), and the phrase in question has been recognized as dicta in other jurisdictions.  See, e.g., Huggins v. Apperson, 69 F.3d 533, 1995 WL 649895, at *6 (4th Cir. Nov. 6, 1995) (unpublished table decision); Merritt v. Mackey, 827 F.2d 1368, 1375 (9th Cir. 1987) (Wallace, J., dissenting).

however, was clearly driven by the fact that a liberty interest was at stake.  See id. at 475-76 (noting

that the plaintiff was discharged by his employer after being denied a security clearance on the basis of

his contacts with alleged communist organizations and that, "[a]fter his discharge, [he] was unable to

secure employment as an aeronautical engineer and for all practical purposes that field of endeavor is

now closed to him").[5]

_____

This Court earlier dismissed any concern that the statement in Greene was dicta, citing later cases in
which the Supreme Court and D.C. Circuit expressed the same principle.  The Supreme Court case,
however, did not involve an exclusion from working on a federal contract, but rather an FDIC order
that prohibited a bank official from participating in bank's affairs altogether.  See FDIC v. Mallen, 486
U.S. 230, 232 (1988); see also Chernin v. Lyng, 874 F.2d 501 (8th Cir. 1989) (USDA refused to
provide his employer with required inspection services unless the employee was removed from working
for the employer in any capacity); Merritt, 827 F.2d at 1370 (federal agency required employer to fire
plaintiff at the earliest possible date and no longer employ him in any capacity).  By contrast, the USMS
medical disqualification of the CSOs simply precluded them from working on contracts with the
USMS, and neither interfered with their greater employment relationship with their contractor nor
precluded them from continued participation with MVM and Akal on other contracts or in other
employment capacities.  The D.C. Circuit case, Phillips  v. Bureau of Prisons, 591 F.2d 966 (D.C. Cir.
1979), did not even involve a termination, but instead held that paralegals possessed a due process
right to jail access because "rules or mutually explicit understandings ha[d] given rise to a legitimate
claim of entitlement."  Phillips, 591 F.2d at 971 (internal quotation marks omitted).  Unlike in Phillips,
there are no "rules or mutually explicit understandings" that would support a conclusion that CSOs have
a "legitimate claim of entitlement" to their medical clearances.

    [5] Stein v. Bd. of City of New York, 792 F.2d 13, 15 n.2 (2d. Cir. 1986), another case on
which the Court previously relied, also can be distinguished as involving a liberty interest.  See id. at 15
n.2 (holding that an order requiring the termination of a plaintiff "because he fell below the standards of
good moral character" represented a constitutional violation because the plaintiff would be foreclosed
from his chosen line of work and his name had been impugned).  Furthermore, as we previously argued
in our motion to dismiss, Stein and other cases involving alleged interference by state governments
implicate the unique language of 42 U.S.C. § 1983, which is not applicable to the federal government.
That statute extends liability not just to those who "subject[]" a person to a deprivation of protected
rights, but also to those who "cause[]" a person to be subjected to the constitutional deprivation.  The
Court found no significance in that distinction when it denied defendant's motion to dismiss, but the
difference in language can be significant where the defendant is not alleged to have terminated the
plaintiff, but simply to have caused him or her to be terminated by another party.  Accordingly,
defendant respectfully requests the Court to reconsider this aspect of its prior decision as well.

Two years after <u>Greene</u>, in a case not involving a liberty interest, the Supreme Court held that a contractor employee was not entitled to notice and hearing before being denied a security clearance to work in a military cafeteria.  <u>See</u> <u>Cafeteria & Restaurant Workers Union, Local 473, AFL-CIO v. McElroy</u>, 367 U.S. 886, 889-90 (1961).  More recently, the Supreme Court held that decisions regarding whether to grant government issued security clearances are unreviewable on the merits, and that their revocation does not give rise to a due process claim.  <u>See</u> <u>Dep't of the Navy v. Egan</u>, 484 U.S. 518, 528 (1988) ("It should be obvious that no one has a "right" to a security clearance."); <u>see also</u>, <u>e.g.</u>, <u>Doe v. Cheney</u>, 885 F.2d 898, 909-10 (D.C. Cir. 1989) (same); <u>Dorfmont v. Brown</u>, 913 F.2d 1399 (9th Cir. 1990) (denying a due process claim because "[t]here is no such entitlement to a security clearance.").  These decisions provide a more appropriate framework for analyzing the due process claim brought by the CSOs in this case.

Here, there is no liberty interest at issue.  Moreover, it is undisputed that plaintiffs were terminated by their employers, not by the USMS, and that nothing that USMS did precluded their employers from keeping them on to work on other contracts.  The real issue, therefore, is whether the plaintiffs had a property interest — <u>i.e.</u>, a legitimate claim of entitlement — to the renewal of their CSO medical clearances.  The judicial security contract makes clear, however, that CSOs have no entitlement to their medical clearances and that USMS retains sole authority to determine whether a CSO is qualified to provide services under the contract.  <u>See</u>, <u>e.g.</u>, Twelfth Circuit Contract §§ H-3(a), (b) (USMS-CON 01249-50).  USMS makes these determinations "in accordance with the requirement to safeguard the federal judicial process, the Judiciary, citizens, and property."  <u>Id.</u> § H-3(b) (USMS-CON 01250).

23

Given the Marshals Service's mission to provide for courthouse security, the decision as to whether to allow an individual to continue guarding a federal courthouse is akin to a decision as to whether a contractor or federal employee should receive a security clearance. See Beesley v. U.S. Dep't of Justice, No. 97-6499, slip op. at 14-30 (C.D. Cal. Jan. 19, 2000), aff'd, No. 00-55418, 2002 WL 169392 (9th Cir. Feb. 1, 2002) (attached hereto as Exhibit 16). In Beesley, a former CSO sued his employer and USMS for violation of due process after USMS refused to restore his special deputation, which is required for all CSOs. See Special Deputation Form (attached hereto as Exhibit 17). The Marshals Service had refused to restore the deputation because of concerns about Beesley's emotional state and several incidents of misconduct. See Beesley, slip op. at 6-7. In rejecting Bivens claims against individual federal defendants, based on alleged violations of due process, the court explained that, even assuming that Beesley "had a right to continued employment as a CSO, that right was dependent on his continued deputation by the USMS." Id., slip op. at 19. It then reasoned that the CSO deputation "may be likened to other sorts of clearances or credentials commonly granted by the federal government . . . [because it] afforded [the plaintiff] access to all areas of the federal courthouse where he was stationed, including judicial chambers, and allowed him to carry a firearm on the premises. Since the deputation afforded Beesley unfettered access, it can be analogized to a security clearance." Id.; see also id., slip op. at 36-37 (holding that the concerns that preclude judicial review of the merits of decisions on security clearances "apply equally to the Marshal's decision respecting the deputation of [CSOs]").

Citing Dep't of Navy v. Egan, 484 U.S. 518, 527 (1988), the Beesley court then held that there was no clearly established "property or liberty interest in continued deputation by the USMS or in

employment that was dependent thereon." Slip op. at 20.  As a result, the plaintiff's claims against the individual federal defendants were dismissed.  Id.  See also id. at 21-22 ("There is no question that Beesley's job as a CSO required continued deputation by the USMS.  . . . [T]here is no entitlement to such a clearance, or to continued employment in a job that requires such a clearance.  Accordingly, Beesley was not entitled to due process in connection with the revocation of his deputation or the termination of his employment."); Perry v. Delaney, 74 F. Supp.2d 824, 836 (C.D. Ill. 1999) (holding that CSOs had "no legitimate expectation of entitlement" to their credentials or special deputation).

This Court should likewise hold that, whatever property interests the plaintiffs may have had in their employment with Akal or MVM, they had no property interest in their medical clearances. Accordingly, Plaintiffs cannot prevail on their due process claim against the USMS.

## C.   The USMS Medical Review Procedures Provide Due Process.

According to Plaintiffs, the USMS medical examination procedure deprives them of a protected property interest without due process of law.  For the reasons set forth above, Plaintiffs do not have a protected property interest.  But even assuming they did, USMS has fulfilled any constitutional requirements of proper procedure that may be owed to the CSOs under the Fifth Amendment.[6]  The assumed protected property interest at issue is an interest in a medical clearance, the loss of which would interfere with Plaintiffs' employment with the security companies.  In the

---

[6] Plaintiffs are only asserting a facial challenge to the USMS procedures.  As the Supreme Court has stated, "[a] facial challenge is 'the most difficult challenge to mount successfully since the challenger must establish that no set of circumstances exists under which the rule would be valid.'" Anderson v. Edwards, 514 U.S. 155 n.6 (1995) (quoting United States v. Salerno, 481 U.S. 739, 745 (1987)).

alternative, assuming further that (as Plaintiffs allege) the USMS is the CSOs' co-employer, the

property interest would be in continued public employment.

> **1.     The USMS Procedures At Issue Comport Fully With <u>Mathews v. Eldridge</u>.**

Constitutional due process "is not a technical conception with a fixed content unrelated to time,

place and circumstance." <u>Mathews v. Eldridge</u>, 424 U.S. 319, 334 (1976) (citation and internal

quotation marks omitted).  Rather, it is a flexible concept that requires "such procedural protections as

the particular situation demands." <u>Morrissey v. Brewer</u>, 408 U.S. 471, 481 (1972).  The determination

of whether administrative procedures are constitutionally adequate depends upon "analysis of the

governmental and private interests that are affected." <u>Mathews</u>, 424 U.S. at 334.

To determine what procedures the Due Process Clause requires, the Court must weigh the

three factors outlined in <u>Mathews</u>:

> First, the private interest that will be affected by the official action; second, the risk of
> an erroneous deprivation of such interest through the procedures used, and the
> probable value, if any, of additional or substitute procedural safeguards; and finally the
> Government's interest, including the function involved and the fiscal and administrative
> burden that the additional or substitute procedures requires would entail.

<u>Mathews</u>, 424 U.S. at 335.  Applying this analysis here, it is apparent that USMS has provided more

than adequate process to the CSOs under the Due Process Clause.

> **a.     Private Interest Affected by the Official Action**

First, the private interest at issue here is not high because the CSOs' interest in their

employment or in their medical clearances is an "essentially economic" interest.  As such, in the

<u>Mathews</u> balancing test, it "should be afforded less weight than the interests of one in his personal

26

liberty or in receiving essential government benefits." See Chemical Waste Management, Inc. v. EPA,

56 F.3d 1434, 1437 (D.C. Cir. 1995).  In particular, at issue is Plaintiffs' interest in a medical

clearance, the loss of which results in their not being permitted to work on the judicial security

contracts, i.e., as CSOs.  A CSO's loss of a medical clearance, however, does not necessarily result in

the CSO's loss of employment with the private security company, let alone the loss of the opportunity to

work as a security guard.

### b.    Risk of Erroneous Deprivation

Second, the risk of an erroneous deprivation of this interest through the procedures used is

minimal.  No process can guarantee that there will be no errors, but the process that USMS has

implemented provides a reasonable assurance that a correct determination will be made as to whether

CSOs meet the relevant medical standards.[7]

Pursuant to Section C-8 of the CSO Contract between USMS and each private security

company that employs CSOs ("Contractor"), the Contractor must submit a Certificate of Medical

Examination for Court Security Officers ("Certificate") for all prospective CSOs.  After the CSO is

initially cleared, the Contractor must submit a Certificate annually for each of its CSOs.  The due date

for this submission is the anniversary of the individual CSO's start date.  The procedure for both the

initial medical determination and the annual review is the same.  The prospective or current CSO must

first undergo an examination by a physician selected by the Contractor and approved by the U.S.

---

[7] Unless otherwise indicated, the following description of the medical examination process is taken from Response to Interrogatory No. 2 of Defendant's Objections and Responses to Plaintiff's First Set of Interrogatories and Requests for Production of Documents, attached hereto as Exhibit 12.

27

Public Health Service's ("PHS") Office of Federal Law Enforcement Medical Program, which specializes in occupational medicine for federal law enforcement officers.  The examining physician performs a comprehensive medical examination, and completes the Certificate, which documents the results of the examination.

The examining physician provides the completed Certificate, along with any related documentation (e.g., EKG data or blood test results), to the Contractor, which forwards the materials to USMS's Judicial Protective Services Program (JPS).  A nurse consultant employed by USMS reviews the Certificate and any related materials to make sure they are complete, then forwards the packet to PHS.  The file is then reviewed by a reviewing physician with the Public Health Service.  The reviewing physicians are experienced in occupational medicine, particularly as it applies to law enforcement occupations.  Farmer Dep. I at 60:5 - 61:8.  Most CSO files are reviewed by a single reviewing physician (currently, Dr. Louis Chelton); other physicians assist when needed.  Id. at 63:11-16.  Because these doctors review hundreds of CSO files each year, they are familiar with the medical standards required of CSOs.

If the reviewing physician determines, based on the information contained in the Certificate, that the CSO may have a disqualifying condition, or that additional information is required before making even a preliminary assessment, the contractor is notified by the Marshals Service of this interim determination, and is given thirty days to respond to the reviewing physician's concerns or provide further medical information or medical examinations as set forth in the review form.  Farmer Dep. I at 74:13 - 75:10; 75:21 - 76:13.  This may include, for example, information from the CSO's treating physician (such as a cardiologist, if the CSO has a heart condition) or data from a hearing center that

has the equipment and training to perform the tests required by the CSO medical standards.  If no

further information is received within thirty days (a period that can be extended), the Contractor may be

asked to remove the CSO from the contract.  If further information is received within the time allowed,

it is forwarded to the reviewing physician for review.

After reviewing all the documentation, if the reviewing physician determines that the CSO is not

medically qualified, the USMS contracting officer sends a disqualification letter to the Contractor

requesting that the CSO be removed from performing under the contract and that the Contractor

submit an application for a replacement within fourteen days.  Farmer Dep. I at 77:1-16.

In sum, only after notice, explanation, and opportunity to present evidence have been provided

does the reviewing physician render a determination as to whether a CSO is medically qualified to serve

in his or her position.  Little risk of error is entailed in this procedure, and accordingly there is no reason

for the Court to require more elaborate procedures.  Although Plaintiffs might prefer a different process

or some additional layer of review, they have not demonstrated that the current medical examination

procedure is constitutionally deficient.  See Johnson v. United States, 628 F.2d 187, 194 (D.C. Cir.

1980) (explaining that the Fifth Amendment "only requires that a person receive his 'due' process, not

every procedural device that he may claim or desire").[8]

---

[8] Plaintiffs may respond by citing a portion of Dr. Miller's deposition testimony, in which he expressed a general concern about a hypothetical system in which a single entity sets rules, enforces them, and reviews any appeals.  See Deposition of Richard J. Miller, M.D. (May 6, 2004) ("Miller Dep.") at 195:8 - 197:20 (attached hereto as Exhibit 18).  However, Dr. Miller's opinion about what "in general" might be "fair" is irrelevant to a determination of whether the current medical examination procedure comports with the Due Process Clause.  Moreover, the current procedure for CSOs does match plaintiffs' hypothetical system.  The medical standards were drafted by Dr. Miller with input from other physicians, and they were approved by the Judicial Conference.  Farmer Dep. I at 59:4-12.  The

c.        The Public Interest

More elaborate procedures would jeopardize the compelling interest of USMS in ensuring the physical safety of federal courthouses and those who work in them.  The USMS is charged with the serious and weighty duty "to protect the Federal courts."  28 U.S.C. §§ 566(a), 604(a)(22) (authorizing the appropriation of funds to USMS "for the procurement, installation, and maintenance of security equipment and protective services for the United States Courts in courtrooms").  USMS fulfills that responsibility by placing CSOs in every federal courthouse in the country.  If those CSOs are not medically fit for duty, the safety of those who work and visit those federal courthouses is placed at significant risk.  See Roth Dep. at 20:20-21:7, 29:7-30:3; Farmer Dep. II at 87:13-16 (explaining that the judiciary's "interest was that they have people who were capable of delivering security services, not only in . . . average times but in times of emergency").

As described above, USMS already provides for fair and adequate procedures before medically disqualifying a CSO.  These procedures strike the right balance between the two extremes of disregarding the private interest at stake and inflating the private interest to the exclusion of the public interest.  At the one extreme, a CSO could be removed from working under the judicial security contract as soon as there was any reason to believe that he or she may not be able to satisfy the medical requirements.  This would minimize the safety risk to federal courthouses and the people who work in and visit them, but would leave CSOs with no opportunity to provide additional information

---

examinations are administered by a number of different physicians designated by the contractors.  Id. at 67:21 – 68:18.  Finally, the review process is conducted not just by Dr. Miller, but by several different reviewing physicians at the Public Health Service.  See Interrog. Resp. No. 2.

before a final decision is made.  At the opposite extreme, if a CSO failed to satisfy the medical

requirements, he or she could be entitled to a full trial-type hearing, plus opportunities for appeal,

before he or she could be removed from the judicial security contract.  However, requiring such

additional procedures would significantly lengthen the amount of time that a medically unfit CSO would

remain in a position of responsibility for protecting the courthouse, placing the performance of that duty

in jeopardy, and endangering those whom the CSO is charged to protect.  See Roth Dep. at 28:13-18

("[O]ur concern was that because we're dealing with the security of the courts and we want to have

CSOs who are medically qualified to do the job, that if there is going to be reevaluation it be done in a

timely manner."), 29:7-13.  Further, such additional procedures would be entail increased fiscal and

administrative burdens for the USMS and the judiciary, which funds the program.  The present medical

examination procedure strikes the right balance between these two extremes.  Accordingly, the Court

should conclude that USMS has provided sufficient procedural protections to the CSOs.

> ### 2.      In the Alternative, the USMS Procedures at Issue Satisfy the
> ### Loudermill Test.

CSOs are not employees of the Marshals Service, but rather of the private security companies.

See Third Am. Compl. ¶ 10 ("The CSOs are directly employed by private security companies . . . .").

Nevertheless, the CSO Plaintiffs allege that the USMS is a co-employer of the CSOs.  Id. ¶ 59.  The

USMS disputes that allegation, but even assuming for purposes of this argument that the USMS is

Plaintiffs' co-employer, and that the CSOs therefore have a property interest equivalent to an interest in

continued federal employment, the Court should rule in favor of the federal defendant because Plaintiffs have received the procedural protections that the Fifth Amendment guarantees to federal employees.[9]

The Supreme Court established the framework for determining whether a terminated public employee received adequate due process in Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532 (1985).[10]  After applying the three-part Mathews analysis, the Court explained that a "pretermination 'hearing,' though necessary, need not be elaborate" and that "[i]n general, something less than a full evidentiary hearing is sufficient prior to adverse administrative action."  Loudermill, 470 U.S. at 545 (citing Mathews, 424 U.S. at 343) (internal quotation marks omitted).  It proceeded to outline the procedures that a public employer is required to undertake before terminating an employee:

_____

[9] Defendant Reyna assumes that Plaintiffs are not covered by the Civil Service Reform Act, 5 U.S.C. § 1101 et seq. ("CSRA").  Even if the CSRA were deemed to apply to Plaintiffs, their due process claims would still largely fail.  Because these claims concern personnel actions taken against them and arise out of their (alleged) employment relationship, they could not maintain a constitutional claim against the United States unless they first exhausted their administrative remedies.  See Steadman v. Governor, U.S. Soldiers' and Airmen's Home, 918 F.2d 963, 967 (D.C. Cir. 1990) ("When the statutory and constitutional claims are premised on the same facts and the CSRA remedy would have been fully effective in remedying the constitutional violation, exhaustion is mandated.  Only in the unusual case in which the constitutional claim raises issues totally unrelated to the CSRA procedures can a party come directly to district court.").  As explained below, 41 of the 44 plaintiffs have failed to exhaust their administrative remedies.

[10] If, as plaintiffs now allege, they *are* USMS employees, they may be precluded from pursuing a due process claim altogether.  See, e.g., Paegle v. Dep't of the Interior, 813 F. Supp. 61, 66 (D.D.C. 1993) (dismissing Fifth Amendment due process claim because Rehabilitation Act provides exclusive remedy for alleged disability discrimination in federal employment); cf. Kizas v. Webster, 707 F.2d 524, 542 (D.C. Cir. 1983) ("The Title VII remedy declared exclusive for federal employees in *Brown v. GSA* [425 U.S. 820 (1976)] precludes actions against federal officials for alleged constitutional violations as well as actions under other federal legislation.").  But because plaintiffs' due process challenge arises in the context of their employment with the contractors, the Court may find the Loudermill test instructive.

> [In the context of public employment], the pretermination hearing need not definitively resolve the propriety of the discharge.  It should be an initial check against mistaken decisions — essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action.
>
> The essential requirements of due process. . . are notice and an opportunity to respond.  The opportunity to present reasons, either in person or in writing, why proposed action should not be taken is a fundamental due process requirement.  The tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story.  To require more than this prior to termination would intrude to an unwarranted extent on the government's interest in quickly removing an unsatisfactory employee.

Id. at 545-46 (internal citations omitted).

Apart from the procedures enumerated in Loudermill, "[t]he D.C. Circuit has not required any additional due process requirements for the termination of its public employees."  Crockett v. District of Columbia Metropolitan Police Dep't, 293 F. Supp.2d 63, 68 (D.D.C. 2003) (citing Kropat v. Fed. Aviation Admin., 162 F.3d 129, 132-34 (D.C. Cir. 1998)); see also Washington Teachers' Union Local #6, Am. Fed. of Teachers, AFL-CIO v. Bd. of Educ. of District of Columbia, 109 F.3d 774, 779 (D.C. Cir. 1997) (noting that "counsel conceded at oral argument that nothing in due process law required the District to provide an evidentiary hearing before a neutral arbiter prior to termination, but only 'an opportunity to present reasons . . . why the proposed action should not be taken'") (quoting Loudermill, 470 U.S. at 546); Twist v. Meese, 661 F. Supp. 231, 234 n.2 (D.D.C. 1987) ("In any event, plaintiff received pre-termination review sufficient to satisfy the Loudermill standard; he received notice of the charges against him, an account of defendant's evidence, and an opportunity to present his view of the facts.") (internal citation omitted).

The medical examination procedure, which is described above, fully complies with the requirements of due process, as set out in Loudermill.  Each Plaintiff received written notice of the

circumstances that warranted his medical disqualification from serving as a Court Security Officer,

together with an explanation of the reasons that the medical review officer was recommending that he

be medically disqualified.  Additionally, each Plaintiff was afforded an opportunity to submit evidence

that would present his or her side of the story.  The Fifth Amendment requires no more.

## II.   THE COURT SHOULD DISMISS OR, IN THE ALTERNATIVE, GRANT SUMMARY JUDGMENT ON PLAINTIFFS' REHABILITATION ACT CLAIMS.

### A.   The Court Lacks Subject-Matter Jurisdiction Over All But Three Plaintiffs' Rehabilitation Act Claims Because They Have Failed to Exhaust Their Administrative Remedies.

#### 1.   The Court Lacks Subject Matter Jurisdiction Over the Claims Made Under § 501 of the Rehabilitation Act by Those Plaintiffs Who Have Neither Sought Counseling nor Filed Administrative Claims with the Marshals Service.

##### a.   An Individual Cannot Sue a Federal Agency Under § 501 of the Rehabilitation Act Without First Complying with Federal-Sector Title VII Exhaustion Procedures.

A party must exhaust administrative remedies under Title VII of the Civil Rights Act, 42 U.S.C.

§ 2000e-16 ("Title VII"), before suing a federal agency under § 501 of the Rehabilitation Act.  See 29

U.S.C. § 794a(a)(1) (incorporating "remedies, procedures, and rights set forth" in Title VII); Milbert v.

Koop, 830 F.2d 354, 356 (D.C. Cir. 1987) ("Thus, Title VII and its exhaustion requirements were

incorporated by the Congress in 1978 into the remedy procedures of section 501.").[11]

---

[11] CSOs are not employees of the Marshals Service, but rather of the private security companies.  See, e.g., Kraus Dep. at 227:23 – 237:10; Special Deputation Form.  Nevertheless, it is clear that Plaintiffs' Rehabilitation Act claims allege work-related discrimination (both by their employers and by USMS).  Accordingly, they must comply with Title VII's exhaustion requirements.  See 28 C.F.R. § 39.170(b) ("The [Department of Justice] shall process complaints alleging violations of section 504 with respect to employment according to the procedures established by the Equal

As a first step in the exhaustion process, all claimants must contact an EEO counselor at his or her agency within forty-five days of the allegedly unlawful employment action.  See 29 C.F.R. § 1614.105(a)(1).  After this initial contact, the agency has thirty days to provide a counselor who will meet with the complainant in an attempt to resolve the complainant's concerns.  See 29 C.F.R. § 1614.105(d).  A complainant who is not satisfied with the results of that consultation then has fifteen days to file a formal complaint.  See 29 C.F.R. § 1614.106(b).  Once a formal complaint has been filed, the agency "is required to conduct an impartial and appropriate investigation of the complaint within 180 days."  29 C.F.R. § 1614.106(e)(2).  Only after this investigation is completed (or 180 days have elapsed since the investigation began) can the claimant bring suit in federal court.  See 42 U.S.C. § 2000e-16(c); 29 C.F.R. § 1614.108(g).

If the agency dismisses the complaint, the complainant may either appeal the dismissal to the Equal Employment Opportunity Commission (EEOC) within thirty days, see 29 C.F.R. § 1614.402(a), or file an action in district court within ninety days, see 42 U.S.C. § 2000e-16(c).  If an administrative appeal is taken and the EEOC issues an unfavorable ruling, the claimant has ninety days to file an action in district court.  See 42 U.S.C. § 2000e-16(c).

In cases against the federal government, Congress "did not casually impose the requirement that a person charging violation of Title VII [and, by incorporation, the Rehabilitation Act] by a federal

---

Employment Opportunity Commission in 29 C.F.R. part 1613 [now Part 1614] pursuant to section 501 of the Rehabilitation Act of 1973 (29 U.S.C. 791).").  In any event, there are no scenarios in which Plaintiffs could avoid exhaustion altogether.  If they were asserting claims unrelated to their employment, they would have to comply with a separate exhaustion procedure, which requires, inter alia, that a complaint be filed with the agency "within 180 days of the alleged act of discrimination."  28 C.F.R. § 39.170(d)(3).

agency initiate his or her complaint with the agency.  Nor is the requirement a technicality." <u>Kizas v. Webster</u>, 707 F.2d 524, 544 (D.C. Cir. 1983).  Indeed, the Supreme Court has recognized that "[section] 2000e-16(c) is a condition to the waiver of sovereign immunity and thus must be strictly construed." <u>Irwin v. Department of Veterans Affairs</u>, 498 U.S. 89, 94 (1990).  Accordingly, presentation of a claim to the agency that is alleged to have discriminated and exhaustion of administrative remedies are non-waivable jurisdictional predicates to filing a § 501 claim against the federal government.  <u>See</u> <u>Singletary v. District of Columbia</u>, 225 F. Supp.2d 43, 66 (D.D.C. 2002) ("Plaintiff failed to exhaust his administrative remedies for his failure to accommodate claim. Accordingly, this Court may not properly exercise subject matter jurisdiction over this claim."), <u>aff'd in relevant part</u>, 351 F.3d 519 (D.C. Cir. 2003); <u>Judd v. Boorstin</u>, 1987 WL 17070 at *3 ("Having failed to exhaust his administrative remedies, this Court has no jurisdiction to review Judd's claim under the Rehabilitation Act . . . and such claim, accordingly, cannot be entertained."); <u>cf.</u> <u>Kizas</u>, 707 F.2d at 546.[12]

---

[12]  Relying on <u>Zipes v. TransWorld Airlines</u>, 455 U.S. 385 (1982), courts have held that the *time limits* for exhaustion of administrative remedies are not jurisdictional, but instead can be tolled for equitable reasons.  <u>See</u>, <u>e.g.</u>, <u>Bayer v. U.S. Dep't of the Treasury</u>, 956 F.2d 330, 332 (D.C. Cir. 1992). However, as the D.C. Circuit explained in <u>Kizas</u>, equitable doctrines cannot justify a complete failure to abide by the exhaustion requirements.  In <u>Kizas</u>, the plaintiffs brought suit in district court without having ever filed proper complaints of discrimination with the agency, "either on time or belatedly."  707 F.2d at 543.  The plaintiffs argued that doctrines of waiver or futility should be invoked to excuse them from the exhaustion requirement.  <u>See id.</u>  The court of appeals, however, affirmed dismissal of the claims and rejected any consideration of plaintiffs' reliance on equitable doctrines, holding that "[w]ere we to embrace the futility or waiver arguments the [plaintiffs] press and hold unnecessary an initial charge filed with the FBI, we would sanction erosion of the carefully structured scheme for resolving charges of discrimination with federal agencies." <u>Id.</u> at 546 (quotation marks and citations omitted); <u>see</u> <u>also</u> <u>id.</u> (explaining that "nothing in <u>Zipes</u> suggests that parties complaining of federal employment discrimination in violation of Title VII should ever be waived into court without filing *any* initial charge with the agency

       **b.**     **Forty-One of the Forty-Four Named Plaintiffs Have Not Exhausted Their Administrative Remedies and Thus Cannot Bring Claims Against Defendant Reyna Under § 501 of the Rehabilitation Act.**

In the present case, only four of the forty-four individual plaintiffs named in the Complaint have filed administrative complaints with the USMS EEO office.  See Declaration of Joann W. Grady ("Grady Decl.") (attached hereto as Exhibit 19), at ¶¶ 4-5.  Of these four plaintiffs, only three (Carl Akins, Don E. Kemp, and Walter E. Lamb) have exhausted their administrative remedies.  See id. ¶¶ 4, 6.  The forty-one remaining plaintiffs have failed to exhaust their administrative remedies against USMS.  Accordingly, this Court lacks subject-matter jurisdiction over their claims under § 501 of the Rehabilitation Act.[13]

       **2.**     **The Plaintiffs Who Have Failed to Exhaust Their Administrative Remedies Are Also Barred from Seeking Relief under § 504 of the Rehabilitation Act.**

In addition to seeking relief under § 501 of the Rehabilitation Act, plaintiffs have asserted claims under § 504 of that statute, which prohibits discrimination "under any program or activity receiving

---

whose practice is challenged") (emphasis in original); Sommatino v. United States, 255 F.3d 704, 710-11 (9th Cir. 2001) ("Equitable estoppel and equitable tolling can extend the deadline for filing when equity so requires.  However, equitable remedies are unavailable in federal court when the record shows that no administrative filing was ever made.") (citations omitted).

    [13] For many, if not all, of the plaintiffs, it is too late to initiate the administrative process.  See 29 C.F.R. § 1614.105(a)(1) (claimant must contact counselor at agency within forty-five days of alleged unlawful action).

Federal financial assistance or under any program or activity conducted by any Executive agency." 29

U.S.C. § 794(a). Those claims should also be dismissed for failure to exhaust.[14]

Whereas § 501 claims are addressed under Title VII, § 504 claims are governed by Title VI, at

least where they involve the recipient or provider of "Federal assistance." See 29 U.S.C. § 794a(a)(2)

(stating that "[t]he remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964

(42 U.S.C. 2000d et seq.) shall be available to any person aggrieved by any act or failure to act by any

recipient of Federal assistance or Federal provider of such assistance").[15] Title VI allows for the

withholding of funds to federal grantees, but does not provide any individual relief to those who have

been subjected to discrimination. See 42 U.S.C. § 2000d-1 et seq. For that reason, in cases not

involving federal employees, courts have held that individuals are not required to exhaust Title VI

administrative remedies before bringing a § 504 lawsuit. See, e.g., Milbert v. Koop, 830 F.2d 354,

356 (D.C. Cir. 1987) (explaining that unlike section 501 of the Rehabilitation Act, "section 504

incorporates Title VI — not Title VII — procedures" and that "Title VI . . . does not contain

exhaustion requirements similar to those of Title VII"). In the case at hand, however, there are several

---

[14] Judge Bartle of the U.S. District Court for the Eastern District of Pennsylvania recently dismissed a similar § 504 claim for failure to exhaust administrative remedies. See Leitch, et al. v. MVM, Inc., et al., No. 03-4344, Mem. Op. at 18-19 (entered July 22, 2004) (attached hereto as Exhibit 20).

[15] Federal procurement contracts such as those between USMS and Akal Security and MVM are not considered "Federal assistance" for purposes of the Rehabilitation Act. See Jacobson v. Delta Airlines, 742 F.2d 1202, 1209 (9th Cir. 1984). Therefore, to be cognizable at all, Plaintiffs' § 504 claim must involve the statute's prohibition against discrimination under "any program or activity conducted by any Executive agency." 29 U.S.C. § 794(a). The Rehabilitation Act does not state which remedies and procedures, if any, are available to individuals who allege that they have suffered discrimination under this portion of § 504.

reasons why the Court should enter summary judgment on the § 504 claim with respect to the plaintiffs who have not exhausted administrative remedies.

First, if Plaintiffs are to be considered employees of the Marshals Service, as they argue they should be, then they cannot obtain relief under § 504 at all.  Their exclusive remedy would be § 501, with its jurisdictional exhaustion requirement.  See Taylor v. Small, 350 F.3d 1286, 1289 (D.C. Cir. 2003) ("We conclude that . . . a federal employee may not bring a claim of employment discrimination under § 504 of the Rehabilitation Act. . .").  Under Taylor, if Plaintiffs are employees of USMS, as they claim, § 501 provides their only cause of action.  See id. at 1291 (holding that "§ 504 does not provide federal employees an alternative route for relief under the Rehabilitation Act.") (citations and internal punctuation omitted).

Moreover, exhaustion should be required, at least as a prudential matter, even if Plaintiffs are not viewed as federal employees.  See Fertilizer Institute v. EPA, 935 F.2d 1303, 1312 (D.C. Cir. 1991) ("As a general rule, this court will not address arguments that were not initially raised before the agency."); cf. Bailey v. Bureau of Prisons, 1995 WL 564200 at *2 (D.D.C. 1995) ("Although exhaustion of administrative remedies is not explicitly prescribed, prudential considerations require that the plaintiff exhaust Bureau of Prison administrative remedies before filing suit in federal court.").  It is clear that Plaintiffs' Rehabilitation Act claim alleges work-related discrimination (both by their employers and by USMS).  Under the Department of Justice's regulations, that type of employment-related claim is subject to the exhaustion procedures that govern Title VII and § 501 claims against the federal government.  See 28 C.F.R. § 39.170(b) ("The [Department of Justice] shall process complaints alleging violations of section 504 with respect to employment according to the procedures

39

established by the Equal Employment Opportunity Commission in 29 C.F.R. part 1613 [now Part

1614] pursuant to section 501 of the Rehabilitation Act of 1973 (29 U.S.C. 791).") (emphasis added).

Even if exhaustion is not a jurisdictional prerequisite under § 504, it would still be appropriate to

require Plaintiffs to seek EEO counseling and file administrative complaints before bringing suit in

federal court.  One of the purposes of exhaustion is to allow the agency an opportunity to resolve

complaints informally, before a lawsuit is filed.  See Park v. Howard Univ., 71 F.3d 904, 907 (D.C.

Cir. 1995) (noting that among the purposes of Title VII's exhaustion requirements are "giving the

charged party notice of the claim and narrowing the issues for prompt adjudication and decision")

(citation and internal punctuation omitted).  Thus, although it appears likely that any formal

administrative complaints would have been dismissed on the ground that CSOs are not federal

employees, the counseling process that proceeds the filing of an administrative complaint might have

resolved some of the individuals' claims or narrowed the issues that remained to be addressed in district

court.  See Grady Decl. ¶ 3 (describing the EEO counseling process).  For these reasons, USMS

should have been given an opportunity to review the claims administratively, before a lawsuit was filed.

To hold otherwise would contravene Congress' intent, through the administrative process, to provide

"an opportunity to settle disputes through conference, conciliation, and persuasion before the aggrieved

party [is] permitted to file a lawsuit." Alexander v. Gardner-Denver Co., 415 U.S. 36, 44 (1974).[16]

---

[16] Even if Plaintiffs were able to bring a § 504 claim, they could not recover damages from the
United States.  See Lane v. Pena, 518 U.S. 187, 192 (1996).

**B.**     **Defendant Reyna is Entitled to Summary Judgment on the Rehabilitation Act Claims of Plaintiffs Akins, Kemp, and Lamb Because These Plaintiffs Failed to Initiate Suit in a Timely Fashion.**

As stated above, only three plaintiffs (Carl Akins, Don Kemp, and Walter Lamb) have exhausted their administrative remedies under the Rehabilitation Act.  However, each of these plaintiffs waited too long after receiving the final administrative decision on his claim before bringing suit.  Accordingly, their Rehabilitation Act claims are barred.

Under 42 U.S.C. § 2000e-16(c), a claimant has 90 days following an EEOC decision to file a suit in district court against a federal governmental entity.  Although the 90-day statute of limitations is subject to equitable tolling, the plaintiff bears the burden of pleading and proving equitable reasons for his failure to adhere to the 90-day deadline.  Saltz v. Lehman, 672 F.2d 207, 209 (D.C. Cir.1982).  If the plaintiff fails to satisfy this burden, the Court should dismiss or grant summary judgment for the defendant.  See, e.g., Carroll v. England, __ F. Supp.2d __, 2004 WL 1149358 at *3-5 (D.D.C. 2004) (dismissing two counts of plaintiff's claim under the Rehabilitation Act that were filed over two months after the deadline for contacting an EEO counselor); Speiser v. U.S. Dep't of Health & Human Servs., 670 F. Supp. 380, 385 (D.D.C. 1986) (rejecting plaintiff's claim under the Rehabilitation Act that was filed over five months after the deadline for contacting an EEO counselor), aff'd, 818 F.2d 95 (D.C. Cir. 1987); see also Brown v. GSA, 425 U.S. 820, 833 (1976) (insisting on the application of Title VII's "rigorous administrative exhaustion requirements and time limitations"); Cristwell v. Veneman, 224 F. Supp.2d 54, 62 (D.D.C. 2002) (dismissing Title VII claim with prejudice for failure to exhaust administrative remedies in a timely manner); McKay v. England, 2003 WL 1799247

41

(D.D.C. 2003) (granting summary judgment for Title VII defendant where plaintiff failed to initiate suit within 90 days after exhausting administrative remedies).

Plaintiff Akins exhausted his administrative remedies by obtaining a dismissal order by USMS, filing an appeal with the EEOC, and receiving a final decision on that appeal.  See Grady Decl. ¶ 4. That final decision, however, was issued on May 8, 2003.  Id.  Plaintiff Akins had 90 days, or until mid-June of 2003, to file a complaint in district court alleging a violation of § 501 of the Rehabilitation Act.  However, he did not move for leave to allege such a violation until March 21, 2004.  It is, therefore, approximately nine months too late for Plaintiff Akins to challenge the EEOC's ruling in this Court.

Similarly, after receiving a final agency decision from USMS dismissing his administrative complaint, Plaintiff Lamb filed an appeal with the EEOC and received a final decision on that appeal on August 23, 2003.  Id.  Because Plaintiff Lamb did not move for leave to allege a § 501 claim under the Rehabilitation Act until March 21, 2004, almost seven months later, his claim is time-barred.

Plaintiff Kemp received his final decision from the EEOC on July 23, 2003.  Id.  He did not move for leave to allege a § 501 claim in the present case until March 21, 2004.  This is not the first time, however, that Mr. Kemp filed suit challenging his medical disqualification.  In fact, he has a suit pending in Louisiana.  See Kemp v. Ashcroft, No. 03-1633-M (W.D. La.).  He should be dismissed from this action, either for untimeliness or for improperly splitting his claim.

Accordingly, because Plaintiffs Akins, Kemp, and Lamb failed to initiate suit under the Rehabilitation Act within the required time period after exhausting their remedies, the Court should grant summary judgment for Defendant Reyna on these three plaintiffs' Rehabilitation Act claims.

**III.    THE COURT SHOULD DISMISS FROM THIS ACTION THE PLAINTIFFS WHO ARE ATTEMPTING TO LITIGATE THEIR CLAIMS IN MORE THAN ONE COURT.**

As noted above, three of the plaintiffs (William J. Burge, Lawrence Churm, and Donald Smith) have a case pending against USMS and MVM in the Eastern District of Pennsylvania, see Leitch, et al. v. MVM, Inc., et al., No. 03-04344 (E.D. Pa.), and one (Don Kemp) has an action pending in Louisiana, see Kemp v. Ashcroft, No. 03-1633-M (W.D. La.).  Five other plaintiffs have cases pending in other jurisdictions.  See Second Am. Complaint, Strolberg v. Akal Security, No. 03-0004-S-DOC (D. Idaho) (plaintiffs include Harlen D. Coy, Albert J. Busam, Walter E. Lamb, and Monte Laughlin); Beck v. U.S. Marshals Service, No. 02-1579-T (W.D. Okla.) (plaintiff Danny E. Beck).[17] For the reasons set forth in the briefs that Defendant Reyna filed in support of his motion for partial judgment on the pleadings, see Def. Mem. in Support of Mot. for Partial J. on the Pleadings, p. 8-12 (Jan. 8, 2004), the Court should dismiss these plaintiffs from this case and require them to pursue their claims in the lawsuits that they originally filed.

---

[17] These pleadings were attached as exhibits to the Marshals Service's Response to Plaintiff's Motion for Leave to File Second Amended Complaint.  They are incorporated herein by reference. They are matters of public record, and therefore can be considered by the Court in ruling on this motion.  See Marshal County Health Care Auth. v. Shalala, 988 F.2d 1221, 1222 (D.C. Cir. 1993) (district court may "examine matters of public record in ruling on a Rule 12(b)(6) motion"); Does I Through III v. District of Columbia, 238 F. Supp.2d 212, 216 (D.D.C. 2002) (in ruling on a Rule 12(c) motion for judgment on the pleadings, "it is well established that courts are allowed to take judicial notice of matters in the general public record, including . . . records of prior litigation") (internal quotation marks and citations omitted).

**<u>CONCLUSION</u>**

For the foregoing reasons, the Court should enter summary judgment with respect to Count I of

the Third Amended Complaint and dismiss or enter summary judgment on Count II of the Third

Amended Complaint.

August 2, 2004                                     Respectfully submitted,

                                                   PETER D. KEISLER
                                                   Assistant Attorney General

                                                   KENNETH L. WAINSTEIN
                                                   U.S. Attorney for the District of Columbia

                                                    /s/  John R. Griffiths
                                                   HENRY A. AZAR, JR. (D.C. Bar No. 417249)
                                                   JOHN R. GRIFFITHS (D.C. Bar No. 449234)
                                                   DANIEL M. RIESS
                                                   Attorneys
                                                   U.S. Department of Justice
                                                   Civil Division, Federal Programs Branch
                                                   P.O. Box 883
                                                   Washington, D.C. 20044
                                                   Telephone:     (202) 514-4652
                                                   Fax:           (202) 616-8460

                                                   Attorneys for the Defendant, Benigno G. Reyna,
                                                   Director of the United States Marshals Service, in
                                                   his Official Capacity

44

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| INTERNATIONAL UNION, UNITED GOVERNMENT SECURITY OFFICERS OF AMERICA, <u>et al.</u>,    ) )  ) | Civil Action No. 1:02cv1484 |
| ) | Judge Gladys Kessler |
| Plaintiffs,    ) | |
| ) | |
| v.    ) | Status Conference Scheduled for |
| ) | 10:00 a.m. on August 10, 2004 |
| BENIGNO G. REYNA, DIRECTOR OF THE UNITED STATES MARSHALS SERVICE, in his Official Capacity, <u>et al.</u>,    ) )  ) | |
| ) | |
| Defendants.    ) | |
| ) | |

## <u>LIST OF EXHIBITS</u>

| <u>Exhibit</u> | <u>Description</u> |
|---|---|
| 1 | Deposition of John Kraus (March 24, 2004) |
| 2 | Relevant excerpts from the "Twelfth Circuit" contract |
| 3 | Declaration of Larry Homenick filed in <u>Walton v. United States Marshals Serv.</u>, No. C 03-1460 (N.D. Cal.) |
| 4 | Deposition of Marc Farmer (March 26, 2004) ("Farmer Dep. II") |
| 5 | Deposition of Marc Farmer (March 25, 2004) ("Farmer Dep. I") |
| 6 | Deposition of the Honorable Jane R. Roth (April 23, 2004) |
| 7 | Judicial Conference Committee on Security and Facilities, June 1999 Agenda Item |
| 8 | Annotated Agenda, Committee on Security, Space and Facilities (June 9-10, 1997) |
| 9 | Deposition of Denis Chapas (April 21, 2004) |

10          Summary of the Report of the Judicial Conf. Comm. on Security and Facilities dated
            Sept. 2000

11          Report of the Proceedings of the Judicial Conf. of the United States (Mar. 14, 2001)

12          Resp. to Interrogatory No. 2, Def.'s Objections and Responses to Pls.' First Set of
            Interrogs. and Request for Production of Documents (Sept. 17, 2003)

13          Declaration of John Kraus and exhibits thereto

14          Kroekel v. United States Marshals Serv., No. 98-N-983, slip op. (D. Colo. May 21,
            1999)

15          Deposition of Donna Huff (June 8, 2004)

16          Beesley v. U.S. Dep't of Justice, No. 97-6499, slip op. at 14-30 (C.D. Cal. Jan. 19,
            2000), aff'd, No. 00-55418, 2002 WL 169392 (9th Cir. Feb. 1, 2002)

17          Special Deputation Form

18          Deposition of Richard J. Miller, M.D. (May 6, 2004)

19          Declaration of Joann W. Grady

20          Leitch, et al. v. MVM, Inc., et al., No. 03-4344, Mem. Op. (entered July 22, 2004)