### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **INTERNATIONAL UNION, UNITED GOVERNMENT SECURITY OFFICERS OF AMERICA**, <u>et al.</u>, | ) )  ) ) |
| **Plaintiffs**, | ) ) |
| **v.** | )  Civil Action No. 02-1484 (GK) |
|  | ) |
| **JOHN CLARK, in his official capacity as Director of the United States Marshals Service**, <u>et al.</u>, | )  )  )  )  ) |
| **Defendants**. | )  ) |

### MEMORANDUM OPINION

Plaintiffs are the International Union, United Government Security Officers of America ("Union") and fifty-four individually named Court Security Officers ("CSOs").[1]  Several claims are currently pending in this matter.  First, the Union is pursuing a Fifth Amendment procedural due process claim against John Clark, Director of the United States Marshals Service ("USMS" or the

---

[1] The individual CSOs are Ann J. Barkley; Frank Brigance; Donald Durham; James E. Lane; Keith Morris; Harvey Simmons; Carl Akins; Thomas A. Alexander; Donald H. Allen; David A. Arriola; Vernon Broad; Frank Browder, Jr.; William J. Burge; Jimmy D. Burrow; Albert J. Busam; Clarence Bynum; Michael L. Campbell; Lawerence K. Churm; Harlen D. Coy; Byron G. Dahlen; Philip I. Elder; Robert Farnsworth; Gilmer S. Forbis; Ruben V. Gonzales; William F. Guthrie; John Hansen; Frank Hruza; Robert Hubbard; Donald W. Johnson; Don E. Kemp; James D. Kimbrel; Walter E. Lamb; William P. Lambright; Monty L. Laughlin; Roberto Lebron; Stephen F. McDonald; Chester L. McKune; Jack C. Morehead; Dallas K. Murphy; Miller Pearson; James Ralph; Robert Rarick; Ronald F. Ray; Willie Rich; Harvey Robideaux; Felipe Jorge-Rodriguez; Thomas J. Roy; John B. Scott; Frank Shaffer; Rhys Sirjane; Brian J. Smith; Donald Smith; Fred A. Thatcher; and Roberto Torrez.

"agency"), challenging the modified medical fitness-for-duty standards USMS began applying to CSOs in 2001. Second, the fifty-four CSOs, in their individual capacities, are pursuing Fifth Amendment due process claims against the USMS and disability discrimination claims against Akal Security, Inc. ("Akal"), MVM Security Services, Inc. ("MVM") and Ares Group Incorporated ("AGI"), under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101, et seq..[2] Third, and finally, a putative class of CSOs seeks to pursue a class-wide claim against USMS under the Rehabilitation Act, 29 U.S.C. §§ 701 et seq..

This matter is now before the Court on Defendant John Clark's Motion for Judgment on the Pleadings or for Summary Judgment on Plaintiffs' Rehabilitation Act Claims and for Judgment on the Pleadings on All Claims as to Eight Individual Plaintiffs [Dkt. No. 171]. Upon consideration of the Motion, Opposition, Reply, Supplemental Memoranda, and the entire record herein, and for the reasons stated below, Defendant's Motion is **granted in part and denied in part**.

## I. BACKGROUND

This is the Court's fourth, although likely not its last,

---

[2] On June 13, 2005, the individual CSOs voluntarily dismissed their claims under the Rehabilitation Act against Akal and AGI. See Dkt. Nos. 159 and 160. On March 30, 2005, the Court dismissed the individual CSOs' claims under the Rehabilitation Act against MVM. See Dkt. No. 134 (granting MVM's Motion to Dismiss Count II of Plaintiffs' Third Amended Complaint or, in the Alternative, for Summary Judgment).

Memorandum Opinion in this four-year-old case.  Rather than set forth the complex factual and procedural history in its entirety, the Court will limit its discussion here to the immediately relevant facts.

**A.   Facts**

>   **1.   The judicial security contracts governing the CSOs'**
>   **employment**

USMS, a division of the Department of Justice ("DOJ"), is a federal law enforcement agency with statutory duties that include providing security services to federal courthouses and courtrooms. <u>See</u> 28 U.S.C. § 566(a).  It performs these duties, in part, by contracting for the services of CSOs with private security companies ("contractors") including Defendants Akal, MVM, and AGI, which currently hold "judicial security contracts" in all twelve federal Circuits.  <u>See</u> 28 U.S.C. § 604(a)(22); Fourth Am. Compl. at 12-13.

The CSOs are not considered federal employees; they are private-sector employees of companies such as Akal, MVM, and AGI who are designated to serve as CSOs pursuant to those companies' contracts with USMS.[3]  <u>See</u> Fourth Am. Compl. ¶ 21.  All of the

---

[3]   In their highly specialized and competitive industry, companies like Akal, MVM, and AGI routinely underbid each other to become the USMS's contractor in a particular judicial district.  As a result, while CSOs working in any given courthouse are employed by the contractor that currently services that judicial district, many have worked, in the same capacity and under the same roof, for two or more of the contractors.  <u>See</u> <u>Strolberg v. Akal et al.</u>, No. 03-04, Mem. Op. at 13 (D. Idaho Jan. 19, 2005).  When one

individual CSOs named as Plaintiffs in this action are members of the Union, which represents contract federal security officers, including CSOs, and negotiates collective bargaining agreements ("CBAs") with the contractors that "determine the terms and conditions of their employment."  Id. ¶¶ 4, 21.

Pursuant to their judicial security contracts with USMS, the contractors "provide all necessary manpower, supervision, transportation, equipment, and clothing, not provided by the Government . . . to perform court security services for each USMS district covered by [the relevant] contract."  Def.'s Mot. for J. on the Pleadings or Summ. J. [Dkt. No. 171], Farmer Decl. Ex. A, Twelfth Circuit Contract with MVM § C-2 (hereinafter "Twelfth Circuit Contract").

By way of personnel, the contractors must provide the following: (1) site supervisors to "oversee and manage the day to day operations of the CSO[s] at their respective district, unless otherwise directed by the Contracting Officer [a USMS employee]," id. § C-5(b)(1); (2) Lead Court Security Officers ("LCSOs") to, inter alia, "coordinate daily activities at their respective facility[,] . . . provide a direct degree of supervision for the daily work of the CSOs[,] and act as a liaison between the Contract

_____

contractor wins a judicial security contract previously held by another, it is often the case that many of the CSOs it hires are the very people who had been working as CSOs under the prior contract.  Id.

Manager, Site Supervisor, and the COTR,"[4] <u>id</u> § C-4(c); and (3) "qualified CSOs at each district facility designated by the Government" to guard courthouse entrances, screen visitors, provide security in courtrooms, and escort judges, courthouse personnel, and jurors, as needed.  <u>Id.</u> § C-5(d)(1).

It is the contractors' sole responsibility to find potential CSOs, conduct an initial screening to determine whether CSO candidates meet the qualifications set by USMS, and forward any potentially eligible CSOs to USMS for a more thorough background check.  The contractors also pay salaries and provide benefits to the CSOs, withhold taxes on their behalf, maintain their time and attendance records, and have the exclusive power to terminate their employment.  <u>See</u> Def.'s Mot. for J. on the Pleadings or Summ. J. at 3-4 (hereinafter "Def.'s Mot.").  Moreover, agents of the contractors—the Contract Managers, site supervisors, and LCSOs—provide much of the supervision of the CSOs' daily activities.  <u>See</u> Twelfth Circuit Contract § C-18.

USMS, however, specifies the qualifications CSO candidates must meet.  These include "at least three calendar years of verifiable experience as a certified law enforcement officer or its

---

[4]   The Contracting Officer Technical Representative ("COTR") is a USMS employee who serves as the agency's main point of contact with the contractor supplying CSOs in any district.  The COTR's responsibilities include "supply[ing] the contractor with post orders/standing operating procedures for each CSO station" in the district."  Twelfth Circuit Contract § C-5(d)(1).

military equivalency." Id. § C-6(6). In addition, CSOs must demonstrate weapons proficiency and satisfy certain physical fitness and medical standards. See id. §§ C-6 - C-25. The validity of revisions to the medical standards implemented by USMS in 2001 is ultimately at issue in this case. See International Union, United Government Security Officers of America, et al. v. Clark, 02-cv-1484, Mem. Op. at 3-4 (D.D.C. 2003).

After a CSO candidate is determined to be eligible to work under a judicial security contract, USMS conducts an intensive residential training program, lasting two to three days, which all CSOs must successfully complete before assuming their responsibilities. See id. ¶ C-23(b). Once on the job, USMS provides certain essential equipment to the CSOs, including their weapons, radios, and handcuffs. See id. § C-26(a). Those items remain government property and must be returned to USMS upon a CSO's departure. Id. USMS establishes the dress code and standards of performance for CSOs and administers an oath of office, which has the effect of deputizing them as "Special Deputy United States Marshal[s]." See id. §§ C-12, C-13; Farmer Decl., Ex. B. On its face, the oath of office states that "[t]his authorization does not constitute appointment or employment by the [USMS], the United States Department of Justice, or the United States Government." Id. It also states that the CSO "agrees to perform [her duties] with the knowledge that he or she is neither

6

entering into an employment agreement with the Federal Government or any element thereof, nor being appointed to any position in the Federal Service by virtue of this Special Deputation." Id.

In addition to determining the qualifications CSOs must meet, and training them in their duties, USMS has the power to require ineligible CSOs to be removed from working under a judicial security contract. This power derives from standard clauses in the contracts providing that: (1) "[a]ny employee provided by the Contractor that fails to meet the requirements of the Contract . . . may be removed from performing services for the Government under this Contract upon written request of the Contracting Officer," id. § H-3(a); (2) USMS "reserves the right at all times to determine the suitability of any Contractor employee to serve as a CSO," id. § H-3(b); and (3) "[a]ny decision to continue a Contractor employee in a CSO capacity will be made solely by the Judicial Protective Services ["JPS"] Program [of the USMS] on a case-by-case basis in accordance with the requirement to safeguard the federal judicial process, the Judiciary, citizens, and property as per policies and directives governing Judicial Protective Services Operations." Id.

### 2. Plaintiffs' exhaustion of their administrative remedies

Section 501 of the Rehabilitation Act requires federal agencies to institute procedures to adjudicate discrimination claims at the administrative level, see 29 U.S.C. § 501(b), and

requires employees to avail themselves of those procedures before filing suit in federal court.  See 29 U.S.C. § 794a(a)(1).  Of the fifty-four Plaintiffs in this case, only  fifteen exhausted their administrative remedies under Section 501.[5]  Ten of those fifteen individuals failed to initiate the administrative complaint process within the statutory deadline.[6]

### B.   The Procedural History

On July 26, 2002, the Union brought this action against the USMS, claiming that the implementation of the modified fitness for duty medical standards deprived the CSOs of procedural due process and violated their rights under the notice and comment requirements of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 706, et seq..  On August 28, 2003, the Court granted in part and denied in part USMS's Motion to Dismiss, concluding that the Union had stated a valid Fifth Amendment procedural due process claim against USMS but that its APA claim could not proceed.  See Int'l Union, United Gov't Sec. Officers of America v. USMS, No. 02-cv-1484, Mem. Op. (D.D.C. Aug. 28, 2003).

---

[5]  They are: Frank Brigance, Donald Durham, Harvey Simmons, Carl Akins, Vernon Broad, William Burge, Albert Busam, Lawrence K. Churm, Harlen D. Coy, Don E. Kemp, Walter E. Lamb, Roberto LeBron, Harvey Robideaux, Frank Shaffer, and Donald Smith.  See Def.'s Mot., Ex. 11, Grady Decl.

[6]  They are Carl Akins, Vernon Broad, William Burge, Albert Busam, Lawrence K. Churm, Harlen D. Coy, Donald Durham, Don E. Kemp, Harvey Robideaux, and Donald Smith.  See Def.'s Mot. at 29-30.

On December 17, 2003, the Court granted the Union leave to file a Second Amended Complaint in order to add as Plaintiffs thirty-eight former CSOs.  These individually-named CSO Plaintiffs asserted that they have "the same claims and are seeking similar redress to that sought by Plaintiff [Union]."  Pls.' Mot. for Leave to File Second Am. Compl. at 4 (November 10, 2003).  With leave of the Court, the Union and the individual Plaintiffs filed a Third Amended Complaint on July 9, 2004, adding five former CSOs as Plaintiffs, stating new claims under the Rehabilitation Act and the ADA, and joining Akal and MVM as Defendants.  On February 4, 2005, again with leave of the Court, the Union and the fifty-four individual Plaintiffs filed a Fourth Amended Complaint, adding as Plaintiffs ten additional former CSOs and AGI as a Defendant.  On April 20, 2005, Plaintiffs filed a Motion for Class Certification, which remains pending.

On March 22, 2005, Akal filed counterclaims against various individual CSOs alleging that they breached the hold harmless and no recourse clauses of the CBAs under which they worked.  In its counterclaims, Akal sought to enjoin Plaintiffs from proceeding with their claims and to be indemnified for all costs, fees, and damages that arise in litigating their claims.  On February 1, 2006, the Court dismissed Akal's counterclaims, finding that Akal had impermissibly failed to exhaust its administrative remedies

prior to bringing those counterclaims.  See Dkt. No. 172.[7]

Defendant USMS filed the instant Motion [Dkt. No. 171] on January 19, 2006.  Plaintiffs filed their Opposition [Dkt. No. 177] on March 6, 2006,[8] and USMS filed its Reply [Dkt. No. 182] on April 14, 2006.

## II.  STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(c) provides that "[a]fter the pleadings are closed but within such time frame as not to delay the trial, any party may move for judgment on the pleadings."  Fed. R. Civ. P. 12(c).  A motion for judgment on the pleadings will be granted if the movant shows, at the close of the pleadings, that no issue of material fact remains to be resolved, and that he or she is entitled to judgment as a matter of law.  See Terry v. Reno, 101 F.3d 1412, 1423 (D.C. Cir. 1996); Haynesworth v. Miller, 820 F.2d 1245, 1249 n.11 (D.C. Cir. 1987); Summers v. Howard University, 127

---

[7] AGI, which also had filed counterclaims, voluntarily dismissed such claims on October 18, 2005.  See Dkt. No. 168.

[8] The Court read with displeasure the intemperate rhetoric that permeates Plaintiffs' Opposition.  Without any support whatsoever, Plaintiffs' counsel make serious allegations of misconduct by Government counsel and urges the Court to enter sanctions.  Government counsel has vigorously and appropriately advocated his client's position.  Doing so is not sanctionable; it is his job.  Moreover, based on the Motions papers, Government counsel has not misrepresented any facts or attempted to mislead the Court.  Unless they can present good cause, which they certainly have not done here, Plaintiffs' counsel are strongly advised not to include such incendiary language in future filings with the Court.  It does not reflect well on them or their cause.

F. Supp. 2d 27, 29 (D.D.C. 2000).

The standard of review for a Rule 12(c) motion is "virtually identical" to that which governs motions to dismiss pursuant to Rule 12(b)(6). Haynesworth, 820 F.2d at 1254; Robinson v. District of Columbia, 403 F. Supp. 2d 39, 47 (D.D.C. 2005). Accordingly, a motion for judgment on the pleadings may be granted only if it appears, based on the allegations set forth in the complaint, that "the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957); Hishon v. King & Spaulding, 467 U.S. 69, 73 (1984). A court may not consider matters outside the pleadings and is "limited to considering facts alleged in the complaint, any documents attached to or incorporated in the complaint, matters of which the court may take judicial notice, and matters of public record." Robinson, 403 F. Supp. 2d at 47 (citing EEOC v. St. Francis Xavier Parochial School, 117 F.3d 621, 624 (D.C. Cir. 1997)).

Because such motions "summarily extinguish litigation at the threshold and foreclose the opportunity for discovery and factual presentation, [they] should be treated with the greatest of care." Haynesworth, 820 F.2d at 1254. The factual allegations of the complaint must be presumed true and liberally construed in favor of the plaintiff. Shear v. Nat'l Rifle Ass'n of Am., 606 F.2d 1251, 1253 (D.C. Cir. 1979).

Where the Court must consider "matters outside the pleading[s]" to reach its conclusion, which is necessary in deciding the pending Motion addressing USMS's claim that Plaintiffs cannot sue under Section 501 of the Rehabilitation Act, a Rule 12(c) motion must be treated, and will be so treated herein, as a motion for summary judgment under Rule 56. See Yates v. District of Columbia, 324 F.3d 724, 725 (D.C. Cir. 2003). Pursuant to Rule 56, summary judgment should be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits or declarations, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c). Material facts are those that "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).

The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The nonmoving party then must "go beyond the pleadings and by [its] own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324. "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." Bias v. Advantage Intern., Inc., 905

F.2d 1558, 1561 (D.C. Cir. 1990).  It must provide "evidence that would permit a reasonable [fact-finder] to find" in its favor. Laningham v. U.S. Navy, 813 F.2d 1236, 1242 (D.C. Cir. 1987).

In deciding a motion for summary judgment, a "court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000); see also Washington Post Co. v. U.S. Dep't of Health and Human Servs., 865 F.2d 320, 325 (D.C. Cir. 1989).  Ultimately, a court must determine "whether the evidence . . . is so one-sided that one party must prevail as a matter of law."  Anderson, 477 U.S. at 251-52.

## III. ANALYSIS

In the instant Motion, USMS seeks three rulings from the Court: first, that Plaintiffs are barred, as a matter of law, from pursuing claims under Section 501 of the Rehabilitation Act ("Section 501"); second, that even if some Plaintiffs may proceed under Section 501, the claims of forty-nine Plaintiffs must be dismissed for failure to exhaust their administrative remedies; and, third, that the claims of eight Plaintiffs must be dismissed under the doctrines of res judicata and claim splitting.[9]  See

_____

[9]  As explained in detail below, the Court finds in USMS's favor on the exhaustion issue and grants judgment on the pleadings as to the Section 501 claims of seven of these eight individuals on that ground.  As to the eighth, Walter E. Lamb, Plaintiffs concede that his claim must be dismissed under the doctrine of res

Def.'s Mot. at 1-2.

**A.    Plaintiffs Are Not Precluded from Suing USMS Under Section 501 of the Rehabilitation Act Because USMS Retains Sufficient Control Over the Terms and Conditions of the CSOs' Employment to Qualify as Their Joint Employer**

USMS argues that Plaintiffs' claims under Section 501 fail as a matter of law because that section "only applies to alleged discrimination in federal employment . . . [but] Plaintiffs were not federal employees." Def.'s Mot. at 4-5. While Plaintiffs do not dispute that the contractors alone were their primary employers, they nevertheless argue that USMS was their "joint employer" and is liable to them under Section 501 on that basis.

Section 501 only protects individuals who are employed by the federal government against disability discrimination. See 29 U.S.C. § 791. By contrast, it is Section 504 of the Rehabilitation Act ("Section 504") which protects individuals who are employed by private employers that receive federal grants or participate in federal programs against disability discrimination. Among the differences between the two sections is the relief available to plaintiffs: whereas Section 501 permits awards of monetary damages against the federal government, Section 504 authorizes only injunctive and declaratory relief against private employers. See 29 U.S.C. § 794a. In this lawsuit, Plaintiffs have stated claims

---

judicata. See Pls.' Opp'n at 55. Accordingly the Court need not address Defendants' res judicata or claim splitting arguments.

against USMS under both Sections.  See Pls.' Opp'n at 3.  Their Section 501 claims may proceed, however, only if they can establish that USMS was their "joint employer."

Two entities may employ the same workforce as joint employers if they "'share or co-determine those matters governing essential terms and conditions of employment.'" Dunkin' Donuts Mid-Atlantic Distribution Center, Inc. v. NLRB, 363 F.3d 437, 440 (D.C. Cir. 2004) (quoting NLRB v. Browning-Ferris Indus., 691 F.2d 1117 (3d Cir. 1982)).

Federal courts generally apply one of two tests to determine whether joint employment exists.  See Redd v. Summers, 232 F.3d 933 (D.C. Cir. 2000).  The first, commonly called the "hybrid test," is known in this Circuit as the "Spirides test," referring to the case in which it was first used.  See Spirides v. Reinhardt, 613 F.2d 826 (D.C. Cir. 1979).  Originally designed to distinguish independent contractors from employees, the Spirides test requires a court to balance eleven factors to determine whether a putative employer possesses the "right to control the 'means and manner' of the worker's performance." Id. at 831.

The second test, which our Court of Appeals has suggested is better suited for analyzing joint employment issues in Rehabilitation Act cases, is commonly described as the "joint employment test." See Redd, 232 F.3d at 938.  It asks "whether 'one employer[,] while contracting in good faith with an otherwise

15

independent company, has retained for itself sufficient control of
the terms and conditions of employment of the employees who are
employed by the other employer.'"   Id. (quoting Browning-Ferris
Indus., 691 F.2d at 1123).   Because our Court of Appeals has
indicated its preference for the joint employment test in
Rehabilitation Act cases, and because the parties agree that it is
the most appropriate standard, that test will govern the Court's
analysis.   See Opp'n at 7.

The Supreme Court has explained that the existence of joint-
employment relationships is "essentially a factual issue." Boire
v. Greyhound Corp., 376 U.S. 473, 481 (1964).   Accordingly,
answering the ultimate legal question—whether USMS retained
"sufficient control of the terms and conditions" of the CSOs'
employment to qualify as their joint employer—requires an analysis
of the precise nature and dynamics of the relationship between
USMS, the contractors, and the CSOs.

USMS highlights several facts that at least one court has held
militate against a joint employment relationship.   See Wilson et
al. v. MVM Inc. et al., 2004 WL 765103 (E.D. Pa. 2004).   It
explains that the contractors, and only the contractors, can make
certain critically important employment decisions, including
"hir[ing] the CSOs, determin[ing] their hourly wages, pay[ing]
those wages, deduct[ing] taxes, determin[ing] and provid[ing] any
benefits . . . [and] decid[ing] whether a CSO should be

16

terminated." Def.'s Mot. at 7. Furthermore, much of the day-to-day supervision of individual CSOs falls to employees of the contractors. Id.

Even in light of these undisputed facts, however, there can be no question that USMS retains significant control over the "'essential terms and conditions of [the CSOs'] employment.'" Dunkin' Donuts Mid-Atlantic Distribution Center, 363 F.3d at 440 (internal citation and quotation omitted). USMS sets the medical, physical, and weapons proficiency standards CSOs must meet. See Twelfth Circuit Contract §§ C-6 - C-11. Representatives from USMS participate on selection panels that interview prospective CSOs. See Pls.' Opp'n at 10. After the contractors have completed initial investigations, USMS performs extensive background checks on all CSO candidates. See Twelfth Circuit Contract § C-25(b). Once a CSO is hired, USMS conducts the bulk of his training, including a residential training program that lasts two to three days. See id. § C-23(b). USMS establishes the orders delineating the duties CSOs assigned to particular posts must perform. See id. § C-5(d).

USMS sets out thirty-nine very specific performance standards governing the CSOs. See id. § C-13. These require CSOs, inter alia, to "perform assignments in accordance with the prescribed regulations," "abide by all ethical standards of the Department of Justice regarding conflict of interest, outside activities, gifts

and use of federal property," and "report violations of prescribed rules, regulations, and any violation of statute or law to appropriate supervisor and/or management officials." Id. They prohibit CSOs, inter alia, from "[participating in] discussions concerning duty assignment, particularly manpower, weapons, security precautions, or procedures," "delay[ing] or refus[ing] to carry out a proper order of a supervisor or other official having responsibility from your work," and "[engaging in] any activity which would adversely affect the reputation of the U.S. Courts, Department of Justice, or the USMS." Id. Any violation of USMS's performance standards constitutes grounds for disciplinary action or removal from the judicial security contract. See id. § C-13(b)(2).

While much of the day-to-day supervision of CSOs falls to agents of the contractors, USMS retains virtually exclusive control over what work CSOs must perform, the time, place, and manner in which it must be performed, and the number of individuals performing it at any given time. USMS can alter the daily assignments of CSOs, requiring the contractors to shift personnel from one duty station to another or assign them to special projects. See id. § C-14(a).[10] It can require the contractors to assign CSOs to overtime duty and provide additional personnel for

_____

[10] The contractors will decide which individual CSO will, for example, perform overtime or shift duty stations; but always subject to the requirements of USMS.

18

particular periods of time.  See id. § C-14(c).  In cases of emergency, moreover, USMS reserves the right to place individual CSOs under its direct control.  See id.; see generally Fromm v. MVM et al., CV-04-1315, Mem. Op. at 24-25 (M.D. Pa. Dec. 14, 2004).

Perhaps most importantly, USMS retains the power to decide, "on a case-by-case basis," whether any particular CSO can be removed from the contract for failure to meet the qualifications it sets for the job.  See Twelfth Circuit Contract § H-3(b).

Defendant argues that the disqualification of an individual CSO simply prevents her from continuing to work under the contract in that capacity, but does not compel the contractors to terminate her employment entirely.  See Def.'s Mot. at 9.  While USMS is technically correct, the record suggests that, as a practical matter, disqualification from serving as a CSO will lead in most cases to outright termination by the contractor.  Unlike the vast majority of government contracts, in which private companies provide administrative or technical services that support the core mission performed by government personnel, this is the rare case where contract workers actually perform the critical mission themselves, namely "provid[ing] for the complete safety and security of judges, court personnel, jurors, witnesses, defendants, federal property, and the public."  Twelfth Circuit Contract C-5(d)(1).  The individuals hired to perform those duties are rarely, if ever, qualified to assume other roles, such as a secretarial or

support job at the contractor's headquarters.  Accordingly, once a CSO is disqualified from serving under a judicial security contract, it is highly unlikely that a contractor will keep that person in its employ.  The fact that all fifty-four Plaintiffs were terminated upon being removed from the judicial security contract under which they worked reflects this reality.

The legal issue presented here, whether USMS is the joint employer of the CSOs, is not without difficulty.  After weighing all the elements of the employer-employee relationship, however, the Court concludes, along with four of the five other courts that have considered this issue, that for purposes of the Rehabilitation Act, the judicial security contracts give USMS sufficient control over the terms and conditions of CSOs' employment to qualify as their joint employer.  See Fromm, CV-04-1315, (M.D. Pa. Dec. 14, 2004); McMullin v. Ashcroft, 337 F. Supp. 2d 1281 (D. Wyo. 2004); Walton v. USMS, No. 03-1460, Mem. Op. (N.D. Ca. Jan. 15, 2004); Strolberg et al. v. Akal et al., 03-04, Mem. Op. (D. Id. Jan. 19, 2006).[11]

Even though the contractors are the primary employers of the CSOs, paying their salaries and providing their benefits, USMS has

_____

[11]  The Court notes that the majority of cases USMS cites for support concern employees working under government contracts other than judicial security contracts.  See Def.s' Mot. at 12-17.  Given the fact-intensive nature of the joint employment issue, the Court finds the specific cases relied upon, all of which concern judicial security contracts, to be far more appropriate in deciding this Motion.

"retained for itself sufficient control of the terms and conditions of employment" to qualify as their joint employer.  Redd, 232 F.3d at 938.  USMS determines exactly what jobs CSOs are to perform, how those jobs should be performed, the qualifications for serving as a CSO, and whether individual CSOs meet those qualifications.[12]  USMS trains CSOs and periodically reviews their eligibility.  It determines the daily duties of CSOs and retains the power to assign different tasks.  It supplies the essential equipment for the job, including firearms, ammunition, handcuffs, "pepper" spray, and radios.  Finally, it makes the ultimate decision to remove a particular CSO, or a group of CSOs, from continuing to function under the contract in the role for which they were originally hired.[13]  In sum, while USMS plays only an indirect role in the day-to-day, "hands-on," supervision of individual CSOs, it exercises

---

[12]  The contracts do not expressly give USMS the right to interview prospective CSOs or select particular individuals from the applicant pool.  Nevertheless, Plaintiffs contend that a USMS representative routinely sits on the panels that interview CSO candidates.  See Opp'n at 10.  The Government does not deny this fact and at least one court has found that USMS officials have participated on CSO selection panels and that USMS and the contractors "come to a consensus" about which candidates to hire.  See McMullin, 312 F.3d at 1218.

[13]  As explained above, it is also notable that many CSOs serve in the same capacity, in the same courthouse, under a succession of different contractors.  See, e.g., Pls.' Opp'n Ex. 4, Sirjane Dep. at 25; Ex. 6, Simmons Dep. at 20-21; Ex. 7, Barkley Dep. at 27-31; Ex. 14, Shaffer Dep. at 27; see also Strolberg, O3-04, Mem. Op. at 13 (D. Id. Jan. 19, 2006).  For these individuals, it was USMS, and not the particular contractor for whom they worked at any given time, that provided the most consistent supervisory presence during their tenure as CSOs.

significant control over the terms and conditions under which those CSOs actually work.

Accordingly, on these facts and in the current procedural posture, the Court cannot find that Plaintiffs' claims under Section 501 fail as a matter of law.  To hold otherwise would, as one court has stated, allow the government to "structure its contracting relations so that . . . it can have its cake and eat it too" — by retaining significant control over the employment relationship between the contractors and the CSOs while disclaiming any liability that might arise out of that relationship. Strolberg, O3-04, Mem. Op. at 13 (D. Id. Jan. 19, 2006).

B.   **Defendant Is Entitled to Judgment on the Pleadings on the Section 501 Claims of Forty Nine Plaintiffs Who Failed to Exhaust Their Administrative Remedies**

Having found that Plaintiffs are not precluded, as a matter of law, from asserting Section 501 claims against USMS, the Court must now address USMS's argument that it is entitled to judgment on the pleadings on the claims of forty-nine Plaintiffs who failed to exhaust the administrative remedies available under the Rehabilitation Act.  See Def.'s Mot. at 26.

There is no dispute that of the fifty-four Plaintiffs, only fifteen exhausted their administrative remedies.  There is also no dispute that ten of these fifteen individuals failed to initiate the administrative complaint process within the statutory

22

deadline.[14]  Nevertheless, Plaintiffs claim that these forty-nine

individuals' failure to exhaust, or to do so in a timely fashion,

should be excused on one of two grounds.[15]  First, they argue that

because some Plaintiffs properly exhausted their administrative

remedies, the claims of those who did not should be deemed

vicariously exhausted.  See Pls.' Opp'n at 53-54; Pls.' Supp. Br.

at 2-3.  Second, Plaintiffs allege that USMS engaged in affirmative

misconduct that prevented them from exhausting their administrative

remedies and therefore should be equitably estopped from asserting

an exhaustion defense.  Pls.' Supp. Br. at 10.

### 1. The forty-nine Plaintiffs who failed to exhaust their administrative remedies cannot invoke the doctrine of vicarious exhaustion

Section 501 requires an aggrieved party to exhaust the

administrative remedies available at the agency level before filing

a civil action.  See 29 U.S.C. § 794a(a)(1).  In matters

---

[14]  The Court notes that even though they had already secured
counsel to advise and represent them, several of these Plaintiffs
failed to exhaust their administrative remedies before the time for
doing so had expired.

[15]  In the opening round of briefing, Plaintiffs relied
primarily on the doctrine of futility to excuse their failure to
exhaust. See Pls.' Opp'n at 41-53.  After the instant Motion had
become ripe, however, our Court of Appeals held, in Spinelli v.
Goss, that exhaustion of administrative remedies is a
jurisdictional requirement of the Rehabilitation Act. See 446 F.3d
159, 162 (D.C. Cir. 2006).  In a Motion filed on June 1, 2006,
Plaintiffs requested leave to file an additional brief
supplementing their arguments in light of that decision. See Pls.'
Mot. for Leave to File Supp. Br. [Dkt. No. 185] at 2.  The Court
granted Plaintiffs' Motion and gave both sides an opportunity to
address the impact of Spinelli on the instant Motion.

challenging an agency's actions, "[e]xhaustion of administrative remedies is generally required before filing suit in federal court so that [an] agency may function efficiently and so that it may have an opportunity to correct its own errors, to afford the parties and the courts the benefit of its experience and expertise, and to compile a record which is adequate for judicial review." Oglesby v. Dep't of the Army, 920 F.2d 57, 61 (D.C. Cir. 1990). There are two types of exhaustion: prudential, "a judicially created doctrine" designed to preserve separation of powers in our tripartite government; and jurisdictional, a statutorily-mandated requirement "rooted in Congress' power to control the jurisdiction of the federal courts." Avocados Plus v. Veneman, 370 F.3d 1243, 1247-48 (D.C. Cir. 2004).

Determining whether exhaustion under a particular law is prudential or jurisdictional "is purely a question of statutory interpretation." Id. at 1247. While any statute creating an administrative remedy "triggers the . . . exhaustion inquiry," jurisdictional exhaustion requires "'[s]weeping and direct' statutory language indicating that there is no federal jurisdiction prior to exhaustion.'" Id. at 1248 (quoting Weinberger v. Salfi, 422 U.S. 749, 757 (1975)). Unlike prudential exhaustion, which courts may waive at their discretion, jurisdictional exhaustion is a "predicate to judicial review" that cannot be excused. Id. at 1248. Furthermore, because a jurisdictional exhaustion requirement

is "a condition to the waiver of sovereign immunity [it] must be strictly construed." <u>Irwin v. Dep't of Veterans Affairs</u>, 498 U.S. 89, 94; <u>see also</u> <u>Galvan v. Federal Prison Indus. Inc.</u>, 199 F.3d 461, 464 (D.C. Cir. 1999) (explaining that any ambiguity in a waiver of sovereign immunity "must be construed in favor of immunity").

In <u>Spinelli</u>, 446 F.3d at 162, a Central Intelligence Agency ("CIA") employee brought a Rehabilitation Act suit in federal court before filing an administrative complaint with the agency. Plaintiff claimed that any attempt to exhaust his administrative remedies would have been futile and that his failure to do so should be excused on that basis. <u>See</u> <u>id.</u> While the district court accepted that argument and denied the CIA's motion to dismiss, the Court of Appeals reversed, holding that the Rehabilitation Act mandates administrative exhaustion and that courts must therefore treat it as jurisdictional rather than prudential. <u>See</u> <u>Spinelli</u>, 446 F.3d at 162. The court explained that the statute "limits judicial review to employees 'aggrieved by the final disposition' of the their administrative 'complaint,'" <u>id.</u> (quoting 29 U.S.C. § 794a(a)(1)), and that such language makes exhaustion a jurisdictional predicate to Section 501 claims. Accordingly, because "a court 'may not read futility or other exceptions into [its] statutory exhaustion requirements,'" the court held that plaintiff's failure to exhaust his administrative remedies

compelled dismissal of his case.  Id. (quoting Booth v. Churner, 532 U.S. 731, 741 n.6 (2001)).

Conceding that Spinelli forecloses their futility argument, Plaintiffs contend that their failure to exhaust may nevertheless be excused under the doctrine of vicarious exhaustion.  See Pls.' Supp. Br. at 2.  That doctrine, which has historically been reserved for class actions arising under Title VII of the Civil Rights Act of 1964, excuses the failure of some plaintiffs to exhaust their administrative remedies so long one of their co-plaintiffs has properly exhausted a claim that is "so similar that it can fairly be said that no conciliatory purpose would be served by filing separate [administrative complaints]."  Fosters v. Gregory, 655 F.2d 1319, 1322 (D.C. Cir. 1981); see also Cook v. Boorstin, 763 F.2d 1462, 1465-66 (D.C. Cir. 1985).

To support their argument that vicarious exhaustion should apply in this case, however, Plaintiffs rely on an exceedingly narrow reading of Spinelli.  See Pls.' Opp'n at 2-8.  They contend that it precludes the futility exception only and that while "dicta in the [opinion] could be construed to touch on the issue of vicarious exhaustion," its holding "can easily be understood to include the doctrine of vicarious exhaustion."  Id. at 8.  The Court cannot agree.  What Plaintiffs dismiss as "dicta" is in fact the central holding of the case: that district courts may not exercise jurisdiction over Rehabilitation Act claims unless and

26

until there has been a "final disposition" of each plaintiff's complaint at the administrative agency level.  See Spinelli, 446 F.3d at 162.  Even though the plaintiff in Spinelli relied on the doctrine of futility to excuse his failure to exhaust, nothing in the reasoning or the language of the Court of Appeals suggests that it intended to limit its holding to the futility doctrine.

On the contrary, the Court of Appeals explains quite clearly that exhaustion is mandatory under the Rehabilitation Act and therefore that courts "'may not read futility or other exceptions into statutory exhaustion requirements.'"  Id. (internal citation and quotation omitted) (emphasis added).  Spinelli specifically recognizes that there are "other exceptions" to the statute's exhaustion requirement besides futility, on which plaintiff relied in that case, and makes all such exceptions unavailable to plaintiffs in this jurisdiction.  Plaintiffs provide no rationale for excluding vicarious exhaustion from the category of "other exceptions" precluded by Spinelli and the Court cannot conceive of one.  Accordingly, the Court finds that Spinelli does not allow Plaintiffs to invoke the doctrine of vicarious exhaustion.

### 2.   USMS is not equitably estopped from raising the exhaustion defense

In a final attempt to rescue the claims of those forty-nine individuals who failed to exhaust their administrative remedies, Plaintiffs argue that the Court should apply the doctrine of equitable estoppel to allow those claims to proceed.  See Pls.'

Supp. Br. at 11-17.  According to Plaintiffs, USMS "repeatedly made false representations regarding Plaintiffs' right to appeal" and therefore should be estopped from asserting an exhaustion defense here.  Id. at 14.

Equitable estoppel "is not, in itself either a claim or a defense.  Rather, it is a means of precluding a litigant from asserting an otherwise available claim or defense against a party who has detrimentally relied on that litigant's conduct."  ATC Petroluem, Inc. v. Sanders, 860 F.2d 1104, 1111 (D.C. Cir. 1988). In this jurisdiction, the elements of equitable estoppel are: "(1) conduct amounting to a false representation or concealment of material fact (2) made with actual or constructive knowledge of the true facts, and (3) with the intention that another person act in reliance upon it; (4) the other person's lack of knowledge and of the means of knowledge concerning the truth of the representation, (5) and his reliance upon the misrepresentation, (6) causing him to act so as to change his position prejudicially."  Cassidy v. Owen, 533 A.2d 253, 255 (D.C. 1987); see also Moore v. Blue Cross and Blue Shield of Nat. Capital Area, 70 F. Supp. 2d 9, 31 (D.D.C. 1999).

It is well-settled that courts may apply equitable estoppel against private litigants.  The Supreme Court has explained that "equitable estoppel will not lie against the Government as it lies against private litigants."  Office of Personnel Management v.

28

Richmond, 496 U.S. 421 (1999); see also United States v. Philip Morris et al., 300 F. Supp. 2d 61, 70 (D.D.C. 2004) (noting that "neither the Supreme Court nor this Circuit has ever upheld a finding of equitable estoppel against the Government"). But while the Court has so far declined to "embrace a rule that no estoppel will lie against the Government in any case," it has noted that the arguments for such a rule are "substantial." Id. at 425; see also Heckler v. Community Health Services of Crawford County, Inc., 467 U.S. 51 (1984). In particular, given the facts of this case, the Supreme Court held in Richmond that "erroneous oral and written advice given by a Government employee to a benefits claimant" cannot "give rise to estoppel against the Government." Richmond, 496 U.S. at 421.[16]

Our Court of Appeals has expressed perhaps even stronger scepticism about the application of equitable estoppel in claims involving the Government. It has held that "estoppel's application to the Government should be rigid and sparing." ATC Petroluem, Inc. 860 F.2d at 1111. Notably, given the instant facts, the D.C. Circuit has interpreted "the Supreme Court's powerful cautions against the application of the doctrine to the [G]overnment . . . as normally barring its use to undercut statutory exhaustion requirements." Rann v. Chao, 346 F.3d 192 (D.C. Cir. 2003).

---

[16]  The Richmond Court also noted that "not a single case has upheld an estoppel claim against the Government for the payment of money." Richmond, 496 U.S. at 427.

Furthermore, it has specifically held that a plaintiff cannot use equitable estoppel "to avoid the exhaustion requirement on the ground that [agency] officials erroneously advised him of the futility of pursuing his administrative remedies." Deaf Smith County Grain Processors, Inc. v. Glickman, 162 F.3d 1206, 1214 (D.C. Cir. 1998).

Applying these principles, the Court must conclude that USMS is not equitably estopped from asserting the exhaustion defense in this case. There is a clear presumption in this Circuit against invoking the doctrine against government actors in any but the most extreme circumstances. See ATC Petroluem, Inc. 860 F.2d at 1111. The specific "misconduct" Plaintiffs allege cannot overcome that presumption. They claim, first, that in response to a series of letters by Akal—in which it protested the medical disqualification of four CSOs—the agency's Chief of Judicial Security Contracts stated that the contracts provide no appeals process for CSOs who have been medically disqualified, a position with which Plaintiffs disagree. See Pls.' Opp'n at 15-16; Exs. 2, 4, 6, 7. Second, they allege that USMS failed to "provide the CSOs with any information regarding its internal E[qual] E[mployment] O[pportunity] process," as it was legally obligated to do. Id. at 18.

Plaintiffs claim that these actions constitute either negligence by USMS in discharging its duty to inform Plaintiffs of their appellate rights or "erroneous written and oral advice by a

Government employee." <u>Richmond</u>, 496 U.S. at 415-16.   Even accepting Plaintiffs' allegations as true and viewing the facts in the light most favorable to them, Plaintiffs' evidence is insufficient to support the application of equitable estoppel in this case.   While USMS's failure to inform Plaintiffs of their appellate rights is distressing and unfortunate, if true, equitable estoppel requires a showing of affirmative misconduct rather than negligence. <u>See</u> <u>Heckler</u>, 467 U.S at 59.   As to the letters from the agency's Chief of Judicial Security Contracts, moreover,[17] the Supreme Court has expressly found that the provision of erroneous information, without more, cannot give rise to an equitable estoppel claim against the Government. <u>See</u> <u>Richmond</u>, 496 U.S. at 415-16.

Given that the D.C. Circuit has held that the Rehabilitation Act makes exhaustion of administrative remedies jurisdictional, <u>see</u> <u>Spinelli</u>, 446 F.3d at 162, and that equitable estoppel may not be invoked to undercut a jurisdictional exhaustion requirement, <u>see</u> <u>Deaf Smith County Grain Processors</u>, 162 F.3d at 1214, there can be no question that the doctrine is inapplicable on these facts. Accordingly, the Court will enter judgment on the pleadings in Defendants' favor on the Section 501 claims of those forty-nine

---

[17]   The Court notes that, as USMS points out, the letters to Akal appear to address appellate rights under the judicial security contracts and not under the agency's EEO procedures. <u>See</u>, <u>e.g.</u>, Pls.' Opp'n, Ex. 2.

Plaintiffs who failed to timely exhaust their administrative remedies.[18]  Four individual CSOs—Frank Brigance, Harvey Simmons, Roberto LeBron, and Frank Shaffer—may proceed on claims against USMS under Section 501 of the Rehabilitation Act.[19]

## V.   CONCLUSION

For the foregoing reasons, Defendant's Motion for Judgment on the Pleadings is **granted in part and denied in part**.

An Order will accompany this Memorandum Opinion.


September 11, 2006

/s/ _____

GLADYS KESSLER

---

[18]   They are: Ann J. Barkley; Donald Durham; James E. Lane; Keith Morris; Carl Akins; Thomas A. Alexander; Donald H. Allen; David A. Arriola; Vernon Broad; Frank Browder, Jr.; William J. Burge; Jimmy D. Burrow; Albert J. Busam; Clarence Bynum; Michael L. Campbell; Lawerence K. Churm; Harlen D. Coy; Byron G. Dahlen; Philip I. Elder; Robert Farnsworth; Gilmer S. Forbis; Ruben V. Gonzales; William F. Guthrie; John Hansen; Frank Hruza; Robert Hubbard; Donald W. Johnson; Don E. Kemp; James D. Kimbrel; William P. Lambright; Monty L. Laughlin; Stephen F. McDonald; Chester L. McKune; Jack C. Morehead; Dallas K. Murphy; Miller Pearson; James Ralph; Robert Rarick; Ronald F. Ray; Willie Rich; Harvey Robideaux; Felipe Jorge-Rodriguez; Thomas J. Roy; John B. Scott; Rhys Sirjane; Brian J. Smith; Donald Smith; Fred A. Thatcher; and Roberto Torrez.

[19]   Plaintiffs have conceded that one individual who did properly exhaust his administrative remedies, Walter E. Lamb, is nevertheless barred from maintaining his Rehabilitation Act claim in this case because he litigated that claim to a judgment on the merits in the case of Strolberg v. Akal et al., No. 03-04, Mem. Op. at 13 (D. Idaho Jan. 19, 2005).  See Pls.' Opp'n at 55.  The doctrine of res judicata therefore applies to Lamb's claim and requires dismissal of his claim.

UNITED STATES DISTRICT JUDGE

**Copies to**: attorneys on record via ECF