# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **INTERNATIONAL UNION, UNITED** | ) | Case No.: 1:02CV01484 |
| **GOVERNMENT SECURITY OFFICERS** | ) | |
| **OF AMERICA**, | ) | Judge Gladys Kessler |
| | ) | |
| and | ) | |
| | ) | |
| **ANN J. BARKLEY** | ) | |
| 6408 Elliot Pl. | ) | |
| Hyattesville, Maryland   20783 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| **KEITH MORRIS** | ) | |
| 13320 Co. Rd. 124 W. | ) | |
| Odessa, TX 79762-8943 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| **FRANK BRIGANCE** | ) | |
| 1147 Winfield Forest Drive | ) | |
| Tallahassee, FL 32317 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| **DONALD DURHAM** | ) | |
| 630 Trace Drive | ) | |
| Wilmington, NC 28411 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| **JAMES E. LANE** | ) | |
| 5216 NW 58th Terrace | ) | |
| Kansas City, Missouri   64151 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| **HARVEY SIMMONS** | ) | |
| 100 War Path Trail | ) | |
| Gulf Port, MS 39503 | ) | |
| | ) | |
| and | ) | |

**CARL AKINS**                          )
P.O. Box 506                            )
Kiefer, Oklahoma 74041                  )
                                        )
and                                     )
                                        )
**THOMAS A. ALEXANDER**                 )
2538 E. 48th St. North                  )
Tulsa, Oklahoma   74130                 )
                                        )
and                                     )
                                        )
**DONALD H. ALLEN**                     )
1333 Gilmore Trail                      )
Fairbanks, Alaska   99712               )
                                        )
and                                     )
                                        )
**DAVID A. ARRIOLA**                    )
3466 W. 97th Avenue                     )
No. 58D                                 )
Westminster, CO 80031                   )
                                        )
and                                     )
                                        )
**VERNON BROAD**                        )
45558 Awapapa Place                     )
Kaneoe, HI 96744                        )
                                        )
and                                     )
                                        )
**FRANK BROWDER, JR.**                  )
9263 High Point Road                    )
Baton Rouge, Louisiana   70810          )
                                        )
and                                     )
                                        )
**WILLIAM J. BURGE**                    )
372 Washington Ave.                     )
Jermyn, Pennsylvania   18433            )
                                        )
and                                     )
                                        )
**ALBERT J. BUSAM**                     )

52 Saville Row #1405     )
Cincinnati, Ohio 45246    )
                )
and              )
                )
**CLARENCE BYNUM**      )
8931 Town Center Cindz     )
Upper Marlboro, Maryland 20774  )
                )
and              )
                )
**MICHAEL L. CAMPBELL**    )
P.O. Box 304        )
Marfa, Texas 79843     )
                )
and              )
                )
**LAWERENCE K. CHURM**    )
R.R. 1 Box 102 D       )
Montrose, Pennsylvania 18801   )
                )
and              )
                )
**HARLEN D. COY**      )
784 Covent Court       )
Vandalia, Ohio 45377     )
                )
and              )
                )
**BYRON G. DAHLEN**     )
3307 Vandiver Drive      )
Marietta, Georgia 30066    )
                )
and              )
                )
**PHILIP I. ELDER**      )
481 Daroca Ave.       )
Long Beach, California 90803   )
                )
and              )
                )
**ROBERT FARNSWORTH**    )
9672 Allegheny Drive      )
Sacito, California 95827     )
                )

and                                                      )
                                                         )
**GILMER S. FORBIS**                                     )
527 Vista Drive                                          )
Fayetteville, North Carolina                             )
                                                         )
and                                                      )
                                                         )
**RUBEN V. GONZALES**                                    )
1923 Iowa                                                )
Pecos, Texas   79772                                     )
                                                         )
and                                                      )
                                                         )
**WILLIAM F. GUTHRIE**                                   )
1551 Orchard Road                                        )
Gardnerville, Nevada   89410                             )
                                                         )
and                                                      )
                                                         )
**JOHN HANSEN**                                          )
709 West 9th Street                                      )
Juneau, AK 99801                                         )
                                                         )
and                                                      )
                                                         )
**FRANK HRUZA**                                          )
7652 Painted Dunes Drive                                 )
Las Vegas, NV 89149                                      )
                                                         )
and                                                      )
                                                         )
**ROBERT HUBBARD**                                       )
240 Hunters Lane                                         )
Gladys, VA 24554                                         )
                                                         )
and                                                      )
                                                         )
**DONALD W. JOHNSON**                                    )
2021 Kilburn Avenue                                      )
Rockford, Illinois   61101                               )
                                                         )
and                                                      )
                                                         )
**FELIPE JORGE-RODRIGUEZ**                               )

URB. Bayamon Gardens )
Jackeline Street, KK-12 )
Bayamon, PR 00957 )
)
and )
)
**DON E. KEMP** )
8489 Hwy. 4 )
Winnsboro, Louisiana   71295 )
)
and )
)
**JAMES D. KIMBREL** )
19000 W. 58th Avenue )
Golden, Colorado   80403 )
)
and )
)
**WALTER E. LAMB** )
30392 Moonlight Court )
Temecula, California   92591 )
)
and )
)
**WILLIAM P. LAMBRIGHT** )
2013 Bedford Place )
Bossier City, LA 7111 )
)
and )
)
**MONTY L. LAUGHLIN** )
3617 53rd Street, N.W. )
Gig Harbor, Washington   98335 )
)
and )
)
**ROBERTO LEBRON** )
HC-01 Box 2715 )
Loiza, PR  00772 )
)
and )
)
**STEPHEN F. McDONALD** )
12515 145th Street, E. )
Puyallup, Washington   98374 )

|   |   |
|---|---|
| | ) |
| and | ) |
| | ) |
| **CHESTER L. McKUNE** | ) |
| 416 The Bluff Drive | ) |
| Modesto, CA 95355 | ) |
| | ) |
| and | ) |
| | ) |
| **JACK C. MOREHEAD** | ) |
| 604 Holly Avenue | ) |
| Oxnard, CA 93036 | ) |
| | ) |
| and | ) |
| | ) |
| **DALLAS K. MURPHY** | ) |
| 2741 Harper Street | ) |
| Lawrence, Kansas 66046 | ) |
| | ) |
| and | ) |
| | ) |
| **MILLER PEARSON** | ) |
| 1117 N. Grand Avenue | ) |
| St. Louis, MO 63106 | ) |
| | ) |
| and | ) |
| | ) |
| **JAMES RALPH** | ) |
| 5002 South LeClaire | ) |
| Chicago, IL 60638 | ) |
| | ) |
| and | ) |
| | ) |
| **ROBERT RARICK** | ) |
| 16121 Old Settlement Lane | ) |
| Zachary, LA 79925 | ) |
| | ) |
| and | ) |
| | ) |
| **RONALD F. RAY** | ) |
| 101 Rohrer Drive, #109 | ) |
| Tipp City, OH 45371 | ) |
| | ) |
| and | ) |
| | ) |

**WILLIE RICH**                                )
1837 Messinger Trail                           )
Bossier City, LA 71111                         )
                                               )
and                                            )
                                               )
**HARVEY ROBIDEAUX**                           )
147 Wright Road                                )
West Monroe, LA 71292                          )
                                               )
and                                            )
                                               )
**THOMAS J. ROY**                              )
5424 Paul Kurtz Way, #106                      )
Las Vegas, NV 89108                            )
                                               )
and                                            )
                                               )
**JOHN B. SCOTT**                              )
402 N. Bonham Drive                            )
Allen, TX 75813                                )
                                               )
and                                            )
                                               )
**FRANK SHAFFER**                              )
4815 White Pine Way                            )
North Ridgeville, OH 44039                     )
                                               )
and                                            )
                                               )
**RHYS SIRJANE**                               )
790 Ledge Road                                 )
Medina, OH 44256                               )
                                               )
and                                            )
                                               )
**BRIAN J. SMITH**                             )
1925 E. 11th Avenue                            )
Spokane, WA 99202                              )
                                               )
and                                            )
                                               )
**DONALD SMITH**                               )
180 Reliance Drive                             )
Wilkes-Barre, PA 18702                         )

)
and )
 )
**FRED A. THATCHER** )
9372 Nevins Way )
Orangevale, CA 95662 )
 )
and )
 )
**ROBERTO TORREZ** )
8916 Moye Drive )
El Paso, TX 79925 )
 )
and )
 )
**JOHN BROWN** )
202 E. Oxford Street )
Coopersburg, PA 18036 )
 )
and )
 )
**THOMAS BRANIGAN** )
4147 Farmdale Road )
Philadelphia, PA 19154 )
 )
and )
 )
**PETER CHURCHILL** )
135 N. 123rd Street )
Wausatosa, WI 53226 )
 )
and )
 )
**GEORGE ELLENBERGER** )
8113 W. Ohio Avenue )
Milwaukee, WI 53219 )
 )
and )
 )
**DARRELL GUILLORY** )
2911 Ellbee Drive )
Alexandria, LA 71301 )
 )
and )
 )

**DUANE HALVORSON**                     )
141 Riverview 6 West                    )
Great Falls, MT  59404                  )
                                        )
and                                     )
                                        )
**JEFFREY WAYNE HOWARD**                )
405 Persimmon Tree Road                 )
Farmville, VA  23901                    )
                                        )
and                                     )
                                        )
**LAWRENCE P. KARNES**                  )
51 W. St. Mary's Road                   )
Hanover Twp., PA  18706                 )
                                        )
and                                     )
                                        )
**GLENN PADGETT**                       )
3612 Greenfield Drive                   )
New Albany, IN  47150                   )
                                        )
and                                     )
                                        )
**RICHARD SCHABER**                     )
3211 North Park Boulevard               )
Spokane, Washington  99205              )
                                        )
and                                     )
                                        )
**ERNESTINE STARKEY**                   )
7107 Cipriano Springs Drive             )
Lanham, MD  20706                       )
                                        )
and                                     )
                                        )
**CARMAN J. ZENTNER**                   )
18831 132nd Place, S.E.                 )
Renton, WA 98058                        )
                                        )
and                                     )
                                        )
**JOHN DOE**                            )
                                        )
and                                     )

|                                                      |     |
| ---------------------------------------------------- | --- |
| **JANE DOE**                                         | )   |
|                                                      | )   |
| Plaintiffs,                                          | )   |
|                                                      | )   |
| v.                                                   | )   |
|                                                      | )   |
| **JOHN CLARK, DIRECTOR OF THE**                      | )   |
| **UNITED STATES MARSHALS SERVICE**                   | )   |
| **(In his Official Capacity)**                       | )   |
|                                                      | )   |
| and                                                  | )   |
|                                                      | )   |
| **AKAL SECURITY, INC.**                              | )   |
| 7 Infinity Loop                                      | )   |
| Espanola, NM 87532                                   | )   |
|                                                      | )   |
| and                                                  | )   |
|                                                      | )   |
| **MVM, INC.**                                        | )   |
| 1593 Spring Hill Road                                | )   |
| Suite 700                                            | )   |
| Vienna, VA 22182                                     | )   |
|                                                      | )   |
| and                                                  | )   |
|                                                      | )   |
| **ARES GROUP INCORPORATED**                          | )   |
| 8625-C Engleside Office Park                         | )   |
| Alexandria, VA                                       | )   |
|                                                      | )   |
| Defendants.                                          | )   |

## <u>PLAINTIFF'S FIFTH AMENDED COMPLAINT</u>

## I. <u>INTRODUCTION</u>

Plaintiff, the International Union, United Government Security Officers of America

("UGSOA"), on behalf of its bargaining unit members, and the individual Plaintiffs listed above

bring this Fourth Amended Complaint against Defendant John Clark, Director of the United

States Marshals Service ("USMS") for violations of due process guaranteed under the Fifth

Amendment to the United States Constitution that arose when the USMS summarily terminated

UGOSA's members without due process for failing to meet certain medical and physical

standards.  Plaintiff UGSOA and the individual Plaintiff Court Security Officers ("CSO") seek

declaratory and injunctive relief under this claim.

The individual Plaintiff  CSOs listed above hereby bring claims against Defendants

USMS, Akal Security, Inc. ("Akal"), MVM Security Services, Inc. ("MVM") and Ares Group

Incorporated ("AGI") alleging violations of their civil rights guaranteed by the Rehabilitation Act

of 1973 and the Americans with Disabilities Act.  The individual Plaintiff CSOs seek to certify a

class of CSOs terminated under similar conditions to prosecute the disability discrimination

claims.  The individual Plaintiffs are seeking injunctive and declaratory relief, as well as

compensatory damages.

## II.  JURISDICTION

1.      This is a civil action arising under the Constitution of the United States of

America  and is brought pursuant to the Fifth Amendment to the United States Constitution.

Jurisdiction is proper in this Court pursuant to 28 U.S.C. §§1331, 1343 and 1367.

2.      This civil action is also brought under the Americans with Disabilities Act, 42

U.S.C. § 12101 *et seq.*, and the Rehabilitation Act of 1973, 29 U.S.C. § 791 *et seq.*  This Court

has jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 & 1343.

3.      Venue is appropriate in this Court pursuant to 28 U.S.C. §1391(e).

## III.  PARTIES

4.      Plaintiff UGSOA is a labor organization serving as exclusive representative for

private-sector security officers and guards throughout the United States, including Court Security

Officers ("CSOs") and Special Security Officers ("SSOs")working in the District Courts of the

United States and contracted to the Federal Judicial Court System through private security companies.[1]  The UGSOA brings this action by and on behalf of its membership and those making up the UGSOA bargaining unit consisting of CSOs.  UGSOA has associational standing to bring this action on behalf of its affected members.

5.      The individual Plaintiffs are: (1) Carl Akins from Kiefer, Oklahoma; (2) Donald Allen from Fairbanks, Alaska; (3) Thomas Alexander from Tulsa, Oklahoma; (4) David A. Arriola from Westminster, Colorado; (5) Ann Barkley from Hyatteville, Maryland; (6) Thomas Branigan from Philadelphia, Pennsylvania; (7) Franklin Brigance from Tallahassee, Florida; (8) Vernon Broad from Kaneoe, Hawaii, (9) Frank Browder from Baton Rouge, Louisiana; (10) John Brown from Coopersburg, Pennsylvania; (11) William J. Burge from Jermyn, Pennslyvania; (12) Albert Busam from Cincinnati, Ohio; (13) Clarence Bynum from Upper Marlboro, Maryland; (14) Michael Campbell from Marfa, Texas; (15) Peter Churchill from Wauwatosa, Wisconsin; (16) Lawrence Churm from Montrose, Pennsylvania; (17) Harlen Coy from Dayton, Ohio; (18) Byron Glenn Dahlen from Marietta, Georgia; (19) Donald Durham from Wilmington, North Carolina; (20) Philip Elder from Long Beach, California; (21) George Ellenberger from Milwaukee, Wisconsin;  (22) Robert Farnsworth from Sacito, California; (23) Gilmer Forbis from Fayetteville, North Carolina; (24) Ruben Gonzales from Pecos, Texas; (25) Darrell Guillory

---

[1] In or about July 2003, the USMS changed the title of the Plaintiff UGSOA's bargaining unit members working in Twelfth Circuit buildings other than the District Court building from Court Security Officers ("CSO") to Special Security Officers ("SSO").  The SSOs work under the same Judicial Security Contract as the CSOs and perform the same duties, only in such buildings as the District of Columbia Superior Courthouse, the National Court building which houses the Federal Circuit Court and the Federal Court of Claims, and the National Tax Court building.  At the time this case was filed, all UGSOA members working under Judicial Security Contracts were titled CSOs.  For the purposes of this Complaint and this case, Plaintiffs will refer to all UGSOA members working under Judicial Security Contracts as CSOs, despite the fact that the USMS may have changed some titles in the course of this litigation.

from Alexandria, Louisiana; (26) William Guthrie from Gardnerville, Nevada; (27) Duane

Halvorson from Great Falls, Montana; (28) John Hansen from Juneau, Alaska; (29) Jeffrey

Howard from Farmville, Virginia; (30) Frank Hruza from Las Vegas, Nevada; (31) Robert

Hubbard from Gladys, Virginia; (32) Donald Johnson from Rockford, Illinios; (33) Lawrence

Karnes from Hanover Township, Pennsylvania; (34) Don E. Kemp from Winnsboro, Louisiana;

(35) James Kimbrel from Golden, Colorado; (36) Walter Lamb from Temecula, California; (37)

William Lambright from Bossier City, Louisiana; (38) James Lane from Kansas City, Missouri;

(39) Monty Laughlin from Gig Harbor, Washington; (40) Roberto Lebron from Loiza, Puerto

Rico; (41) Stephen McDonald from Puyallup, Washington; (42) Chester McKune from Modesto,

California; (43) Jack Morehead from Oxnard, California; (44) Keith Morris from Odessa, Texas;

(45) Dallas Murphy from Lawrence, Kansas; (46) Glenn Padgett from New Albany, Indiana; (47)

Miller Pearson from St. Louis, Missouri; (48) James Ralph from Chicago, Illinois; (49) Robert

Rarick from Zachary, Louisiana; (50) Ronald Ray from Tipp City, Ohio; (51) Willie Rich from

Bossier City, Louisiana; (52) Harvey Robideaux from West Monroe, Louisiana; (53) Felipe

Jorge-Rodriguez from Bayamon, Puerto Rico; (54) Thomas Roy from Las Vegas, Nevada; (55)

John Scott from Allen Texas; (56) Richard Schaber from Spokane, Washington; (57)  Frank

Shaffer from North Ridgeville, Ohio; (58) Harvey Simmons from Gulf Port, Mississippi; (59)

Rhys Sirjane from Medina, Ohio; (60) Brian Smith from Spokane, Washington; (61) Donald

Smith from Wilkes-Barre, Pennsylvania; (62) Ernestine Starkey from Lanham, Maryland; (63)

Fred Thatcher from Orangevale, California, (64) Roberto Torrez from El Paso, Texas; (65)

Carman Zentner from Seattle, Washington.  All individual Plaintiffs were employed as CSOs in

federal courthouses in which Plaintiff UGSOA served as the exclusive representative for the

CSOs.  All individual Plaintiff were employed under negotiated collective bargaining agreements

("CBAs")that provided that they could not be terminated except for cause. Each was terminated after the USMS rescinded their credentials and ordered they be removed from working on the judicial security contract based on the USMS finding that they failed the new USMS medical/physical exam. Each was adversely affected because the USMS deprived them of their property, their employment, without providing any due process either prior or subsequent to said termination. All were terminated based on either actual or perceived medical disabilities without consideration of whether they could perform the essential functions of their job with or without reasonable accommodation.

6.      Plaintiffs John Doe and Jane Doe are as yet unidentified CSOs who have been or will be terminated from their positions as CSOs due to medical disqualification because they failed to pass the new USMS medical/physical standards. Their claims are essentially the same as the individual Plaintiffs named herein. Specifically, each was terminated after the USMS rescinded their credentials and ordered they be removed from working on the judicial security contract based on the USMS finding that they failed the new USMS medical/physical exam, each was adversely affected because the USMS deprived them of their property, their employment, without providing any due process either prior or subsequent to said termination and all were terminated based on either actual or perceived medical disabilities without consideration of whether they could perform the essential functions of their job with or without reasonable accommodation.

7.      Defendant Clark is the Director of the Unites States Marshals Service ("USMS") which is vested with the authority to protect the Federal courts. Defendant Clark is sued in his official capacity as the Director of the USMS. The USMS is an executive-branch federal agency operating under the United States Department of Justice which contracted with Defendants Akal,

MVM, and AGI to provide judicial security to the federal courthouses.

8.      Defendant Akal Security, Inc., a New Mexico corporation doing business in the District of Columbia, was the direct employer of several of the above-listed CSO Plaintiffs and other Class members.  Akal is a federal contractor which contracts with the USMS Judicial Protective Services Program to provide judicial security in various federal courthouses across the country.  In those federal courthouses in which it provides judicial security and in which the CSOs are represented by Plaintiff UGSOA, Akal entered into collective bargaining agreements ("CBAs") with Plaintiff UGSOA that provided the CSO a property interest in their employment.

9.      Defendant MVM Security, Inc., a California corporation headquartered in Vienna, Virginia, does business in the District of Columbia.  Defendant MVM was the direct employer of several of the above-listed CSO Plaintiffs and other Class members.  MVM is a federal contractor which contracts with the USMS Judicial Protective Services Program to provide judicial security in various federal courthouses across the country, including the federal courthouses known as the Twelfth Circuit.  In those federal courthouses in which it provides judicial security and in which the CSOs are represented by Plaintiff UGSOA, MVM entered into collective bargaining agreements ("CBAs") with Plaintiff UGSOA that provided the CSOs a property interest in their employment.

10.     Defendant Ares Group Incorporated ("AGI"), a corporation headquartered in Alexandria, Virginia, does business in the District of Columbia.  Defendant AGI was the direct employer of several of the above-listed CSO Plaintiffs and of other Class members.  AGI is a federal contractor which contracts with the USMS Judicial Protective Services Program to provide judicial security in various federal courthouses across the country, including the federal courthouses in the Eleventh Circuit.  In those federal courthouses in which it provides judicial

security and in which the CSOs are represented by Plaintiff UGSOA, AGI entered into collective

bargaining agreements ("CBAs") with Plaintiff UGSOA that provided the CSOs a property

interest in their employment.

## IV. CLASS ACTION ALLEGATIONS

11.     Individual Plaintiffs, through proposed Class Representatives Plaintiffs Ann

Barkely, Keith Morris, Frank Brigance, Donald Durham, James Lane and Harvey Simmons

[hereinafter "Plaintiff Class Representatives"] bring Counts Two and Three as a class action

pursuant to Rules 23(a) and 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf

of themselves and a Class of CSOs in the USMS Judicial Protective Services Program who were

terminated by Defendants Akal Security, MVM and AGI [hereinafter collectively "Employers"]

after Defendant USMS medically disqualified them and ordered them removed from the judicial

security contracts.  Plaintiffs define the proposed class as follows:

> All CSOs in the USMS Judicial Security Program who worked at locations
> governed by judicial security contracts between the USMS and the Employers
> that employed the CSOs and who were terminated by the Employers from
> their position as CSOs after being medically disqualified and removed from
> the Judicial Security Contract by the USMS, ie "Class".

12.     The members of the Class are so numerous that joinder of all members is

impracticable.  At the current time, Plaintiffs believe Class members number between 200 and

300 CSOs and the number increases on a regular basis due to newly-terminated CSOs.  It is

anticipated that the number will continue to grow over the life of this suit.  The Class members

are geographically dispersed across the country, as seen with the geographical dispersion of

Plaintiffs listed in Paragraph 5.

13.     In their claims, the Plaintiff Class Representatives raise questions of law and fact

common to all Class members.  Defendant USMS implemented discriminatory policies in

violation of the Rehabilitation Act of 1973, 29 U.S.C. § 791 *et seq.* ("Rehabilitation Act"), that

applied equally to all Class members. Similarly, Defendants Akal, MVM and AGI discriminated

equally against all Class members in violation of the Americans with Disabilities Act, 42 U.S.C.

§ 12101 *et seq.* ("ADA"), when they entered into contracts that had the effect of subjecting Class

members to discriminatory practices.

14.     Plaintiff Class Representatives raise questions of law and fact common to the

Class members that include the following:

a.      Whether the USMS is a joint-employer of the CSOs for the purposes of

joint liability under Section 501 of the Rehabilitation Act;

b.      Whether Defendants Akal Security, MVM, and Ares Group are

government actors for the purposes of joint-employer liability under

Section 501 of the Rehabilitation Act;

c.      Whether Plaintiffs and the proposed Class members were adequately

performing the essential job functions of the CSO position;

d.      Whether Defendant USMS discriminated against the Plaintiffs and the

proposed Class members when it instituted a medical certification

procedure that, on its face, denied them reasonable accommodation for

their disability or perceived disability;

e.      Whether Defendants discriminated against the Plaintiffs and the proposed

Class members when they instituted a medical certification procedure by

which they terminated the Plaintiffs and proposed Class members because

of their disability or perceived disability regardless of whether the

Plaintiffs and proposed Class members were performing the essential

functions of their position;

    f.    Whether Defendants discriminated against the Plaintiffs and proposed

Class members by using qualification standards that screened out disabled

individuals in violation of the Rehabilitation Act;

    g.    Whether Defendants Akal Security, MVM, Inc., and AGI entered into

contracts with Defendant USMS that had the effect of subjecting the

Plaintiffs and proposed Class members to discrimination based on their

disability or perceived disabilities in violation of the ADA; and

    h.    Whether the Plaintiffs and proposed Class members have sustained

damage and, if so, what is the proper measure of damages.

15.    Plaintiff Class Representatives' claims are typical of the claims of the members of the Class because the Class Representatives and all of the Class members were removed from their positions as CSOs due to their failure of the USMS medical/physical exam for either hearing loss, diabetes, cardiovascular problems or vision impairment, and all are alleging they were discriminated against based on a disability or perceived disability when the USMS disqualified them medically, removed them from the Judicial Security Contract and when their Employer terminated them.

16.    The Plaintiff Class Representatives will fairly and adequately protect the interests of the Class members and have retained counsel who are experienced and competent in class action, labor, and employment litigation. The Plaintiff Class Representatives have no interest which is contrary to or in conflict with those of the members of the Class whom they seek to represent.

17.    The proposed Class can be properly certified under FED. R. CIV. P. 23(b)(2)

because the Defendants have acted on grounds generally applicable to the Class, so that final injunctive and declaratory relief is appropriate for the Class as a whole. Defendants have instituted policies and procedures which were applied to all Class members that had the effect of discriminating against the Class members based on their disabilities or perceived disabilities. Plaintiffs have sought injunctive and declaratory relief that, if granted, would result in significant changes to the manner in which Defendants treat all Class members.

18.     The proposed Class can be properly certified as a hybrid under FED. R. CIV. P. 23(b)(2) and (b)(3). In addition to significant injunctive and declaratory relief, the Class members also seek the remedy of monetary damages, which is not available as a class certified under Rule 23(b)(2). The proposed Class can be properly certified under Rule 23(b)(3); however, the Plaintiffs believe that the cohesiveness of the Class that exists for purposes of liability and injunctive and declaratory relief may diminish regarding questions of monetary relief.

19.     The proposed Class can be certified under Rule 23(b)(3) because common questions of law and fact predominate over non-common issues and because the class action is the superior method for the fair and efficient adjudication of this controversy. Common questions of law and fact predominate in this case because the common questions identified in Paragraph 13 above are dispositive of Defendants' liability towards Plaintiffs. While Plaintiffs acknowledge that claims for monetary damages will differ significantly for different Class members, such factual differences do not preclude a finding that common questions of law and fact predominate.

20.     The class action is the superior method for the fair and efficient adjudication of these issues. The individual class members do not have a significant interest in exercising

individual control over this litigation because the costs, complexity and history of this litigation indicates that the CSOs are better served by group representation than retention of individual control. The proposed class would benefit from being concentrated in this Court because this Court is familiar with the facts, issues and parties in this case, it has substantial experience in handling class actions and actions against federal agencies, and it would reduce the risk of inconsistent adjudications, which has already occurred in other cases. The proposed Class should not cause any administrative difficulties because it is not unduly large and has readily identifiable members.

## IV.  STATEMENT OF FACTS

21.      In or about 1983, the Judicial Protective Services Program was formed for the purpose of establishing a federal court security system for the United States District Courts. Since its inception, the Program has sought and employed as its primary security work force retired law enforcement officers and military personnel, due in part to the requirement that all security personnel have a minimum of three years law enforcement experience. As such, an overwhelming majority of the CSOs are retired state and local law enforcement and military personnel.

22.      The CSOs are directly employed by private security companies, including Defendants Akal, MVM, and AGI, which contract for the provision of security services in the United States Courts through the USMS Judicial Protective Services Program. Plaintiff UGSOA negotiates CBAs with the Employers that determine the terms and conditions of employment of its member CSOs.

23.      As part of the application process and annually after employment begins, CSOs are required to take a physical examination. The original physical exam was similar in scale and

scope to that given to the Deputy U.S. Marshals and consisted of three pages of medical questions.

24.     In or about 1998, the Judicial Conference, through its Securities and Facilities Committee ("Committee"), began an inquiry into the CSOs' medical standards in response to concerns regarding the CSOs' physical appearances.  In 1999, the Committee ordered the USMS to conduct a CSO job function analysis, which was ultimately conducted by the United States Public Health Service's Office of Federal Law Enforcement Medical Programs ("USPHS").

25.     After the analysis, the USPHS doctors compiled their findings, devised new medical standards and presented their findings to the Judicial Conference's Security and Facilities Committee in April 2000.  The Committee endorsed the findings and the Judicial Conference adopted the same and then requested that the USMS Judicial Protective Services Program apply the new standards.

26.     In or about January 2001 and pursuant to the mandate given to the USMS by the Judicial Conference, Marc Farmer, USMS Chief of Judicial Protective Services, implemented a new twenty-two (22) page medical/physical examination for CSOs containing new and heightened medical standards, especially as related to hearing and vision, for the annual medical/physical examination given to the CSOs.

27.     After the adoption of the new medical/physical examination, the USMS implemented the same by advising Defendants Akal and MVM that it was amending its judicial security contracts and that it would require full compliance with the new medical/physical examination as to all present and future CSOs.

28.     After the implementation of new USMS medical/physical standards, the USMS established a new procedure for the CSOs' physicals.  For their annual physicals, the CSOs were

required to go to doctors chosen by their Employers and approved by the USMS. The CSO would take the doctor's report of the examination to his or her Employer, which would forward it to Mr. Farmer's office at the USMS. In Mr. Farmer's office, Thomas Galgon collected the medical reports and forwarded them to Dr. Richard Miller's office in USPHS. Dr. Miller or another physician in his office then reviewed the medical reported and decided if the CSO was medically qualified or if more information was needed. If more information was needed, USPHS sent a form to Mr. Galgon which included a request for specific additional medical information. Mr. Galgon then transmitted the request from USPHS to the Employer, which gave the request to the CSO who was given a period of time, typically thirty (30) days, in which to gather the information. The CSO returned the responsive medical information to the Employer for it to be forwarded through the USMS to USPHS for a final determination of medical qualification or disqualification.

29.     Upon failure of the new medical/physical examination by the CSO and medical disqualification by USPHS, Defendant USMS then transmitted the USPHS disqualification form to the Employer along with a letter instructing the Employer to remove the disqualified CSO from the judicial security contract and provide a replacement within fourteen (14) days.

30.     After the Employers received notification of the results, they advised the CSO of the same and terminated the CSO's employment due to the USMS's demand that he be removed from the contract because of the USMS's medical disqualification.

31.     Pursuant to the terms and conditions of the respective UGSOA CBAs under which they work, the individual Plaintiffs are not "at will" employees, but rather can only be terminated for just cause. Each of the CBAs negotiated by Plaintiff UGSOA contained and continues to contain a "just-cause clause", providing that the its members can only be terminated

for cause or just cause. In most of the CBAs, "just cause" is defined to include, among other things, a determination by the USMS that the CSO be removed from the judicial security contract.

32. Prior to July 2002, under Section H(3) of the judicial security contracts between Defendants Akal and MVM and the USMS, the USMS could not direct Akal and MVM to remove a CSO from the contract without cause. The judicial securities contracts required the USMS to have grounds to order removal of CSOs and allowed appeals of the sufficiency of USMS's basis for ordering said removals.

33. In or around July 2002, Defendant USMS inserted a new clause into the judicial security contracts with the Employers. Under the new clause, Section H(3)(h), the appeals procedure from Section H(3) would not apply to CSOs whom Defendant USMS had ordered removed from the judicial security contract due to failing the new medical/physical exam and medical disqualification.

34. After inserting Section H(3)(h) into the judicial service contracts, the USMS failed to adopt any comprehensive and effective administrative review process whereby the disqualified CSOs could have their cases reviewed for both medical and legal errors.

<u>Disability Discrimination</u>

35. Plaintiff Ann Barkley began working as a CSO in 1997. She had suffered from a hearing loss for thirty (30) years without change. She suffered this same hearing loss while she worked as an officer with the District of Columbia Department of Corrections, from which she retired after twenty-seven (27) years. Plaintiff nonetheless performed successfully as a law enforcement officer, and specifically as a CSO, without hearing aids during her entire career. Plaintiff passed the required physical in 1997 and each year thereafter until the 2002 physical.

On or about February 5, 2003, she was terminated by Defendants USMS and MVM for her hearing loss. She was not given the opportunity to acquire hearing aids or be tested while using hearing aids.

36.     Plaintiff Keith Morris began working as a CSO in April 1995 after retiring from his position as a sergeant with the Texas Highway Patrol. Plaintiff Morris successfully performed his duty as a CSO. He passed the hearing test until 2001. In 2001, Plaintiff Morris was sent to an audiologist for the new hearing test. After the audiologist found he suffered from hearing loss, Plaintiff Morris paid $1,500 for hearing aids to correct his hearing. He wore those hearing aids at work and continued to ably perform his duties. In May 2002, Defendants USMS and Akal terminated Plaintiff Morris for failing the hearing part of the new USMS medical/physical exam when not using hearing aids. Plaintiff Morris was not given an opportunity to re-test with his hearing aids.

37.     Plaintiff Franklin Brigance began working as a CSO in June 1996. When he was eleven (11) years old, Plaintiff Brigance suffered a hearing loss in one ear. Despite his hearing loss, Plaintiff Brigance worked successfully as a Miami police officer for ten years and as a CSO and Lead CSO for eight years. In July 2004, Defendants USMS and AGI terminated Plaintiff Brigance due to his hearing loss. Plaintiff Brigance was not given an opportunity to acquire or be tested with hearing aids.

38.     Plaintiff James Lane became a CSO in November 2001 after retiring from a career as an officer with the Missouri State Highway Patrol. Plaintiff Lane had been diagnosed with Type II Diabetes in the 1980s. He informed Defendants USMS and Akal that he had diabetes when he was hired as a CSO. Plaintiff Lane worked successfully as a state highway patrol officer and successfully performed all his duties as a CSO with diabetes. He controlled his diabetes with

medication.  After the physical he took in October 2002, Plaintiff Lane was asked to provide

more information on his diabetes, which he did.  Nonetheless, Defendants USMS and Akal

terminated Plaintiff Lane in July 2003 for failing the new USMS medical/physical standards

because of his diabetes.

       39.     Plaintiff Harvey Simmons became a CSO in 1989 after he retired from his

position as a state trooper with the Mississippi state police.  Plaintiff Simmons had controlled his

diabetes with medication until January 2004, when he began taking insulin.  Plaintiff Simmons

successfully performed his duties as a CSO during his tenure.  Nonetheless, Defendants USMS

and Akal terminated Plaintiff Simmons in April 2004 for failing the new USMS medical/physical

standards because of his diabetes.

       40.     Plaintiff Donald B. Durham began working as a CSO in 1991 after retiring from

the North Carolina State Highway Patrol.  Plaintiff Durham was diagnosed with a cardiac

condition, hypertrophic cardiomyopathy, in or around 1984.  He had the condition when he was

hired as a CSO and informed Defendants USMS and Akal thereof.  Plaintiff Durham's medical

condition never interfered with the performance of his duties.  He successfully performed all of

his CSO duties during his tenure.  After his 2003 annual physical, Plaintiff Durham was sent for

re-testing, allegedly for an abnormal EKG.  He submitted information from his doctor that his

EKG was not abnormal.  Nonetheless, Defendants USMS and Akal terminated Plaintiff Durham

in November 2003 for failing the new USMS medical/physical standards because of his cardiac

condition.

       41.     Plaintiff Donald Allen began working as a CSO in December 1999.  He had

suffered a hearing loss and had worn hearing aids since approximately 1996 and he was hired as

a CSO with the hearing loss and with his hearing aids.  Plaintiff Allen performed successfully his

duties as a CSO.  In 2002 after his annual physical, Defendant USMS requested that his hearing

be re-tested.  Plaintiff Allen had his hearing re-tested, but was not allowed to use his hearing aids

during the test.  Defendants USMS and Akal terminated Plaintiff Allen in April 2002 because of

his failure to pass the hearing part of the new USMS medical/physical without the use of hearing

aids.  Subsequent to his termination, Plaintiff Allen took the same hearing test with his hearing

aids, passed the test and sent the results to Defendant USMS.  He was not reinstated based on the

subsequent hearing test.

     42.    Plaintiff David Arriola was hired as a CSO in July 2003.  He had previously

worked as a police officer with the Denver police department and as security guard.  Plaintiff

Arriola was diagnosed with hearing loss in 1993.  He got digital hearing aids in 1998 that

corrected 95% of his hearing loss.  Prior to being hired as a CSO, Plaintiff Arriola underwent two

separate hearing tests.  At the conclusion of his second test, the audiologist informed him that he

had passed the test and his hearing exceeded USMS standards.  Plaintiff Arriola worked as a

CSO for one month, during which time Defendant Akal and the local Deputy United States

Marshal found him to be an exemplary employee.  On or about August 4, 2003, Defendants

USMS and Akal terminated Plaintiff Arriola because of his failure to pass the hearing part of the

new USMS medical/physical without the use of hearing aids.  Subsequent to his termination,

Plaintiff Arriola's audiologist reviewed the USMS's reasons for his termination and stated that

he should not have been medically disqualified based on his hearing loss.

     43.    Plaintiff Thomas Branigan was hired as a CSO by Defendant MVM on May 1,

2001.  He served as an officer with the Philadelphia Police Department, retiring as a sergeant

after thirty-two (32)years.  Plaintiff Branigan suffered hearing loss while serving in the military

in Vietnam and worked successfully with the Philadelphia Police Department and as a CSO with

the hearing loss. He passed the new medical/physical exam in 2002 and 2003, and, based on information and belief, passed in 2004. Plaintiff Branigan wore digital hearing aids in both ears and was able to pass the USMS medical/physical exam with those hearing aids. Defendants USMS and MVM terminated Plaintiff on or about September 20, 2005, because of his failure to pass the hearing part of the new USMS medical/physical without the use of hearing aids.

44.     Plaintiff Frank Browder, Jr. was hired as a CSO by Defendant Akal in February 2003. He took a physical before he was hired and believed he passed the physical. He worked as a CSO until August 15, 2003, when Defendants USMS and Akal terminated him for failing the hearing part of the new USMS medical/physical exam. Prior to that point, Plaintiff Browder was unaware that he had a hearing loss. Mr. Browder's doctor suggested that his hearing could be corrected with hearing aids. He was not provided any opportunity to acquire hearing aids to remedy his hearing loss.

45.     Plaintiff John Brown became a CSO in August 1990 after retiring from his position as an officer with the Pennsylvania State Police, a position he held for twenty-nine (29) years. Plaintiff performed his duties as a CSO successfully from 1990 until his termination on February 13, 2006. He began to suffer hearing loss while working as a CSO, first noticing the hearing loss in 2001. Plaintiff got a hearing aid in 2002 and took the USMS new medical/physical exam with the hearing aid in 2003 and 2004. He passed the new medical/physical exam in both those years. In 2005, Plaintiff was tested without his hearing aid and did not pass the medical/physical exam. Defendants USMS and MVM terminated Plaintiff on February 13, 2006, because of his failure to pass the hearing part of the new USMS medical/physical without the use of hearing aids.

46.     Plaintiff Michael Campbell was hired by Defendant Akal to work as a CSO in

May 2001. Plaintiff Campbell performed his duties successfully as a CSO. The first physical

Plaintiff took after he was hired indicated that he had some high-frequency hearing loss.

Although his audiologist did not consider the high-frequency hearing loss a real hearing loss,

Plaintiff paid approximately $5,000 for hearing aids that corrected his high-frequency hearing.

Plaintiff passed the hearing part of the new USMS medical/physical exam with the hearing aids,

but he failed the test when he was forced to take the test without hearing aids. Defendants

USMS and Akal terminated Plaintiff in May 2002 because of his failure to pass the hearing part

of the new USMS medical/physical without the use of hearing aids.

      47.    Plaintiff Peter Churchill began working as a CSO in December 1999 after retiring

from a twenty-five (25) year career as an officer with the Milwaukee County Sheriff's

Department and serving ten (10) years as a guard for the USMS. Plaintiff successfully performed

his duties during his tenure as a CSO. Plaintiff Churchill had passed his hearing test until his

2006 annual physical. In the spring of 2006, he was sent for additional testing and the

audiologist told him he met the hearing standards. He was again sent for additional tests in June

2006. He understood his hearing loss could be completely corrected by hearing aids.

Nevertheless, Defendants USMS and Akal terminated Plaintiff Churchill on August 15, 2006,

because of his failure to pass the hearing part of the new USMS medical/physical without the use

of hearing aids.

      48.    Plaintiff Byron Glenn Dahlen began working as a CSO in 1990. He passed the

hearing part of the physical exam every year until 2001. Plaintiff Dahlen performed his duties

successfully during his entire career as a CSO. At his physical in the spring of 2001, Plaintiff

Dahlen was told that his hearing did not meet the standards. He spent $1,500 on hearing aids and

used them for more than one year. Plaintiff Dahlen's hearing was re-tested with the hearing aids

and he met or exceeded the USMS standards with the hearing aids. Plaintiff was unable to pass the same test when not using the hearing aids. Plaintiff Dahlen was terminated by Defendants USMS and Akal in September 2002 for failing to meet the hearing part of the new USMS medical/physical standards without using hearing aids.

49. Plaintiff George Ellenberger began working as a CSO on May 28, 1996, after retiring as a detective with thirty (30) years service with the Milwaukee Police Department. Plaintiff successfully performed his duties as a CSO during his tenure. Plaintiff Ellenberger did not notice any hearing loss until 2004, when he was sent back for additional testing. Plaintiff paid $3,400 for hearing aids that corrected a high-frequency hearing loss. Nevertheless, Defendants USMS and Akal terminated Plaintiff on September 1, 2005, because of his failure to pass the hearing part of the new USMS medical/physical without the use of hearing aids.

50. Plaintiff Gilmer Forbis began working as a CSO in 1985. He successfully performed his duties throughout his career as a CSO. After a physical during which he was told that he suffered from hearing loss, Plaintiff Forbis paid $5,000 for hearing aids to correct his hearing. He passed the hearing part of the new USMS medical/physical exam with the hearing aids, but failed the test without the hearing aids. Defendants USMS and Akal terminated Plaintiff Forbis in January 2003 for failing the hearing part of the new USMS medical/physical exam without hearing aids.

51. Plaintiff Darrell Guillory began working as a CSO in November 2003 after retiring from his position as a Louisiana State Trooper with twenty-seven (27) years of service. Plaintiff Guillory successfully performed his duties during his tenure as a CSO. Plaintiff suffered hearing loss while working as a state trooper and has worn hearing aids since the mid-1990s. He wore hearing aids while serving successfully as a SWAT team leader and detective. Plaintiff

passed the new medical/physical exam in 2003 and 2004 after returning to take a second functional hearing exam each year. Plaintiff was not able to pass the hearing test in 2005. Defendants USMS and Akal terminated Plaintiff on January 18, 2006, because of his failure to pass the hearing part of the new USMS medical/physical without the use of hearing aids.

52.     Plaintiff William Guthrie suffered from a hearing loss for more than ten years. He was diagnosed with a hearing loss while working as a police officer for the Las Vegas Police Department and used hearing aids to correct his hearing. He was hired as a CSO in 1996 with the hearing loss and with his hearing aids. Plaintiff Guthrie successfully performed his duties during his entire tenure as a CSO. Plaintiff Guthrie was able to pass the hearing part of the new USMS medical/physical exam with his hearing aids; he was not able to pass the hearing test without his hearing aids. In June 2002, Defendants USMS and Akal terminated Plaintiff Guthrie for failing the hearing part of the new USMS medical/physical exam when not using hearing aids.

53.     Plaintiff Duane Halvorson became a CSO in April 2000 after retiring from the Cascade County Sheriff's Office and having spent almost twenty-nine years in law enforcement. Plaintiff successfully performed his duties as a CSO during his tenure. Plaintiff does not know when he first suffered hearing loss, but it likely occurred while serving in the Army during the period of 1966-1969. He had passed the USMS medical/physical exams until his 2005 exam, in which a high-frequency hearing loss was identified. Defendants USMS and Akal terminated Plaintiff on June 9, 2005, because of his failure to pass the hearing part of the new USMS medical/physical without the use of hearing aids.

54.     Plaintiff Jeffrey Howard became a CSO in July 2001 after retiring from the Virginia State Police having served twenty-four (24) years. Plaintiff Howard successfully

performed his duties as a CSO during his tenure. Plaintiff suffered a hearing loss in the early

1980s as a result of his work as a SCUBA diver with the Virginia State Police. He acquired a

hearing aid in 2003 and consistently wore them while working as a CSO. The hearing aids

corrected his hearing to levels required in the new USMS medical/physical standards. In 2004,

Plaintiff was tested without his hearing aids and was unable to pass the new USMS hearing

standards. Defendants USMS and Akal terminated Plaintiff on April 7, 2005, because of his

failure to pass the hearing part of the new USMS medical/physical without the use of hearing

aids.

55.     Plaintiff Frank M. Hruza became a CSO in 1997 after retiring from his position of

Deputy Chief of Police with the Newark, New Jersey Police Department. He discovered he had

suffered a hearing loss in 1998 or 1999 during his annual physical, and spent $5000 on hearing

aids. He passed the old physicals with the hearing aids. Plaintiff Hruza successfully performed

his CSO duties during his tenure. In his 2001 annual physical, Plaintiff Hruza was sent to an

audiologist for the hearing test. Plaintiff Hruza was able to pass the hearing part of the new

USMS medical/physical exam with his hearing aids; he was not able to pass the hearing test

without his hearing aids. In June 2002, Defendants USMS and Akal terminated Plaintiff Hruza

for failing the hearing part of the new USMS medical/physical exam when not using hearing

aids.

56.     Plaintiff Donald Johnson began working as a CSO in 1986. He started using

hearing aids prior to becoming a CSO and used them regularly at work. He successfully

performed his duties as a CSO until 2002. Plaintiff Johnson was able to pass the hearing part of

the new USMS medical/physical exam with his hearing aids, but he was not able to pass the

hearing test without hearing aids. On or about March 22, 2002, Defendants USMS and Akal

terminated Plaintiff Johnson for failing the hearing part of the new USMS medical/physical exam when not using hearing aids.

57.     Plaintiff Chester McKune began working as a CSO in June 2000 after retiring from his position as a police officer with the Modesto Police Department.  He had been deaf in his left ear since 1986, but he worked successfully for the police department with the disability until 1999.  Plaintiff McKune was hired as a CSO with his deafness and successfully performed his duties during his tenure.  When he was hired as a CSO, he was able to pass the general hearing test.  After his annual physical in 2002, Plaintiff McKune was sent to be re-tested; however, his condition is permanent and had not changed.  Defendants USMS and Akal terminated Plaintiff McKune for failing the hearing part of the new USMS medical/physical exam when not using hearing aids.

58.     Plaintiff Dallas Murphy became a CSO in 1994 after retiring from his position as a police officer.  Plaintiff Murphy performed his duties successfully as a CSO.  In 2000, Plaintiff Murphy became aware that he had a hearing loss.  He spent $4,800 on hearing aids.   In 2002, Plaintiff Murphy was sent back for re-testing two times.  He passed the hearing part of the new USMS medical/physical exam with his hearing aids; he did not pass the hearing part of the new exam without the hearing aids.  In October 2002, Defendants USMS and Akal terminated Plaintiff Murphy for failing the hearing part of the new USMS medical/physical exam when not using his hearing aids.

59.     Plaintiff Glenn Padgett became a CSO after retiring as a sergeant from the Indiana State Police having served twenty-five (25) years.  Plaintiff worked as a CSO in Indiana during the period of March 1998 until May 2001, then again in Louisville, Kentucky during the period of July 2002 until February 2005.  Plaintiff successfully performed his duties as a CSO during his

tenure in both Indiana and Kentucky.  Plaintiff did not discover his hearing loss until 2004 when

he did not pass the hearing test in April 2004.  Plaintiff returned for additional testing two times,

but was unable to pass the hearing test without hearing aids.  Plaintiff was told that his hearing

loss would be corrected by hearing aids.  Nevertheless, before he was given an opportunity to

acquire hearing aids, Defendants USMS and Akal terminated Plaintiff on February 23, 2005,

because of his failure to pass the hearing part of the new USMS medical/physical without the use

of hearing aids.

      60.    Plaintiff Miller Pearson became a CSO in 1990 after he retired from his position

as a MP with the U.S. Army.  He performed successfully as a CSO.  Plaintiff Pearson discovered

he had a small hearing loss in 2002 after his annual physical, at which time he was sent to an

audiologist for additional testing.  The audiologist stated he had a small hearing loss in one ear

and that his hearing loss would be corrected by hearing aids.  Plaintiff Pearson was not given the

opportunity to acquire the hearing aids and re-test with the hearing aids.  Defendants USMS and

Akal terminated Plaintiff Pearson in December 2002 for failing the hearing part of the new

USMS medical/physical exam when not using his hearing aids.

      61.    Plaintiff James Ralph became a CSO in February 1991 after retiring from a

twenty-seven (27) year career with the Chicago Police Department.  Plaintiff Ralph developed

hearing loss in one ear while he served in the Navy during the period of 1955-1959.  After

Plaintiff Ralph was told he had not passed the hearing test in 2002, he decided to get hearing

aids, which cost approximately $3,000.  Thereafter, Plaintiff Ralph was notified by his employer,

Defendant Akal, that he had thirty (30) days to go for additional hearing tests.  Two (2) days after

being notified that he had 30 days to have the additional tests done, Defendants USMS and Akal

terminated him due to his hearing loss.

62. Plaintiff Ronald Ray became a CSO in 1997 after serving as a police officer for more than twenty (20) years. Plaintiff Ray successfully performed his duties as a CSO. Plaintiff Ray knew that he had a hearing loss for years and certainly years before he was hired as a CSO. After his 2001 annual physical, Defendant USMS directed Plaintiff Ray to have his hearing re-tested. He went for additional tests, but still did not pass the hearing part of the new USMS medical/physical exam. He did not get hearing aids because his supervisor told him he would be terminated if he used hearing aids and that others had been terminated for using hearing aids. Plaintiff Ray also suffers from diabetes, with which he was diagnosed in the early 1990s. He suffered from diabetes when he was hired and during his tenure as a CSO. His diabetes was controlled by medicine and diet and it never interfered with the performance of his duties as a CSO. Defendants USMS and Akal terminated Plaintiff Ray in September 2002 for failing the hearing part of the new USMS medical/physical exam when not using his hearing aids and for having diabetes.

63. Plaintiff Willie Rich became a CSO in 1990 after retiring from his position as a police officer with the East St. Louis, Illinois, police department. Plaintiff Rich successfully performed his duties as a CSO during his tenure. After his physical in October 2003, Defendant USMS requested additional tests for Plaintiff Rich's hearing. Subsequent testing revealed that Plaintiff Rich had a non-malignant tumor in his right ear. In May 2004, Plaintiff Rich underwent surgery that successfully shrank the tumor. Due to the type of surgery, Plaintiff Rich fully recovered from the surgery within several days. Notwithstanding the temporary nature of his hearing loss and his subsequent recovery, Defendants USMS and Akal terminated Plaintiff Rich on May 12, 2004, before the surgery due to his hearing loss.

64. Plaintiff Harvey Robideaux became a CSO in 2002 after retiring as a sergeant

with the Louisiana State Police Department.  He suffered from hearing loss and had acquired

hearing aids after his last physical.  He spent $5,000 on hearing aids.  Plaintiff Robideaux

performed his duties as CSO well, including qualifying other CSOs on their service weapons.

On or about August 13, 2004, Plaintiff Robideaux was terminated by Defendants Akal and

USMS for failing the new medical/physical standards due to hearing loss.  Plaintiff Robideaux

was not allowed an opportunity to be tested with his hearing aids.

      65.    Plaintiff Thomas Roy became a CSO in 1994 after retiring as a police officer in

Minnesota.  Plaintiff Roy started wearing hearing aids when he was thirty (30) years old and

wore them while he served as a police officer and CSO.  Plaintiff Roy was wearing his hearing

aids when he was hired as a CSO and wore them during his entire tenure as a CSO.  Plaintiff Roy

successfully performed his duties as a CSO.  In his 2002 annual physical, the audiologist

informed Plaintiff Roy that his hearing aids were no longer working and tried to sell him new

hearing aids.  Plaintiff Roy did not want to purchase hearing aids from that audiologist and,

instead, went to a highly-respected audiologist and spent $3,200 on new hearing aids.

Defendants USMS and Akal terminated Plaintiff Roy in May 2002 for failing the hearing part of

the new USMS medical/physical exam when not using his hearing aids.  Plaintiff Roy was not

given any opportunity to be re-tested with his new hearing aids.  Nonetheless, Plaintiff Roy

returned to the audiologist with his new hearing aids and passed the hearing standards from the

new USMS medical/physical exam.

      66.    Plaintiff Richard Schaber became a CSO in September 1997 after retiring with

twenty-six (26) years of service in his position as a police officer with the Spokane Police

Department.  Plaintiff Schaber successfully performed his duties as a CSO during his tenure.

Plaintiff Schaber suffered hearing loss in a helicopter crash in the 1960s while serving in the

military in Vietnam. His hearing has not materially deteriorated since the hearing loss was first diagnosed. He wore a hearing aid that corrected his hearing while working both as a police officer and a CSO. Plaintiff Schaber was able to pass the USMS hearing test with his hearing aid, but was not able to pass without his hearing aid. Defendants USMS and Akal terminated Plaintiff Schaber on August 15, 2006, for failing the hearing part of the new USMS medical/physical exam.

      67.    Plaintiff Rhys Sirjane became a CSO in 1994 after retiring from his position as a deputy sheriff in Louisiana. He had been a firearms instructor in the 1960s and 1970s and, as a result, had suffered a hearing loss that was diagnosed in the mid 1980s. After surgeries on his ear, he suffered a complete hearing loss in one ear, a loss that cannot be corrected by hearing aids. Plaintiff Sirjane was hired as a CSO with the uncorrected hearing loss and performed his duties so successfully that he was asked to apply for the Lead CSO position and was selected for the position in early 2002. He also was able to pass the CSO hearing test until the implementation of the new USMS medical/physical standards. After his annual physical in 2001, Plaintiff Sirjane was sent for re-testing; however the results did not vary. Defendants USMS and Akal terminated Plaintiff Sirjane in June 2002 for failing the hearing part of the new USMS medical/physical exam.

      68.    Plaintiff Donald Smith became a CSO in 1998 after retiring from his position as a police officer with the Wilkes-Barre, Pennsylvania police force. He was diagnosed with a hearing loss and acquired hearing aids in 2001 that corrected his hearing. Plaintiff Smith's hearing loss did not interfere with the performance of his CSO duties. In his 2002 annual physical, Plaintiff Smith failed to pass the hearing portion of the new USMS medical/physical exam because he was tested without his hearing aids. As a result of failing the hearing test,

Defendants USMS and MVM terminated Plaintiff Smith in April 2002.  Subsequent to his

termination, Plaintiff Smith had his hearing tested with his hearing aids and he passed the hearing

test.

69.     Plaintiff Roberto Torrez became a CSO in 1988 after retiring from his position as

Inspector with the U.S. Boarder Control.  At all times, Plaintiff Torrez successfully performed

his CSO duties, including working as a firearms instructor.  Plaintiff Torrez discovered his

hearing loss in December 2001, after he was sent for re-testing from his 2001 annual physical.

He was told by Defendant Akal's site supervisor that he should get a hearing aid, so he spent

$2,100 on a hearing aid.  He wore the hearing aid but was never allowed to re-test with the

hearing aid.  The hearing aid fully corrected his hearing.  Defendants USMS and Akal terminated

Plaintiff Torrez in May 2002 for failing the hearing portion of the new USMS medical/physical

exam.

70.     Plaintiff Fred A. Thatcher became a CSO in 1993 after a career in law

enforcement.  Plaintiff Thatcher suffered from hearing loss and used hearing aids during his long

tenure as a CSO.  Plaintiff Thatcher successfully performed his duties until 2001.  In 2001,

Plaintiff Thatcher received a letter from Defendant USMS stating that, because he wore hearing

aids, he needed to take a new hearing test.  He took the hearing test with and without hearing

aids.  He passed the hearing test with his hearing aids.  Nonetheless, Defendants USMS and Akal

terminated Plaintiff Thatcher in August 2001 for failing the hearing part of the new USMS

medical/physical exam.

71.     Plaintiff Carman Zentner became a CSO in August 1999 after retiring with

twenty-nine years of service from his position as a police officer with the Seattle Police

Department.  He successfully performed his duties as a CSO during his tenure.  Plaintiff Zentner

suffered hearing loss in 1996 while working for the Seattle Police Department. He acquired

digital hearing aids at that time and wore them both while working as a police officer and CSO.

Plaintiff Zenter passed the USMS hearing test with his hearing aids, but, in 2004, he was forced

to take the hearing test without his hearing aids and did not pass. Defendants USMS and Akal

terminated Plaintiff Zentner in April 2005 for failing the hearing part of the new USMS

medical/physical exam.

72.      Plaintiff Carl Akins became a CSO in April 2002 after retiring from his position

as a corporal with the Tulsa Police Department. He had been diagnosed with diabetes

approximately fifteen years earlier, but controlled his diabetes with low amounts of medication.

Plaintiff Akins worked successfully both as a police corporal and a CSO with diabetes, which

never interfered with the performance of his duties. Plaintiff Akins took a physical exam prior to

being hired and informed Defendants USMS and Akal that he had diabetes. He was not told his

employment was conditional on passing the physical exam; he understood that he had passed the

physical exam prior to being hired. Plaintiff Akins successfully performed his duties as a CSO.

He never missed a day of work due to diabetes and suffered no symptoms from the disease.

Despite the absence of symptoms, Defendants USMS and Akal terminated Plaintiff Akins in

December 2002 for allegedly failing the new USMS medical/physical exam because of his

diabetes.

73.      Plaintiff Thomas Alexander became a CSO in April 2002 after retiring as a police

officer from the Tulsa Police Department. Plaintiff Alexander had suffered from diabetes for

fifteen or twenty years prior to his becoming a CSO. Plaintiff Alexander took a physical exam

prior to being hired and informed Defendants USMS and Akal that he had diabetes. He was not

told his employment was conditional on passing the physical exam; he understood that he had

passed the physical exam prior to being hired.  Plaintiff Alexander successfully performed his

duties as a CSO.  Plaintiff Alexander's diabetes was under control with low doses of insulin,

which he has since stopped taking.  He never missed a day of work due to diabetes and suffered

no symptoms from the disease.  Despite the absence of symptoms, Defendants USMS and Akal

terminated Plaintiff Alexander in December 2002 for allegedly failing the new USMS

medical/physical exam because of his diabetes.

74.     Plaintiff Vernon Broad became a CSO in 1996 after retiring from his position as a

police officer and investigator with the Department of Defense.  Plaintiff Broad was diagnosed

with diabetes in 1980, which he controlled.  Plaintiff Broad successfully performed his duties as

a CSO during his tenure.  Plaintiff Broad has foot surgery in June 2003, after which three doctors

certified that he could perform all functions and suffered no loss of agility, balance or ability to

stand for long periods of time.  Nonetheless, in July 2003 Defendants USMS and Akal

terminated Plaintiff Broad for allegedly failing the new medical/physical standards due to his

diabetes.

75.     Plaintiff Jimmy Burrow became a CSO in 1990 after retiring from a career in law

enforcement.  He developed Type II diabetes in 1996 or 1997, which was controlled by

medication until 2004.  Plaintiff Burrow performed his CSO duties successfully.  He had no

physical weaknesses from the diabetes and had no restrictions on his work therefrom.  Plaintiff

Alexander passed all of the physicals under the old standards.  After the implementation of the

new USMS medical/physical exam, Plaintiff was sent for re-testing on his diabetes.  His doctor

sent in information stating that Plaintiff was physically fit to work.  Despite the absence of

symptoms, his good performance and doctor's certification of his physical fitness, Defendants

USMS and Akal terminated Plaintiff in September 2003 for failing to pass the new USMS

medical/physical exam because of his diabetes.

76.     Plaintiff Lawrence Churm became a CSO in 1999 after retiring from the New Jersey State Police as a police officer. Plaintiff Churm successfully performed his CSO duties during his tenure. He developed Type II Diabetes in 2002, which he controlled with medication and diet. After his 2002 annual physical, Plaintiff Churm was asked for additional information on his diabetes, which Defendant USMS first complained about not receiving but later admitted having received. After his 2003 annual physical, Plaintiff Churm was not given an opportunity for retesting. Despite the absence of symptoms and good performance, Defendants USMS and MVM terminated him due to his failure of the new USMS medical/physical exam because of his diabetes.

77.     Plaintiff Robert Farnsworth became a CSO in 1985 after working as a law enforcement officer for many years. He successfully performed his CSO duties during his tenure. Plaintiff Farnsworth suffered from diabetes for a number of years. His diabetes did not interfere with the performance of his duties. Nonetheless, in May 2002, Defendants USMS and Akal terminated Plaintiff Farnsworth for failing the new USMS medical/physical standards based on his diabetes.

78.     Plaintiff Ruben V. Gonzales became a CSO in August 2000 after retiring from law enforcement work with the local sheriff's office. Plaintiff Gonzales has had diabetes since approximately 1977, however, his illness never interfered with the performance of his duties, either as a deputy sheriff or a CSO. Indeed, Plaintiff Gonzales successfully performed his CSO duties during his tenure. After his 2001 annual physical, Plaintiff Gonzales was requested to provide additional information on his diabetes. He provided the medical information on three different occasions. Nonetheless, in October 2002, Defendants USMS and Akal terminated

Plaintiff Gonzales for failure to provide medical documentation on his medical condition and, therefore, failing to pass the new USMS medical/physical exam.

79.     Plaintiff John Hansen became a CSO in April 2001 after retiring from his position as a senior patrol officer for the Juneau Police Department.  He was diagnosed with diabetes in 1996 and both Defendants USMS and Akal knew about his condition.  Plaintiff Hansen controlled his diabetes with medication.  Plaintiff Hansen successfully performed his CSO duties during his tenure.  His diabetes never interfered with his performance as a CSO.  Nonetheless, Defendants USMS and Akal terminated Plaintiff Hansen in August 2002 for failing the new USMS medical/physical standards because of his diabetes.

80.     Plaintiff William Lambright became a CSO in December 1991.  He spent three years working in the U.S. District Court for the Eastern District of Texas and then, after a gap of approximately fifteen (15) months, spent six years working in the Western District of Louisiana. Plaintiff Lambright contracted diabetes when he was twenty-seven (27) years old, in or around 1961.  He controlled his diabetes with insulin.  Plaintiff Lambright successfully performed his CSO duties during his tenure.  After his 2001 annual physical, Plaintiff Lambright was sent for re-testing for his diabetes.  His doctor submitted documentation stating that Plaintiff Lambright's disease created no limitations on his work activities and posed no risk to the health or safety of himself or other.  Nonetheless, Defendants USMS and Akal terminated Plaintiff Lambright in May 2002 for his failing the new USMS medical/physical standards because of his diabetes.

81.     Plaintiff Robert Rarick became a CSO in 1995 after retiring from his position as a police officer with the Baton Rouge Police Department.  He developed diabetes in or around 1992 and worked successfully as a police officer and CSO with diabetes.  Plaintiff Rarick informed Defendants USMS and Akal of his medical condition when he was hired.  He

performed his CSO duties well despite his condition and, in fact, was promoted to the position of Lead CSO. He never missed a day of work due to his diabetes or related conditions. After his physical in Octobe 2001, Plaintiff Rarick was asked to submit additional documentation on his condition. His doctor submitted documentation and stated that Plaintiff Rarick's diabetes was under control with medication. Nonetheless, Defendants USMS and Akal terminated Plaintiff Rarick in May 2002 for failing the new USMS medical/physical standards because of his diabetes.

82.    Plaintiff Felipe Jorge-Rodriguez began working as a CSO in 1998 after leaving a career as a law enforcement officer. He suffered from diabetes, however, passed the annual physical in 2000. Plaintiff Jorge successfully performed his CSO duties during his tenure. After his 2001 annual physical, Plaintiff Jorge was requested to submit additional documentation, which he did. He was asked again for additional information after his 2002 annual physical. Plaintiff Jorge submitted the requested medical information from his Veterans Administration doctor, but did not realize he needed to submit medical information from the specialized physician he was seeing for his diabetes. As a result, Defendants USMS and MVM terminated Plaintiff Jorge in February 2003 for failing the new USMS medical/physical exam due to his diabetes, stating, among other things, that Plaintiff Jorge failed to fill his prescriptions and take his medications. Despite the fact that Plaintiff Jorge submitted additional information demonstrating he was taking the medication prescribed by his specialist, Defendant USMS refused to reconsider the additional information and its determination.

83.    Plaintiff John Scott began working as a CSO in 1995 after retiring from law enforcement work. He had been diagnosed with diabetes prior to becoming a CSO. Despite his medical condition, Plaintiff Scott successfully performed his CSO duties during his tenure.

Plaintiff Scott's medical condition was controlled with medication and he never missed a day of work due to his diabetes or any related conditions. After his physical in spring 2002, Plaintiff Scott was requested to submit additional information, which he did. Nonetheless, Defendants USMS and Akal terminated Plaintiff Scott in June 2002 for failing the new USMS medical/physical standards because of his diabetes.

84.    Plaintiff Philip Elder became a CSO in 1984 after spending eighteen (18) years with the county marshals. He successfully performed his CSO duties during his tenure. After his 2002 annual physical, he was sent to take a stress test, which did not provide conclusive results. Upon further request, Plaintiff Elder made an appointment to re-take the stress test, however his appointment was cancelled by the doctor. Without being given an opportunity complete the testing, Defendants USMS and Akal terminated Plaintiff Elder in April 2003 for failing the new USMS medical/physical standards because of his cardiovascular condition.

85.    Plaintiff Lawrence Karnes became a CSO in February 1998 after retiring with thirty (30) years service from his position as a police officer with the Plymouth Borough police department. Plaintiff Karnes successfully performed his CSO duties during his tenure. In his 2005 annual physical, the examining physician thought he heard a heart murmur. Plaintiff Karnes went to two cardiologists and underwent a MRI and EKG. Neither doctor was able to discern any heart murmur or abnormality. Despite that fact, Defendants USMS and MVM terminated Plaintiff Karnes for failing the new USMS medical/physical standards because of an alleged cardiovascular condition

86.    Plaintiff Jack Morehead became a CSO in 1996 after retiring from his position as a police officer from the local police department. Plaintiff Morehead was diagnosed with atrial tachycardia in the 1980s and with mild cardiomyopathy in 1993. When he was hired, he

Case 1:02-cv-01484-GK-DLF Document 203-2 Filed 10/24/2006 Page 44 of 59

informed Defendant Akal about the atrial tachycardia. Plaintiff Morehead successfully performed his CSO duties despite his medical condition and his medical condition never interfered with the performance of his duties. He regularly passed the annual physical until 2002, when his doctor stated that his atrial tachycardia "was up" and he should not lift more than 150 pounds and engaged in vigorous exercise. Plaintiff Morehead returned to his physician several times and provided the additional information to Defendants. Six months later in April 2003, Defendants USMS and Akal terminated Plaintiff Morehead for failing the new USMS medical/physical standards because of his cardiovascular condition.

87.     Plaintiff Frank Shaffer became a CSO in 1990 after retiring from the Cleveland Police Department after a twenty-five (25) year career. He performed his duties as a CSO well during his tenure. Plaintiff Shaffer suffered a heart attack in May 2003. He recovered and returned to work in and around July 2003 after his doctor certified that he was fit to return to work. He had no physical problems performing his duties after he returned to work in July 2003. Plaintiff Shaffer went for his physical in December 2003 and the doctors found an abnormal EKG. Plaintiff Shaffer returned to his physician twice for additional information requested by the USMS and USPHS on his cardiovascular condition. Nonetheless, in September 2004, Defendants USMS and Akal terminated Plaintiff Shaffer for his cardiovascular condition.

88.     Plaintiff Robert Hubbard began working as a CSO in April 2003 after retiring from a career in law enforcement. He suffers from a condition called deutan anomoly or partial color vision, which limits his ability to differentiate shades of color. He was diagnosed with this condition in 1970. Plaintiff Hubbard passed his pre-employment exam, including the color vision part of the exam. Several months after he began working as a CSO, Defendant Akal requested that he go for further vision testing. Plaintiff Hubbard returned twice for testing, with

one doctor stating that his vision limitation should not present any functional difficulties. Plaintiff Hubbard successfully performed his duties as a CSO and his medical condition did not interfere with the performance of his duties. Nevertheless, Defendants USMS and Akal terminated Plaintiff Hubbard in December 2003 for failing the new USMS medical/physical exam because of his impaired vision.

89.     Plaintiff James Kimbrel became a CSO in 1998 after retiring from his position as a police officer. He performed his CSO duties successfully during his tenure. In April 2002, Plaintiff Kimbrel was diagnosed with melanoma in his right eye, which had to be removed to remove the cancer. He was left with monovision. His doctor cleared him to return to work in May 2002 with no limitations. Prior to returning to work, Plaintiff Kimbrel passed the firearms test at an expert level and in all other ways was medically fit to perform his CSO duties. Despite his doctor's clearance, Defendants USMS and Akal would not allow him to return to his duties and terminated him two weeks after he returned to work. Neither Defendant provided any opportunity to discuss or explore reasonable accommodation of his condition.

90.     Plaintiff Ernestine Starkey worked as a CSO after retiring from the District of Columbia Metropolitan Police Department having served twenty-four (24) years as a police officer. Plaintiff Starkey served as a CSO from November 1996 until May 1999, and then October 2000 until October 2005. Plaintiff has an eye condition caused by a blocked blood vessel in on eye that results in small patches in her field of vision being blurry, while the remainder of her field of vision is clear. She had laser surgery in 2001 and 2002 to relieve and stabilize the condition. In her 2005 physical, Plaintiff informed the USMS that she had laser eye surgery and, upon their request for additional information, her doctor supplied medical records indicating that she was considered legally blind in one eye. As a result, Defendants USMS and

MVM terminated Plaintiff from her position as a CSO in October 2005.

91.     Plaintiff Roberto Lebron worked as a CSO for twenty-two years in San Juan, Puerto, Rico.  He performed his duties as a CSO well.  Plaintiff Lebron had knee-replacement surgery on one knee approximately ten years ago.  He fully recovered from that surgery and returned to work performing all CSO duties without limitation.  Plaintiff Lebron then had knee-replacement surgery on the second knee recently.  He fully recovered from that surgery and, again, returned to work performing all CSO duties without limitations.  Nonetheless, Defendants USMS and MVM terminated Plaintiff Lebron on or about September 2, 2004, after Defendant USMS medically disqualified him because of the two knee-replacement surgeries and prostheses.

92.     Similar to the Plaintiffs described in Paragraphs 34-86, each Class member was CSO who was fully medically fit to perform the essential functions of the CSO position with or without reasonable accommodation.  Each Class member was fully performing the duties of the position with or without reasonable accommodation at the time each was terminated after being medically disqualified for a disability or perceived disability.  None of the Class members were provided any consideration of new or continued reasonable accommodation of their disabilities or perceived disabilities.

93.     Defendant USMS controlled the hiring and firing of individual CSOs.  In some locations, Defendant USMS's employees and agents actively participated in the hiring process for the CSOs.  It controlled many aspects of the CSOs' job, including the CSOs' duties and responsibilities and the physical requirements.  It controlled the means of a CSOs' work by providing the service weapons and other equipment and the manner and times of work.  As such, Defendant USMS was a co-employer along with the federal contractor, either Defendant Akal, MVM or AGI.

94.     Defendants USMS, Akal, MVM and AGI, as co-employers of the CSOs, perceived each terminated CSOs to be disabled for the specific medical condition from which the individual Plaintiff CSO or Class member suffered.  Defendants believed that the CSOs who were medically disqualified and terminated due to hearing loss were disabled based on that hearing loss.  Defendants believed that CSOs who were medically disqualified and terminated due to diabetes were disabled based on the likely presence of such substantially limiting symptoms as impairment of cognitive functions, loss of sensation in hands and feet, somnolence and impaired vision.  Defendants believed that CSOs who were medically disqualified and terminated due to cardiovascular problems were disabled because they were substantially limited in such activities as standing for long periods of time, standing out in adverse weather, running upstairs and engaging in other aerobic activities.  Defendants believed that CSOs who were medically disqualified and terminated due to vision impairment were disabled because they were substantially limited in their vision.

95.     Defendants USMS, Akal, MVM and AGI failed to provide any reasonable accommodation to the individual Plaintiffs for their actual or perceived disabilities.  Further, Defendants failed even to consult with the individual Plaintiffs regarding possible accommodation of their disabilities, as required under the standards of the Americans with Disability Act, 42 U.S.C. § 12101 *et seq.*, and incorporated into the Rehabilitation Act of 1973, 29 U.S.C. § 791 *et seq.*

96.     Defendant USMS prevented Plaintiffs from filing discrimination complaints under the Rehabilitation Act of 1973, 29 U.S.C §§ 791 & 794, for their termination.  Individual Plaintiffs who contacted Defendant USMS to attempt to file a discrimination claim were told that they could not file a complaint with Defendant USMS.  Indeed, the Equal Employment

Opportunity Office for Defendant USMS told Plaintiffs that it would not accept their disability discrimination complaints and failed to send their complaints to the Department of Justice Equal Employment Opportunity Office. This advice was contrary to the regulations of the U.S. Department of Justice, which called for agency officials to fully advise and apprise CSOs of their civil rights and forward complaints of discrimination under the Rehabilitation Act to the Department of Justice Director for Equal Employment Opportunity. See 28 C.F.R. § 39.170(d)(4).

97.    As a result of Defendant USMS's actions, the individual Plaintiffs suffered harm when they were terminated from their CSO positions because of their disabilities or their perceived disabilities. Plaintiffs suffered additional harm when they were denied access to EEO procedures that could have provided them with some measure of relief from the disability discrimination by Defendant USMS's actions that deliberately prevented said Plaintiffs from asserting their rights and filing claims of disability discrimination.

## COUNT ONE:
## VIOLATION OF FIFTH AMENDMENT DUE PROCESS RIGHTS
### (Against Defendant USMS by All Plaintiffs Except Plaintiff David Arriola)[2]

98.    Plaintiffs hereby reallege the prior paragraphs 1 through 97, supra, as if fully set forth below.

99.    The presence of Plaintiff UGSOA's CBA just-cause clauses that limit the termination Plaintiff UGSOA's members and the individual Plaintiffs to instances of just cause creates a constitutionally-protected property interest in the CSO position, the deprivation of which can only occur with due process.

---

[2] Plaintiff David Arriola was a probationary CSO when terminated and, therefore, was not a UGSOA bargaining unit member. Accordingly, he did not have a property interest in his employment and did not have a Fifth Amendment right to due process prior to termination.

100.     Plaintiff UGSOA's members have a constitutionally-protected property interest in their employment that arises from their CBAs and which justifies the claims of entitlement to continued employment absent sufficient cause and procedural safeguards.  Individual Plaintiffs have a constitutionally-protected property interest in their employment as CSOs arising out of the CBA's just-cause provision so that Defendant USMS cannot deprive them of said employment without due process.

101.     Defendant USMS has caused the termination of Plaintiff UGSOA's members and individual Plaintiff CSOs listed herein for allegedly failing to pass the new USMS medical/physical examination.

102.     In causing the termination of Plaintiff UGSOA's members and individual Plaintiff CSOs, Defendant USMS's actions have denied Plaintiff UGSOA's bargaining unit members their right to procedural due process as secured to them by the Fifth Amendment to the Constitution of the United States.  As a result of the Defendant USMS's unlawful deprivations of procedural due process, Plaintiff UGSOA and individual Plaintiffs have suffered damages due to their resulting inability to protect themselves from the Defendant USMS's unlawful actions. Their damages include costs and reasonable attorney's fees.

103.     Plaintiff UGSOA, its bargaining unit members and individual Plaintiff CSOs have been and will continue to be damaged and threatened with immediate irreparable harm by being subjected to the new medical/physical examination for which they have no adequate remedy at law.

### COUNT TWO:
### VIOLATION OF THE REHABILITATION ACT OF 1973
### (Against Defendant USMS)

104.     Plaintiffs hereby reallege the prior paragraphs 1 through 103, supra, as if fully set

forth below.

105.    The following individual Plaintiffs bring claims for violations of the

Rehabilitation Act of 1973, 29 U.S.C. §§ 791 & 794, against Defendants USMS:  Carl Akins,

Thomas Alexander, Donald Allen, David Arriola, Anne Barkley, Frank Brigance, Thomas

Branigan, John Brown, Vernon Broad, Frank Browder, Jimmy Burrow, Michael Campbell, Peter

Churchill, Lawrence Churm, Byron Glenn Dahlen, Donald Durham, George Ellenberger, Philip

Elder, Robert Farnsworth, Gilmore Forbis, Ruben Gonzales, Darrell Guillory, William Guthrie,

Duane Halvorson, John Hansen, Jeffrey Howard, Frank Hruza, Robert Hubbard, Donald

Johnson, Lawrence Karnes, James Kimbrel, William Lambright, James Lane, Roberto Lebron,

Chester McKune, Jack Morehead, Keith Morris, Dallas Murphy, Glenn Padgett, Miller Pearson,

James Ralph, Robert Rarick, Ronald Ray, Willie Rich, Harvey Robideaux, Felipe Jorge-

Rodriguez, Thomas Roy, John Scott, Richard Schaber, Frank Shaffer, Harvey Simmons, Rhys

Sirjane, Donald Smith, Fred Thatcher, Roberto Torrez, Carmen Zentner, John Does and Jane

Does.

106.    Plaintiffs, including Plaintiffs John Doe and Jane Doe, bring claims for violation

of the  Rehabilitation Act of 1973, 29 U.S.C. §§ 791 & 794, against Defendant USMS on behalf

of the entire Class.

107.    Defendant USMS discriminated against individual Plaintiffs in violation of the

Rehabilitation Act by terminating them solely because of their disability or perceived disability

regardless of whether Plaintiffs could perform the essential functions of their position.  The

individual Plaintiffs all performed the essential functions of their position with or without any

accommodation and without any performance problems.

108.    Defendant USMS discriminated against individual Plaintiffs by failing to offer

reasonable accommodation for their disabilities or perceived disabilities as required by the Rehabilitation Act.  Defendant also discriminated against said Plaintiffs and all Class members by failing to even discuss or entertain reasonable accommodation as required under the Rehabilitation Act.

109.    Defendants further discriminated against the individual Plaintiffs and all Class members by using qualification standards that screen out disabled individuals in violation of the Rehabilitation Act, 29 U.S.C. § 794.

110.    Plaintiffs listed in Paragraph 105 and all Class members are excused from exhausting any administrative remedies because of futility because Defendant USMS failed to provide notice of the administrative complaint procedure, refused to accept their complaints and actively sought to prevent Plaintiffs from filing said complaints.

111.    Plaintiffs Frank Brigance, Thomas Branigan, Vernon Broad, John Brown, Lawrence Churm, Donald Durham, Darrell Guillory, Duane Halvorson, Jeffrey Howard, Roberto Lebron, Glenn Padgett, Harvey Robideaux, Frank Shaffer and Harvey Simmons all exhausted their administrative remedies with Defendant USMS and their exhaustion should serve as exhaustion for all individual Plaintiffs through the doctrine of vicarious exhaustion.  Their right-to-sue letters are attached as Attachment A.  Plaintiffs Peter Churchill, Lawrence Karnes, Richard Schaber and Ernesting Starkey are in the process of filing formal complaints with Defendant USMS and expect to timely exhaust their administrative remedies and receive right to sue letters shortly.  They plead their claims of discrimination in this Amended Complaint in the interests of judicial efficiency and economy because their claims arise from the same set of facts and circumstances as the claims properly brought above and are otherwise properly included in this Amended Complaint.

112.     Plaintiffs named in Paragraph 105 and not named in Paragraph 111 are excused from exhausting their administrative remedies under the theory of vicarious exhaustion.  Because Plaintiffs Brigance, Branigan, Broad, Brown, Churm, Durham, Guillory, Halvorson, Howard, Lebron, Padgett, Robideaux, Shaffer and Simmons have already exhausted their administrative remedies and because the remaining Plaintiffs have claims that are sufficiently similar to their claims such that exhausting administrative remedies would serve no purpose and would be wasteful, their exhaustion of administrative remedies serves to exhaust administrative remedies for all.

113.     As a result of Defendants' discriminatory actions in violation of the Rehabilitation Act, said Plaintiffs suffered loss of wages and benefits and compensatory damages including, but not limited to, pain and suffering and mental anguish.

### COUNT THREE:
### VIOLATIONS OF AMERICANS WITH DISABILITIES ACT
#### (Against Defendants Akal, MVM)

114.     Plaintiffs hereby realleges the prior paragraphs 1 through 113, supra, as if fully set forth below.

115.     Plaintiffs David Arriola, Vernon Broad, Frank Browder, Peter Churchill, Donald Durham, George Ellenberger, Darrell Guillory, Duane Halvorson, Jeffrey Howard, Robert Hubbard, James Lane, Glenn Padgett, Willie Rich, Harvey Robideaux, Harvey Simmons, Frank Shaffer and Richard Schaber have all filed complaints of disability discrimination with the U.S. Equal Employment Opportunity Commission against Defendant Akal for violation of the Americans with Disability Act ("ADA"), 42 U.S.C. § 12112(b).  Plaintiffs Arriola, Broad, Durham, Hubbard, Lane, Rich, Robideaux, Simmons and Padgett have all received their right-to-sue letters and attach them as Attachment B.  Plaintiffs Churchill, Ellenberger, Guillory,

Halvorson, Howard, Schaber and Shaffer are in the process of filing timely complaints of disability discrimination with the U.S. Equal Employment Opportunity Commission against Defendant Akal for violations of the ADA. Although they have not yet received their right-to-sue letters, they expect said letters shortly. They plead their claims of discrimination in this Amended Complaint in the interests of judicial efficiency and economy because their claims arise from the same set of facts and circumstances as the claims properly brought above and are otherwise properly included in this Amended Complaint. All Plaintiffs named in this Paragraph bring claims of disability discrimination in violation of the ADA against Defendant Akal as described below in Paragraph 119.

116. The timely exhaustion of administrative remedies by the individual Plaintiffs listed in Paragraph 115 serves to exhaust the administrative remedies through vicarious exhaustion for claims brought under the ADA against Defendant Akal Security by the following individuals: Carl Akins, Thomas Alexander, Donald Allen, Michael Campbell, Byron Glenn Dahlen, Donald Durham, Phillip Elder, Robert Farnsworth, Gilmore Stacey Forbis, Ruben Gonzales, Bill Guthrie, John Hansen, Frank Hruza, Donald Johnson, James Kimbrel, William Lambright, Chester McKune, Jack Morehead, Timothy Keith Morris, Dallas Murphy, Miller Pearson, James Ralph, Robert Rarick, Ronald Ray, Thomas Roy, John Scott, Rhys Sirjane, Fred Thatcher, Roberto Torrez, Carmen Zentner and John Does and Jane Does. As such, all Plaintiffs named in this Paragraph bring claims of disability discrimination against Defendant Akal for violation of the ADA against Defendant Akal as described below in Paragraph 119.

117. Plaintiffs Felipe Jorge-Rodriguez and Roberto Lebron filed complaints of disability discrimination with the U.S. Equal Employment Opportunity Commission against Defendant MVM for violation of the ADA. They received their right-to-sue letters and includes

them in Attachment C.  Plaintiffs Thomas Branigan and John Brown are in the process of filing

timely complaints of disability discrimination with the U.S. Equal Employment Opportunity

Commission against Defendant MVM for violations of the ADA.  Although they have not yet

received their right-to-sue letters, they expect said letters shortly.  They plead their claims of

discrimination in this Amended Complaint in the interests of judicial efficiency and economy

because their claims arise from the same set of facts and circumstances as the claims properly

brought above and are otherwise properly included in this Amended Complaint.  All Plaintiffs

named in this Paragraph bring claims of disability discrimination in violation of the ADA against

Defendant MVM as described below in Paragraph 119.

     118.    The timely exhaustion of administrative remedies by the individual Plaintiffs

listed in Paragraph 116 serves to exhaust the administrative remedies through vicarious

exhaustion for claims brought under the ADA against Defendant MVM by the following

individuals: Anne Barkley, Lawrence Churm, Lawrence Karnes, Donald Smith and John Does

and Jane Does.  As such, all Plaintiffs named in this Paragraph bring claims of disability

discrimination against Defendant Akal for violation of the ADA against Defendant MVM as

described below in Paragraph 119.

     119.    Defendants Akal and MVM violated the ADA and discriminated against the

Plaintiffs listed in Paragraphs 115-118 when they entered into contractual relationships with

Defendant USMS that had the effect of subjecting the Plaintiffs, qualified employees with

disabilities or perceived disabilities, to prohibited discrimination based on their disabilities or

perceived disabilities.  Defendants Akal and MVM discriminated against Plaintiffs listed in

Paragraphs 115-118 based on their disabilities and/or perceived disabilities when they agreed to

implement the new USMS medical/physical standards which instituted physical standards that

screened out individuals based on their disabilities. Defendants Akal and MVM discriminated against Plaintiffs listed in Paragraphs 115-118 based on their disabilities and/or perceived disabilities when Defendants agreed to implement changes in judicial services contracts that resulted in Plaintiffs' termination due to medical disqualification by Defendant USMS without any consideration of reasonable accommodation.

120. As a result of the discriminatory actions, Plaintiffs listed in Paragraphs 115-118 and Plaintiffs John Does and Jane Does suffered lost wages and benefits as well as compensatory damages including, but not limited to, emotional distress and mental anguish.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff UGSOA, the individual Plaintiffs and the Class members pray that the Court issue the following Orders and relief:

A. An Order declaring that the Defendant USMS failed to provide adequate and sufficient process prior to the deprivation of the Plaintiff UGSOA's members' and the individual Plaintiffs' property interests in their employment and that the actions of the Defendant USMS towards these members and Plaintiffs regarding said deprivation violated the 5th Amendment; and

B. An Order permanently enjoining Defendant USMS from removing Plaintiff UGSOA's members and the individual Plaintiffs from judicial security contracts due to medical disqualification after failing to pass the USMS medical/physical exam without providing them meaningful and adequate due process prior and subsequent to the deprivation; and

C. An Order requiring Defendant USMS to rescind any and all prior orders and/or directives it issued to Defendants Akal, MVM, AGI, and any other private security companies employing Plaintiff UGSOA's members and individual Plaintiff CSOs, that mandated removal of

medically-disqualified CSOs from the judicial security contracts and recision of their credentials

because the removal and recision was done without due process of law; and

       D.     An Order reinstating all Plaintiff UGSOA's terminated bargaining unit members

and individual Plaintiff CSOs to their former positions as CSOs which they held prior to their

removal from the judicial security contracts under which they were working because they were

deprived of said position without due process; and

       F.     An Order restoring USMS credentials to all Plaintiff UGSOA's bargaining unit

members and individual Plaintiffs who were terminated due to medical disqualification without

due process; and

       G.     An Order providing remedies on behalf of all CSOs represented by Plaintiff

UGSOA and all individual Plaintiffs injured as described in Paragraph 5 on grounds generally

applicable to all, including reinstatement, back pay and benefits, and all declaratory, injunctive

and equitable relief available; and

       H.     An Order requiring Defendant USMS to develop and implement meaningful and

constitutionally-adequate due process for all current CSOs who the fail the new USMS

medical/physical exam and stand to be medically disqualified and removed from the judicial

security contract before Defendant USMS medically disqualifies and orders removal of one more

CSO; and

       I.     An Order declaring that Defendants USMS, Akal and MVM, as co-employers of

the CSOs, discriminated against the individual Plaintiffs and Class members in violation of the

Rehabilitation Act of 1973 and the ADA when they terminated said Plaintiffs and Class members

because of their disabilities or perceived disabilities without consideration of whether they could

perform the essential functions of their job with or without reasonable accommodation; and

J.      An Order declaring that Defendants USMS, Akal and MVM violated the

Rehabilitation Act and ADA by establishing and implementing medical and physical standards

that had the effect of screening out disabled individuals who could perform the essential

functions of the position with or without reasonable accommodation; and

K.      An Order mandating that Defendants USMS, Akal and MVM cease and desist

from the discriminatory practices described above in Paragraphs 107-109 and 119, including, but

not limited, to failing to provide reasonable accommodation to Plaintiffs and Class members who

are qualified individuals with a disability or perceived disability by virtue of being medically

disqualified by Defendant USMS; and

L.      An award to the individual Plaintiff CSOs and Class members of any and all

equitable relief and/or damages to which they may be entitled, including, but not limited to, back

pay, reinstatement, or if reinstatement is not practicable, front pay, fringe benefits and

compensatory damages for loss of enjoyment of life, emotional distress and mental anguish; and

M.      An award to the Plaintiffs of their reasonable attorney fees and expenses,

including expert witness expenses, under the Equal Access to Justice Act, the Rehabilitation Act

and the ADA and any other applicable statutes, for prosecuting this action; and

L.      Any and all other relief that may be just and appropriate in this matter.


Respectfully submitted,


/s/
_____
Leslie Deak, Esq. [PA0009]
Deats & Levy, P.C.
1200 G Street, N.W.

Suite 800, #099
Washington, D.C.  20005
Tel.:    (512) 474-6200
Fax:     (512) 474-7896


/s/
_____
John A. Tucker (0052055 - OH. S.Ct.)
Malyuk, Tucker & Gingrich, LLP
39 East Market Street, Suite 402
Akron, Ohio 44308
Phone: (330) 258-1400
Fax:    (330) 258-1407

ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing Fourth Amended Complaint was

served on the following parties via electronic mail on this date, the 23rd of October, 2006.

John R. Griffith, Esq.,
Trial Attorney Federal Programs Branch,
U.S. Department of Justice, Civil Division
P.O. Box 883,Washington,
D.C., 20044

Tyler A. Brown
John M. Remy
Jackson Lewis, L.L.P.
8614 Westwood Center
Suite 950
Washington, D.C.  20005

Kurt N. Peterson
Jackson Lewis, L.L.P.
1900 Marquis One Tower
245 Peachtree Center Ave., N.E.
Altanta, GA 30303

Ronald I. Tisch
Jason M. Branciforte
Katherine A. Goetzl
1225 I Street, N.W.
Suite 1000
Washington, D.C.  20005

_____
Leslie Deak, Esq. [PA0009]