# Exhibit 9

## TO DEFENDANT JOHN CLARK'S MEMORANDUM IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' DUE PROCESS CLAIM

International Union, United Government Security Officers of America, et al. v.
John Clark, Director of the United States Marshals Service, et al.,
Civ. A. No. 1:02cv1484 (GK)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| RONALD STROLBERG, et al., ) <br> ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> AKAL SECURITY, INC., et al., ) <br> ) <br> Defendants ) <br> ) | Civil Action No. 03-0004-DOC |

### DECLARATION OF RICHARD J. MILLER

I, Richard J. Miller, declare as follows:

#### Background

1. I am a Medical Consultant for Federal Occupational Health (FOH), a component of the U.S. Public Health Service. From 1995 through June 30, 2004, I was Director for Law Enforcement Medical Programs for FOH. A copy of my curriculum vitae is attached to this declaration as Exhibit A.

2. Law Enforcement Medical Programs (LEMP), a component of FOH, provides medical consultation and services to federal law enforcement agencies. These consultations and services include validation of medical standards, medical exams and medical qualification determinations for applicants and incumbents, medical surveillance (for example, hearing and lead testing for firearms instructors), and fitness for duty determinations for incumbents. Services in FOH/LEMP are provided by occupational

medicine physicians with several years of experience working exclusively with weapons-carrying occupations within the federal government.

3. As the Director for FOH/LEMP, I oversaw the delivery of medical services to our federal law enforcement agency customers, supervising a staff of about 40 physicians, nurses, and administrative personnel in Atlanta, GA. My administrative responsibilities ranged from the development of the interagency agreement between FOH and the receiving agency to ensuring that the medical review process was consistent, complete and up to current standards of care. In addition, I directly oversaw the delivery of medical services at our health units at the Federal Law Enforcement Training Center (FLETC) in Brunswick, GA and Artesia, NM, and at the U.S. Secret Service Headquarters in Washington, DC. I also functioned as the Primary Reviewing Physician for the U.S. Secret Service.

4. Currently, as a medical consultant to FOH/LEMP, I continue as the Primary Reviewing Physician for the U.S. Secret Service, with a new assignment in assisting in the development of a medical program for the U.S. Forest Service Law Enforcement and Investigations organization. In addition, I provide medical consultation to federal law enforcement agencies and FOH/LEMP staff, on request. One of these consultation functions is to review all of the proposed medical disqualification recommendations for the Court Security Officer program. I no longer have administrative responsibilities within FOH/LEMP.

5. My role with respect to the Court Security Officer (CSO) medical review program has evolved during the program's four-year existence. As described in more detail below, in

1999, I conducted a study for the U.S. Judicial Conference and the U.S. Marshals Service to identify the essential functions of the CSO position and recommend any changes in the medical standards then in place. After that study was completed and the basic standards approved, the USMS hired FOH (through an inter-agency agreement) to conduct the medical reviews. As Director for FOH/LEMP, I was primarily responsible for implementation of the CSO medical review program. In addition, during the first year or so of the program (until late 2001 or the first part of 2002), I was the primary reviewing physician. Dr. John Barson and Dr. Louis Chelton took over those responsibilities in later years, and Dr. Chelton remains the primary reviewing physician today. As noted above, since 2003, I have reviewed (first as the Director, now as the Medical Consultant) all disqualification recommendations regarding CSOs.

### Development of the CSO Medical Standards

6. On or about July 26, 1999, the United States Marshals Service and the Committee on Security and Facilities of the Judicial Conference of the United States (hereinafter, the "Committee" or the "Judicial Conference") jointly requested that FOH/LEMP conduct a job task analysis of the CSO position. The purpose of the study was to identify the essential job functions of the CSO position and advise the Judicial Conference on the medical standards needed to assess whether CSOs were able to perform those functions.

7. My understanding was that judges on the Committee were concerned that some CSOs were not physically capable of safeguarding the federal courts, particularly in the heightened security environment after the bombing of the federal building in Oklahoma

-3-

City. The concern, as expressed to me, was that CSOs be able to perform not only routine duties, but to respond adequately in emergency situations.

8. Five federal court districts were chosen for the functional job analysis. An effort was made to select districts of various sizes and attributes. The five districts, and dates visited, were:

| | |
|---|---|
| Northern Georgia District (Atlanta) | 9/29-30/99 |
| Delaware District (Wilmington) | 10/13-14/99 |
| Colorado District (Denver) | 10/20-21/99 |
| Maryland District (Baltimore) | 10/27-28/99 |
| Oregon District (Portland) | 11/3-4/99 |

In each court, I (with the assistance of colleagues from FOH/LEMP) conducted focus groups consisting of five CSOs of varying seniority. The goal, through group discussion, was to identify the frequency and importance of various job functions. Each focus group discussed and then agreed upon (by consensus or vote) the essential job functions of the CSO position. They also provided narrative comments on how they perform their jobs and the nature of their work environment. In addition to these focus groups, my FOH/LEMP colleagues and I collected information through interviews with federal judges, U.S. Marshals, Deputy U.S. Marshals, and other CSOs. We also spent time observing CSOs on the job to gain greater insight into their work functions and environments.

9. In 2000, I provided the Committee with a final report describing the results of the job task analysis and recommending a number of changes to the CSO medical standards. A copy of the final report is attached hereto as Exhibit B. It is dated February 4, 2000, but I

believe it was completed a few months after that. Due to a typographical error, the date was not changed from a prior draft.

10. Sometime after I presented the report, the Committee indicated that they were interested in having FOH/LEMP implement the recommendations of the report and establish the CSO medical review program. We formalized that agreement through another inter-agency agreement with the USMS.

11. I did not intend for the job task analysis report to describe every detail of the testing procedures and protocols that would be used to determine whether CSOs were qualified. Rather, my understanding was that any specific procedures and protocols would be developed by the organization conducting the medical reviews and would be refined as needed based on experience. That is, in fact, how we proceeded once FOH/LEMP was selected to carry out the program. We periodically consult with the USMS and the Committee regarding the medical review program and discuss any major issues that arise, but do not seek approval for every change in the testing procedures or protocols.

12. The job task analysis study was conducted, and the medical standards developed, specifically for the CSO position. Our objective was to identify the essential job functions of the CSO position and recommend medical standards based on those functions. The medical standards were not meant to assess whether CSOs are medically qualified to perform other jobs or whether they are substantially limited in any major life activities. In the field in which I specialize (law enforcement occupational medicine), law enforcement agencies have a wide range of medical requirements, depending on their specific mission, job duties and risk factors presented. The reviewing physicians at

FOH/LEMP make individualized assessments of medical qualification based on their knowledge of the medical standards that apply to the specific position at issue and the essential functions of that position.

13. I was never instructed to conduct the job function analysis or devise the CSO medical standards so as to disqualify older CSOs. Age was never a consideration in our analysis.

## Medical Review Process

14. FOH/LEMP reviewing physicians examine all pertinent medical information available in order to make a medical qualification recommendation to the agency as to whether an individual is or is not capable of safe and effective job performance. They have been trained to understand a wide range of medical conditions that are likely to impact on the job performance of weapons-carrying positions and are very familiar with essential job functions and the work environment of the particular position at issue. Given the variety of medical conditions that may be present and may affect job performance, the reviewing physician is unlikely to be a specialist in the treatment of the medical condition at issue in a particular case. He or she is, however, in a unique position to understand the medical qualifications for a weapons-carrying position and the impact of a medical condition on the ability to carry out the essential functions of that position.

15. FOH/LEMP uses a two-tiered approach for reviewing the medical qualifications of CSOs. The applicant or incumbent is first examined by a qualified examining physician in or near the district in which the CSO works. The contractor is responsible for finding physicians in each area. FOH/LEMP assists the USMS by checking each physician to make sure he or she is properly licensed and reviewing his or her malpractice history.

Upon reviewing the work of the examining physicians, FOH/LEMP also provides feedback on their clinical skills and consistency.

16. The examining physician reviews and compiles a complete medical history, commenting on all positive and significant negative historical findings, conducts a complete physical examination, interprets test results, identifies any concerns, and provides patient education and recommendations. He or she documents the result of the exam on USMS Form 229 and attaches related test results and other medical information. All of that material is then given to the contractor, which forwards it to the USMS, which reviews it for completeness and then forwards it to FOH/LEMP.

17. The second phase consists of the medical review performed by the reviewing physician at FOH/LEMP. In order to make recommendations to the USMS regarding the medical qualifications of CSOs, it is important to have an extensive knowledge of the essential job functions and work environment of the CSO position. In developing the CSO medical review process, I concluded that it was unreasonable to expect the examining physician to have the required job knowledge needed to make the individualized medical qualification recommendation. An examining physician may only see a few applicants or incumbent CSOs, whereas the reviewing physician performs thousands of reviews each year. This allows the reviewing physician to develop greater familiarity with the position and greater knowledge of the specific medical requirements for the position. Therefore, although FOH/LEMP considers recommendations made by examining physicians and relies on the objective results of their examinations, the ultimate responsibility for making a recommendation to the USMS rests with the reviewing physician. This provides a more

consistent review process, particularly when the individuals who are the subject of the medical reviews are spread across the country. With the documentation of a proper and complete medical history and physical examination, lab work, hearing and vision testing results, and any additional tests or reports, the reviewing physician should have all the necessary medical information to make an informed individualized medical qualification recommendation.

18. Except in the most unusual cases (where immediate action is needed), the reviewing physician never recommends disqualification based solely on the results of the annual medical examination. Instead, the reviewing physician will either state that the CSO is medically qualified or will request additional information. In many cases, that information will come from the individual's personal treating physician (for example, if he or she is under care for diabetes or a heart condition). In other cases (such as those involving hearing or vision), the CSO may be asked to visit a specialist to have additional tests done.

19. FOH/LEMP recommends medical disqualification of CSOs in two circumstances. First, if the CSO fails to provide the requested information, we may recommend medical disqualification on that basis. In many cases, CSOs are given two or even three opportunities to provide information before we make that recommendation. Second, we may recommend disqualification if the CSO provides the additional information requested and that information demonstrates to the reviewing physician that the CSO does not meet the relevant medical standard. As noted above, although I am no longer the reviewing physician, since 2003 I have reviewed all disqualifications.

## Hearing Standards

20. One of the issues we examined in the job task analysis was the importance of hearing to the CSO position. Based on the focus groups and interviews with CSOs, USMS personnel, and judges, and our observations of the job, it was clear that CSOs must possess and maintain adequate hearing in order to carry out their assigned duties in a safe and effective manner. The safety of the federal judiciary, court personnel, and the public depends on CSOs' ability to hear, localize, discriminate, recognize, and/or understand a variety of environmental and speech sounds. Our job task analysis identified six hearing-related essential job-functions for the CSO position:

   a. Comprehend speech during face-to face conversations
   b. Comprehend speech during telephone conversations
   c. Comprehend speech during radio transmissions
   d. Comprehend speech when you can see another CSO
   e. Hear sounds that require investigation; and
   f. Determine the location of sound.

21. The environment in which the CSO operates is a very dynamic and evolving one. In most work environments, the potential hazard and threat incidents that can occur can often be predicted with regards to their frequency of occurrence, the cause of the incident, the course the incident will run, and what is required to deal with incident. While the ability to hear is important in these environments, analysis of the potential threats and hazards can allow the development of plans and procedures to deal with the incident in a predictable way. In the environment of the CSO, potential threats and hazards involve the human element (individual or group), which is actively attempting to disrupt the normal state of the environment (e.g., court room, hallway, area surrounding the court

house) for their own purposes (e.g., escape, disruption of court, assassination). The risk for those who depend on CSOs for their safety is great if the CSO is unable to perform their essential hearing job functions.

22. Our job task analysis also indicated that communication is critical to informing the responding officers about an emergency situation and rapidly developing responses to security breaches. CSOs must, therefore, be able to clearly understand directions in times of crisis. They must be able to hear communication at a level of sound that does not inform persons causing an incident of the CSOs' response plans. They also must be able to discern the direction of a disturbance or detect an approaching threat (sound localization).

23. Based on our conclusions regarding the importance of hearing to the CSO position, FOH/LEMP recommended, and then implemented, a two-tiered system for detecting and assessing CSOs' hearing ability.

   a. **Pure-tone Screening**. The first phase consists of an unaided pure tone audiogram, performed by a licensed and/or certified audiologist, or a technician certified by the Council for Accreditation in Occupational Hearing Conservation, or the equivalent. The purpose of this screening test is to identify and assess the degree of any hearing loss at various frequencies.

      i. The number of frequencies tested depended, at least during the early life of the program, on the judicial circuit in which the CSO worked. My understanding is that, as contracts were renewed by the USMS, additional frequencies were added for CSOs working under those contracts. The

    basic criteria was no loss greater than 30 decibels (dB) in either ear at the test frequencies of 500 Hertz (Hz), 1000 Hz, and 2000 Hz. As of October 1, 2001, we used a more extensive range of test frequencies (allowing hearing loss up to 40 dB at 3000 Hz and 50 dB at 4000 Hz) for CSOs in the 3rd, 5th, and 12th circuits. As of October 1, 2002, CSOs in the 1st, 2nd, 4th, and 6th circuits also were tested at those higher frequencies. Other circuits may have been added since that time.

  ii.    In addition to this phasing-in of some of the pure tone frequencies, FOH/LEMP also allowed for slightly greater hearing loss for incumbent CSOs, as compared to applicants. This was an attempt to account for the fact that the incumbents were familiar with the job and in a better position to compensate for hearing loss that slightly exceeded our requirements.

  iii.    The hearing standards established for CSOs allow for mild to moderate hearing loss. These standards do not require perfect or even "normal" hearing (generally defined in the field to include hearing loss up to 25 dB at 500, 1000, 2000, and 3000 Hz). We attempted, in the CSO hearing standards, to strike a balance by allowing some hearing loss, but requiring a level of unaided hearing ability necessary to safely and efficiently perform the job.

  iv.    If the CSO or CSO applicant meets the unaided screening criteria and does not wear hearing aids, adequate auditory function is inferred and no further testing is necessary.

-11-

b. **Functional Testing.** Those who fail to meet the unaided pure tone screening criteria, or meet those criteria but wear hearing aids, are referred for a more in-depth second phase evaluation to determine auditory function, particularly for speech recognition. A licensed and/or certified audiologist must perform this evaluation. The second phase evaluation includes:

i. Additional, unaided audiogram testing to verify the results of the initial screening audiogram and identify any significant (greater than 25 dB) disparities between the ears (which would indicate a compromised ability to localize sound).

ii. Testing for unaided speech reception thresholds (SRT) for each ear under headphones. These results should not exceed 30 dB in each ear.

iii. Testing for unaided speech recognition in quiet for each ear, performed under headphones at +30 dB SL (30 dB over the SRT level determined in ii), but not to exceed 75 DB. This tests the ability of the CSO to hear and distinguish a spoken list of words in a quiet environment. At least 90% of the words must be identified correctly.

iv. Testing for unaided sound field speech recognition in noise. This tests the CSO's ability to hear and distinguish a spoken list of words in a noisy environment. At least 50% of the words must be identified correctly.

v. If the CSO meets the above requirements unaided, but wears hearing aids, we also require him or her to take the functional tests aided (i.e., with the hearing aids in place). We compare the results to the unaided testing to

       make sure that the hearing aid is functioning and does not in fact worsen the individual's hearing abilities (which can occur in some cases). We originally instructed CSOs who wore hearing aids take both sets of tests (unaided and aided) during the same visit to the audiologist. This was meant to save time and expense, because it eliminated the need to return for additional testing after the reviewing physician determined that the unaided portion had been passed. However, that procedure seemed to cause confusion, in that some CSOs thought they could qualify solely on the basis of the aided testing (which was never the case). Therefore, we now limit our initial request to unaided testing and only request the aided testing after determining that an individual meets the unaided requirements, but wears hearing aids on the job.

24. In developing and implementing hearing standards and testing procedures for all of our client agencies, FOH/LEMP periodically consults with Lynn Cook, Au.D., an Occupational Audiologist for the U.S. Naval Medical Center who specializes in law enforcement occupational audiology. Dr. Cook did not create the CSO standards, but the standards reflect input we received from her regarding the hearing demands of this type of position and the problems associated with hearing aids (as described below). Since the CSO standards were first implemented in late 2000 or early 2001, FOH/LEMP has adjusted them periodically as we have learned more about currently available technologies and research on hearing loss. In making these adjustments, we again consulted periodically with Dr. Cook.

25. One requirement that has remained unchanged since the program began is that CSOs pass both the pure tone audiogram and the functional tests unaided – i.e., without the use of a hearing aid. I initially recommended to the Judicial Conference that the use of hearing aids by CSOs be prohibited entirely. However, the Judicial Conference expressed concern that such a prohibition would disqualify too large a percentage of the CSO workforce. Accordingly, we agreed to an approach in which CSOs are required to pass the relevant tests unaided, but if they do so are allowed to wear hearing aids on the job.

26. Our concerns regarding the use of hearing aids were based on knowledge acquired in FOH/LEMP's work for various weapons-carrying positions and consultations with Dr. Cook and other experts in the field. Unlike eyeglasses in those with visual impairment, hearing aids do not restore those with permanent hearing loss to normal hearing. Hearing aids come with a legal disclaimer stating this fact. A certain level of distortion is inherent in all sensori-neural hearing losses and hearing aids improve hearing ability the least under the most difficult listening situations (increased background noise) where hearing impaired individuals need the greatest enhancement and where CSOs face the most critical and safety-sensitive situations. With a significant hearing difference between the two ears, the ability to localize sound (determine its direction) is generally lost. In addition, hearing aids are mechanical devices and as such are subject to loss, malfunction, and breakage. Batteries die and hearing aids may be dislodged in physical confrontations. For all of these reasons, we determined that allowing CSOs to meet the requirements using hearing aids was not compatible with the extremely demanding hearing critical job functions of the CSO.

27. FOH/LEMP is not responsible for drafting the contracts between the USMS and the companies that employ the CSOs. My understanding, however, is that until 2002, those contracts did not spell out the hearing requirements and testing procedures in much detail. Toward the later part of 2002, USMS indicated that they were interested in modifying the contracts to include more information regarding the hearing requirements and the hearing evaluation procedures, and they sought my input regarding the language of that modification. Attached to this declaration as Exhibit C is the 9th Circuit version of that modification. The functional tests and requirements described in that document are the same ones FOH/LEMP was using prior to the contract modification. In other words, the contract modification reflected practices that were already being followed and had been in place since shortly the new CSO medical review program began in 2001.

### Diabetes Standard

28. Diabetes itself is not a disqualifying condition for CSOs. Rather, an individualized assessment of each individual's diabetic condition is performed using evaluative criteria to determine whether the diabetic condition permits safe and efficient job performance. The objective is to assess the risk that the diabetic will experience symptoms or complications of the disease while on the job, such that he or she will be unable to perform the essential job functions. For example, a CSO experiencing a hypoglycemic episode (low blood sugar), may suffer from cognitive impairment, slow reaction time, loss of sensation, etc. That, in turn, will affect the CSO's ability to respond to a physical attack, retain and use his or her weapon, detect threats, and respond quickly in all types of emergency situations. The reviewing physician considers a number of factors in

-15-

determining whether a CSO's diabetes is under sufficient control, including: history of blood glucose control, current stability of blood glucose, risk for significant hypoglycemia and hyperglycemia, and presence of diabetic complications, such as cardiac disease, vision loss, neurological changes and kidney function loss.

### My Work as Primary Reviewing Physician

29. As noted above, I was the primary reviewing physician during approximately the first year to eighteen months of the new CSO medical review program. During that time, I reviewed the medical examinations and medical records of thousands of incumbent CSOs. Of these, I would estimate that hundreds had diabetes or hearing impairments. Although I don't have exact numbers, I know that I recommended medical disqualification for only a small percentage of individuals with those conditions. As described above, diabetes and hearing impairments are not automatic disqualifiers under the standards. Rather, the reviewing physician evaluates each individual to assess whether their diabetes is sufficiently controlled and whether the hearing impairment is of such a level that they can be qualified.

30. During my time as the primary reviewing physician, I qualified many CSOs over the age of sixty and some over the age of seventy. I never disqualified individuals based on their age or considered that a relevant factor.

31. Based on records that have been provided to me, I was the reviewing physician who recommended disqualification of two of the plaintiffs in this case. They are as follows:

# These paragraphs refer to individual plaintiffs from the <u>Strolberg</u> case and have therefore been redacted.

These paragraphs refer to individual plaintiffs from the Strolberg case and have therefore been redacted.

These paragraphs refer to individual plaintiffs from the <u>Strolberg</u> case and have therefore been redacted.

I declare, under penalty of perjury, that the above information is true and correct.

_11-29-04_
Date

_[signature]_
Richard J. Miller, M.D.

-18-