1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
-----------------------------------
                                   )
INTERNATIONAL UNION, UNITED        )
GOVERNMENT SECURITY OFFICERS       )
OF AMERICA, ET AL.                 )
                                   )
          Plaintiffs,              )
                                   )
   vs.                             ) Civil Action No.
                                   ) 1:02cv1484
BENIGNO G. REYNA, DIRECTOR OF      )
THE UNITED STATES MARSHALS         )
SERVICE, in his Official           )
Capacity                           )
                                   )
          Defendant.               )
                                   )
-----------------------------------
```

Thursday, May 6, 2004
Washington, D.C.


          Deposition of Richard Jay Miller, M.D.,

called by counsel for the Plaintiffs, pursuant to

notice, at the U.S. Department of Justice, 20

Massachusetts Avenue, N.W., Washington, D.C. 20044,

before Jacqueline L. Wood, a notary public in and

for the District of Columbia, beginning at 9:40

a.m., when were present on behalf of the respective

parties:



Page 2

APPEARANCES:

ON BEHALF OF THE PLAINTIFFS:

JOHN A. TUCKER, ESQ.
39 East Market Street
Suite 402
Akron, Ohio   44308

LESLIE DEAK, ESQ.
1204 San Antonio Street
Suite 203
Austin, Texas   78701
(800) 781-3967

ON BEHALF OF THE DEFENDANT:

JOHN R. GRIFFITHS, ESQ.
DANIEL RIESS, ESQ.
U.S. Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, D.C.   20044
(202) 514-4652

C. JOSEPH CARROLL, ESQ.
U.S. Department of Justice
U.S. Marshals Service
Arlington, Virginia   22202
(202) 307-9054

Page 3

I N D E X

Witness                                    Page

Richard Jay Miller, M.D.

          By Ms. Deak                        4


               (NO EXHIBITS)

Page 4

1          P R O C E E D I N G S
2      Whereupon,
3          RICHARD JAY MILLER, M.D.
4  was called as a witness and, having been first duly
5  sworn by the notary public, was examined and
6  testified as follows:
7      EXAMINATION BY COUNSEL FOR THE PLAINTIFFS
8          BY MS. DEAK:
9      Q. Would you please state your full name for
10 the record.
11     A. Richard Jay Miller. My middle name is
12 spelled J-A-Y.
13     Q. Mr. Miller, my name is Leslie Deak. I'm
14 here representing the plaintiffs in this case who
15 are UGSOA, a union representing court security
16 officers, and 45 individual court security officers
17 who I will not name specifically. Over here is Mr.
18 Tucker, my co-counsel in this matter. I'm going to
19 go over a couple ground rules and then ask you some
20 questions about this issue.
21         First, have you taken any medication in
22 the last 48 hours that could affect either your
23 ability to understand the questions I'm asking you

Page 5

1  or to respond to them?
2      A. No.
3      Q. Is there anything in your personal life,
4  anything else that would distract you so as to give
5  you problems either understanding my questions or
6  responding to them accurately?
7      A. No.
8      Q. Okay. Just a couple other ground rules.
9  I'm going to ask that you let me finish my
10 questions. I'm going to do the same with you and
11 let you finish answer.
12         This is for a couple things. One, I want
13 to make sure that you allow me to ask my full
14 question so that's on the record so that everyone
15 understand what I'm asking you, and also for the
16 court reporter so that she is able to record what
17 we're saying.
18         If you do not understand what I'm saying,
19 please stop me. I will repeat it or rephrase it.
20 If you don't say something then your answer will be
21 taken as if you understood my question regardless
22 of whether you did or didn't.
23         The last thing is that it's very

Page 50

1    Q  Which ones do you think you did prior to
2  doing the review for the CSO's?
3    A. I really can't tell you. I can't
4  remember.
5    Q. But probably the Park Service, probably
6  INS inspectors, probably GSA?
7    A  And IRS  Those for sure.
8    Q  And then you're not sure whether you did
9  any others before that?
10    A. I can't remember.
11    Q. Let's talk about the survey that you did
12  for the CSO's. How did you get hooked up with the
13  Marshals Service?  How did that happen?
14    A  My program had been doing the medical
15  reviews for the Deputy U.S. Marshals. In fact,
16  FOHS has been working with Deputy U.S. Marshals for
17  many years. I was meeting with the Marshals
18  Service and Mark Farmer, with judicial security,
19  came and met with me.
20    Q  He met with you in the context of your
21  review for the deputy marshals?
22    A. No. He came to discuss my getting
23  involved with the CSO's.

Page 51

1    Q  So you don't know where he heard your
2  name from or did he tell you?
3    A  I don't know.
4    Q  And when he sat down with you what did he
5  ask?  What did he say to you?
6    A  I can't remember specifically, but he
7  basically talked about my getting involved in the
8  medical reviews for CSO's. Actually, initially we
9  even talked about our doing the actual examinations
10  and the reviews.
11    Q. Did you tell home your background?
12  Strike that. Did he ask you about your background?
13    A  I'm not sure.
14    Q. Did you provide him with a CV?
15    A. I don't remember.
16    Q. Do you remember if he asked you how many
17  medical standard reviews you had done?
18    A. I don't remember.
19    Q. Do you remember if you told him?
20    A  I don't remember.
21    Q  You said that you met with Mr. Farmer.
22  Did you either meet with or interview with anyone
23  else in the Marshals Service?

Page 52

1    A. Not that I remember.
2    Q. You wouldn't have met with Sylvester
3  Jones?
4    A. I have met with Sylvester Jones, but I
5  don't think it was in the context of the question
6  you're asking.
7    Q. That was a broad question. Let me narrow
8  that. Did you meet with Sylvester Jones prior to
9  being awarded the contract to provide medical
10  reviews for the court security officer program?
11    A. I don't know if he was actually the
12  director of JSD at that time. I don't know if he
13  was in the program.
14    Q  Did you meet with someone who was Mark
15  Farmer's superior at that time?
16    A  Not that I remember.
17    Q  So it may have been only Mr. Farmer?
18    A  That's all I remember within the Marshals
19  Service.
20    Q. So you met with Mr. Farmer. He told you,
21  I have these CSO's, we need to get a new medical
22  program and new medical standards for them. Is
23  this basically true?

Page 53

1    Let me ask. What did he tell you more
2  specifically that he wanted to do?  I want to make
3  sure that I understand that.
4    A. From what I remember, he was talking
5  about my looking at the current medical standards
6  and providing a determination as to whether they
7  were valid or whether changes needed to be made.
8    Q. So it was a review of the then current
9  CSO medical standard and a determination as to
10  whether changes needed to be made?
11    A. To the best of my memory, yes.
12    Q. You had mentioned this. I just wanted to
13  make sure. At the initial time, did you talk about
14  your office conducting the actual exams?
15    A. There was discussion, yes.
16    Q. At that time, too. So it was sort of a 2
17  part thing, during a review of the standards and
18  then your office potentially or possibly coming in
19  to do the exams?
20    A. Yes. There were actually 3 things. The
21  review of the exams.
22    Q. So then it would have been, in this
23  initial meeting you talked about reviewing the

Page 54

1 current standards and making sure they were
2 accurate and adequate; correct?
3    A. Correct.
4    Q. The second thing being your agency
5 performing the exams for the CSO's?
6    A. Correct.
7    Q. And then your agency reviewing the
8 outcomes of the exams to determine whether the CSO
9 met the medical standards?
10    A. Correct.
11    A. That's a large problem; right?
12    A. Yes.
13    Q. So he sits down with you and says he's
14 interested in a contract with your agency; right?
15    A. It's actually termed an interagency
16 agreement. Its not a formal contract.
17    Q. So they wanted an interagency agreement
18 with your agency to do this type of work. So you
19 didn't talk to anyone else in the Marshals Service.
20 He just said he wants you guys to look at doing
21 this; right?
22    A. To the best of my memory, yes.
23    Q. Did you meet with anyone from the

Page 55

1 Judicial Conference on this?
2    A. Yes.
3    Q. Who did you meet with?
4    A. There was a meeting with the subcommittee
5 of the facility security.
6    Q. So you met with the full subcommittee?
7 I'm sorry. You met with the full committee?
8    A. I think it was the subcommittee.
9    Q. That was then the subcommittee on
10 security?
11    A. Yes. I'm not sure what the title is.
12 But it's a subcommittee under the big committee.
13    Q. Who was at that meeting, to the best of
14 your recollection?
15    A. Of course there were the judges.
16    Q. Do you remember the names of any of the
17 judges, to the best of your recollection?
18    A. No. And there were representatives from
19 the Administrative Office of the U.S. Courts.
20    Q. Do you remember who was there from the
21 AOC, the Administrative Office of the Courts?
22    A. Dennis Chapas, head of security or chief
23 of security, was there. Others I can't remember.

Page 56

1    Q. Was Mr. Issaman?
2    A. I don't remember.
3    Q. Was there anyone there from the Marshals
4 Service?
5    A. Yes.
6    Q. Can you tell me who?
7    A. Mark Farmer was there.
8    Q. Anyone else from the Marshals Service?
9    A. Not that I remember.
10    Q. Was there anyone else that we've omitted?
11 Say anyone else from your agency? Did anyone else
12 come with you?
13    A. There were other people at the meeting.
14    Q. Do you know who they were?
15    A. They were, to the best of my memory, the
16 Marshals Service or the committee had contracted
17 with an outside entity, Washington Occupational
18 Health Associates, to do a study concerning the
19 medical requirements and there were two
20 representatives from that organization.
21    Q. Do you remember their names by any
22 chance?
23    A. No.

Page 57

1    Q. The one thing I haven't asked was when
2 was this meeting with the Judicial Conference?
3    A. 1998 or 1999.
4    Q. Basically, tell me what occurred at that
5 meeting?
6    A. That I was aware of?
7    Q. I'm looking for when you were there, what
8 you saw, what happened. Nothing that you heard of
9 later.
10    A. The representatives from Washington
11 Occupational Health Associates gave a presentation
12 as to the results of their study, their report.
13    Q. And you were present for that
14 presentation?
15    A. Yes. And after their report I basically
16 gave, the judges asked me what I thought about
17 that, what my opinion was, and my recommendations.
18    MR. GRIFFITHS: Do you want to take a
19 quick break?
20    MS. DEAK: That would be fine. We can
21 take ten minutes.
22    (Recess.)
23    BY MS. DEAK:

Multi-Page™

Page 70

1  A. Not that I remember.
2  Q. Did you tell them about your background,
3  how long you had been doing these medical standard
4  reviews?
5  A. I don't remember.
6  Q. Do you remember if they asked?
7  A. No.
8  Q. Did you tell them about your training and
9  how you learned to do these medical standard
10 reviews?
11 A. I don't remember.
12 Q. And you don't remember if they asked?
13 A. Correct.
14 Q. Do you remember anything else about this
15 meeting in 1999?
16 A. No.
17 Q. So you don't remember if Mark Farmer said
18 anything at the meeting when you were present?
19 A. Correct.
20 Q. So after this meeting, July 1999, what
21 happened with regard to your involvement in the CSO
22 medical standards?
23 A. As I remember, shortly after that Mark

Page 71

1  Farmer contacted me and told me that the committee
2  had approved the study and the study went forward.
3  Q. So they had approved you doing a study of
4  the CSO medical standards; correct?
5  A. Yes.
6  Q. You had not performed a study or review
7  of the CSO medical standards at that point?
8  A. Correct.
9  Q. What was the next step?  They said okay,
10 we want you to do a study.  What happened?
11 A. We embarked upon a study which was to
12 visit 5 districts.
13 Q. You embarked upon a study.  How did you
14 decide how to do the study?
15 A. It was a format that we had been using.
16 Q. Describe the format that you had
17 developed?
18 A. The format would be to spend a day in a
19 focus group of 5 incumbent CSO's and a day in
20 observation.
21 Q. And was this a general format that you
22 used with other agencies?
23 A. Yes.

Page 72

1  Q. So with all other agencies you spent one
2  day in a focus group and one day observing; is that
3  correct?
4  A. Yes.  Per field visit.
5  MS. DEAK: Can we go off the record for a
6  second?
7  (Off the record.)
8  BY MS. DEAK:
9  Q. Back on the record.  Dr. Miller, I'm
10 going to go a little bit out of order because this
11 has been a little bit of a question for me that I
12 would like to figure out.
13 I'm going to point you to a document,
14 Exhibit 56, starting at page 8007.  Do you
15 recognize this?
16 A. Yes.
17 Q. Can you tell me what that is?
18 A. Interim draft report medical requirements
19 for court security officers.
20 Q. Is that date correct?  Is that the
21 correct date in which you prepared this report?
22 A. Yes.
23 Q. Did you author this report?

Page 73

1  A. Yes.
2  Q. Now I'm going to give you what has been
3  marked as Plaintiffs' Exhibit 11.  Do you recognize
4  that?
5  A. Yes.
6  Q. Can you state for the record what it is?
7  A. Final report, medical requirements for
8  court security officers.
9  Q. That's also dated February 4, 2000.  Is
10 that the correct date?
11 A. I probably made an error in not updating
12 the date.
13 Q. This was a confusion that I wanted you to
14 clarify.  Do you remember how long it was between
15 the interim report and the final report?
16 A. No.
17 Q. Do you know which is dated incorrectly?
18 A. My assumption is that the final report is
19 dated incorrectly.
20 Q. And you authored both of these documents;
21 correct?
22 A. Yes.
23 Q. Are there differences in the document?

Multi-Page™

Page 74

1 Did you make changes between the interim draft
2 report and the final report?
3    A. Yes.
4    Q. We will get to those. We just needed
5 that clarification because we weren't sure. All
6 right. Let me go back and I'm going to be starting
7 with the interim draft report. So you conducted
8 focus groups; correct?
9    A. Yes.
10    Q. In 5 areas. Atlanta; Wilmington,
11 Delaware; Denver; Baltimore; and Portland, Oregon;
12 correct?
13    A. Yes.
14    Q. Who determined where you were going to
15 go, what sites you were going to go?
16    A The Marshals Service.
17    Q. The Marshals Service told you where to
18 go?
19    A Yes.
20    Q. Did you have any input on which sites you
21 would visit?
22    A Yes.
23    Q. What was your input?

Page 75

1    A  My input was to tell them up front that
2 we wanted to view districts in which the broad
3 performance could be observed, the maximum exposure
4 that we would get.
5    Q. The maximum exposure to what?
6    A. To their job performance. That they
7 would be performing the wide range of duties.
8    Q. So you told the Marshals Service that's
9 where you wanted to go so you could observe a broad
10 range of duties and they said, okay, we're going to
11 have you go to these places?
12    A. Correct.
13    Q. In each of these places you spent one day
14 on the focus group; correct?
15    A. Yes.
16    Q And then did you spend a full day then
17 observing?
18    A. Yes.
19    Q Let's talk about the focus groups. You
20 said you spent one day meeting with the focus
21 group. That's an 8 hour day generally speaking?
22    A. Yes.
23    Q. How many CSO's were in each focus group?

Page 76

1    A. 5.
2    Q. So 5 CSO's in each location were picked?
3    A Yes.
4    Q. Who picked the CSO's to participate in
5 the focus groups?
6    A. The Marshals Service.
7    Q. Did you have any input into who was
8 picked?
9    A. Yes.
10    Q. What was your input?
11    A. My input was to ask that we have 1 junior
12 CSO, 2 mid career, I'll explain this, 1 who had
13 been there for awhile, and 1 supervisor. I can't
14 remember. I would have to review the actual years.
15 But one person would have let's say a couple years
16 on-the-job. 2 would have 5 to 10 years. One would
17 have 10 plus years and then there would be a
18 supervisor.
19    Q. By supervisor do you mean a lead CSO or
20 do you mean a site supervisor?
21    A. I don't know if I was that specific.
22    Q. Do you know what you ended up with? Did
23 you end up with a lead CSO or a site supervisor?

Page 77

1    A. I'd have to review the documentation.
2    Q. If you can find it in there, yes, go
3 ahead?
4    A  I'm not sure if I see that information in
5 here.
6    Q. All right. We can go forward. You
7 didn't specify and it didn't leap out at you when
8 you were doing the focus groups whether they were
9 lead CSO's or site supervisors?
10    A. Correct.
11    Q. Do you know the difference between those
12 2 positions?
13    A. Not at this time.
14    Q. Did you at that time know the difference
15 between those 2 positions?
16    A. I would say probably.
17    Q. Let me ask you this question, and I don't
18 know if you had any discussions with the Marshals
19 Service about this. Not all locations have that
20 many CSO's. There are some courthouses that have
21 very few.
22       Did you discuss where you went in terms
23 of they needed to have 5 CSO's available? Did you

Page 130

1 on that and I'll go over that with you later. Let
2 me go back to these reports then because that did
3 clarify part of the question for me.
4     So we talked about the differences with
5 regard to the hearing standards. Can you tell me,
6 were there other substantive differences in the
7 standards between the interim draft report and the
8 final report?
9     A  Without going through that's what I'm
10 aware of.
11    Q. This was the big change between the 2
12 reports?
13    A. It's the one I am aware of at this time.
14    Q. So to the best of your recollection, the
15 vision standards, diabetes standard, cardiac
16 standards, those things stayed the same between the
17 2 reports?
18    A. As I remember without actually looking
19 and comparing, yes.
20    Q. Dr. Miller, you were brought in in July
21 of 1999, you met with the Judicial Conference, and
22 you were told that they were looking to have a
23 review of their medical standards, possibly have

Page 131

1 your group do the examinations and then do the
2 review.
3     A. Correct.
4     Q. Did the Marshals Service, Mark Farmer, or
5 anyone in the Judicial Conference tell you why they
6 were looking to review these standards?
7     A  Yes.
8     Q. Can you tell me what you were told?
9     A. To the best of my recollection, I was
10 told that the judiciary was concerned about the
11 security of the courthouses and the ability of the
12 CSO's to provide that security.
13    Q. Who told you that?
14    A. I can't remember specifically.
15    Q. Do you remember if you had a conversation
16 with any judge?
17    A. I can't remember specifically.
18    Q. Were they any more specific other than
19 just a concern about the security?
20    A  I can't remember.
21    Q  Did anyone tell you about any specific
22 security breaches that occurred in the courts?
23    A. Not that I remember.

Page 132

1     Q  Did anyone discuss any problems with the
2 CSO's that they wanted to remedy?
3     A. I can't remember any specific cases.
4     Q  I asked you about the judges. I didn't
5 ask you about conversations with Dennis Chapas. I
6 think you said you had spoken to him?
7     A. Correct.
8     Q. Did he tell you about any problems that
9 had arisen that they were looking to resolve?
10    A  I can't remember the specific discussion
11 we had.
12    Q. But you had a discussion with him?
13    A. Yes.
14    Q. What do you remember about that
15 discussion?
16    A. Really, the only thing I can remember is
17 sitting down in his office. I can remember the
18 physical setting but I can't remember the content
19 of the discussion.
20    Q. And this was before you began the survey?
21    A. I think it was.
22    Q. No idea what you talked about?
23    A. No.

Page 133

1     Q. Did you ever talk to Mr. Issaman from the
2 AOC?
3     A  Yes.
4     Q. Did you talk to him about why they were
5 seeking to review and perhaps change the CSO
6 medical standards?
7     A  At any time?
8     Q. At any time.
9     A  No.
10    Q. You told me what was relayed to you in
11 terms of why they wanted to change the medical
12 standards or review the medical standards. Did
13 they tell you actually they wanted to change them
14 or just review them?
15    A. I'm not sure exactly how it was placed to
16 me.
17    Q. What did you understand?
18    A. As I remember, they wanted to me to
19 review and evaluate.
20    Q. Okay. Not necessarily change?
21    A. I can't remember any customer coming to
22 me and saying we want it changed.
23    Q. Was there an implication that we wanted

Page 134

1 it changed.
2     MR. GRIFFITHS: Object to the form, but
3 you can answer.
4     BY MS. DEAK:
5   Q. Did you understand an implication?
6   A. My understanding was that they weren't
7 happy with let's broaden it to the current medical
8 program.
9   Q. In this process you conducted the review,
10 you did an evaluation, you prepared a report. This
11 final report, Exhibit 11, this was provided to the
12 Judicial Conference; correct?
13   A. As I said before, I provided it to Mark
14 Farmer. What he did and who he distributed it with
15 I do not know.
16   Q. Let me clarify one thing. When I say the
17 Judicial Conference I'm referring to not just the
18 conference but also the Committee on Security and
19 Facilities and the subcommittee. I'm just going to
20 use that blanket term, the Judicial Conference, and
21 if I need to specify something further I'll make it
22 more specific. But I'd like you to understand that
23 if I say Judicial Conference I mean that.

Page 135

1   A. Correct. That was my understanding.
2   Q. All right. Good. You did meet with the
3 Judicial Conference after July of 1999; correct?
4   A. Correct.
5   Q. And you met with them regarding your
6 final report; correct?
7   A. Correct.
8   Q. So you know at point they did receive
9 your final report; correct?
10   A. Correct.
11   Q. And you gave a presentation with the
12 final report; correct?
13   A. Correct.
14   Q. Please tell me what you remember about
15 the presentation and the meeting at that point?
16   A. I gave a summary of the study findings.
17 I'm not sure if I had already drafted up the
18 report, the one, I guess the Minneapolis meeting.
19 I guess I had already done the report by then. So
20 I gave a summary of the study and the findings and
21 my recommendations.
22   Q. Were there any questions? This was to
23 the committee; correct?

Page 136

1   A. It was the full committee; correct.
2   Q. Did you have any questions from the
3 committee members?
4   A. I'm sure I did.
5   Q. Do you remember what any of them were?
6   A. Mo, I don't.
7   Q. Did any of them ask about an appeal
8 process for the CSO's?
9   A. I'm not sure if they brought up that as a
10 question.
11   Q. Did you bring that up, that subject up?
12   A. I probably did.
13   Q. Is Exhibit 56 in front of you?
14   A. Yes.
15   Q. Did anyone, either in this meeting or
16 prior to, did anyone talk to you about sort of the
17 CSO's perspective on this medical exam and new
18 medical standards?
19     Did they talk to you about, for example,
20 what the CSO's concerns might be with regard to
21 this and what their interest might be with regard
22 to the new medical standards?
23     MR. GRIFFITHS: Object to the form, but

Page 137

1 you can answer.
2     BY MS. DEAK:
3   Q. If you understood.
4   A. No.
5   Q. Let me rephrase. Actually, I'm going to
6 draw that and go on.
7     On page 8006, there was a discussion I believe
8 by you about a process to deal with medical review
9 and medical disqualification; correct?
10   A. Correct.
11   Q. Is this your writing here on this page?
12   A. No.
13   Q. So this is before the beginning of your
14 report?
15   A. Correct.
16     MR. GRIFFITHS: When you say writing you
17 mean the typewritten?
18     MS. DEAK: I m sorry. I meant drafting
19 in terms of writing, not handwriting.
20     BY MS. DEAK:
21   Q. I'm back on page 8006. Did you suggest
22 to them an appeals process for dealing with medical
23 disqualifications?

Page 138

1    A. Did I suggest?
2    Q. To the Judicial Conference.
3    A I can't remember whether I suggested it.
4 I probably did.
5    Q. On this page there is a procedure laid
6 out with bullet points?
7    A. Correct.
8    Q. Are you familiar with this procedure?
9    A. Yes.
10    Q. Is this a procedure that you have
11 endorsed in the past?
12    A. Yes.
13    Q. Do you remember if you recommended that
14 this procedure be used with regard to the CSO's?
15    A. As I look at this now and try to
16 recollect the discussion that occurred, it seems to
17 me that I was discussing an appeal process.
18    Q. And you were discussing it with the
19 Judicial Conference?
20    A. Correct.
21    Q. Is this something that you recommended to
22 them?
23    A. Again, I don't know if I specifically

Page 139

1 recommended it, but I probably did.
2    Q. Did you end up adopting this procedure?
3    MR. GRIFFITHS: Object to the form.
4    THE WITNESS: By this procedure you mean
5 all 4 bullets?
6    BY MS. DEAK:
7    Q. Right. That was written out on page 8006
8 in terms of disqualifying CSO's.
9    MR. GRIFFITHS: The question is, did he
10 adopt it?
11    MS. DEAK: Yes. That was the question.
12 Let me clarify. When I say you I mean you
13 representing the agency and PHS who are developing
14 the medical standards and process. I don't mean
15 him personally as an individual. I mean in the
16 official capacity.
17    MR. GRIFFITHS: As PHS adopting it.
18    MS. DEAK: Right. In terms of the CSO
19 program.
20    MR. GRIFFITHS: I just want to make sure
21 you weren't implying that he was representing the
22 Judicial Conference. I just object to the form. I
23 don't want to say any more than that.

Page 140

1    MS. DEAK: I'm not asking this question
2 to be tricky or misleading.
3    MR. GRIFFITHS: I'll just object to the
4 form.
5    MR. GRIFFITHS: I think. As my counsel
6 is suggesting, it's my opinion I would not be in a
7 position to adopt an appeal policy. That would be
8 the purview of the employer or the Marshals
9 Service.
10    BY MS. DEAK:
11    Q. So in terms of whether this was adopted
12 or not, that would be the Marshals Services'
13 decision?
14    A. Yes.
15    Q. Okay. So you provided them with the
16 information, meaning the Marshals Service and the
17 Judicial Conference, and it was up to them to
18 decide what they wanted to do with it?
19    A. Yes. If you're looking at all 4 bullets,
20 yes.
21    Q. And you don't remember if you played any
22 role with regard to them adopting this full
23 procedure?

Page 141

1    A. Well, to the best of my knowledge, there
2 is no medical review board. So I guess my
3 interpretation is it has not been adopted.
4    Q. My question is, did you recommend and did
5 you suggest that they should adopt medical review
6 board? They meaning the Marshals Service and
7 Judicial Conference?
8    A. I can't remember specifically whether I
9 recommended it, but I probably did.
10    Q. Do you know why such a medical review
11 board was not adopted?
12    A. No.
13    Q. Is this procedure with the medical review
14 board, is that used by other agencies who have
15 implemented the medical standards that you've
16 developed?
17    A. Some. Yes.
18    Q. Dr. Miller, do you have an understanding
19 of what happens to CSO's after they're medically
20 disqualified?
21    A. I'm assuming you mean after we recommend
22 a medical disqualification. PHS recommends a
23 medical disqualification.

Page 142

1    Q. Let me understand this because we've
2 gotten different information. You view what you do
3 as making a recommendation?
4    A. Correct.
5    Q. So PHS only recommends medical
6 disqualification; correct?
7    A. Correct.
8    Q. Does PHS have the authority to actually
9 medically disqualify a CSO?
10    A. No.
11    Q. And once you recommend medical
12 disqualification, do you have an understanding as
13 to what happens with the CSO's?
14    A. No.
15    Q. Have you received information from CSO's
16 saying that they've lost their employment as a
17 result of the recommendation that they be medically
18 disqualified?
19    A. Have I seen such documentation?
20    Q. Yes.
21    A. Yes.
22    Q. From that documentation do you have an
23 understanding that CSO's are losing their jobs as a

Page 143

1 result of PHS's recommendation that they be
2 medically disqualified?
3    A. Yes.
4    Q. And you understand that CSO's who lose
5 their jobs as a result of this medical
6 disqualification, they then suffer financially;
7 correct?
8        MR. GRIFFITHS: I'll object. Calls for
9 speculation. You can answer.
10        BY MS. DEAK:
11    Q. You can speculate on this and I'm asking
12 you to speculate based on general knowledge.
13        MR. GRIFFITHS: I'm not instructing him
14 not to answer.
15        THE WITNESS: I assume that if someone
16 loses their job and is not reemployed at that
17 moment, that there would be a financial loss.
18        BY MS. DEAK:
19    Q. Did you have any discussions with Mr.
20 Farmer about what would happen with your
21 recommendations of medical disqualification?
22    A. I may have but I can't remember.
23    Q. Did you have any knowledge that the

Page 144

1 Marshals Service was in no -- strike that.
2        Were you aware that the Marshals Service,
3 once you recommended medical disqualification, the
4 Marshals Service provided no further review and
5 didn't question your medical disqualification
6 whatsoever?
7    A. Was I aware at any point?
8    Q. Yes.
9    A. Yes
10    Q. When did you become aware of that?
11    A. I can't tell you for sure.
12    Q. I'll take an approximate.
13    A. Sometime after the program got started.
14    Q. You think a year after the program got
15 started?
16    A. Possibly.
17    Q. Did that affect the way you handled the
18 medical disqualifications?
19    A. Yes.
20    Q. How did it affect that?
21    A. Well, initially it was my understanding
22 that I would be making a determination based upon
23 the information that I reviewed as to whether the

Page 145

1 CSO had complied with the medical requirements.
2 And my decision if they had not complied, if the
3 examination was incomplete or that there were
4 significant medical conditions, that I would
5 medically disqualify that individual. That they at
6 this point in time were not cleared that work. It
7 was my recommendation that they were not medically
8 cleared to work.
9        I guess when I realized that some of
10 these individuals were getting terminated perhaps I
11 changed our practice and individuals, those
12 determinations were the initial opinion which I
13 wasn't citing before.
14        The initial opinion that if they had not
15 complied with the medical requirements I would
16 medically disqualify them. My understanding was
17 that they would have the opportunity to provide
18 missing information or additional reports to in
19 essence appeal my initial determination.
20        It appeared to me that there were
21 misunderstandings, perhaps on my part, perhaps on
22 others, and I changed the process business by which
23 prior to a disqualification there would be a

Page 190

1 functions and still could do them?
2     A  I cannot remember having any such
3 expectations.
4     Q  Dr. Miller, you testified earlier about a
5 review process that you had at least proposed and
6 perhaps recommended to the Judicial Conference for
7 the CSO's regarding medical disqualification.  And
8 this review process included a medical review
9 board; correct?
10     A  The discussion included discussion about
11 a medical review board; right.
12     Q  And you were not sure but you thought you
13 may have recommended it?
14     A  Correct.
15     Q  In your proposal about this medical to
16 the Judicial Conference, and there was a
17 representative from the Marshals Service there;
18 correct?  Mark Farmer was present?
19     A  Most likely.
20     Q  Did either you discuss or was there a
21 discussion in your presence about any
22 administrative burden that such a medical review
23 board would create?

Page 191

1         MR. GRIFFITHS: Object to the form, but
2 you can answer.
3         THE WITNESS: Not that I remember.
4         BY MS. DEAK:
5     Q  Was there any discussion in your presence
6 about whether such a medical review board would
7 create intolerable delays in disqualifying a CSO?
8     A  Not that I remember.
9     Q  Was there any discussion at that time
10 about concerns regarding the costs of providing the
11 CSO with the medical review board, an opportunity
12 for that type review?
13         MR. GRIFFITHS: Objection.  Asked and
14 answered.  You asked earlier about administrative
15 costs.
16         MS DEAK: Administrative burden.
17         MR. GRIFFITHS: My mistake then.
18         BY MS DEAK:
19     Q  I'll re-ask the question just to make
20 sure we have it clear on the record.
21         Was there any discussion, again we're
22 going back with the meeting with the Judicial
23 Conference and the discussion about the appeals

Page 192

1 procedure and using a medical review board as you
2 recommended or suggested.
3         Was there any discussion regarding the
4 cost of providing such a medical review board being
5 too burdensome?
6     A  Not that I remember.
7     Q  Since that meeting of the Judicial
8 Conference and your presentation of that, have you
9 had any discussions with the Marshals Service or
10 the Judicial Conference regarding such a procedure
11 being too burdensome administratively?
12     A  Not that I remember.
13     Q  Have you had any discussions since that
14 time about such an appeals process creating an
15 intolerable delay?
16     A  Not that I remember.
17     Q  Or have you had any discussions about
18 such a medical review board, such a process
19 creating costs that would be intolerable?
20     A  Not that I remember.
21     Q  Have you had any discussions about
22 establishing an appeals process other than what you
23 already have in terms of reviewing the medical

Page 193

1 records with the Marshals Service?
2     A  Not that I remember.
3     Q  With anyone at the Judicial Conference?
4     A  No.
5     Q  So I've covered all my bases.  I've asked
6 you about conversations on all these issues.  Has
7 there been anything in writing, any written
8 communications regarding these issues, the
9 establishment of a medical review board or any
10 procedures?
11     A  Not that I'm aware of.
12     Q  Let me also ask this.  Is it my
13 understanding that the Marshals Service, that you
14 would rely on the Marshals Service to do an
15 analysis of whether such review, such as a medical
16 review board, would be too costly?
17         MR. GRIFFITHS: Object to the form.
18         BY MS DEAK:
19     Q  Would you have relied on the Marshals
20 Service to do an analysis of whether using a
21 medical review board would have been too costly?
22     A  Yes.
23     Q  Would you have relied on the Marshals

Page 194

1  Service to do an analysis of whether such a medical
2  review board or appeals process would be too
3  burdensome administratively or create intolerable
4  delays?
5      A. Yes.
6      Q. Correct me if I'm wrong. You viewed your
7  role as simply reviewing the medical documents and
8  making the medical determination; is that correct?
9      A. Those recommendations. Yes.
10     Q. Did you view your role as being involved
11 in any other consideration such as reasonable
12 accommodation or other types of issues such as
13 that?
14     A. No.
15     Q. Just to be clear. In this review
16 process, and since this program has begun, you've
17 never had any direct contact with any of the CSO's;
18 is that correct.
19         MR. GRIFFITHS: What time period?
20         BY MS. DEAK:
21     Q. Since you've instituted the new standards
22 and begun doing the reviews, have you ever had
23 contact with any of the individual CSO's?

Page 195

1      A. To the best of my knowledge, no.
2      Q. When I say you, I meant you or your
3  staff, your office, any of them?
4      A. Not to my knowledge.
5      Q. Have you had contact with any of the
6  examining physicians of the CSO's?
7      A. Not to my knowledge.
8      Q. Dr. Miller, from the perspective of a
9  CSO, let me tell you what they see. They see a
10 system where you set up medical standards. You
11 determine what they were. You do the first
12 enforcement of those standards, meaning you take a
13 look at their records on the first instance, say
14 no, go back for more tests, no, we need more
15 information, and then you conduct the only review
16 that exists.
17         So essentially, what you've done is set
18 up a system where you write the rules, enforce the
19 rules, and review appeals for those rules. Does
20 that sound like a fair system to you?
21         MR. GRIFFITHS: I'll object to the form.
22         THE WITNESS: Yes.
23         BY MS. DEAK:

Page 196

1      Q. It does. So you would like to be in a
2  system where you have one entity writing the rules
3  that you have to live up to, enforcing those rules,
4  making sure you live up to those rules, and if they
5  say you don't live up to those rules then reviewing
6  your appeal of that finding. Do you think that's
7  fair?
8         MR. GRIFFITHS: Object to the form.
9  Again, you can answer.
10        THE WITNESS: I think as you present it
11 as a general concept may be different in this
12 specific example.
13        BY MS. DEAK:
14     Q. I would like for you to answer then my
15 question which was in a general context.
16     A. I think in general, well, it's hard to
17 answer, respond to your general concept in light of
18 the current situation because the current situation
19 is rather unique.
20     Q. But I would like you to answer my general
21 question and then we can discuss the current
22 situation.
23     A. I think everyone would like.

Page 197

1      Q. Let's refer back to my general question.
2  My general question was, do you think it's fair and
3  would you like to be in a system where you have one
4  entity writing the rules, then that entity enforces
5  the rules, and then if the entity finds in
6  enforcement you don't quite meet the rules, you get
7  to put your appeal back to that same entity. Do
8  you think that's fair in general?
9         MR. GRIFFITHS: I'll object to the form.
10 You can answer.
11        THE WITNESS: I would say in general it's
12 probably not fair.
13        BY MS. DEAK:
14     Q. Would you not agree then it is more fair
15 in general if you have separate entities or some
16 type of differentiation between the people who
17 actually write the rules, enforce the rules, and
18 then judge appeals to the rules. Would you not
19 agree with me that that's true?
20     A. I would agree.
21     Q. All right. So in that vein, it would be
22 more fair, would it not, if there were a medical
23 review board as you suggested with members outside

Page 198

1 of your staff to review the enforcement of the
2 rules?
3    A. Yes.
4    MS. DEAK: Could we go off the record.
5    (Off the record.)
6    BY MS. DEAK:
7    Q. I'm handing you what has been marked as
8 Exhibits 16 and 17. These are U.S. Marshals
9 Service forms 229 and 229-A. First, did you draft
10 these forms?
11    A. I think my office helped to draft these
12 forms.
13    Q. And who worked with you? I gather if you
14 helped you didn't do it alone.
15    A. Perhaps Dr. Barson assisted at that time.
16 I can't remember if he was there. I don't remember
17 doing this by myself in my office, but I can't
18 remember who else beside myself from my office
19 worked on it.
20    Q. So it was your office as opposed to just
21 you?
22    A. Yes.
23    Q. So no one else outside of your office

Page 199

1 drafted this?
2    A. The Marshals Service I'm sure had some
3 play in this also.
4    Q. Can you describe what type of input?
5    A. This form is modeled on the medical
6 examination form for the Deputy U.S. Marshals. In
7 fact, much of it is copied, the format, the
8 questions are basically a copy of the U.S. Deputy
9 Marshals medical exam form. We made some changes
10 to that form. We being my office. And I'm sure
11 judicial security also had some input in the
12 drafting of this document, too.
13    Q. These documents are both titled
14 certificate of medical examination for court
15 security officers; correct?
16    A. Correct.
17    Q. So these are not the same as, these are
18 not medical examinations for the Marshals Service,
19 the deputy marshals and the marshals; correct?
20    A. Correct.
21    Q. First, can you describe for me the
22 differences between these forms, 229 and 229-A?
23    A. I hope it doesn't surprise you that I

Page 200

1 didn't even realize that there was a 229 and 229-A.
2    Q. That sort of does surprise me. I've been
3 trying to figure out what's the differences of the
4 2 forms. So you don't understand then why there
5 are 2 forms in front of you? Is that your
6 testimony?
7    A. Other than the note, I have not reviewed
8 these forms to tell you the changes that occurred
9 from one form to the other.
10    Q. Tell me what you know about why there are
11 2 different forms?
12    A. As I said, I didn't realize that there
13 was a revision to a new form.
14    Q. So you really don't know anything about
15 that?
16    A. Correct.
17    Q. Does this form incorporate the medical
18 standards that you developed in your final report?
19    A. I do not believe it does.
20    Q. This does not?
21    A. Let me take a quick look and see.
22 Correct. It does not.
23    Q. Which one did you flip through, 229 or

Page 201

1 229-A?
2    A. 229.
3    Q. This is Exhibit 16. Shall we check
4 Exhibit 17? Does it incorporate your standards?
5    A. No. Neither one does.
6    Q. I'm confused, Dr. Miller. I have to be
7 very honest with you. I don't understand what the
8 purpose of these forms are then if they don't match
9 the standards.
10    MR. GRIFFITHS: Object to the form. You
11 can answer.
12    THE WITNESS: I understood your question
13 to represent whether the medical requirement
14 standards were actually printed or displayed in
15 this form which they are not.
16    BY MS. DEAK:
17    Q. Okay. Then let me restate my question.
18 What I was trying to find out is if the standards
19 are incorporated into these questions in that these
20 questions are geared towards your making
21 determinations based on the new medical standards.
22    A. Yes. The form is geared to collect a
23 wide array of information to act really as a screen