UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| INTERNATIONAL UNION, UNITED GOVERNMENT SECURITY OFFICERS OF AMERICA, <u>et al.</u>, <br><br> Plaintiffs, <br><br> v. <br><br> JOHN CLARK, in his official capacity as Director of the United States Marshals Service, <u>et al.</u>, <br><br> Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)   Civil Action No. 02-1484 (GK)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

<u>MEMORANDUM OPINION</u>

Plaintiffs in this case are International Union, United Government Security Officers of America and 65 individual Court Security Officers ("CSOs") who were medically disqualified, removed as CSOS, and then terminated from their positions. They allege that the United States Marshals Service ("USMS" or "Defendant") violated their Constitutional rights in effecting their termination. As described in great detail in prior opinions, the case has a long and complex factual and legal background. The present matter is before the Court on parties' Cross-Motions for Summary Judgment [Dkt. Nos. 263 and 268].

Upon consideration of the Motions, Oppositions, Replies, and the entire record herein, and for the reasons set forth below, Defendant's Motion for Summary Judgment on Plaintiffs' Due Process Claim and on All Claims Asserted by Plaintiffs William J. Burge,

Lawrence Churm, and Donald Smith ("Def.'s Mot.") is **granted** and Plaintiffs' Cross-Motion for Summary Judgment ("Pls.' Mot.") is **denied**.

## I.   BACKGROUND[1]

### A.   Factual Background

In exercising its statutory responsibility to "provide for the security of" various federal courts, 28 U.S.C. § 556(a), USMS contracts with private companies to employ CSOs in courthouses. The employment contracts are negotiated on a circuit-by-circuit basis. Decl. of Marc A. Farmer, Nov. 30, 2004 ("Farmer Decl.") (Ex. 1 to Def.'s Mot.), at ¶ 5. By statute, the judiciary oversees the program. 28 U.S.C. § 604(a)(22).

Plaintiffs entered into a collective bargaining agreement ("CBA") with the private companies that USMS had contracted with. Those CBAs include language governing the conditions for termination and suspension, among other subjects. For instance, under the terms of the CBA between certain Plaintiffs and MVM, Inc. (one of the private companies with which USMS had a contract, and also a Defendant in this lawsuit, but not a moving party on these Motions):

> [a]fter completion of the probationary period, no
> Employee shall be dismissed or suspended without just
> cause, unless the Employee is ordered by the
> Government to be removed from working under the

---

[1]     Unless otherwise noted, the facts set forth herein are drawn from parties' Statements of Material Facts Not in Dispute.

Employer's contract with the Government, or if the Employee's credentials are denied or terminated by the Marshals Service. ("just-cause provision")

Twelfth Circuit CBA Between MVM, Inc. and United Government Security Officers of America Local #80, Inc. ("12th Cir. CBA"), at § 6.1.1 (Ex. 11 to Def.'s Mot. (Ex. E to Decl. of Maxine W. Robinson, Dec. 12, 2007 ("Robinson Decl."))).[2]

The contracts between USMS and the private companies are referenced in the CBAs, and include procedures that provide for notice of any disciplinary decisions and an opportunity to respond to those decisions. See Twelfth Circuit Contract Between USMS and

---

[2] The similarly worded language in the CBA between Plaintiffs and Akal Security, Inc. (another of the private companies with which USMS had a contract, also a Defendant in this lawsuit, but not a moving party on these Motions) reads: "[a]fter completion of the probationary period . . . no Employee shall be dismissed or suspended without just cause. Just cause shall include any action or order of removal of an employee from working under the contract by the U.S. Government, or revocation of required CSO credentials by the USMS under the removal of Contractor employee provision in Section H-3 of Contract MS-01-D-0002 between the US [sic] Marshals Service and Akal Security, Inc." District of Alaska CBA Between Akal Security, Inc. and United Government Security Officers of America Local #67 ("D. Alaska CBA"), at § 6.1(a) (Ex. 11 to Def.'s Mot. (Ex. A to Robinson Decl.)).

Defendant points out that six Plaintiffs were employed under contracts whose terms did not include exceptions to the just-cause provision. For Thomas Branigan, John Brown, William Burge, Lawrence Churm, Lawrence Karnes, and Donald Smith, the relevant language stated that the CSOs could be fired only for just cause. Def.'s Mot. at 10 n.2. Plaintiffs do not dispute these facts, nor dispute the arguments that Defendant makes in reliance on these facts. Further, it is undisputed that Plaintiff David Arriola was a probationary employee, and therefore is not asserting a due process claim based on having been deprived of a property interest. Fifth Am. Compl. at 39 n.2 [Dkt. No. 227].

-3-

MVM, Inc. ("12th Cir. Judicial Contract"), at H-3(a)-(e) (USMS-CON 01251) (Ex. 2 to Def.'s Mot.).  All such contracts were modified in July of 2002.  The following section was added: "[t]he procedures of Section H-3 do not apply to situations where a CSO is removed for failure to meet the contract's medical and/or physical qualification standards and firearms requirements."  12th Cir. Judicial Contract, at H-3(h) (M011; USMS-CON 01305 C).

The CSOs are comprised mainly of retired law enforcement and military personnel.  The program requires that the CSOs have a minimum of three years of law enforcement experience.  There is evidence that starting in 1997, members of the Judicial Conference of the United States began to express concern that the security force overseen by the USMS was not physically capable of responding to security threats or emergency situations. Farmer Decl. at ¶ 19. The following year, the Judicial Conference ordered the United States Public Health Service's Office of Federal Law Enforcement Medical Programs ("USPHS") to conduct a job function analysis of the CSOs.

The doctors at USPHS presented their findings and recommendations to the Judicial Conference in Spring of 2000.  A committee of the Judicial Conference endorsed these findings, and USMS implemented the recommended standards contained in the USPHS analysis.  USMS informed the security companies employing the CSOs that the contracts would be modified, and that it would require

-4-

full compliance with the new standards.

Under the new procedures, CSOs had regular physicals conducted by a physician chosen by the security company. The employer collected the records from these physicals and sent them to Mark Farmer, who oversees the CSO program for USMS, Farmer Decl. at ¶ 1. Farmer's office then passed the documents on to doctors at USPHS. The USPHS doctors reviewed these records and either certified the CSO as medically fit for duty, or issued a request for more information. Farmer's office would communicate the doctor's decision to the security company, who then informed the CSO of the determination. The record contains an example of a medical review where the CSO was not certified as medically fit. The document, addressed to the CSO, informed the CSO that "[i]ncumbent has medical findings which may hinder safe and efficient performance of essential job functions." Judicial Security Division, Medical Review Form, Felipe Jorge-Rodriguez (Oct. 9, 2001; Aug. 14, 2002) (Ex. 18 to Pls.' Mot.). The form then states that, "[p]er agency request, if further information is not provided, a determination will be made based on available medical information." Id.

If the CSO was notified that she was not certified as fit for duty and that more information would aid a final determination, she then had the opportunity to submit further information, or face disqualification. The form described what medically relevant

information the responding physician should include; there is no language prohibiting or limiting what additional information or explanation can be included in the response report by either the CSO's personal physician or the physician paid for by the employer. See id.

**B. Procedural Background**

In Plaintiffs' Amended Complaint, filed on September 9, 2002 [Dkt. No. 2], they alleged due process violations against the Defendant.[3] Int'l Union v. Clark, No. 02-1484, slip op. at 10 (D.D.C. Aug. 28, 2003) [Dkt. No. 25]. On August 28, 2003, the Court denied Defendant's Motion to Dismiss [Dkt. No. 7] these Constitutional claims. Id. at 10, 16. After following applicable law and assuming the Plaintiffs' version of the facts to be true, the Court held that Plaintiffs did have a property interest in their employment, which was created by the just-cause provision in their CBAs. See id. at 10 (basing legal conclusion on Plaintiffs' claim that CBA contained "an explicit provision prohibiting the termination of employees except in cases of 'just-cause'").

---

[3] Three CSOs--Plaintiffs Burge, Churm, and Smith--also brought suit in the Eastern District of Pennsylvania, raising Rehabilitation Act of 1973, 29 U.S.C. § 701 et seq., and due process claims. Leitch v. MVM, Inc., 538 F. Supp. 2d 891, 894-95 (E.D. Pa. 2007). Guided by the Third Circuit's reasoning in Wilson v. MVM, Inc., 475 F.3d 166 (3d Cir. 2007), the Leitch Court ruled that Plaintiffs had a property interest in their employment, but were provided with adequate process before being deprived of that interest. Leitch, 538 F. Supp. 2d at 897-98. Therefore, the court entered summary judgment for the federal defendants. Id.

In January of 2007, Plaintiffs were granted leave to file a Fifth Amended Complaint. <u>See</u> Order (Jan. 4, 2007) [Dkt. No. 223]. The new Plaintiffs added in the Fifth Amended Complaint are permitted to raise only due process claims. <u>See</u> Order (Sept. 20, 2007), at 2-3 [Dkt. No. 249]; Order (Jan. 22, 2009), at 2 [Dkt. No. 282]. On January 10, 2008, Defendant filed his Motion for Summary Judgment on these Fifth Amendment claims. Plaintiffs filed their Cross-Motion on February 19, 2008. Briefing was not completed until March 28, 2008.

## II. STANDARD OF REVIEW

Summary judgment is appropriate only "when the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "A dispute over a material fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" <u>Arrington v. United States</u>, 473 F.3d 329, 333 (D.C. Cir. 2006) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)). A fact is "material" if it might affect the outcome of the action under the governing law. <u>Anderson v. Liberty Lobby Inc.</u>, 477 U.S. 242, 248 (1986). The Supreme Court has consistently emphasized that "at the summary judgment stage, the judge's function is not . . . to weigh the evidence and determine the truth

of the matter, but to determine whether there is a genuine issue for trial." Id. at 248.

## III. ANALYSIS

Defendant maintains that the CSOs do not possess a protectable property interest, and therefore their Fifth Amendment claims must be dismissed. In the alternative, Defendant argues that even if Plaintiffs have established a property interest in continued employment as CSOs, they have not been deprived of that property without due process; rather, USMS claims, the process afforded to Plaintiffs was Constitutionally sufficient.

For those Plaintiffs whose factual posture differs from the large majority of Plaintiffs in this case, Defendant offers separate grounds for dismissal. Without abandoning the arguments just cited, USMS argues that the six Plaintiffs whose contracts contain no exception to the just-cause provision were provided with adequate due process, regardless of whether they had a property interest in their employment. Def.'s Mot. at 10 n.2. Additionally, Defendant insists that three of those six Plaintiffs whose contracts contain no exception to a just-cause provision are barred from bringing their claims under the doctrine of res judicata, as they have brought identical claims in another district court. Id.

**A. Law of the Case Doctrine Does Not Compel the Conclusion that the CSOs Have a Property Interest in Their Employment.**

Plaintiffs argue that the Court's 2003 decision resolved the question of whether or not the CSOs have a property interest in their continued employment with USMS. Pls.' Mot. at 10-13. Under law of the case doctrine, they maintain, this conclusion should not be disrupted. Id. Defendant counters that law of the case does not preclude a court from reaching a different legal conclusion in deciding a motion for summary judgment than it reached in denying a motion to dismiss. Def. Clark's Reply Brief in Support of His Mot. for Summ. J. on Pls.' Due Process Claims ("Def.'s Reply"), at 3-4 [Dkt. No. 272].

In support of its position, USMS relies heavily on the fact that the 2003 ruling on the property interest issue came in the context of Defendant's Motion to Dismiss. In considering such motions, a court is required to presume as true all the allegations in the complaint, or in this case the Amended Complaint. See Int'l Union, slip op. at 5. Further, Plaintiffs did not present evidence that the CBAs and the judicial security contracts between USMS and the private companies contained language that could be read to carve out an exception to just-cause removal in the event that a CSO failed to meet medical standards. Instead, the opinion focused on the allegation that the just-cause provision in the CBAs created a cognizable property interest. Id. at 10.

The Supreme Court has made clear that denial of a motion to dismiss is an interlocutory order. See Office of Senator Mark Dayton v. Hanson, 550 U.S. 511, 515 (2007); see also EAW Group, Inc. v. Republic of the Gambia, No. 02-2425, 2007 WL 1297180, at *2 (D.D.C. May 1, 2007). Our Court of Appeals has stated that "[i]nterlocutory orders are not subject to law of the case doctrine and may always be reconsidered prior to final judgment." Langevine v. District of Columbia, 106 F.3d 1018, 1023 (D.C. Cir. 1997); see also Safir v. Dole, 718 F.2d 475, 481 n. 3 (D.C. Cir. 1983) (noting that doctrine is discretionary).

The 2003 decision discusses only the just-cause provision in the CBAs. The holding--that the CSOs had demonstrated a property interest in employment so as to defeat Defendant's Motion to Dismiss--did not discuss language in the CBAs that has since been offered as evidence. Nor did the Court rely on an analysis of the contracts between USMS and private companies. Subsequent to that interlocutory order, Defendant presented additional facts that could have a substantial impact on the question of whether a property interest exists. Specifically, it has provided whole sections of the CBAs as well as judicial security contracts that contain an exception to certain removal procedures. These provisions suggests that Defendant has greater latitude in effecting the removal of CSOs.

Therefore, the factual landscape is markedly different from what was presented in 2003. Additionally, the Court is no longer under a duty to presume the Plaintiffs' allegations to be true. In view of the fact that application of the law of the case doctrine is discretionary, and cannot be invoked to limit a court's ability to reconsider interlocutory orders when new facts come to light, Defendant is not foreclosed from raising his due process arguments by the earlier decision in this case. See 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2713 (3d ed. 1998) ("The ruling on a motion to dismiss for failure to state a claim for relief is addressed solely to the sufficiency of the complaint and does not prevent summary judgment from subsequently being granted based on material outside the complaint.").

## B. Plaintiffs Do Have a Property Interest in Their Continued Employment.

Under the Fifth Amendment, the federal Government must not deprive individuals of property "without due process of law." U.S. Const. Amend V. To determine whether a Constitutional due process violation has occurred, courts must first establish whether a property or liberty interest has been denied. Bd. of Regents of State Colleges v. Roth, 408 U.S. 564, 577 (1972). There is no allegation in this case that the Plaintiffs have been denied any liberty interest. Focusing on property interests alone, the case law is clear that those interests are not created by the

Constitution; "[r]ather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." Id. Private employment contracts may create a property interest entitled to due process protection. Greene v. McElroy, 360 U.S. 474, 492, 493 n.22 (1959).

Plaintiffs maintain that even in light of new facts in the record, the resolution of the property interest issue should be the same. They cite the CBAs' just-cause provision, and the general presumptions in the field of federal labor law that agreements with just-cause provisions should be favorably construed to support their position that Plaintiffs have a property interest in their continued employment as CSOs. Pls.' Mot. at 15-19.

USMS takes issue with the focus of Plaintiffs' analysis. Defendant argues that the relevant question is not whether the CSOs had a property interest in their employment, but whether they had such an interest in their medical clearances, and that the case law compels the conclusion that they had no protected property interest in their medical clearances. Def.'s Mot. at 14-20. Further, USMS argues that even if there is a property interest in continued employment, the terms of the CBAs and judicial contracts demonstrate that Plaintiffs had no protected interest in their positions as CSOs. Def.'s Mot. at 9-14.

Roth holds that any property interest must be defined by a source independent of the Constitution.  Roth, 408 U.S. at 577. Here, the parties agree that the collective bargaining agreements are central to determining what, if any, property interest is at stake.  See id. at 578 ("'[P]roperty' interest in employment . . . was created and defined by the terms of [Roth's] employment."); see also Greene, 360 U.S. at 492 (finding that property interest at issue was continued employment where Department of Defense employee was denied security clearance).  The Court must therefore examine the terms of Plaintiffs' collective bargaining agreements to determine whether they have a protectable property interest in continued employment.  Because both the CBAs and the judicial security contracts between USMS and the private companies set forth conditions of employment, both may be relevant in determining the scope of any property interest that may exist.

"To determine whether [one] ha[s] a property interest in continued employment, we ask if he ha[s] a legitimate expectation, based on rules (statutes or regulations) or understandings (contracts, expressed or implied), that he would continue in his job."  Hall v. Ford, 856 F.2d 255, 265 (D.C. Cir. 1988).  In examining the question of whether the agreements create a property interest, the Court must be guided by the language of the contracts.  American Fed. of Gov. Employees v. Fed. Labor Relations Auth., 470 F.3d 375, 381 (D.C. Cir. 2006); see also N.L.R.B. v.

United States Postal Serv., 8 F.3d 832, 836 (D.C. Cir. 1993);
Vanover v. Hantman, 77 F. Supp. 2d 91, 102 (D.D.C. 1999) ("Of
course, the language involved must be sufficient to create an
'objectively reasonable' expectation that an employee will be
terminated only for certain causes.").

The CBAs providing for just-cause termination also contain
language, immediately following the just-cause clauses, that limits
the scope of those clauses. See 12th Cir. CBA, at § 6.1.1; see
also D. Alaska CBA, at § 6.1(a). For example, one CBA states that
USMS can direct the private security companies to terminate CSOs if
the "Employee is ordered by the Government to be removed from
working under the Employer's contract with the Government, or if
the Employee's credentials are denied or terminated by the Marshals
Service." 12th Cir. CBA, at § 6.1.1; see also D. Alaska CBA, at §
6.1(a) ("Just cause shall include any action or order of removal of
an employee from working under the contract by the U.S. Government,
or revocation of required CSO credentials by the USMS under the
removal of Contractor employee provision in Section H-3 of Contract
MS-01-D-0002 between the US [sic] Marshals Service and Akal
Security, Inc.").

Plaintiffs contend that simply because USMS has discretion--in
some circumstances--to remove them without just cause does not mean
that they have no property interest whatsoever in continued
employment as CSOs. Pls.' Brief in Reply to Def.'s Opp'n to Pls.'

Cross-Mot. For Summ. J. ("Pls.' Reply"), at 3-7 [Dkt. No. 274]. It is true, as they observe, that "[v]irtually no property interest is absolute," id. at 4, and therefore the question is whether the existence of limitations on the just-cause provision completely eliminates any property interest in employment.

The fact that certain actions by USMS limit the protection granted by the just-cause clause (i.e., revocation of credentials, failure to satisfy medical standards, etc.) does not and cannot mean that Plaintiffs are deprived of all property interest in their collective bargaining agreements. Such a conclusion would completely eviscerate the significance of including a just-cause provision in the CBA, and would render the provision, for all practical purposes, a nullity. Smith v. Kerrville Bus Co., Inc., 709 F.2d 914, 919 (5th Cir. 1983) ("To hold as a matter of law that management could, at its sole discretion, terminate an employee without cause would in effect allow it the unqualified power to avoid contractually mandated rights and benefits.").

In this case, the contractual language creates an objective expectation that CSOs can only be removed for cause, although that language places what are concededly substantial limits on their expectation "that [they] would continue in [their] job." Hall, 856 F.2d at 265; see also 12th Cir. CBA, at § 6.1.1; see also D. Alaska CBA, at § 6.1(a). For example, Plaintiffs could not be terminated, without cause, because of disagreements with their private

employers, rather than USMS, over working conditions.  In short, Plaintiffs have a property interest in their continued employment as CSOs subject to the limitations contained in their collective bargaining agreements.

Plaintiffs are correct that fundamental labor law principles support this conclusion.  As the Ninth Circuit has stated, it is "difficult to imagine a meeting of the minds between an employer and a union authorizing an employer to discharge an employee without good cause.  Employer security goes to the very essence of a collective bargaining agreement."  Dickeson v. DAW Forest Products Co., 827 F.2d 627, 631 (9th Cir. 1987).  Courts and arbitrators have often construed language in CBAs in order to avoid rendering the just-cause principle a nullity.  Id. at 630 ("Courts may, however, expand by implication the provisions of a collective bargaining agreement more readily than the provisions of an ordinary contract."); Smith, 709 F.2d at 919 ("Mindful that we are bound to exercise a reasoned flexibility in construing the terms of a labor contract . . . we are loath to conclude, as a matter of law and undisputed fact, that no just cause limitation inheres in the . . . collective bargaining agreement.") (citations omitted); Young v. Sw. Bell Tel. Co., 309 F. Supp 475, 478 (E.D. Ark. 1969), aff'd 424 F.2d 256 (8th Cir. 1970).[4]

_____

[4]    In Smith, the Fifth Circuit explained at some length the reasoning underlying its conclusion:

Defendant actually admits that "the CBAs between Plaintiffs'
union and Akal/MVM may create a 'just cause' relationship in some
circumstances," but then argues that, as construed in this case,
these CBAs represent only at-will agreements. Def.'s Reply at 6.
However, the presence of certain exceptions to the just-cause

---

Because a collective bargaining agreement is
designed to regulate virtually all facets of the
employer-employee relationship, and is subject to federal
labor law, the construction and application of its terms
cannot be narrowly confined by ordinary principles of
contract law. See Transportation-Communication Employees
Union v. Union Pacific Railroad, 385 U.S. 157, 87 S.Ct.
369, 17 L.Ed.2d 264 (1966); N.L.R.B. v. L.B. Priester,
669 F.2d 355 (5th Cir. 1982). Thus the provisions of a
labor contract may be more readily expanded by
implication than those of contracts memorializing other
transactions. Local 205, United Electrical, Radio and
Machine Workers of America v. General Electric Co., 172
F.Supp. 53 (D. Mass. 1959). See generally R. Gorman,
Basic Text on Labor Law 540-41 (1976 ed.).

In instances where the language of a collective
[sic] contract does not explicitly prohibit dismissal
except for just cause, arbitrators typically infer such
prohibitions from seniority clauses or grievance and
arbitration procedures. Summers, Individual Protection
Against Unjust Dismissal: Time For A Statute, 62 Va. L.
Rev. 481, 499-500 (1976). . . . Inherent in the body of
arbitral common law which has evolved in this context is
a marked awareness of the harshness of discharge, and an
adherence to the principle that seniority, grievance,
arbitration, and other provisions that reflect the
contracting parties' tacit acceptance of the employees'
right to some measure of job security, pretermit
discharge without good cause. . . . One arbiter
summarizes this development as follows: "The weight of
arbitral opinion is that a standard of just cause may be
imposed upon disciplinary actions even though such a
standard is not spelled out in the agreement."

709 F.2d at 917-18 (citations omitted).

language in the CBA cannot be allowed to totally eliminate the property interest created by that language. Even if this language was deemed to create an at-will relationship (an issue this Court need not decide), USMS has offered no controlling case law requiring such language to be interpreted so as to nullify the property interest created by the just-cause language in the CBA. See id. at 5-6.[5]

**C. Plaintiffs Received Due Process Before Being Terminated.**

Having found that a property interest exists, the Court must address whether Plaintiffs received due process when they were deprived of that interest.

"[D]ue process is flexible and calls for such procedural protections as the particular situation demands." Morrissey v. Brewer, 408 U.S. 471, 481 (1972). Courts consider three factors in deciding whether due process has been provided: "[f]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the

_____

[5] The Court recognizes that a different analysis has been adopted in several other cases involving this issue. See Strolberg v. United States Marshals Serv., No. 03-0004, slip op. at 9-10 (D. Idaho June 18, 2008); Leitch v. MVM, Inc., No. 03-0344, 2005 WL 331707, at *3 (E.D. Pa. Feb. 10, 2005); Int'l Union, Sec., Police, and Fire Prof'l of Am. (SPFPA) v. United States Marshal's Serv., 350 F. Supp. 2d 522 (S.D.N.Y. 2004). With all due respect to those courts, this Court disagrees with their analysis of the property interest issue.

Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." Mathews v. Eldridge, 424 U.S. 319, 335 (1976). "The essential requirements of due process . . . are notice and an opportunity to respond." Loudermill, 470 U.S. at 546.

Plaintiffs contend that the procedures followed by USMS do not supply the CSOs with notice of their medical disqualification, and do not provide sufficient opportunity to respond. Further, they assert that the lack of post-deprivation process offends the Constitution. Pls.' Mot. at 38-41. The Government argues that the procedures offered do comport with due process, and that no post-deprivation process is required if pre-deprivation process is sufficient. Def.'s Reply, at 22-24; 28-31.

In this case, all Plaintiffs were given notice that the USPHS had deferred certifying them as medically fit for service. That notice indicated the particular medical diagnoses that led to this decision, and what information could be provided to assist in a final medical determination. While the information provided to Plaintiffs at this stage could certainly have been more specific about the nature of the review, the contact between USMS and the CSOs was sufficiently targeted to put the employees on notice that they faced potential medical disqualification and the reasons for it. Cf. Bagenstose v. District of Columbia, 503 F. Supp. 2d 247,

257 (D.D.C. 2007) ("In having his 'grievance heard and redressed,' . . . plaintiff is not entitled to perfect procedures or the procedures of his choice.") (citation omitted).

The situation in this case therefore differs from that presented in Gray Panthers v. Schweiker, 642 F.2d 146 (D.C. Cir. 1980), which Plaintiffs rely on to argue that the medical forms did not indicate the grounds upon which CSOs could be terminated, Pls.' Reply at 14. In Gray Panthers, Medicare beneficiaries were provided with notice of treatment denials. As a reason for the denial, the forms referred beneficiaries to "Item 5" on the back of the form, which explained that "either the provider has not charged the 'customary charge' or that his charges are not 'prevailing,' that is, not in the 75th percentile of his provider peers." Id. at 168. The Court of Appeals faulted the notices for not indicating "whether [beneficiaries'] doctors were allegedly more expensive than others in the locality, or were charging them more than other patients, or whether or why the treatments were deemed unnecessary." Id. Unlike the boilerplate language found insufficient in that case, the notice here contained detailed medical information particular to the individual CSO.

Here, after receiving the deferral notice, each CSO was permitted to submit, through the filing of medical evidence from the employer-paid doctor who personally examined her, as well as her own physician, additional information responsive to the USPHS

doctor's report and concerns.  The report in no way limited what additional information could be provided.  Therefore, the CSO was provided with an opportunity to respond fully to the findings of the USPHS doctor.  Further, when medical records are being reviewed, it is Constitutionally permissible to conduct such a hearing on a written record alone.  See Mathews, 424 U.S. at 344 (noting less value in holding evidentiary hearing where employment decision turns on assessment of written medical records concerning a patient who the doctor personally examined).  Thus, the opportunity to respond satisfies the Loudermill requirement that a hearing be conducted.  Loudermill, 470 U.S. at 546.

The ultimate question is whether this system satisfies due process requirements.  In balancing the individual and Government interests, the Court finds that the parties both have very significant interests at stake.  The CSOs face the likely loss of their jobs,[6] while USMS must secure our federal courthouses and

_____

[6]    Defendant notes that the disqualification by USMS did not necessarily terminate the CSOs' employment with their private employers; rather, the disqualification meant that the individuals could not be employed under contracts with the Defendant.  The private companies were free to place these individuals in positions at other facilities. Def.'s Mot. at 6 n.5; see also Pls.' Mot. at 28-34 (arguing that termination of Plaintiffs from all employment was foreseeable).  This argument is disingenuous given the fact that almost all CSOs were fired because there were no non-USMS jobs to be transferred to.

It is difficult to credit Defendant's argument that such termination was not foreseeable.  The record indicates that the private companies alerted Defendant that medical disqualification would result in termination.  See Ex. 25 to Pls.' Mot. (2001 letter

courthouse personnel at a time of rising threats and violence against the judiciary.

The remaining factor, the risk of error from use of these procedures when compared to the improved accuracy that additional procedures might supply, tilts in favor of the Defendant. In this context, the Supreme Court has recognized that there is less of a concern about witness credibility or reliability. Mathews, 424 U.S. at 344; see also Wilson v. MVM, Inc., No. 03-4514, 2005 WL 1231968, at *13 (E.D. Pa. May 24, 2005). As Mathews observed, the review of written medical records provided by doctors who have personally examined the patient is a reliable method of review. See Mathews, 424 U.S. at 344. Moreover, the CSO's personal doctor has the opportunity to correct any errors or misimpressions in the USPHS doctor's report.

---

from Akal to USMS warning that proposed changes to medical clearance process led Akal to "anticipate[]," among other outcomes, "[i]ncreased unemployment insurance tax costs due to the need to lay off large numbers of employees"); Ex. 27 to Pls.' Mot. (2000 letter from Akal to USMS noting same concern over unemployment costs). Additionally, Defendant demanded that medically disqualified CSOs be removed "immediately," and then promptly stopped paying for the hours of these CSOs. Ex. 18 to Pls.' Mot. (letter from USMS to Akal); see also Exs. 19-21 to Pls.' Mot. (same). The drastic and rapid removal demands, as well as the security companies' notice that the employees would become unemployed, mean that Defendant cannot have expected that his actions would result in anything but loss of employment for medically disqualified CSOs. See Ex. 9 to Pls.' Mot., at 142-43 (deposition testimony of Richard Miller, a doctor at USPHS, stating that he was aware that "CSO's are losing their jobs as a result of PHS's recommendation that they be medically disqualified").

Plaintiffs argue that they should have "direct contact" with the decision-maker and the ability to personally craft their objections to the initial medical determination (as opposed to having their doctor craft it), Pls.' Mot. at 39. These additional steps simply are not required under the due process clause. Adequate process can be provided based on written medical records. Mathews, 424 U.S. at 344; see also Loudermill, 470 U.S. at 546 (finding that individual should have "opportunity to present reasons . . . either in person or in writing"). The due process inquiry does not focus on the correctness of outcomes, but rather on the adequacy of the process afforded; indeed, there is no guarantee against "incorrect or ill-advised personnel decisions." Bishop v. Wood, 426 U.S. 341, 350 (1992). In sum, there is no evidence that having their objections lodged via written medical reports or communicating through their doctors denied Plaintiffs "a meaningful opportunity to present their case." Mathews, 424 U.S at 349.[7]

The Third Circuit reached the same conclusion on similar facts. Wilson v. MVM, Inc., 475 F.3d 166, 178-79 (3d. Cir. 2007). In Wilson, the court held that while the CSOs' opportunity to respond may not constitute a "traditional hearing, the process

---

[7]	The Court is very mindful of Plaintiffs' concerns in this case. However, as the court noted in Bagenstose, "plaintiff is not entitled to perfect procedures or the procedures of his choice." 503 F. Supp. 2d at 257.

afforded the [Plaintiffs] is sufficient given the balance of their interest in maintaining employment and the [G]overnment's interest in security." Id. at 179. Further, a "more rigorous process would not significantly enhance the accuracy of the medical qualification process." Id. The Court agrees with the reasoning in that case.

Plaintiffs' objection that the lack of post-deprivation process renders the procedures Constitutionally infirm ignores the guidance in Mathews that the due process determination should be flexible and take into account the particular interests and circumstances of each case.[8] 424 U.S. at 334; see also Parham v. J.R., 442 U.S. 584, 608 n.16 (1979). Moreover, our Court of Appeals has approved termination procedures that provide for only post-deprivation process where pre-deprivation process would have been overly burdensome. Washington Teachers' Union Local #6, Am. Fed. of Teachers, AFL-CIO v. Bd. of Educ. of the Dist. of Columbia, 109 F.3d 774, 781 (D.C. Cir. 1997) (holding that where post-

---

[8] Plaintiffs correctly point out that Loudermill's holding rested "in part on the provisions in Ohio law for a full post-termination hearing," 470 U.S. at 1495. Pls.' Mot. at 48-51 (discussing need for post-termination process). Indeed, the Supreme Court reasoned that "the existence of post-termination procedures is relevant to the necessary scope of pre-termination procedures." Loudermill, 470 U.S. at 1496 n.12. However, the case's holding focused on the need for pre-termination process. See id. at 1495. It is significant that the Court reached this conclusion after considering a statutory scheme that provided for no pre-termination process whatsoever. Id. at 1489-90. Further, the Court is not aware of any line of cases that has seized on the language in Loudermill to insist that post-termination process is a requisite of due process where sufficient pre-termination process is provided.

termination relief was available, "due process did not require pre-termination proceedings before [a] 1996 [reduction-in-force]"). There is no firm rule that termination procedures must be furnished at a specific time in order to be deemed Constitutionally adequate. See Adkins v. Rumsfeld, No. 1:04CV494, 2005 WL 2593450, at *5 (E.D. Va. Oct. 13, 2005), aff'd 464 F.3d 456 (4th Cir. 2006), cert. denied, 551 U.S. 1130 (2007).

This conclusion applies to all Plaintiffs including the six whose contracts contained no exception to a just-cause provision. While the terms of their employment contracts also created a protectable property interest, as described supra, those Plaintiffs were provided with adequate process before being removed, and therefore their Fifth Amendment claim cannot survive. As a result, the Court need not resolve the res judicata issue presented by Defendant.[9]

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment on Plaintiffs' Due Process Claim and on All Claims Asserted by Plaintiffs William J. Burge, Lawrence Churm, and Donald

---

[9] The res judicata argument raised in Defendant's Motion was not discussed by Plaintiffs in any of their subsequent filings. "It is well-settled that where a non-moving party fails to oppose arguments set forth in a motion for summary judgment, courts may treat such arguments as conceded." Evans v. Holder, 618 F. Supp. 2d 1, 13 (D.D.C. 2009).

Smith is **granted** and Plaintiffs' Cross-Motion for Summary Judgment
is **denied.**  An order shall issue with this Memorandum Opinion.


                                    _/s/_____
April 15, 2010                      Gladys Kessler
                                    United States District Judge

**Copies to**: attorneys on record via ECF