1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| INTERNATIONAL UNION, UNITED ) | |
| GOVERNMENT SECURITY OFFICERS ) | |
| OF AMERICA, ET AL. ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| vs. ) | Civil Action No. |
| ) | 1:02cv1484 |
| BENIGNO G. REYNA, DIRECTOR OF ) | |
| THE UNITED STATES MARSHALS ) | |
| SERVICE, in his Official ) | |
| Capacity ) | |
| ) | |
| Defendant. ) | |

Friday, May 7, 2004
Washington, D.C.

Deposition of Richard Jay Miller, M.D., called by counsel for the Plaintiffs, pursuant to notice, at the U.S. Department of Justice, 20 Massachusetts Avenue, N.W., Washington, D.C. 20044, before Jacqueline L. Wood, a notary public in and for the District of Columbia, beginning at 11:25 a.m., when were present on behalf of the respective parties:

Page 2

APPEARANCES:
ON BEHALF OF THE PLAINTIFFS:
  JOHN A. TUCKER, ESQ.
  39 East Market Street
  Suite 402
  Akron, Ohio 44308
  LESLIE DEAK, ESQ.
  1204 San Antonio Street
  Suite 203
  Austin, Texas 78701
  (800) 781-3967
ON BEHALF OF THE DEFENDANT:
  JOHN R. GRIFFITHS, ESQ.
  U.S. Department of Justice
  Civil Division, Federal Programs Branch
  P.O. Box 883
  Washington, D.C. 20044
  (202) 514-4652
  C. JOSEPH CARROLL, ESQ.
  U.S. Department of Justice
  U.S. Marshals Service
  Arlington, Virginia 22202
  (202) 307-9054

Page 3

INDEX

| Witness | Page |
|---|---|
| Richard Jay Miller, M.D. | |
| By Ms. Deak | 4, 118 |
| By Mr. Griffiths | 110 |

EXHIBITS

| Dr. Miller Deposition Exhibits | Page |
|---|---|
| 65 | 15 |
| 66 | 16 |
| 67 | 70 |
| 68 | 78 |

CERTIFIED QUESTIONS
Page 75, Line 15
Page 82, Line 13
Page 83, Line 2
Page 83, Line 19

Page 4

1        PROCEEDINGS
2        Whereupon,
3        RICHARD JAY MILLER, M.D.
4 was called as a witness and, having been first duly
5 sworn by the notary public, was examined and
6 testified as follows:
7     EXAMINATION BY COUNSEL FOR THE PLAINTIFFS
8     BY MS. DEAK:
9     Q. Dr. Miller, we are back on the record.
10 You are still under oath. I hope you understand
11 I'm not going to have you sworn in again today. We
12 are continuing the deposition that we recessed from
13 yesterday.
14     A. Yes.
15     Q. Dr. Miller, you are here testifying
16 because you are designated as an expert for the
17 Marshals Service. Can you tell me in what capacity
18 or what subject are you offering your expertise to
19 the Marshals Service?
20     MR. GRIFFITHS: I would just object to
21 the general statement that he is designated as an
22 expert. We designated him as a fact witness who
23 may give some opinion testimony related to due

Page 5

1 process claims.
2     MS. DEAK: I thought you put in a Rule 26
3 (B)4.
4     MR. GRIFFITHS: As someone who is not
5 specifically retained as an expert but may give
6 opinion testimony under the federal rules of
7 evidence. That opinion testimony would be for your
8 due process claims. So the factors that would go
9 into due process claims. I think it's basically
10 things you've already talked about in this
11 deposition.
12     His testimony is as a fact witness. I
13 don't know that I would call him an expert but as
14 someone who may provide opinion testimony I think
15 would be largely the same in that respect.
16 Certainly we have not designated him as an expert
17 on Rehabilitation Act issues or disability issues
18 or anything like that.
19     MS. DEAK: I just want to get this
20 straight. So he is not, at this point, designated
21 as an expert witness for you?
22     MR. GRIFFITHS: We provided a notice
23 under, I forget what provision of 26. But there's

Page 42

1 generic hypothetical situation. Diabetes can
2 present in such a variety of conditions. So I
3 think I need a little more information to render
4 that opinion.
5     BY MS. DEAK:
6   Q. Let me back up then and I'll ask you a
7 different question. The standard in the contract
8 for diabetes is fairly broad. And even in your
9 report the standard, I believe, is fairly broad.
10 Something to the effect that diabetes should be
11 under control or something to that effect.
12     What are the specific standards? What
13 does your office regard as controlled diabetes?
14   A. Maybe I could just go through how we
15 would evaluate a diabetic.
16   Q. Sure. That would be fine.
17   A. There are unique features for diabetics
18 who are controlled either by diet and exercise
19 versus oral medication versus insulin. The
20 treatment itself can cause risks or reduction in
21 the ability to perform certain tasks. So for each
22 of those we would want to evaluate a hemoglobin
23 A-1-C which looks at overall glucose control over a

Page 43

1 2 or 3 month period to see overall control.
2     Then we would get glucose logs to look at
3 specific times and days based upon their activity,
4 whether there is hypoglycemic low blood sugars,
5 which are particularly relevant to insulin treated
6 but it can also be for certain oral medication
7 treatment diabetes, to determine if the blood
8 sugars dropped significantly. And very low blood
9 sugars can cause cognitive impairment as far as
10 judgment or reaction time to anxiety, tremor, and
11 coma. So an individual may not be able to respond
12 at all if blood sugars get too low.
13     At the other point, blood sugars could
14 get very, very high. And high blood sugars, very
15 high blood sugars, can cause significant medical
16 conditions that require immediate medical
17 treatment, let's say in the 400's and 500's. But
18 between normal and 400 you can also get cognitive
19 impairment as well.
20     Frequently we see individuals who are on
21 oral medications who really need to be on insulin
22 plus oral medication, but have avoided that and run
23 on a regular basis very, very, very high blood

Page 44

1 sugars. So we're looking at the hemoglobin A-1-C
2 that provides overall control, we look at the log
3 that provides day to day control, looking at the
4 highs and lows.
5     We look at complications. Diabetes over
6 along period of time, especially if it's poorly
7 controlled, can cause heart disease, can cause
8 strokes, can cause blindness, vision problems,
9 kidney problems, and neurological problems, loss of
10 sensation in like a foot, and problems with balance
11 and standing, walking, et cetera. So the
12 complications. I'm trying to think if there is
13 more evaluation. There is an valuative process
14 that we go through for each individual with
15 diabetes.
16   Q. Are there specific standards say if
17 someone's blood sugar is, I don't know what's high.
18 Is 200 high? I think there's a count, 200,
19 something like that.
20   A. 200 is high. But again, it would depend.
21 If it was just a couple or 3 of 200's I probably
22 wouldn't be that concerned.
23   Q. Let me rephrase the question. Are there

Page 45

1 any hard and fast guidelines. Like if someone has
2 high blood sugar X number of times, that's it. Or
3 is it all a more subjective type evaluation?
4   A. One of the things we look at is the
5 American Diabetes Association established a
6 hemoglobin A-1-C above 8 as requiring additional
7 treatment. So we do currently use an A-1-C as over
8 8 as an objective parameter. The other items are
9 really case by case, the complications and the
10 looking at the logs to see the magnitude, the lows
11 and the highs.
12   Q. How do you connect that assessment to the
13 essential job functions? How do you connect the
14 assessment of somebody's diabetes, which sounds
15 like fairly complex assessment, to the essential
16 job functions?
17   A. I can just go through some of the job
18 functions and maybe relate that.
19   Q. Please.
20   Q. Item 3 is work alone while armed. That
21 goes to the fact of the frequently roving patrols
22 or may be by themselves while armed. It goes to
23 weapon retention. If they are severely

Page 46

1  hypoglycemic they may not be able to respond to an
2  individual trying to take their weapon away.
3      Work under stress. If their blood sugars
4  are extremely high or extremely low, the work
5  stress, whether it's mental or physical, stressing
6  them could drive their blood sugars lower or higher
7  and cause and exacerbation of any cognitive
8  impairment or even awareness of their environment
9  surroundings.
10     It similarly goes to the use of their
11 weapon, confiscating a weapon from a person in a
12 pat down. If they've got complications and have no
13 sensation in their fingers or hands, that is going
14 to impair that performance.
15     Similarly, as I mentioned, if they have
16 complications from their diabetes affecting their
17 sensation in their foot and their foot is numb,
18 they're not going to be able to stand, walk, or run
19 as one would need to perform their job, much less
20 respond to an attack or crisis.
21     To attempt to subdue after running in
22 pursuit or respond to an emergency with unplanned
23 strenuous activity. Again, if their diabetes is

Page 47

1  poorly controlled and they don't, they're not
2  educated, as far as their diabetes, how to adjust
3  their medication, their food, and their exercise to
4  balance their blood sugar, any unplanned activity
5  is going to cause an imbalance of their blood sugar
6  and drive it much higher or much lower causing
7  again appearance or exacerbation of cognitive
8  impairment or worse.
9      To stand in one position for a couple of
10 hours. If their blood sugar is extremely high or
11 extremely low they may get somnolence or fatigue.
12 And sitting in a position they may fall asleep much
13 more readily than an individual without diabetes or
14 diabetes that is well controlled.
15     Vision can change markedly with diabetes.
16 The blood sugar will cause a movement of fluid in
17 and out of the lens of the eye causing it to expand
18 or shrink.
19     Q. So it actually could change on the spot
20 as opposed to over time?
21     A. Over time. It's not an immediate effect
22 but over the course of a shift visual acuity could
23 change markedly. And it obviously would affect

Page 48

1  many of these essential job functions.
2      Q. The CSO's that you have disqualified, do
3  you believe that the CSO's that you recommend as
4  disqualification or your office, do you believe
5  that they are incapable of performing these
6  essential job functions?
7      A. It would be my opinion that they are
8  either incapable of performing these job functions
9  or there is a significant reduction in their
10 ability to perform these job functions.
11     Q. So in general then you believe that the
12 CSO's that have been medically disqualified based
13 on their diabetes, that they are likely to be
14 impaired in one or more of these functions that you
15 are talking about; their cognitive functioning, the
16 sensation in their limbs, somnolence, vision. Is
17 that your position?
18     MR. GRIFFITHS: Object to the form, but
19 you can answer.
20     THE WITNESS: The word impairment I think
21 is a legal term and I'd rather not agree to that.
22     BY MS. DEAK:
23     Q. Okay. Then how would you phrase it?

Page 49

1      A. It would be my opinion that if they were,
2  if I recommend a medical disqualification that
3  there would be a significant reduction in their
4  ability to perform one or more of these essential
5  job functions.
6      Q. And in their ability to perform those job
7  functions, one or more of those job functions, that
8  means that they are significantly limited? Were
9  those your words?
10     A. I would say there was a significant
11 limitation in their ability to perform one or more
12 of these essential job functions.
13     Q. But that means that they are
14 significantly limited either in their cognitive
15 functioning, the sensation, their ability to stand
16 or sit without falling to sleep, somnolence,
17 vision; is that correct?
18     MR. GRIFFITHS: Object to the form.
19     THE WITNESS: I'm not sure I understand.
20     BY MS. DEAK:
21     Q. My question is, the essential job
22 functions that you've listed, you're saying that a
23 diabetic can't perform one or more of those, the

## Page 50

1  diabetic that you disqualified as a CSO. That's
2  the group we're talking about. We're not talking
3  about diabetes in general. Let's limit these
4  questions to the ones that you have disqualified.
5      There is a reason that they can't perform
6  one or more of those job functions. And the reason
7  is the symptoms that arise from the diabetes;
8  correct?
9      A. Not necessarily.
10     Q. Then let me ask this question. Are some
11 of these things that you've listed, and I don't
12 have a complete list, an exhaustive list written
13 down, but the cognitive function, the sensation in
14 limbs, the somnolence, the vision, those are
15 symptoms of diabetes; correct?
16     A. Could be.
17     Q. Potential symptoms of diabetes. I
18 understand that they don't all appear in one person
19 at one time; correct?
20     A. Correct.
21     Q. And it's because of those symptoms or the
22 potential for those symptoms that you are
23 disqualifying or finding these diabetics not to be

## Page 51

1  medically qualified?
2      A. Generally it's the potential.
3      Q. For those symptoms?
4      A. For the symptoms.
5      Q. Do you know if when you disqualify a CSO,
6  based on their diabetes, do you know if they're
7  suffering from one or more of these symptoms?
8      A. We would base our determination based on
9  information we receive. And it doesn't, that
10 information does not always provide documentation
11 of those symptoms.
12     Q. Do you request information to document
13 those symptoms?
14     A. The information we request is stated in a
15 fashion that it should solicit such information.
16     Q. So that at the very least the theory is
17 that if you disqualified a CSO based on their
18 diabetes, that they should have suffered from one
19 or more of these symptoms which would then not
20 allow them to perform one or more of the essential
21 job functions?
22     A. No.
23     Q. Can you explain?

## Page 52

1      A. Most of the time the information we get
2  doesn't provide documentation of their symptoms for
3  a variety of reasons. But there will be
4  documentation that's perhaps more objective as far
5  as the hemoglobin A-1-C and their logs, and perhaps
6  other information that would lead me to the
7  conclusion that these symptoms are likely to occur.
8      Q. Do you perform any type of individualized
9  assessment to determine whether those symptoms
10 occur or not?
11     A. Yes.
12     Q. Can you tell me what that is?
13     A. The individualized assessment is based
14 upon our request for information.
15     Q. And that's the information that you've
16 already discussed and explained?
17     A. Correct.
18     Q. So then a CSO who you have disqualified
19 based on diabetes, and let me ask if this statement
20 is true. In general you believe that this CSO is
21 likely substantially limited in one or more of
22 these symptoms that have been previously listed?
23     MR. GRIFFITHS: Object to form.

## Page 53

1      THE WITNESS: I don't understand your
2  question and, again, substantial limitation.
3      BY MS. DEAK:
4      Q. Were those not your words or significant
5  limitation? I think you did say significant.
6      A. Significant limitation.
7      Q. Okay. You can change it to significant
8  limitation. That's fine.
9      MS. DEAK: Can we read back the question.
10 I want to ask the same question but we'll change it
11 to significant limitation.
12     (The last question was read by the court
13 reporter.)
14     BY MS. DEAK:
15     Q. So then the question is, because we will
16 rephrase or change substantially limited to
17 significantly limited, in general do you believe
18 that a CSO who has been disqualified based on
19 diabetes is substantially limited in one or more of
20 the abilities that are the symptoms that you've
21 listed; the cognitive function, the sensation, k the
22 standing, the vision.
23     MR. GRIFFITHS: Object to the form.

Page 54

1    THE WITNESS: It would be my opinion that
2 there is a significant limitation in the ability to
3 perform one or more essential job functions.
4    BY MS. DEAK:
5    Q. And that's as a result of the symptoms?
6    A. It would be as a result of the condition
7 likely to cause symptoms which in turn would
8 prohibit their performance of the essential job
9 functions.
10   Q. So it's likely that the symptoms are
11 present. You don't care in general if they have
12 diabetes. What you care about are the symptoms
13 that arise there from; correct?
14   A. Correct.
15   Q. So the issue is that these symptoms are
16 likely present?
17   A. Likely to occur. Yes.
18   Q. Likely to occur in the future or present
19 at the time?
20   A. Likely to occur during the current time,
21 however you define that.
22       MR. GRIFFITHS: Can we go off the record
23 for a minute.

Page 55

1       (Recess for lunch at 1:00 p.m, to
2 reconvene at 1:45 p.m.)
3            2:00 p.m.
4    BY MS. DEAK:
5    Q. We are back on the record after lunch.
6 Dr. Miller, regarding the CSO's, there have been
7 CSO's who have been disqualified based on their
8 cardiac function or cardiac illness disease. I
9 don't know if that's the right way to term it.
10   A. Yes.
11   Q. Do you believe those CSO's who have been
12 disqualified based on a cardiac problem -- what's
13 the correct term?
14   A. Cardiovascular condition.
15   Q. Thank you. Cardiovascular condition. Do
16 you believe that those CSO's cannot perform
17 essential functions of the position?
18   A. Yes. That and/or there is a significant
19 reduction in their ability to perform essential job
20 functions.
21   Q. What functions can those CSO's, the ones
22 who have been disqualified based on a
23 cardiovascular function, what essential functions

Page 56

1 cannot they perform?
2    A. Cardiovascular conditions include a wide
3 variety of conditions. It would be based upon the
4 type of condition that would lead me to believe
5 that a specific or several would be.
6    Q. Let me ask a different question first.
7 What cardiovascular conditions are disqualifying?
8    A. There are no blanket disqualifications
9 based on the fact that you have a condition. There
10 would be an individual assessment as to the control
11 and treatment and symptomology of that condition
12 that would lead to the disqualification
13 recommendation.
14   Q. Is it generally symptomology related that
15 you're looking at?
16   A. It can be in that some conditions will
17 limit the amount of exercise capacity which
18 generates symptoms. Inability to perform certain
19 physical tasks.
20   Q. What types of cardiovascular problems
21 would limit? What types have you seen from the
22 CSO's that would limit?
23   A. There are quite a number. But one could

Page 57

1 be, a frequent one would be, I'm sure, recent heart
2 attack and whether or not time and treatment and
3 stability has allowed that individual to currently
4 be able to perform essential job functions.
5    Q. A CSO who's had a heart attack at some
6 point in the past could be able to still perform
7 the essential job functions; is that correct?
8    A. Correct.
9    Q. Let me go back then. What are the
10 essential job functions that CSO's who have been
11 disqualified based on a cardiovascular problem
12 generally cannot perform?
13   A. I would include these job functions as
14 possible, possibly related to a cardiac condition.
15 Of course, it would be the specific cardiac
16 condition, its treatment and stability that would
17 determine which ones. But let's say work under
18 stress.
19      I have seen reports coming back. I'm not
20 sure if it was for CSO's or other occupations. But
21 a cardiologist could say due to the condition or
22 it's due to the condition that my patient should
23 not work under stress, should not get alarmed or

Page 58

1 that might rise blood pressure, cause increased
2 demand on the heart.
3     It could impact on working in adverse
4 weather, going out and working in the cold. It
5 could relate to the work alone while armed in that,
6 again, the individual may not have the exercise
7 capacity to prevent somebody from taking their
8 weapon away from them.
9     It could be certainly in the ability to
10 physically subdue an attacker, control violent or
11 unruly crowds, subdue after running in pursuit,
12 respond to an emergency with unplanned strenuous
13 activity, climb stairs in pursuit. It could
14 prevent somebody from standing in a position for a
15 long period of time. So I think, that's off the
16 top of my head.
17   Q. So this is a broad or broader range of
18 functions than simply what one might consider just
19 typical aerobic type of exercises. Like running
20 upstairs, I would think of that as an aerobic type
21 of exercise. This is a broader range that you're
22 suggesting could be impaired?
23   A. I'm not following you.

Page 59

1   Q. The question was, when I was looking at
2 this as a lay person I can understand that someone
3 with heart problems could have then problems doing
4 certain functions that would be aerobic related
5 like running or walking or things like that.
6     What you are suggesting then is a much
7 broader range; the working in adverse weather,
8 standing for longer periods of time. Those are
9 other things that the CSO could potentially not do
10 based on cardiac problems?
11   A. Yes.
12   Q. Is it true, as with the diabetics, that
13 the essential job functions that the CSO with the
14 disqualifying cardiovascular problem could not
15 perform, they could not perform the job functions
16 based on the symptoms of the cardiovascular
17 problem; is that true?
18     MR. GRIFFITHS: Object to form. You can
19 answer.
20     THE WITNESS: That would be a large
21 component, but there could be others.
22     BY MS. DEAK:
23   Q. What would be the other components?

Page 60

1   A. It could be the treatment. The treatment
2 in itself caused side effects or likely to cause
3 side effects that would impair or reduce the
4 ability to perform essential job functions.
5   Q. Are these treatments medications?
6   A. Yes.
7   Q. Anything else?
8   A. An individual may not currently exhibit
9 symptoms because they are at rest and their
10 cardiologist would say if my patient was to respond
11 to an emergency or climb stairs in pursuit they are
12 likely to develop these symptoms.
13     So they are not currently exhibiting the
14 symptoms. But if they were to perform, asked to
15 perform essential job functions they would likely
16 develop symptoms.
17   Q. Do you believe that the CSO's who have
18 been medically disqualified for cardiac problems --
19 strike that.
20     So in general, is it true that the CSO's
21 that have been medically disqualified based on
22 cardiovascular problems, that they are
23 significantly limited in the types of things that

Page 61

1 you've listed?
2     When you say working in adverse weather I
3 gather you mean standing out in adverse weather or
4 being in adverse weather for a certain length of
5 time.
6   A. Correct.
7   Q. Standing for long periods of time,
8 running, running upstairs, things like that. Is
9 that a correct statement?
10   A. Correct.
11   Q. Dr. Miller, what essential job functions
12 can a CSO who is color blind not perform?
13   A. The essential job function is recognize
14 basic colors.
15   Q. Why is that an essential job function can
16 I just ask?
17   A. I'm trying to remember back on the study
18 and information. Could I refresh my memory with
19 the report?
20   Q. Certainly. That's Exhibit 11.
21   A. Okay. The identification of ID cards,
22 people, vehicles is generally done. A description
23 for those are usually done by, I should say that

### Page 118

1  MR. GRIFFITHS: Are these all form
2  objections? I just want to make sure.
3  MS. DEAK: Form. May be exceeding the
4  scope of my discovery. I didn't get into whether
5  these restriction restrict them from performing
6  jobs other than.
7  MR. GRIFFITHS: You asked him a lot of
8  questions about the development of the standards
9  and the medical review process and the
10 recommendations they were making. So I certainly
11 think I'm entitled to ask him about those
12 recommendations and for what purpose they were.
13 MS. DEAK: I don't want to do a long
14 argument on the record, but my objection is greater
15 than form, the scope.
16 MR. GRIFFITHS: That's fine. You can
17 object for the record. I understand. That's all
18 the questions I have for you, Dr. Miller.
19 MR. TUCKER: Let's go off the record.
20 (Off the record.)
21 FURTHER EXAMINATION BY COUNSEL FOR
22 PLAINTIFFS
23 BY MS. DEAK:

### Page 119

1  Q. I have some very brief follow up, Dr.
2  Miller. You testified that treating physicians play
3  a role in your review of the CSO's medical
4  examination?
5  A. They can play a role.
6  Q. They don't play a role in the first
7  review; correct?
8  A. Correct.
9  Q. So this is only after you've gone and
10 you've asked for additional information; correct?
11 A. Correct.
12 Q. Now, you testified that in cardiac cases
13 there have been instances where they've played a
14 role; is that correct?
15 A. Yes.
16 Q. Is it true that the treating physician
17 played a role in the case of every CSO who is
18 disqualified for cardiovascular reasons?
19 A. I would not know.
20 Q. What about for CSO's who are disqualified
21 for failing the hear standards? Were there
22 treating physicians consulted and did they play a
23 role in those disqualifications?

### Page 120

1  A. I would think that treating physicians
2  would play a much less of a role for hearing
3  standards because with hearing standards the
4  objective criteria will generally outweigh the
5  subjective information that a treating physician
6  might provide.
7  Q. So you generally don't take into account
8  the treating physician's recommendations for those
9  CSO's who are suffering from hearing loss?
10 A. It may be a consideration, but I guess I
11 want to say it's much less useful than let's say a
12 cardiologist opinion for a cardiac condition.
13 Q. The CSO's are required to take a stress
14 test at a certain point; is that correct?
15 A. I do not believe that they are.
16 Q. So a stress test is not part of the
17 cardiovascular functional test if I can put it that
18 way?
19 A. It's not a part of the basic medical
20 examination.
21 Q. Do you ever send CSO's for a stress test
22 after perhaps on first review you decided that they
23 perhaps don't qualify under the cardiovascular

### Page 121

1  standards?
2  A. I'm not sure I understand your question.
3  Q. Let me rephrase it. Actually, let me
4  just start with another question.
5  In terms of the treating physicians for
6  diabetics, do you take into consideration
7  recommendations from treating physicians of CSO's
8  who have diabetes?
9  A. We take into consideration the medical
10 report provided by treating physician.
11 Q. Do you take their opinions into
12 consideration?
13 A. When their opinions are supported by
14 medical facts and documentation.
15 Q. You rely primarily on the medical facts
16 and documentation; is that correct?
17 A. Yes.
18 Q. What about for the CSO's who have vision
19 problems, either color deficits, if that's the
20 correct word, or limited vision? Do you take into
21 account treating physicians' opinions in those
22 cases?
23 A. Only where it would be supported by

Page 122

1 medical facts.
2   Q. And tests?
3   A. And tests.
4   Q. And would it be correct to say that you
5 rely much more heavily on the medical test
6 information in those cases than the opinion of the
7 treating physicians?
8   A. Yes. And that is because, as I said
9 earlier in my testimony, treating physicians are
10 generally going to be advocates for their patients
11 and are going to provide subjective opinions. And
12 it's only when those opinions are supported by
13 medical evidence would those opinions be taken into
14 consideration.
15   Q. Dr. Miller, you were asked about the
16 disqualifications from the CSO's and whether that
17 pertained to other type of law enforcement
18 positions by Mr. Griffith.
19       You devised and developed medical
20 standards for other type of law enforcement
21 positions; correct?
22   A. Yes.
23   Q. And these include Secret Service

Page 123

1 investigators; is that correct?
2   A. Criminal investigators?
3   A Criminal investigators. Okay. Criminal
4 investigators for other agencies; correct?
5   A. Correct.
6   Q. There were some FPS officers, I believe?
7   A. Correct.
8   Q. So you have familiarity with standards
9 for a wide range of law enforcement positions. Is
10 that a correct characterization?
11   A. I have some familiarity.
12   Q. And you've developed standards for a
13 variety of different type of law enforcement
14 positions; correct?
15   A. Yes.
16   Q. Would you consider in general the
17 standards that you've developed for the CSO's,
18 would you consider them more stringent or less
19 stringent than the standards for these other types
20 of law enforcement positions?
21   A. My recommendations for other law
22 enforcement organizations vary tremendously. And
23 as I've testified earlier, they range from

Page 124

1 inspector generals to drug enforcement, alcohol,
2 tobacco, et cetera, so that CSO's would fall within
3 that spectrum.
4   Q. In terms of stringency of medical
5 standards?
6   A. Correct.
7   Q. Where would they fall in the spectrum?
8   A. Probably in the middle.
9   Q. So there are some positions that have
10 less stringent standards than the CSO's?
11   A. Possibly.
12   Q. From the positions for which you've
13 developed standards, based on your knowledge today,
14 are there positions for which you've developed
15 standards that have less stringent standards than
16 those of the CSO's?
17   A. Possibly. I'm just not at this time able
18 to recollect what the specific recommendations were
19 for all those agencies. But it is likely that some
20 have less stringent requirements.
21   Q. And it's likely that some had more
22 stringent requirements?
23   A. Correct.

Page 125

1       MS. DEAK: That's all the questions I
2 have.
3       MR. GRIFFITHS: I don't have any further
4 questions. We will read and sign.
5       [Whereupon, at 4:15 p.m., the taking of
6 the deposition concluded.].
7       S I G N A T U R E   N O T   W A I V E D