56

Agenda Book

for

the Committee on Security

and Facilities

June 5-7 2000
Minneapolis, Minnesota

USMS-DC 08003

V.    Security Items

A    USMS Personal Services Contracting for Court Security
     Officer (CSO) Services . . . . . . . . . . . . . . . . . . . . . . . . . . . Tab N

     The Committee will discuss the USMS proposal to use personal services
     contracts to contract directly with CSOs for services. Should the Security
     Subcommittee recommend this proposal, the Committee will consider
     forwarding a recommendation to the Judicial Conference

B    CSO Physical Examination Standards . . . . . . . . . . . . . . . . . . . . . . Tab O

     The Committee will discuss the impact of the draft report, *Medical
     Requirements for Court Security Officers,* and a process for appealing
     medical determinations of CSOs by government-designated physicians

C    Information Items

     1    Presentation by USMS Director Marshall **(Oral)**

     2.   Financial Disclosure Reports Proposal **(Oral)** . . . . . . . . . . . . . . Tab P

     3.   New Classification for Deputy Marshals . . . . . . . . . . . . . . . Tab Q

          The USMS has proposed to the Congress the re-establishment of
          the O82 classification of deputy marshal to provide security in
          courtrooms  It is working with the Office of Personnel Management
          to classify these positions up to GS-11

     4    USMS Proposal for Movement of Prisoners . . . . . . . . . . . . . . . Tab R

          The USMS will discuss with the Committee proposed standards for
          moving and handling prisoners in court facilities.

     5    Court Security Officer Orientation Video . . . . . . . . . . . . . . . Tab S

          The Committee will receive an update and view the draft video.

     6    Automated Electronic Defibrillator Program . . . . . . . . . . . . . . Tab T

          The Committee will receive an update on the implementation of the
          AED program.

USMS-DC 08004

4

USMS-DC 08005

Agenda Item
Security and Facilities
June 2000
*Potential Action*

## CSO PHYSICAL EXAMINATIONS

**Issue:**

What is the status of implementation of the U S Marshals Service program to provide government-designated physicians to perform court security officer physical examinations?

**Background/Discussion:**

Each CSO is required to have an initial pre-employment physical examination before assuming duty. Subsequent annual physical examinations are also required throughout the term of a CSO contract. Currently, the individual CSO selects a physician, such as a family doctor, to perform the medical exam. This practice has resulted in varied interpretation and application of the medical standards included in the CSO contract. Under this system, some CSOs may report for duty without adequately meeting the medical standards

To promote uniformity and integrity the Committee endorsed a program for the USMS to establish a national network of government-designated physicians to perform CSO physical examinations. Under an interagency agreement with the U.S. Public Health Service, the USMS obtained the services of a medical officer to assist the judiciary with development of medical standards that would be used by the government-designated physician when conducting the physical examinations

The medical officer, Dr Richard Miller, conducted a functional job analysis to determine applicable medical and physical standards for CSO job functions at five locations by interviewing CSOs and observing them at work in Baltimore, Maryland; Denver, Colorado; Portland, Oregon; Atlanta, Georgia; and Wilmington, Delaware. Dr. Miller presented preliminary findings to the Committee at its December 1999 meeting The completed, final draft report of the medical officer contains recommended medical requirements and standards for CSOs beginning on page 13 of Attachment 1. Dr Miller will report on the impact these recommendations will have on the current CSO work force. The Subcommittee on Security wants to ensure it knows the effects the standards might have on the CSO workforce before approving them for consideration by the full Committee If the medical standards and recommendations are approved, the USMS will have to modify all CSO contracts to include them

The USMS had planned to "ride" an Immigration and Naturalization Service (INS) contract to establish the national network of government-designated physicians The USMS has recently learned that the contract is under a formal protest Since resolving the protest is a protracted process for the INS, the USMS is considering an independent contract to establish the

network of government-designated physicians, although this contract could substantially increase the cost of providing physical examinations to CSOs.

The Security Subcommittee, at its April 6, 2000 meeting, reviewed the draft copy of *Medical Requirements for Court Security Officers* that was prepared by the Public Health Service at the request of the Committee. The Subcommittee agreed that Dr. Miller should explain to the Committee how the standards would be used to disqualify a CSO. This Committee also discussed medical standards with Dr. Miller on May 24, 2000. It also requested that the forms currently used to record examination results and draft forms that might be used to incorporate Dr. Miller's standards be provided for information. (See Attachments 3 and 4.)

*describe*

At the December 1999 meeting, the Committee discussed an appeals process that would include a policy on whether CSOs can continue to work during an appeal of the government-designated physician's decision. Discussion has begun on the appeals process with Dr. Miller, who provided the following description of an appeals process for medical determinations. The Committee may wish to compare this process to the process used for deputy marshals. (See Attachment 2.)

*background*

According to Dr. Miller the appeals process for medical determinations used by the federal law enforcement agencies that use the Public Health Services's Federal Occupational Health, Law Enforcement Programs to provide medical officer support services, applies to government employees – not contractors. Steps in the process include:

- The medical review officer receives the results of the individual's medical examination and determines whether or not the individual meets the medical standards

- If a question regarding a portion of the exam may result in a disqualification, the medical review officer will request additional information from the examining physician or require additional tests.

- If the additional information supports a determination of disqualification for medical reasons, the appeal process begins

- The hiring agency impanels a medical review board that consists of program managers, agency medical experts, and legal personnel. The panel reviews all pertinent information and determines whether or not the individual meets all of the medical requirements

The AO and USMS are unaware of other government agencies that afford contract guards an appeals process for failing to meet the medical requirements in the contract.

USMS-DC 08006

2

Attachment 1

# INTERIM DRAFT REPORT

## MEDICAL REQUIREMENTS
## FOR
## COURT SECURITY OFFICERS

### PREPARED FOR THE
### U.S. MARSHALS SERVICE

## JUDICIAL FACILITY SECURITY PROGRAM

### PREPARED BY
### FEDERAL OCCUPATIONAL HEALTH
### LAW ENFORCEMENT MEDICAL PROGRAMS

USMS-DC 08007

February 4, 2000

# TABLE OF CONTENTS

Overview                                                       Page 4

Functional Job Analysis                                        Page 5

Development of Medical Requirements                            Page 6

Results of the Functional Job Analysis                         Page 8

     Job Task Frequency                                  Page 8
     CSO Risk Profile                                    Page 9
     Job Task Importance                                 Page 10
     Essential Job Functions                             Page 11

CSO Medical Requirements                                       Page 13

     Cardiovascular                                      Page 14
     Dermatology                                         Page 16
     Endocrine and Metabolic                             Page 17
     Gastrointestinal                                    Page 18
     Genitourinary                                       Page 19
     Head, Nose, Throat, and Neck                        Page 20
     Hearing                                             Page 21
     Hematology                                          Page 22
     Medications                                         Page 23
     Musculoskeletal                                     Page 24
     Neurological                                        Page 26
     Organ Transplantation and Prosthetic Devices        Page 28
     Psychiatric                                         Page 29
     Respiratory                                         Page 30
     Vision                                              Page 32

USMS-DC 08008

# APPENDICES

Appendix A    Federal Law Enforcement Work Functions Inventory and
              Directions for Use, Revised (US Marshals Service—Judicial
              Security Division) 7/28/99

Appendix B    Focus Group Determination of Job Task Frequency, by Site

              Northern Georgia District (Atlanta),
              Delaware District (Wilmington),
              Colorado District (Denver),
              Maryland District (Baltimore),
              Oregon District (Portland)

Appendix C    Focus Group Determination of Job Task Importance, by Site

Appendix D    Focus Group Narrative Comments and Critical Incidents, by Site

Appendix E    Focus Group Determination of Essential Job Functions, by Site,
              with Consensus Essential Job Functions Determination

Appendix F    Interviews and Observations

USMS-DC 08009

3

## I. Overview

On July 26, 1999, Federal Occupational Health, Law Enforcement Medical Programs, was requested to review and validate the medical requirements for Court Security Officers  This request was made jointly by the Sub-Committee on Security, Committee on Security and Facilities, U S Judicial Conference; the Judicial Facility Security Program, U.S Marshals Service, and the Office of Court Security, Administrative Office of the U S Courts

Court Security Officers, a contract workforce, supplement the mission of the U.S. Marshals Service by providing security for U S federal courthouses, their property and employees  In providing these vital services, the Court Security Officers are a major component of the Judicial Facility Security Program, which is administered by the U S Marshals Service

Recent years have seen increased security threats to U.S. federal buildings, U S. courthouses, and federal judiciary  The federal judicial system of the U S is the foundation of American freedom, and security threats to the federal courthouse or the federal judiciary are a threat to our national security  Therefore, these threats must be taken extremely seriously  Security threats to the sanctity of the federal court range from threats to the safety of the federal judge to distractions in the courtroom during trial that can cause misconduct or mistrial.

The U.S Marshals Service is deployed to meet threats to the sanctity of the federal court Assisting them in this mission are the Court Security Officers (CSO), who must be capable of providing both a deterrence to potential threats, and a timely and appropriate response to actual threats.  The primary functions of the CSO include physical security for the federal courthouse and perimeter, checkpoint security for the courthouse and courtroom entry points, courtroom monitoring, and a rapid response to emergencies and alarms within the courthouse

USMS-DC 08010

## II. Functional Job Analysis--Development of CSO Medical Requirements

Federal Occupational Health, Law Enforcement Medical Programs (FOH/LEMP) is a major provider of medical occupational consultation to the management of federal law enforcement agencies. FOH/LEMP provides medical occupational consultation to over 35 federal law enforcement agencies and has performed functional job analyses on over 20 federal law enforcement occupations.

The goal of a functional job analysis is to determine the occupational requirements of a job or occupation. The functional job analysis must be performed using scientific methods so that occupational data is collected in a fair, consistent, objective manner. A properly performed analysis will become the foundation for the development of an occupation's medical requirements and will be capable of withstanding the most vehement medico-legal challenges.

The functional job analysis performed by FOH/LEMP included the following:

1   Interviews with federal judges, U.S. Marshals, Deputy U.S. Marshals, and CSOs regarding their view on the functions and work environments of the CSO;

2   Direct observations of CSO work functions and environments; and

3   Incumbent CSO focus groups scoring the "Federal Law Enforcement Work Functions Inventory," a tool developed by FOH/LEMP, to define both the occupational requirements and risk profile for the CSO.

Five federal court districts were chosen by the Judicial Facility Security Program, U.S. Marshals Service in which to perform the functional job analysis. These districts were chosen for their unique and diverse contribution to the CSO workforce. The five districts, and dates visited, were:

|                                        |             |
|----------------------------------------|-------------|
| Northern Georgia District (Atlanta),   | 9/29-30/99  |
| Delaware District (Wilmington),        | 10/13-14/99 |
| Colorado District (Denver),            | 10/20-21/99 |
| Maryland District (Baltimore),         | 10/27-28/99 |
| Oregon District (Portland)             | 11/3-4/99   |

In each federal court district, interviews and observations were made (see Appendix G, "Interviews and Observations"). In each district, five CSOs with varying experience in the CSO job worked as participants in the focus group process using the "Federal Law Enforcement Work Functions Inventory" (see Appendix A, "Federal Law Enforcement Work Functions Inventory and Directions for Use, Revised (US Marshals Service—Judicial Security Division) 7/28/99."

USMS-DC 08011

### III.  Development of Medical Requirements

Recommendations for the medical requirements of the CSO position are based on the analysis of collected data obtained during the functional job analysis. This data includes the occupational requirements of the CSO position; the risk profile; narrative information collected from focus group participants, judges, U S Marshals, Deputy U S Marshals, and CSOs; and an intimate understanding of law enforcement occupational medicine, using reference manuals and expert consultants.

1      **Occupational requirements** or essential job functions for the CSO position were determined by incumbent CSOs within the focus group (See Appendix A, for the focus group directions, goals, Inventory of questions, and key to scoring scales.) In turn, the occupational requirements determine whether a medical requirement is needed to ensure that individuals hired to perform their job safely and efficiently The focus groups were asked to evaluate the job tasks listed in the "Federal Law Enforcement Work Functions Inventory" and determine the following:

      a      Job task frequency,
      b      Job task importance, and
      c      Define essential job functions (occupational requirements).

Responses from each of the five focus groups were merged to develop an overall score  The overall CSO job task frequency score is an average of all five focus group scores for job task frequency  Within a single focus group, a job task is essential if at least three of the five focus group members agree that the job task is essential  For a job task to be determined an essential job function for CSOs, at least four of the five focus groups must agree that the job task is essential

2      The **Risk profile** identifies the unique job requirements and working environments of the CSO position and describes their potential and actual physical and safety risks  The risk profile is derived from the focus group determination of job task frequency (Appendix B)  After a medical requirement becomes necessary, as determined by the occupational requirements, the risk profile determines the level of the medical requirement.

3      **Narrative information** obtained from participants during the focus group provides significant information that describes the work environments typically encountered by the CSOs  Such narrative information will include critical incidents that highlight unique activities involving CSOs in critical situations that may highlight the need for specific medical requirements  Critical incidents may include incidents that involve shootings, fighting with suspicious individuals, identifying contraband items, or performing rescues.

USMS-DC 08012

4.    **Interviews and observations.** Information concerning CSO occupational requirements was collected through interviews with federal judges, U.S. Marshals, Deputy U.S. Marshals, and CSOs. Direct observations of CSO work functions and environments provided further insight into their occupational requirements.

5.    **Medical documents** from law enforcement and occupational medicine specialists are referenced to support the need for medical requirements. A major reference used in the development of law enforcement medical standards is the <u>Medical Screening Manual for California Law Enforcement</u> developed by the Commission on Peace Officer Standards and Training of the State of California, 1996 (California POST).

6.    **Subject matter experts** in the field of law enforcement occupational medicine have provided their opinions concerning medical requirements in law enforcement occupations. Assisting in the development of the vision section was Greg Good, OD, Ph.D., Professor of Optometry, College of Optometry, Ohio State University, Columbus, Ohio. Assisting in the development of the hearing section was Lynn Cook, M.Ed., CCC-A, FAAA, Occupational Audiologist, National Naval Medical Center, Bethesda, Maryland.

USMS-DC 08013

7

## IV.  Results of the Functional Job Analysis

### A.   Job Task Frequency

Job task frequency is determined by focus group members who score the Inventory job tasks as to how often each task is performed in an average year  The most important usage of the job task frequency results is to develop a risk profile for the CSO occupation.  For results of the CSO job task frequency determinations, see Appendix B

### Risk Profile

The CSO risk profile in this functional job analysis examines the average performance frequency of certain high-risk or aggressive law enforcement functions determined by focus group participants  The job tasks used in the risk profile (see below) are closely related to the probability that the law enforcement employee will or will not engage in physical confrontation, use of weapons, or face high-risk individuals with a propensity to violence.  The risk profile category determination was made by comparing the CSO risk profile with the risk profile of other law enforcement occupations that have participated in this functional job analysis

In addition to the supportive information listed above for justification of medical requirements, the risk profile for a law enforcement agency further identifies the unique job requirements and working environment of a law enforcement agency and therefore is vital in justifying medical requirements  The risk profile reviews the potential physical and safety risks to the occupation when performing essential job functions  After a medical requirement becomes necessary, as determined by the occupational requirements, the risk profile determines the level of the medical requirement

A high-risk profile law enforcement occupation demands a high level of medical requirements (vision, hearing, cardiopulmonary, metabolic, etc.) in order to minimize the safety threat to the incumbent  Similarly, a low risk profile law enforcement occupation presents a lower safety threat by the fact that aggressive law enforcement functions (listed below) are infrequent

USMS-DC 08014

**CSO Risk Profile**

For each of the following functions the average frequency was obtained by averaging the group scores for all five CSO focus groups   Frequency scoring scales, unless given as a percentage of time, follow the scoring scale of the "Inventory," in Appendix A

|  | Function | Average Frequency |
|---|---|---|
| I B 4 | Use of body armor | 0 |
| I B 6 | High pursuit, emergency, evasive driving | 0 |
| II B 1 | Perform LE functions under low/poor light | 2 6 |
| I B 9a | Percent of work time outside of the office | 86% |
| I B 10 | Work alone while armed out of the office | 5.6 |
| I B 14 | Conduct vehicular stops | 1 0 |
| I B 15 | Stop, question, detain individuals | 4.32 |
| I B 16 | Encounter individual with violent or irrational Temperament | 2 40 |
| I C 2 | Use of shoulder weapon | 0 |
| I C 3a | Use of baton | 0 |
| I C 3b | Use of pepper spray | 0 |
| I C 4 | Use of handcuffs | 0 |
| I C 5a | Resisting during handcuffing (% of total) | 0 |
| I C 7a | Draw handgun while performing LE function | 0 |
| I C 7b | Draw handgun & make shoot/no-shoot decision | 0 |
| I C 7c | Fire handgun while performing LE function | 0* |
| III 1 | Engage in physical confrontation | 0 88* |
| III 3 | Pursue fleeing suspect on foot | 0 |
| III 4 | Subdue combative person after running in pursuit | 0 |
| III 9 | Use bodily force to gain entrance | 0 |

* Indicates number of times function used during career as CSO   Otherwise, use frequency scoring scale in appendix A

USMS-DC 08015

**Risk profile for CSO's**          Low-Medium  (26 points/225 possible)

High-risk characteristics include:

Frequent LE work under low or poor light  (Up to 6 times per year)
Very high percentage of time working outside an office  (86%)
Very high frequency working alone while armed outside the office  (Daily)
Vehicular car stops are made, although infrequent  (1-2 times yearly)
Very high frequency stop or question individuals (Weekly)
Frequent encounters with violent or irrational persons (Up to 6 times per year)
Physical confrontations are engaged, although infrequent  (Yearly)

## B.  Job Task Importance

Job task importance is determined by focus group members who score the Inventory functions as to the importance of the task in the performance of their job  Each task is rated by how important it is to have the ability to perform the task  The most important usage of the job task importance results is to define the essential job functions  For the results of the CSO job task importance determinations, see Appendix C

## C.  Essential Job Functions

*Any example of this happening* ⊗

*explain*

Essential job functions are essential to the performance of the CSO job.  A CSO who is unable to perform an essential job function is likely to disrupt the flow of required work and directly threaten the health and safety of themselves and others  The essential job functions, as determined by the incumbent CSO in the functional job analysis, become the bona fide occupational requirements for the job  Essential job functions take into consideration both the actual function and the environment in which the function is to be performed

### Levels of Confidence of Essential Job Functions

As previously discussed, each focus group determines whether a job function is essential by a majority vote  If the majority (at least 3 of 5) of focus groups determine that a job function is essential then that job function is classified as essential  To ensure that a level of confidence is reached in the determination of essential job functions a higher standard is used in determining whether a job function is essential  For this functional job analysis for CSOs, a job function is essential if the following conditions are met:

1      **Consensus essential job function**.  All five focus groups agree that the job function is essential
2      **Near consensus essential job function**  Four of the five focus groups agree that the job function is essential

USMS-DC 08016

<u>CSO Essential Job Functions</u>

Based on the results of the CSO functional job analysis the following job functions are essential for the CSO position  The consensus essential job functions are marked by an * for distinction.

## Work Environment

1   Work extended hours
2.  Work in adverse weather
3   Work alone while armed*
4   Work under stress*
5.  Stop, question or detain individuals*
6.  Encounter individuals who display a violent or irrational temperament*
7.  Provide armed escort*

## Weapons

8   Use handgun with weak (non-dominant) hand*
9.  Use handcuffs*
10. Use handgun*
11. Confiscate weapon from person in pat down*

## Cardiovascular and Musculoskeletal

12. Attempt to physically subdue attacker*
13. Physically control violent or unruly crowds
14. Attempt to subdue after running in pursuit
15. Respond to emergency with unplanned strenuous physical activity
16. Climb stairs in pursuit or in emergency*
17. Sit or stand in one position for at least 2 hours

## Vision

18. Use distant vision to monitor front checkpoint and to monitor courtroom*
19. Use distant vision to monitor garage/vehicles
20. Use distant vision to detect if individual has weapon*
21. Use near vision to read x-ray monitor*
22. Recognize basic colors*
23. Visually detect peripheral movement/ID threat

USMS-DC 08017

## Hearing

24. Comprehend speech during face-to-face conversations*
25. Comprehend speech during telephone conversations
26. Comprehend speech during radio transmissions*
27. Comprehend speech when you can't see another CSO*
28. Hear sounds that require investigation*
29. Determine location of sound*

USMS-DC 08018

12

## V.   CSO Medical Requirements

Based on the results of the functional job analysis and the knowledge of the job requirements for weapons-carrying positions (see Section III, "Development of Medical Requirements") the following recommendations are made for the CSO medical requirements



These recommendations do not include any requirement to satisfy weight and/or body composition standards. Many research studies and court decisions direct us to examine the ability to perform the functional or essential job functions rather than satisfy a weight and/or body composition requirement. A comprehensive study regarding body composition and physical performance within the U.S. military provided the following findings

1.   No consistent relationship between bodyfat and physical performance.

2.   If job-related performance standards were in place, a body composition standard would be unnecessary in relation to physical performance

3.   Appearance of different individuals at the same body weight and fat content can vary considerably depending on other factors. A stronger rationale for appearance criterion and standards that define acceptable and unacceptable appearance must be developed

(Marriot and Grumstrup-Scott, eds., Body Composition and Physical Performance: Applications for the Military Service, 1992.)

USMS-DC 08019

## A. CARDIOVASCULAR SYSTEM REQUIREMENT

The applicant/incumbent must have a cardiovascular system that is sufficient for the individual to safely and efficiently carry out the requirements of the position.

- Blood pressure must be controlled, with or without medication, equal or less than 150 mmHg systolic and 90 mmHg diastolic
- Confirmation of hypertension will require at least three (3) serial readings of blood pressure   Serial readings must include at least three (3) blood pressure readings taken on different days and should include readings in both arms in a standing, sitting, and recumbent position
- All medications taken for cardiovascular conditions will be carefully reviewed to ensure that they do not compromise safe and efficient job performance
- Any history of a cardiovascular condition or newly diagnosed conditions will be evaluated on a case-by-case basis and may require further evaluation

## CONDITIONS WHICH MAY RESULT IN DISQUALIFICATION INCLUDE, BUT ARE NOT LIMITED TO, THE FOLLOWING EXAMPLES:

1   ANGINA PECTORIS

2   AORTIC ANEURYSM

3   CARDIOMYOPATHY

4   CEREBROVASCULAR CONDITIONS  such as Cerebrovascular Accident or Transient Ischemic Attacks or Carotid Artery Disease

5   CHRONIC THROMBOPHLEBITIS

6   CHRONIC VENOUS INSUFFICIENCY

7   CONGENITAL ANOMALIES such as Atrial and Ventricular Septal Defect

8   CONGESTIVE HEART FAILURE

9   CORONARY ARTERY DISEASE or HISTORY OF MYOCARDIAL INFARCTION

10.   DEEP VEIN THROMBOSIS

11   DYSRHYTHMIAS such as Ventricular Tachycardia or Fibrillation, Wolff-Parkinson-White syndrome, Paroxysmal Atrial Tachycardia with or without block, Atrial Flutter or Fibrillation

USMS-DC 08020

14

12    ELECTROCARDIOGRAM FINDINGS such as
  a    Left Bundle Branch Block
  b    Newly acquired Right Bundle Branch Block
  c    ST segment alterations
  d    Atrioventricular dissociation
  e    First Degree A-V Block with PR interval >= 0.3 seconds
  f    Second and Third Degree A-V Block
  g    Atrial fibrillation or Flutter
  h    Bradycardia with heart rate of less than 40 or sinus pauses of 3.0 seconds
       or longer

13.   **HYPERTENSION** that exceeds a systolic blood pressure of 150 and/or diastolic
      blood pressure of 90 mm Hg with or without medication

14.   **MARFAN'S SYNDROME**

15    **MYOCARDITIS/ ENDOCARDITIS/ PERICARDITIS**

16.   **OCCLUSIVE PERIPHERAL ARTERIAL DISEASE** such as Raynaud's

17    **PACEMAKERS or PROSTHETIC VALVES are** generally disqualifying
      Any other condition or post-surgical management that requires the use of
      Coumadin or other anti-coagulants is generally disqualifying

18    **PULMONARY EMBOLISM**

19    **SYNCOPE, history of** (Cardiogenic or vasovagal). This history will require
      cardiology evaluation and/or tilt table testing for final determination

20.   **VALVULAR HEART DISEASE** such as mitral valve stenosis or regurgitation,
      aortic stenosis or regurgitation

USMS-DC 08021

## B. DERMATOLOGY REQUIREMENT

The applicant/incumbent must be free of dermatological conditions that may result in restricted function or movement, thereby impairing the safe and efficient performance of essential job functions. Dermatological conditions may cause the applicant/incumbent to be unduly susceptible to injury or disease as a consequence of environmental exposures, including the sun, as well as other functions. All dermatological conditions will be reviewed on a case-by-case basis.

## CONDITIONS WHICH MAY RESULT IN DISQUALIFICATION INCLUDE, BUT ARE NOT LIMITED TO, THE FOLLOWING EXAMPLES:

1. COSMETIC DISFIGUREMENTS such as severe scars or burns, which results in restricted flexibility, grip, movement, etc.

2. PHOTOSENSITIVE SKIN CONDITIONS that limit significantly limit job performance by limiting the work environment

3. SCLERODERMA

4. SEVERE CHRONIC DERMATITIS such as eczema or psoriasis

5. SEVERE SKIN INFECTION

USMS-DC 08022

## C. ENDOCRINE AND METABOLIC SYSTEMS REQUIREMENT

The applicant/incumbent must have an endocrine and metabolic system free of conditions that may affect normal hormonal or metabolic functioning and response that is likely to adversely affect safe and efficient job performance. Any excess or deficiency in hormonal production can produce metabolic disturbances affecting weight, stress adaptation, energy production, and a variety of symptoms or pathology such as elevated blood pressure, weakness, fatigue and collapse. All endocrine and metabolic conditions will be reviewed on a case-by-case basis.

**CONDITIONS WHICH MAY RESULT IN DISQUALIFICATION INCLUDE, BUT ARE NOT LIMITED TO, THE FOLLOWING EXAMPLES:**

1. **ADRENAL DYSFUNCTION** (In the form of Addison's Disease or Cushing's Syndrome). These conditions may be acceptable if present without evidence of disease, such as hypertension, diabetes, hypoglycemia, electrolyte imbalance, or musculoskeletal weakness.

2. **DIABETES INSIPITUS**

3. **DIABETES MELLITUS or HYPERGLYCEMIA** will require additional medical tests and documentation of treatment to evaluate whether an individual is capable of safe performance of essential job functions.

4. **PARATHYROID DISORDERS**

5. **PITUITARY DYSFUNCTION**

6. **THYROID DISEASE (Hypothyroidism or Hyperthyroidism)** may be acceptable if adequately controlled and stable for at least one year and is without complications (such as significant weight changes, cardiac arrhythmia, tachycardia, poor exercise tolerance, tremors, heat or cold intolerance, significant swelling, or muscle pain). Documentation of control will include a thyroid profile and a medical report from the treating physician.

USMS-DC 08023

## D.  GASTROINTESTINAL SYSTEM REQUIREMENT

The applicant/incumbent must have a gastrointestinal tract that is sufficient for the individual to safely and efficiently carry out the requirements of the job

- There should be no evidence by physical examination (including laboratory testing) and medical history of gastrointestinal conditions likely to present a safety risk or to worsen as a result of carrying out the essential functions of the job
- All new and existing gastrointestinal conditions will be reviewed on a case-by-case basis
- All medications taken for gastrointestinal conditions will be carefully reviewed to insure that they do not compromise job performance and therefore interfere with safe and efficient job performance
- Any condition that is recurrent with significant diarrhea and/or pain, that may limit activity, requires pain medication, or that causes anemia, weakness or significant weight loss may be disqualifying

CONDITIONS WHICH MAY RESULT IN DISQUALIFICATION INCLUDE, BUT ARE NOT LIMITED TO, THE FOLLOWING EXAMPLES:

1. ANAL FISSURES

2. CHOLECYSTITIS, CHOLELITHIASIS, or GALLBLADDER DISEASE

3. CIRRHOSIS OF THE LIVER

4. COLOSTOMIES

5. CROHN'S DISEASE, ULCERATIVE COLITIS, REGIONAL ENTERITIS, ILEITIS, or IRRITABLE BOWEL SYNDROME

6. DIVERTICULITIS

7. DYSPHAGIA

8. HEPATITIS, acute or chronic

9. HERNIA, UNTREATED INGUINAL, INCISIONAL, or VENTRAL

10. INTESTINAL OBSTRUCTION

USMS-DC 08024

11. PANCREATITIS

## E. GENITOURINARY SYSTEM STANDARD

The applicant/incumbent must have a genitourinary system that is sufficient for the individual to safely and efficiently carry out the requirements of the job   All medications taken for genitourinary conditions will be carefully reviewed to insure that they do not compromise job performance and therefore interfere with safe and efficient job performance.  All genitourinary conditions will be reviewed on a case-by-case basis

CONDITIONS WHICH MAY RESULT IN DISQUALIFICATION INCLUDE, BUT ARE NOT LIMITED TO, THE FOLLOWING EXAMPLES:

1.  DYSMENORRHEA or ENDOMETRIOSIS that causes chronic and severe pain requiring the frequent use of narcotic medications

2.  GLOMERULONEPHRITIS or PYELONEPHRITIS

3.  KIDNEY STONES (URINARY CALCULI) that are symptomatic, recurrent, or that causes kidney dysfunction.

4.  NEPHROTIC SYNDROME

5.  NEUROGENIC BLADDER

6.  POLYCYSTIC KIDNEY DISEASE

7.  RENAL FAILURE, acute or chronic

8.  RENAL TOXICITY

9.  RENAL VEIN THROMBOSIS

10.  UROPATHIES, uncorrected obstructive

USMS-DC 08025

19

## F. HEAD, NOSE, MOUTH, THROAT AND NECK STANDARD

The applicant/incumbent must have structures and functions of the head, nose, mouth, throat and neck that are sufficient for the individual to safely and efficiently carry out the requirements of the job  This may be demonstrated by:

- A physical exam of the head, nose, mouth, throat and neck that is within the range of normal variation, including normal flexion, extension and rotation of the neck;
- Open nasal and oral airways;
- Unobstructed Eustachian tubes;
- No structural abnormalities that would prevent the normal use of protective eyewear;
- Normal conversational speech;
- No evidence of a pre-existing or newly diagnosed medical condition of the head, nose, mouth, throat, or neck that could significantly interfere with the individual's ability to successfully perform essential law enforcement functions, such as speech or breathing, or that has the potential to render the person suddenly incapacitated.
- All head, nose, mouth, throat, and neck conditions will be reviewed on a case-by-case basis

## CONDITIONS WHICH MAY RESULT IN DISQUALIFICATION INCLUDE, BUT ARE NOT LIMITED TO, THE FOLLOWING EXAMPLES:

1. ARTIFICIAL LARYNX or ESOPHAGEAL SPEECH

2. FACIAL DEFORMITIES that impair breathing or speech

3. MUTISM or APHONIA (inability to speak)

4. NASAL POLYPS that impair breathing or speech

5. NECK MASSES, LYMPHADENOPATHY or TRACHEOSTOMY that impair breathing or speech

6. RESTRICTED RANGE OF MOTION IN THE NECK

7. TEMPOROMANDIBULAR JOINT SYNDROME

USMS-DC 08026

## G.  HEARING STANDARD

The applicant/incumbent must be able to hear well enough to safely and efficiently carry out the requirements of the job.  This requires binaural hearing (to localize sounds) and auditory acuity, which may be demonstrated by:

- A current pure tone, air conduction audiogram, using equipment and a test setting which meet the standards of the American National Standards Institute (see 29 CFR 1910.95);
- Documentation of hearing thresholds as specified below:

1.  In the frequency range from 500 - 2000 hertz (Hz), the pure tone audiometric deficit should not exceed 30 decibels in either ear, without the use of hearing aids.
2.  At 3000 Hz, the pure tone audiometric deficit should not exceed 40 decibels in either ear, without the use of hearing aids.
3.  At 4000 Hz, the pure tone audiometric deficit should not exceed 50 decibels in either ear, without the use of hearing aids.
4.  At 6000 Hz, the pure tone audiometric deficit should not exceed 60 decibels in either ear, without the use of hearing aids.

- Binaural hearing (hearing in both ears) is required.  Complete loss of hearing in one ear is disqualifying.
- HEARING AIDS: The use of any hearing aid to comply with the medical standards is unacceptable.
- Functional hearing test, including speech recognition and the HINT, will be used to determine the medical qualification of all individuals who fail the pure tone audiometric screening
- All audiological conditions will be reviewed on a case-by-case basis

OTOLOGICAL CONDITIONS WHICH MAY RESULT IN DISQUALIFICATION INCLUDE, BUT ARE NOT LIMITED TO, THE FOLLOWING EXAMPLES:

1    ACOUSTIC NEUROMA

2    MENIERE'S DISEASE

3    OTOSCLEROSIS

4    VESTIBULAR NEURONITIS

5    VERTIGO or PAROXYSMAL POSITIONAL VERTIGO

USMS-DC 08027

## H. HEMATOLOGY SYSTEM STANDARD

The applicant/incumbent must have a hematopoietic (blood and blood-producing) system that is sufficient for the individual to safely and efficiently perform the aggressive law enforcement functions of the job. All hematological conditions will be reviewed on a case-by-case basis.

### CONDITIONS WHICH MAY RESULT IN DISQUALIFICATION INCLUDE, BUT ARE NOT LIMITED TO, THE FOLLOWING EXAMPLES:

1.   **ANEMIA**

2.   **BLEEDING DISORDERS** such as genetic bleeding disorders (Hemophilia, von Willebrand's disease), acquired bleeding disorders (caused by liver disease or infection) and medications (Coumadin, Heparin) which are likely to cause bleeding with physical confrontation or defensive tactics training.

3.   **HEMOGLOBINOPATHIES** such as Sickle Cell Disease or Thalassemia which are likely to cause infarction at high altitude, reduce exercise capacity, and prevent working in certain environments

4.   **MULTIPLE MYELOMA**

5.   **SYSTEMIC LUPUS ERYTHEMATOSUS**

6.   **THROMBOCYTOPENIA**

USMS-DC 08028

## I. MEDICATION STANDARD

All medication requirements, including psychotropic medication, will be evaluated to ensure that safe and efficient job performance will not be adversely affected by their use Medical conditions that require medications will be reviewed on a case-by-case basis Each of the following considerations will be reviewed in order to make a medical determination.

1. Drug-food interactions

2. Drug-environmental interactions

3. Drug toxicity

4. History of patient compliance

5. Medical complications associated with long-term drug use

6. Medication type and dosage requirements

7. Potential drug side effects and adverse reactions

8. Potential drug-drug interactions

Medications such as narcotics, sedative hypnotics, barbituates, amphetamines, or any drug with the potential for addiction, that is taken for extended periods of time (usually beyond 10 days) or is prescribed for a persistent or recurring underlying condition would generally be considered disqualifying

USMS-DC 08029

## J. MUSCULOSKELETAL SYSTEM STANDARD

The applicant/incumbent must have a musculoskeletal system that allows the individual sufficient movement, agility, flexibility, strength, dexterity, coordination, acceleration, deceleration and the ability to change directions in order to safely and efficiently carry out the requirements of the job   This may be demonstrated by:

- A physical exam of the upper and lower extremities, neck, and back that is within the range of normal variation for strength, flexibility, range of motion, and joint stability;
- No evidence of physical examination and medical history of musculoskeletal conditions likely to present a safely risk or to worsen as a result of carrying out the essential functions of the job
- All musculoskeletal conditions will be reviewed on a case-by-case basis

## CONDITIONS WHICH MAY RESULT IN DISQUALIFICATION INCLUDE, BUT ARE NOT LIMITED TO, THE FOLLOWING EXAMPLES:

1   AMPUTATIONS of an EXTREMITY.  Any loss of an upper or lower extremity, hand, foot.

2   AMPUTATIONS of THUMB or INDEX FINGER that affect the ability to perform essential functions, such as involving lethal and non-lethal weapons, handcuffs, etc.

3   ARTHRITIS of any type if there is limited joint motion, pain, and/or muscle atrophy that affects the ability to perform essential job functions

4.   CERVICAL, THORACIC, LUMBAR, LUMOSACRAL DISK DISEASE, FRACTURES, OR DISLOCATIONS of any type if there is limited joint or gait motion, pain, motor or sensory manifestations, and/or muscle atrophy that affects the ability to perform essential functions, such as limitations of flexibility and strength causing an inability to stand, bend, stoop, carry heavy objects or sit for long periods of time

5   CHRONIC LOW BACK PAIN with recurrence of pain and/or restricted range of motion or gait that affects the ability to perform essential functions  Each case will be reviewed in context to the original history of the injury (or whatever the etiology), the response to therapeutic regimes, frequency of recurrence, exacerbating factors, and lengths of disability associated with the recurrences combined with the current clinical presentation

6   CHRONIC SPRAIN OR STRAIN OF THE NECK limiting mobility or causing recurring cephalgia (headaches) may be disqualifying

USMS-DC 08030

7.    FRACTURES may require orthopedic evaluation to determine whether functional limitations currently exist. A recent fracture with current immobilization (such as casting, bracing, etc.) of a limb that prevents the performance of the full range of essential law enforcement functions will require documentation from the treating physician that immobilization is no longer required and that no physical limitations are present. Fractures that continue to cause pain, swelling, muscle atrophy, limitation of motion, abnormal gait may be disqualifying.

8.    KNEE CONDITIONS with current symptoms such as swelling; pain; reduced range of motion, gait, or strength; or instability that prevents the full range of essential law enforcement functions

9.    Any PROSTHETIC DEVICE will be reviewed on a case-by-case basis

10    SCIATICA, CERVICAL NEUROPATHY, OR OTHER NEUROPATHIES with evidence of numbness, tingling, loss of motor strength, or limited gait

12.   SCOLIOSIS with curve greater than or equal to 45 degrees, pain, significant curve progression, or with limitations for physical activity that affects the ability to perform essential job functions

12    SHOULDER CONDITIONS such as history of multiple dislocations (three or more) without surgical repair or any history of dislocation with current pain, or reduced strength or range of motion, acromioclavicular (AC) separation with current pain, or reduced strength or range of motion

13    SPINAL DISORDERS such as Spina Bifida, Spondylolysis, Spondylolisthesis, or Ankylosing Spondylitis which limit mobility, gait, or skeletal strength, or cause pain

USMS-DC 08031

## K.  NEUROLOGICAL SYSTEMS STANDARD

The applicant/incumbent must have a nervous system that is free of central or peripheral nervous system interference that will allow the individual to safely and efficiently carry out the requirements of the job   This may be demonstrated by:

- A physical exam of the cranial and peripheral nerves and the vestibular and cerebellar system that is within the range of normal variation, including intact cranial nerves I-XII;
- Normal vibratory sense in the hands and feet;
- Normal proprioception (sense of movement and position of the body) of the major joints;
- Normal sensation of hot and cold in the hands and feet;
- Normal reflexes of the upper and lower extremities;
- Normal balance (e g , heel-toe walk, Romberg, balance on one foot);
- Normal basic mental status evaluation (e.g., person, place, time, current events);
- No evidence by physical examination and medical history of nervous, cerebellar, or vestibular system conditions likely to present a safety risk or to worsen as a result of carrying out the essential functions of the job;
- Any condition with loss of motor skills, muscle strength, cognitive function, coordination, or gait; sensory loss (limb, hearing, or vision); tremor; pain, or effect on speech may result in further evaluation or disqualification
- All neurological conditions will be reviewed on a case-by-case basis.

## CONDITIONS WHICH MAY RESULT IN DISQUALIFICATION INCLUDE, BUT ARE NOT LIMITED TO, THE FOLLOWING EXAMPLES:

1.   ALZHEIMER'S or other degenerative dementia disorders

2.   AMYOTROPHIC LATERAL SCLEROSIS

3.   CEREBRAL PALSY

4.   CRANIAL NEUROPATHIES such as Tic Douloureux, Trigeminal Neuralgia

5.   DEGENERATIVE SPINAL CORD DISORDERS

6.   EPILEPSY with a history of past or current seizures requires additional medical documentation that this condition is unlikely to adversely effect the safe and efficient performance of essential job functions

7.   HAND TREMOR

8.   HEAD TRAUMA

USMS-DC 08032

9.  HUNTINGTON'S CHOREA

10. HYDROCEPHALUS

11. MENINGITIS which is current or a history of meningitis with residual neurological damage or changes.

12. MIGRAINE and other headaches that interfere with performance of essential job functions (such as sensory changes) or that require medication that is either frequent, sedating, or that is likely to interfere with essential job functions

13. MULTIPLE SCLEROSIS

14. MYASTHENIA GRAVIS

15. NARCOLEPSY

16. PARKINSON'S DISEASE

17. PERIPHERAL NEUROPATHIES such as Carpal Tunnel Syndrome (Median nerve), Foot Drop (Peroneal nerve), Diabetic and Alcoholic Neuropathy

18. SYNCOPE

19. TRANSIENT ISCHEMIC ATTACKS or CEREBROVASCULAR ACCIDENT (STROKE)

USMS-DC 08033

## L. ORGAN TRANSPLANTATION AND PROSTHETIC DEVICES

COCHLEAR IMPLANTATION is acceptable provided that the applicant meets the hearing standards

OCULAR LENS IMPLANTATION may be acceptable considering an adequate post surgical recovery period and if the visual acuity meets the medical standards. (See vision standards)

PACEMAKERS or PROSTHETIC VALVES are generally disqualifying. Any other condition or post-surgical management that requires the use of coumadin or other anti-coagulants may be disqualifying. (See cardiovascular standards)

RENAL TRANSPLANTATION may be considered disqualifying unless the applicant is not taking immunosuppressive drugs and is medically cleared by the surgeon who performed the operation to participate in strenuous activities. The applicant must be considered by the surgeon to be capable of withstanding blunt trauma to his/her flanks without a significant probability of untoward personal damage

Other transplantations or prosthetic devises will be considered on a case-by-case basis.

USMS-DC 08034

## M.  PSYCHIATRIC DISORDERS STANDARD

The applicant/incumbent must have judgement, cognitive functioning, and social interaction/behavior that will provide for the safe and efficient conduct of job requirements  Medical conditions may require the medical review by a psychologist, neuropsychologist, neurologist, and/or a psychiatrist for final medical determination of qualification  There should exist no evidence by physical examination and medical history of psychiatric conditions (including alcohol and substance abuse) likely to present a safety risk or to worsen as a result of carrying out the functions of the job.  All psychiatric conditions will be reviewed on a case-by-case basis.

All psychiatric diagnoses must be consistent with the diagnostic criteria as established by the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition (DSM-IV) published by the American Psychiatric Association, and should include the results of a multi-axial assessment  All psychotropic medications will be evaluated to determine their impact on job performance.   All psychiatric conditions will be reviewed on a case-by-case basis

SPECIFIC PSYCHIATRIC DISORDERS THAT MAY BE DISQUALIFYING INCLUDE BUT ARE NOT LIMITED TO THE FOLLOWING EXAMPLES.

1   DELIRIUM, DEMENTIA, AMNESTIC AND OTHER COGNITIVE DISORDERS

2.  MAJOR DEPRESSION

3  MANIC-DEPRESSIVE DISORDER or Bi-Polar Disorder

4  PANIC DISORDER AND OTHER ANXIETY DISORDERS

5.  SCHIZOPHRENIA AND OTHER PSYCHOTIC DISORDERS

USMS-DC 08035

## N. RESPIRATORY SYSTEM STANDARD

The applicant/incumbent must have a respiratory system that is sufficient for the individual to safely and efficiently carry out the requirements of the job. This is demonstrated by:

- A physical exam of the respiratory system that is within the range of normal variation;
- A normal pulmonary function test, if required;
- A normal chest x-ray, if required;
- A normal symptom-limited exercise stress EKG, if required;
- All medications taken for respiratory conditions will be carefully reviewed to insure that they do not compromise job performance and therefore interfere with safe and efficient job performance.
- All respiratory conditions will be reviewed on a case-by-case basis.

## CONDITIONS WHICH MAY RESULT IN DISQUALIFICATION INCLUDE, BUT ARE NOT LIMITED TO, THE FOLLOWING EXAMPLES:

1. ASTHMA currently controlled on any medication will be evaluated on a case-by-case basis. Exercise-induced asthma requiring medication either before or after exercise is generally disqualifying.

2. BRONCHITIS, chronic

3. EMPHYSEMA

4. FEV1/FVC RATIO SHOULD NOT REFLECT EVIDENCE OF A SIGNIFICANT OBSTRUCTIVE OR RESTRICTIVE DISORDER. Values of less than 70% will be further evaluated and a medical decision may be made on a case-by-case basis.

5. FORCED VITAL CAPACITY (FVC) AND/OR FORCED EXPIRATORY VOLUME AT ONE SECOND (FEV1) THAT IS LESS THAN 70% OF THE EXPECTED VALUE. Values of less than 70% will be further evaluated and a medical decision may be made on a case-by-case basis.

6. LUNG ABSCESS

7. PNEUMONECTOMY

8. PULMONARY EMBOLISM

9. PULMONARY INFARCTION

USMS-DC 08036

10. **SARCOIDOSIS**

11. **SPONTANEOUS RECURRENT PNEUMOTHORAX**

12. **TUBERCULOSIS (TB)** A recent positive (conversion) TB test that has been treated for at least three weeks is acceptable providing the patient remains under continuing treatment and supervision. A chest x-ray will be required to document the stability of this condition. Evidence of active TB with or without symptoms, chest x-ray findings, or presence of sputum production, or presence of significant lung destruction on chest x-ray in fully treated cases will be evaluated on a case-by-case basis.

13. **TUMORS OF THE LUNG** such as Malignant Mesothelioma, Bronchogenic Carcinoma

USMS-DC 08037

OPHTHALMOLOGIC CONDITIONS WHICH MAY RESULT IN
DISQUALIFICATION INCLUDE, BUT ARE NOT LIMITED TO, THE
FOLLOWING EXAMPLES:

Ophthalmologic conditions which are particularly susceptible to environmental exposures
such as sunlight, dusts, fumes, or various volatile compounds may cause an applicant to
be disqualified   Any eye condition likely to impact on color vision will require further
assessment of color vision.

1.   CONJUNCTIVITIS, chronic

2.   CORNEAL ABRASIONS

3.   CORNEAL DYSTROPHY

4.   CORNEAL SCARS

5.   CORNEAL ULCERS

6.   DIPLOPIA (or double vision)

7.   GLAUCOMA

8.   KERATITIS

9.   KERATOCONUS

10.  LENS OPACITIES

11.  NIGHT BLINDNESS

12.  ORTHOKERATOLOGY

13.  PHOTOPHOBIA

14.  PTERYGIUM

USMS-DC 08038

15.  REFRACTIVE SURGICAL PROCEDURES -- Radial Keratotomy,
     Photorefractive laser surgery (PRK or LASIK), ALK Keratoplasty. These
     procedures will require an assessment of visual function prior to qualification.

16.  RETINAL DETACHMENT

17.  RETINITIS PIGMENTOSA